## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: '318 PATENT INFRINGEMENT LITIGATION | ) ) ) ) | C.A. No. 05-356 (KAJ) (consolidated) |

**COMPENDIUM OF UNREPORTED OPINIONS RELATING TO DEFENDANT MYLAN'S RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS DISMISSING PLAINTIFFS' WILLFUL INFRINGEMENT CLAIM OR, IN THE ALTERNATIVE, TO BIFURCATE AND STAY DISCOVERY ON SUCH CLAIM**

Mary B. Matterer # 2696
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Ave., 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
mmatterer@morrisjames.com

*Of Counsel (admitted pro hac vice):*
William A. Rakoczy
Christine J. Siwik
Amy D. Brody
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60610
Telephone: (312) 527-2157
Facsimile: (312) 222-6321
wrakoczy@rmmslegal.com

*Attorneys for Defendants/Counterclaim-Plaintiffs
Mylan Pharmaceuticals Inc. and
Mylan Laboratories Inc.*

Dated: December 13, 2005

# Table of Contents

| Exhibit # | Opinion Citation |
|---|---|
| A | *Allergan, Inc. v. Alcon Inc.*, No. 04-968 (GMS) (D. Del. July 26, 2005) (Sleet, J.) |
| B | *Allergan Inc. v. Pharmacia Corp.*, No. Civ.A.01-141-SLR, 2002 WL 1268047 (D. Del. May 17, 2002) (Robinson, C.J.) |
| C | *St. Clair Intellectual Prop. Consultants, Inc. v. Sony Corp.*, No. Civ.A.01-557-JJF, 2002 WL 1901268 (D. Del. Aug. 16, 2002) (Farnan, J.) |
| D | *Arthrocare Corp. v. Smith & Nephew, Inc.*, No. 01-504-SLR, slip op. (D. Del. Nov. 27, 2002) (Robinson, C.J.) |
| E | *CP Kelco U.S., Inc. v. Pharmacia Corp.*, No. CIV.A.01-240-RRM, 2002 WL 31230812 (D. Del. Sept. 19, 2002) (Thynge, M.J.) |
| F | *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, No. 04-1689 (D.N.J. Apr. 18, 2005) |
| G | Oral Argument Transcript, dated April 18, 2005, in *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, No. 04-1689 (D.N.J. Apr. 18, 2005) |
| H | *Aptargroup, Inc. v. Owens-Illinois, Inc.*, No. 02 C 5058, 2003 WL 21557632 (N.D. Ill. July 3, 2003) |
| I | *Sage Prods., Inc. v. Devon Indus., Inc.*, No. 93-2403 RG(CTX), 1994 WL 791601 (C.D. Cal. Jan. 25, 1994) |
| J | *aaiPharma, Inc. v. Barr Labs., Inc.*, No. 7:01-CV-150-F1, slip op. (E.D.N.C. Sept. 9, 2002) |
| K | *Lear Corp. v. Bertrand Faure Technical Ctr., Inc.*, No. 00-CV-72895, slip op. (E.D. Mich. Sept. 4, 2001) |
| L | *Thomcast, A.G. v. Cont'l Elecs. Corp.*, No. 94-G-2486-S, slip op. (N.D. Ala. Apr. 24, 1995) |
| M | *Eli Lilly & Co. v. Barr Labs., Inc.*, No. 1:02-CV-1844-SEB, slip op. (S.D. Ind. Mar. 31, 2004) |
| N | *SmithKline Beecham Corp. v. Teva Pharms. USA, Inc.*, No. 02-3779(JWB), slip op. (D.N.J. Mar. 5, 2003) |

| O | *Ortho-McNeil v. Teva Pharms. USA*, No. 02-2794(GEB), slip op. (D.N.J. Jan. 28, 2003) |
| P | *Eli Lilly & Co. v. Barr Labs., Inc.*, No. IP 96-0491-C-B/S, slip op. (S.D. Ind. Oct. 29, 1998) |
| Q | *Bayer AG v. Barr Labs., Inc.*, No. 92 Civ. 0381 (WK), slip op. (S.D.N.Y. Sept. 11, 1995) |
| R | *United States Gypsum Co. v. Nat'l Gypsum Co.*, No. 89 C 7533, 1994 WL 74989 (N.D. Ill. Mar. 10, 1994) |

Dated:  December 13, 2005

MYLAN PHARMACEUTICALS INC. and
MYLAN LABORATORIES INC.

By:  _____/s/ Mary B. Matterer_____
　　　　　　Mary B. Matterer # 2696
　　　　　　MORRIS JAMES HITCHENS & WILLIAMS LLP
　　　　　　222 Delaware Ave., 10th Floor
　　　　　　Wilmington, DE 19801
　　　　　　Telephone:  (302) 888-6800
　　　　　　Facsimile:  (302) 571-1750
　　　　　　mmatterer@morrisjames.com

*Of Counsel (admitted pro hac vice)*:
William A. Rakoczy
Christine J. Siwik
Amy D. Brody
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60610
Telephone:  (312) 527-2157
Facsimile:  (312) 222-6321
wrakoczy@rmmslegal.com

*Attorneys for Defendants/Counterclaim-Plaintiffs*
*Mylan Pharmaceuticals Inc. and Mylan Laboratories Inc.*

*In re: '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT A
# to Mylan's Rule 12(c) Motion:

*Allergan, Inc. v. Alcon Inc.*, No. 04-968 (GMS)
(D. Del. July 26, 2005) (Sleet, J.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN, INC., and ALLERGAN SALES, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 04-968 (GMS) |
| ALCON INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LTD., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

1.    Allergan, Inc. and Allergan Sales, LLC (collectively, "Allergan") filed the above-captioned

action against Alcon Inc., Alcon Laboratories, Inc., and Alcon Research, Ltd. (collectively, "Alcon")

on August 24, 2004.  Allergan filed this suit for patent infringement pursuant to 35 U.S.C. §

271(e)(2).[1]  The complaint alleges that Alcon infringes U.S. Patent No. 6,673,337 (the "'337 patent")

and U.S. Patent No. 6,641,834 (the "'834 patent") because it submitted a § 505(b)(2) application,

or paper New Drug Application ("paper NDA"), to the Food and Drug Administration ("FDA"),

---

[1] Section 271(e)(2) states, in pertinent part:

> [i]t shall be an act of infringement to submit – an application under
> section 505(j) of the Federal Food, Drug, and Cosmetic Act or
> described in section 505(b)(2) of such Act for a drug claimed in a
> patent or the use of which is claimed in a patent if the purpose of such
> submission is to obtain approval under such Act to engage in the
> commercial manufacture, use, or sale of a drug or veterinary
> biological product claimed in a patent or the use of which is claimed
> in a patent before the expiration of such patent.

35 U.S.C. § 271(e)(2)(A).

seeking approval of its proposed generic brimonidine tartrate ophthalmic drug product.[2]  (Compl. ¶¶ 14-15, 17.)  The complaint further alleges that Alcon acted without a reasonable basis for believing that it would not be liable for infringement of the '337 and '834 patents and, as such, its infringement of the '337 and '834 patents is willful.  (*Id.* ¶¶ 19, 23.)  Allergan requests injunctive relief and attorney's fees, pursuant to 35 U.S.C. § 285.[3]  The issue presently before the court is whether Allergan may assert a claim for willful infringement.

2.      Allergan contends that a willfulness claim is proper based on the totality of the circumstances.  Allergan further contends that the totality of the circumstances comprises many factors, including whether Alcon intentionally copied ALPHAGAN® P, whether Alcon exercised due care to avoid infringing Allergan's patents, whether Alcon relied on competent legal advice, and Alcon's behavior as a party to the litigation.  (D.I. 64, at 2.)  According to Allergan, its claim of willfulness is based the following: (1) Alcon's Paragraph IV certification was filed without reasonable basis; and (2) Alcon's conduct in the litigation demonstrates its lack of reasonable basis. (*Id.* at 3).  Lastly, Allergan contends that the Federal Circuit's holding in *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004) does not foreclose a claim for willful infringement in Abbreviated New Drug Application ("ANDA") or paper NDA cases.  (*Id.*)

---

[2] Alcon also filed a certification with the FDA under 21 C.F.R. § 314.50(i)(1)(i)(A)(4), or Paragraph IV Certification, alleging that the '337 and '834 patents are invalid and/or not infringed by its product.

[3] Section 285 provides: "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  The Federal Circuit has recognized willful infringement as a type of misconduct that creates an exceptional case.  *See Hoffmann-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1365 (Fed. Cir. 2000) (citing *Beckman Instruments, Inc. v. LKB Produkter AB*, 894 F.2d 1547, 1151 (Fed. Cir. 1989)).

3.     Alcon asserts that the only act of infringement alleged in the complaint is the filing of its paper NDA with the FDA.  According to Alcon, in light of the Federal Circuit's holding in *Glaxo*, "Allergan's conclusory allegation – standing alone – cannot support a charge of willful infringement." (D.I. 75, at 2.)

4.     The Federal Circuit first addressed the issue of willfulness in ANDA and paper NDA cases in *Yamanouchi Pharm. Co., Ltd. v Danbury Pharmacal, Inc.*, 231 F.3d 1339 (Fed. Cir 2000).  In *Yamanouchi*, the court found that "[a]n ANDA [or paper NDA] filing by its very nature is a 'highly artificial act of infringement,' therefore, the trial court need not have elevated the ANDA certification into a finding of willful infringement." 231 F.3d at 1347.  Nonetheless, the court held that the case was exceptional and awarded attorney fees to the plaintiff, based on the defendant's "misconduct in filing a wholly unjustified ANDA certification and misconduct during the litigation that followed. . . ." *Id.*

5.     The Federal Circuit addressed the issue again in *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004), holding that "the mere fact that a company has filed an ANDA application or certification cannot support a finding of willful infringement for purposes of awarding attorney's fees pursuant to 35 U.S.C. § 271(e)(4)." 376 F.3d at 1350-51.  In the *Glaxo* opinion, the court explained that in *Yamanouchi* it "determined that a baseless and 'wholly unjustified' paragraph IV certification in an ANDA filing, when combined with litigation misconduct, warranted an exceptional case finding." *Id.* at 1350.  According to the court, "in *Yamanouchi* we did not agree that the generic company had engaged in willful infringement, but rather determined that an award of attorney's fees was permitted because the generic had filed numerous baseless filings supporting its fruitless and meritless arguments, both in its case at trial and in its ANDA certification." *Id.*

3

6.    In the present case, Allergan has not pointed to anything which would support a finding of willful infringement. The only act of infringement alleged in Allergan's complaint is Alcon's allegedly baseless paper NDA filing and Paragraph IV Certification with the FDA. Because a paper NDA filing cannot be considered willful, Allergan's complaint does not state any basis under which it could assert a claim for willful infringement. Allergan, however, maintains that Alcon's change in position with respect to its written description defense set forth in its summary judgment motion, combined with the paper NDA filing, permits a claim for willful infringement. The court disagrees. As the Federal Circuit explained in *Glaxo*, a finding that a ANDA/paper NDA case is "exceptional" can be based on meritless filings combined with litigation misconduct, but a finding of willful infringement cannot. Accordingly, the court will not permit a claim for willful infringement in this case. That being said, the court will not foreclose Allergan from, at the appropriate time, seeking to prove additional facts that would support its claim of an exceptional case for which the court should award attorney's fees. *See Aventis Pharma Deutschland GmbH v. Cobalt Pharms., Inc.*, 355 F. Supp. 2d 586, 592-93 (D. Mass. 2005).

Therefore, IT IS HEREBY ORDERED that:

1.    A claim for willful infringement is not permitted in this case.

2.    Allergan's claim for willful infringement shall be stricken from the complaint.

Dated: July 26 , 2005

/s/ Gregory M. Sleet
UNITED STATES DISTRICT JUDGE

4

*In re:  '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT B
# to Mylan's Rule 12(c) Motion:

*Allergan Inc. v. Pharmacia Corp.*,
No. Civ.A.01-141-SLR, 2002 WL 1268047
(D. Del. May 17, 2002) (Robinson, C.J.)

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

▷

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ALLERGAN INC. and Allergan Sales, Inc.,
Plaintiffs,
v.
PHARMACIA CORPORATION, Pharmacia AB,
Pharmacia Enterprises S.A. and Pharmacia &
Upjohn Company, Defendants,
and THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,
Additional Defendant on Counterclaim in Reply.
**No. Civ.A.01-141-SLR.**

May 17, 2002.

MEMORANDUM ORDER

ROBINSON, J.
*1 At Wilmington this 17th day of May, 2002, having reviewed the various pending discovery motions and the papers submitted in connection therewith;

IT IS ORDERED that:

1. Columbia's motion for a protective order precluding plaintiffs from deposing and obtaining documents from John P. White, Esquire (D .I. 77) is granted.

a. Plaintiffs have subpoenaed Columbia's lead trial counsel, Mr. White, to appear for a deposition on the issue of inventorship of U.S. Patent No. 4,599,353 ("the '353 patent"). More specifically, plaintiffs contend "that the inventor of the '353 patent, with Columbia's full knowledge and participation through its attorneys, failed to credit one or more co-inventors who collaborated in and contributed to the conception and reduction to practice of the '353 invention." (D.I. 87 at 4) Plaintiffs argue that Mr. White has relevant information based on an amendment filed by Mr. White wherein he declares that "[a]pplicant is the sole inventor of the invention described and claimed in the subject application." (*Id.,* Ex. 2 at 4) The amendment reflects facts as averred by the inventor in his declaration. (*Id.,* Ex. 3)

b. As a general principle, depositions of trial counsel are limited to those circumstances where " the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton v. Am. Motors Corp.,* 805 F.2d 1323, 1327 (8th Cir.1987) (internal citation omitted). *Cf., Environ Prods., Inc. v. Total Containment, Inc.,* 41 U.S.P.Q.2d 1302, 1306 (E.D.Pa.1996) ("Impressions protected by the work-product doctrine may be discovered when directly relevant to the litigation and when the need for production is compelling."); *Bio-Rad Labs., Inc. v. Pharmacia, Inc.,* 130 F . R.D. 116, 122 (N.D.Cal.1990) ("[A]n attorney's opinion work product is discoverable where such information is directly at issue and the need for production is compelling."). Moreover, absent a *prima facie* showing of fraud, an allegation of inequitable conduct, in and of itself, does not vitiate the attorney-client privilege or the protections of the attorney work product doctrine. *See In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800, 806-07 (Fed.Cir.2000).

c. The court concludes that plaintiffs have not met their burden to demonstrate a compelling need for the requested discovery. Plaintiffs apparently contend, in support of their inequitable conduct contentions, that Mr. White knew or should have known that one or more co-inventors collaborated in and contributed to the conception and reduction to practice of the patented invention and was obligated to so inform the PTO. The court suggests that until such time as plaintiffs have demonstrated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the truth of the matters asserted (i.e., there were co-inventors), Mr. White's knowledge is irrelevant. Because the issue of inequitable conduct is a matter for the court to determine, and because the factual predicate to the issue of inventorship can be pursued independent of Mr. White's testimony (through the depositions of the inventor and alleged co-inventors and through access to the documents that reflect the inventive process), the court declines to permit the deposition of Mr. White at this time.

**\*2** 2. Defendants' motion to compel the production of documents (D.I.82) is granted to the extent explained below.

a. Defendants have moved to compel plaintiffs to produce "all documents relating to the subject matter of three opinion letters provided by their counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP ("Finnegan, Henderson"), and to permit questioning of Allergan witnesses regarding the subject matter of those opinion letters." (*Id.* at 1) By way of background, plaintiffs have chosen to rely upon the opinions written by Finnegan, Henderson in defense of the claim of willful infringement. Plaintiffs have produced the three opinion letters and drafts thereof, and "all communications between Allergan and Finnegan regarding those letters as well as all of the materials that Allergan considered in connection with its reliance on the letters." Defendants seek, in addition to the above, "documents relating to [Allergan's] other infringement and validity analyses of the patents." (*Id.* at 3)

b. From the court's perspective, the question posed by this discovery dispute is whether the scope of a party's voluntary waiver is defined by the course of conduct between the party and its opinion counsel, or whether it is defined by the subject matter discussed in the opinion letters. The court concludes that it is the latter.

c. It is undisputed that,

[w]hen an alleged infringer decides to respond to a claim of willful infringement by offering evidence that he or she reasonably and in good faith relied on advice of counsel in making, using or selling the allegedly infringing device, then the advice

becomes relevant and admissible. Documents and testimony relating to that advice are relevant in that they are probative of the alleged infringer's intent. They are admissible because the alleged infringer has waived the privilege as to the subject matter of the advice.

*Thorn EMI North Am., Inc. v. Micron Tech., Inc.,* 837 F.Supp. 616, 621 (D.Del.1993). In order to determine whether the alleged willful infringer " reasonably and in good faith relied on" the advice rendered by opinion counsel, it is appropriate to test the knowledge of the alleged willful infringer concerning the subject matter of the opinion. *Cf. id.* (the patentee should be entitled to discover facts relating to what the alleged willful infringer "knew and had concluded about the credibility, value and reasonableness of the opinions.").

d. Consistent with the above reasoning, the court concludes that the only equitable way for a patentee to test the knowledge of an alleged willful infringer (so as to test the reasonableness of its evaluation of counsel's opinions) is for the alleged willful infringer to disclose all of the information it possessed prior to or at the time it obtained opinions of counsel as to the subject matters discussed in such opinions. [FN1]

> FN1. The court recognizes that the scope of discovery allowed at bar is relatively broad and potentially prejudicial to plaintiffs. Therefore, rather than requiring disclosure consistent with this order at this time, the court will bifurcate the issue of willfulness, stay discovery relating to willfulness, and conduct a separate trial with a new jury in the event plaintiffs are found to infringe valid patents. *See Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.,* No. 00-800-JJF, 2002 WL 576088, at \*3 n. 2 (D.Del. Mar. 28, 2002).

3. Plaintiffs' motion to compel the production of documents withheld under the common legal interest doctrine (D.I.99) is denied as untimely. The parties agreed to exchange their privilege logs on January 23, 2002. By stipulation filed on March 11,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3

Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

2002, the discovery cutoff date was extended to March 15, 2002. Plaintiffs filed the instant motion on April 8, 2002. Motions that relate to fact discovery must be filed during fact discovery, especially where, as here, the underlying facts relating to the motion were known to plaintiffs in January 2002. Therefore, the court declines to address the motion on its merits.

**\*3** 4. Plaintiffs' motion for leave to file a sur-reply brief (D.I.96) is denied as moot.

D.Del.,2002.
Allergan Inc. v. Pharmacia Corp.
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:01CV00141 (Docket) (Mar. 01, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*In re: '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT C
# to Mylan's Rule 12(c) Motion:

*St. Clair Intellectual Prop. Consultants, Inc. v.*
*Sony Corp.*, No. Civ.A.01-557-JJF,
2002 WL 1901268 (D. Del. Aug. 16, 2002) (Farnan, J.)

Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1

Not Reported in F.Supp.2d, 2002 WL 1901268 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

▷

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ST. CLAIR INTELLECTUAL PROPERTY
CONSULTANTS, INC., Plaintiff,
v.
SONY CORPORATION, Sony Electronics, Inc.,
and Sony Corporation of America, Defendants.
**No. Civ.A.01-557-JJF.**

Aug. 16, 2002.

Frederick L. Cottrell, III and Thomas H. Kovach, of
Richards, Layton & Finger, Wilmington, Delaware.
Ronald J. Schutz, Jake M. Holdreith, Becky R.
Thorson, and Carrie M. Smith, of Robins, Kaplan,
Miller & Ciresi, L.L.P., Minneapolis, Minnesota,
for Plaintiff, of counsel.
Josy W. Ingersoll and Adam W. Poff, of Young
Conaway Stargatt & Taylor, L.L.P., Wilmington,
Delaware. Sidney David, Joseph S. Littenberg,
Jonathon A. David, Jeffrey S. Dickey, and April M.
Mayo, of Lerner, David, Littenberg, Krumholz &
Mentlik, L.L.P., Westfield, New Jersey, of counsel.

MEMORANDUM OPINION

FARNAN, J.
**\*1** Presently before the Court is a Motion For
Bifurcation Of Liability And Damages/Willfulness
Issues And For A Stay Of Discovery Regarding
Damages/Willfulness Issues (D.I.43) filed by
Defendants Sony Corporation, Sony Electronics,
Inc., and Sony Corporation of America (collectively
"Sony"). For the reasons set forth below, Sony's
Motion will be granted in part and denied in part.

I. BACKGROUND

This is a patent infringement action in which
Plaintiff St. Clair Intellectual Property Consultants,

Inc. (hereinafter "St. Clair") alleges that Sony
willfully infringes four of St. Clair's patents by
manufacturing, using and selling numerous models
of digital camcorders and still cameras. (D.I. 44 at
1). Sony answers these allegations by denying
infringement, claiming the patents are invalid, and
asserting a laches defense. Sony also asserts
counterclaims, including patent misuse and unfair
competition. [FN1] (D.I. 44 at 1).

> FN1. Originally, Sony also pleaded the
> defense of estoppel. (D.I. 44 at 1).
> However, Sony has since withdrawn this
> defense. (See D.I. 47 at 1).

On March 28, 2002, after discovery had
commenced in this action, the Court issued a
decision in *Novartis Pharmaceuticals Corp v. EON
Labs Mfg., Inc.,* 206 F.R.D. 396 (D.Del.2002). As a
result of the *Novartis* decision, Sony filed the
instant Motion (D.I.43) pursuant to Federal Rule of
Civil Procedure 42(b), seeking to bifurcate the
issues of damages and willful infringement from the
other issues in this case.

On July 17, 2002, the Court heard argument on
Sony's Motion. During the course of the argument,
Sony's counsel represented that Sony intends to rely
on opinions of counsel in defense of St. Clair's
willfulness claim. (D.I.80). At the close of the
parties' arguments, the Court denied Sony's Motion
to the extent it pertains to damages, and ordered
Sony's counsel to provide the opinion letters Sony
intends to rely upon for an *in camera* review. [FN2]
(D.I.80).

> FN2. The Court agrees with St. Clair that
> Sony will not suffer any undue prejudice if
> the liability and damages issues are not
> bifurcated.

On August 1, 2002, the Court received Sony's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2002 WL 1901268 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

opinion letters, as well as other related documents, and has since reviewed them. This Memorandum Opinion will address whether separation of St. Clair's willfulness claim is warranted in the circumstances of this case.

## II. DISCUSSION

Counsel for Sony contends that the discovery required by *Novartis* in the circumstances of this case (i.e. that Sony has elected to present a reliance on advice of counsel defense in response to St. Clair's charge of willfulness, and the fact that Sony's trial counsel authored the legal opinion relied upon) requires that the issue of willfulness be separated for both discovery and trial. (D.I. 44 at 2-4). Specifically, Sony's counsel represents that communications occurred between Sony and its counsel which relate to issues other than willfulness as well as strategies that Sony might undertake with regard to those issues. (D.I. 44 at 2; D.I. 80). According to Sony, in the event the Court fails to separate the issue of willfulness, the disclosure of these communications to St. Clair will result in undue prejudice to Sony. (D.I. 44 at 2-4).

In response, St. Clair contends that separation of the willfulness issue is not warranted in this case. (D.I. 45 at 4). Specifically, St. Clair contends that separation would result in delay and wasteful duplication of discovery. (D.I. 45 at 11-13).

**\*2** After reviewing the documents submitted by Sony, the Court finds that undue prejudice could result if these otherwise privileged documents were exchanged and used during the trial of the infringement and validity issues. Neither Sony nor St. Clair had the benefit of the Court's *Novartis* decision when Sony engaged counsel to obtain an infringement opinion. Sony and trial counsel conducted their dialogue without the knowledge that their communications on matters other than infringement could be revealed in litigation. For these reasons, the Court is sensitive to Sony's prejudice claim and will separate willfulness from the other patent issues for both discovery and trial.

## III. CONCLUSION

For the reasons set forth above, the Court will grant Sony's Motion For Bifurcation (D.I.43) to the extent it pertains to willfulness and deny Sony's Motion For Bifurcation (D.I.43) to the extent it pertains to damages.

An appropriate Order will be entered.

## ORDER

At Wilmington this 16th day of August, 2002, for the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY ORDERED that:
1. Sony's Motion (D.I.43) to bifurcate the issue of willfulness for both discovery and trial is *GRANTED;*
2. Sony's Motion (D.I.43) to bifurcate the issue of damages is *DENIED;*
3. Discovery on the issue of willfulness is *STAYED* pending resolution of the issues of infringement, validity, and damages.

D.Del.,2002.
St. Clair Intellectual Property Consultants, Inc. v. Sony Corp.
Not Reported in F.Supp.2d, 2002 WL 1901268 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:01cv00557 (Docket) (Aug. 14, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*In re: '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT D
# to Mylan's Rule 12(c) Motion:

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
No. 01-504-SLR, slip op.
(D. Del. Nov. 27, 2002) (Robinson, C.J.)



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ARTHROCARE CORPORATION,        )
                               )
            Plaintiff,         )
                               )
        v.                     )    C.A. No. 01-504-SLR
                               )
SMITH & NEPHEW, INC.,          )
                               )
            Defendant.         )


## MEMORANDUM ORDER

At Wilmington this 27th day of November, 2002, having
reviewed the papers submitted by the parties in connection with
various motions filed by defendant;

IT IS ORDERED that defendant's motion to stay pending
reexamination (D.I. 187) is denied, for the reasons that follow:

1.  The United States Court of Appeals for the Federal
Circuit recognizes that "[c]ourts have inherent power to manage
their dockets and stay proceedings . . ., including the authority
to order a stay pending conclusion of a PTO reexamination."
Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)
(citations omitted).  Courts clearly have the authority to order
their cases to trial.

2.  The Federal Circuit also has recognized that patent
litigation in a district court and reexamination proceedings

before the PTO do not implicate a "precise duplication of effort"
because "litigation and reexamination are distinct proceedings,
with distinct parties, purposes, procedures, and outcomes." <u>Id.</u>
at 1427.

3. Given the court's view that its primary purpose is
to manage litigation in an expeditious manner in order to create
an appropriate record (through motion practice or trial) for
review by the Federal Circuit, the court generally will not stay
its cases pending reexamination proceedings absent extraordinary
circumstances. In this case, where only one of the three patents
is undergoing reexamination, where the patents at issue relate to
an evolving and highly competitive market, and where the
reexamination proceedings to date have not been conducted with
what the court would consider "special dispatch", the court
declines to find this an exceptional case warranting a stay. The
court understands that, prior to trial, the PTO may issue rulings
that will need to be considered, thus causing some inefficiencies
in the pretrial and trial process. Nevertheless, the court
concludes that such inefficiencies are an inherent byproduct of
concurrent litigation and reexamination and, therefore, do not
constitute exceptional circumstances justifying a stay of the
litigation at bar.

2

IT IS FURTHER ORDERED that defendant's motion to bifurcate willfulness and damages and to stay discovery (D.I. 107) is granted.  Discovery on the issues of willfulness and damages will be stayed until after the verdict on infringement and invalidity has been returned; these issues will be tried to a new jury.

IT IS FURTHER ORDERED that defendant's claim of privilege pertaining to redactions in certain documents (D.I. 190) is denied.  The court finds that the information redacted is equivalent to the information required to be included in a privilege log, and thus not privileged information.

IT IS FURTHER ORDERED that defendant's second motion for leave to amend answer and counterclaim (D.I. 111) is granted. However, discovery and trial of defendant's newly added counterclaim for antitrust violations are stayed consistent with the above ruling on the issues of damages and willfulness.

IT IS FURTHER ORDERED that defendant's motion for reargument is denied, as is its motion to strike.  (D.I. 160, 172)

United States District Judge

3

*In re:  '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT E
# to Mylan's Rule 12(c) Motion:

*CP Kelco U.S., Inc. v. Pharmacia Corp.*,
No. CIV.A.01-240-RRM,
2002 WL 31230812 (D. Del. Sept. 19, 2002)
(Thynge, M.J.)

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
CP KELCO U.S., INC., Plaintiff/Counterclaim
Defendant
v.

PHARMACIA CORPORATION,
Defendant/Counterclaim Plaintiff/Third-Party
Plaintiff,
v.

LEHMAN BROTHERS MERCHANT BANKING
PARTNERS II, L.P. Hercules Incorporated, and
Hercules 2000, LLC Third-Party Defendants
**No. CIV.A.01-240-RRM.**

Sept. 19, 2002.

Edward M. McNally, Esquire and Richard D. Kirk,
Esquire, Morris, James, Hitchens & Williams, LLP,
Wilmington, Delaware; Francis G.X. Pileggi,
Esquire, Fox, Rothschild, O'Brien & Frankel, LLP,
Wilmington, Delaware. Of Counsel: Roberto A.
Rivera-Soto, Esquire, Abraham C. Reich, Esquire,
and Michelle T. Wirtner, Esquire, Fox, Rothschild,
O'Brien & Frankel, LLP, Philadelphia,
Pennsylvania; counsel for defendant/counterclaim
plaintiff/third-party plaintiff Pharmacia Corporation.
Lawrence Ashby, Esquire and Philip Trainer, Jr.,
Esquire, Ashby & Geddes, Wilmington, Delaware.
Of Counsel: William T. Hangley, Esquire, Michael
Liberman, Esquire, and Allison M. Meade, Esquire,
Hangley Aronchick Segal & Pudlin, Philadelphia,
Pennsylvania; counsel for third-party defendants
Hercules Incorporated and Hercules 2000, LLC.

MEMORANDUM OPINION

THYNGE, Magistrate J.

I. Introduction

*1 On April 11, 2001, plaintiff CP Kelco U.S., Inc. (

"CP Kelco"), a Delaware corporation, brought this
action against Pharmacia Corporation ("Pharmacia"
), also a Delaware corporation, in connection with
CP Kelco's purchase of the biogums business assets
of Pharmacia (formerly, the Monsanto Company, "
Monsanto"). CP Kelco alleges that Pharmacia
fraudulently misrepresented the financial condition
of its biogums business. On June 14, 2001,
Pharmacia filed a third-party complaint against
Lehman Brothers Merchant Banking Partners II,
L.P. ("Lehman Brothers"), Hercules Incorporated ("
Hercules"), and Hercules 2000, LLC ("Hercules
2000") (each third-party defendant is a Delaware
entity) seeking contribution or indemnification from
those entities should CP Kelco prevail on any of its
claims against Pharmacia. Presently before the court
is Hercules and Hercules 2000's Fed.R.Civ.P. 12(c)
motion for judgment on the pleadings.

II. Facts [FN1]

FN1. The facts recited are taken from CP
Kelco's Complaint (D.I.1), Pharmacia's
Answer and Counterclaims to CP Kelco's
Complaint (D.I.7), Pharmacia's
Third-Party Complaint (D.I.8), the Answer
of Hercules and Hercules 2000 to
Pharmacia's Third-Party Complaint
(D.I.29), as well was any documents
incorporated into, and integral to, those
pleadings.

In October 1999, Monsanto, through its investment
advisor, Goldman Sachs & Company, issued a
Confidential Memorandum (also referred to as the "
Offering Memorandum") for the sale of its biogums
business (the "Biogums Business"). [FN2] In
November 1999, Hercules responded to the
Confidential Memorandum with an expression of
interest. Hercules was interested in purchasing
Monsanto's Biogums Business and combining those
assets with Hercules' own preexisting food gum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

business. Hercules determined it would need a partner in its acquisition effort and teamed with Lehman Brothers to pursue a transaction with Monsanto. Hercules and Lehman Brothers formed Hercules 2000 as the entity that would purchase both Hercules' existing food gums business and Monsanto's Biogums Business. [FN3]

> FN2. The assets purchased in the transaction at issue included the Kelco Company ("Kelco") and the other biopolymers business of Monsanto and are referred to collectively as the "Biogums Business." Food gums and biogums (or "biopolymers") are two particular types of the general category of hydrocolloids. These gums are used in a wide range of applications including oil and gas drilling, industrial manufacturing, and prepared foods. *See,* D.I. 1 at ¶ 9.

> FN3. As noted below, it was not Hercules 2000 that ended up purchasing the Biogums Business. Another entity formed by Hercules and Lehman Brothers, CP Kelco (plaintiff in the main action), was the ultimate buyer. The complete ownership structure of CP Kelco is detailed in the complaint: "[CP Kelco] is a wholly-owned subsidiary of CP Kelco ApS, a private limited company organized under the laws of Denmark with offices in Wilmington, Delaware. CP Kelco ApS is owned, in turn, by Hercules and by Lehman FG Newco, Inc., the company through which Lehman [Brothers] made its investment in CP Kelco." D.I. 1 at ¶ 10.

From November 1999 through January 2000, Hercules and Lehman Brothers conducted a due diligence review of the Biogums Business. This review included interviews with Monsanto employees as well as examination of documents made available to qualified purchasers in a "data room" at the offices of Monsanto's attorneys. Following their due diligence review, Hercules and Lehman Brothers made an offer of $685 million for the Biogums Business which was accepted by

Monsanto. On February 22, 2000, an asset purchase agreement (the "Asset Purchase Agreement") was entered into by Monsanto, on one side, and Lehman Brothers, Hercules, and Hercules 2000, on the other side, for the purchase of the Biogums Business for $685 million. After the Asset Purchase Agreement was signed, Lehman Brothers hired Ernst & Young, LLC ("Ernst & Young") who conducted a further three-month due diligence review of the Biogums Business. In April 2000, a merger involving Monsanto and Pharmacia occurred with Pharmacia being the surviving corporation succeeding to the rights, duties and obligations of Monsanto.

By August 2000, further negotiations resulted in a reduction of $93 million from the original purchase price of $685 million. On August 10, 2000, a written amendment to the Asset Purchase Agreement ("Amendment No. 1") was executed. [FN4] Amendment No. 1 incorporated the results of the Ernst & Young review and reflected a reduced purchase price of $592 million. On September 15, 2000, a second amendment ("Amendment No. 2"), was made to the Asset Purchase Agreement. By Amendment No. 2, CP Kelco was substituted for and in place of Hercules 2000 as the "Buyer" of the Biogums Business in the Asset Purchase Agreement. The sale closed on September 28, 2000.

> FN4. Amendment No. 1 was dated August 7, 2000, *see,* D.I. 8 at ¶ 25, D.I. 7, Ex. B (Amendment No. 1), but was signed on August 10, 2000. *See,* D.I. 1 at ¶ 97.

*2 On April 11, 2001, CP Kelco filed a suit against Pharmacia alleging various fraudulent misrepresentations and omissions regarding the financial condition of the Biogums Business and the existence of environmental violations by a major asset of the Biogums Business, its Okmulgee, Oklahoma plant. [FN5] On June 14, 2001, Pharmacia filed its third-party complaint, pursuant to Fed.R.Civ.P. 14, against Hercules, Hercules 2000, and Lehman Brothers. Pharmacia contends that if it is found liable under CP Kelco's complaint, Pharmacia is entitled to contribution or indemnification from the third-party defendants for any damages assessed against Pharmacia. [FN6] On

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

August 6, 2001, Hercules and Hercules 2000 filed their answer to the third-party complaint. [FN7] On February 15, 2002, Hercules and Hercules 2000 filed a motion for judgment on the pleadings. [FN8] Briefing on this motion was completed on March 25, 2002.

> FN5. Briefly, the claims asserted in CP Kelco's complaint (D.I.1) are: (I) Breach of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 (" deceptive and manipulative conduct," ¶ 155, "false representations," ¶ 156), (II) Fraud: Misrepresentations and Non-Disclosures In Connection with the Purchase Agreement ("false representations and fraudulent non-disclosures," ¶ 176), (III) Fraudulent Misrepresentations and Non-Disclosures in Connection with the Amendment to the Purchase Agreement (" false representations and fraudulent non-disclosures," ¶ 180), (IV) Fraudulent Misrepresentations and Non-Disclosures in Connection with the September 28 Closing of the Purchase, ("false representations and fraudulent non-disclosures," ¶ 184), (V) Breach of Warranty and Representation as to the June 2000 Financial Statements (" June 2000 financial statements were inaccurate and materially misleading," ¶ 189), (VI) Breach of Representations and Warranties as to Compliance with Covenants ("representation and warranty was false when made" ¶ 194, " Monsanto/Pharmacia misled Buyers, provided false information ... and generally acted to prevent the Buyers from learning the truth about the Kelco assets and business," ¶ 200, "provided misleading information ... did not correct misleading information in the offering materials when given the opportunity, and made affirmative misrepresentations to potential lenders," ¶ 202), (VII) Breach of Environmental Representations Warranties ("withheld information in its possession that the ... [EPA] was investigating the wastewater treatment facility of the City of Okmulgee, Oklahoma for longstanding violations," ¶ 207), (VIII) Breach of the Implied Covenant of Good Faith and Fair Dealing ("fraudulent concealments and fraudulent non-disclosures," ¶ 211), (IX) Equitable Fraud ("made false representations to and fraudulently concealed material information from CP Kelco," ¶ 213), (X) ("conduct in deceiving the Buyers and misleading purchasers of debt in CP Kelco was willful, wanton and malicious," ¶ 217).

> FN6. *See,* Third-Party Complaint, D.I. 8 at ¶ 27.

> FN7. D.I. 29.

> FN8. D.I. 105. Third-party defendant Lehman Brothers is not a party to the motion for judgment on the pleadings.

### III. Legal Standard for Fed.R.Civ.P. 12(c) Judgment on the Pleadings

In order for the court to grant a Rule 12(c) judgment on the pleadings, " 'the movant [must] clearly establish[ ] that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.' " ' [FN9] In making its determination, the court must " 'view[ ] the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.' ' [FN10] The court is not required, however, to accept a plaintiff's conclusory allegations or statements of law. [FN11]

> FN9. *Hayes v. Community General Osteopathic Hospital,* 940 F.2d 54, 56 (3d Cir.1991) (citing *Society Hill Civic Association v. Harris,* 632 F.2d 1045, 1054 (3d Cir.1980) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1386, at 690 (1969)).

> FN10. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

FN11. *Daggers v. Thaens,* C.A. No. 98-256-SLR, 1999 WL 223504, at *2 (D.Del. Mar. 31, 1999) (citing *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp 1119, 1125 (D.Del.1988)).

## IV. Positions of the Parties

Pharmacia contends that if it is found liable for damages under CP Kelco's complaint:
Lehman Brothers, Hercules and Hercules 2000 are jointly and severally liable to Pharmacia either by way of remedy over, contribution, indemnification or otherwise on account of the same transaction, occurrence or series of transactions or occurrences as alleged in the complaint filed by CP Kelco; without limiting the foregoing, under the Asset Purchase Agreement, as amended, Lehman Brothers and Hercules, on their own behalf and on behalf of Hercules 2000, agreed to indemnify and reimburse Pharmacia for the claims and damages sought by CP Kelco against Pharmacia. [FN12]

FN12. Third-Party Complaint, D.I. 8 at ¶ 27.

Pharmacia notes that Amendment No. 2 to the Asset Purchase Agreement substituted CP Kelco for Hercules 2000 as the "Buyer" of the Biogums Business only thirteen days prior to the September 28, 2001 closing of the transaction. Pharmacia argues that because Hercules conducted several months of due diligence in its investigation of the Biogums Business prior to this substitution, any failure on the part of CP Kelco to obtain all necessary information on which to make an informed decision about whether, and at what price, to acquire the Biogums Business was the result of either an inadequate due diligence review on the part of Hercules or Hercules' failure to share with CP Kelco all of the information it discovered during that review. In either case, Pharmacia's position is that it is entitled to contribution from Hercules for any damages this court determines CP Kelco suffered as a result of having insufficient information prior to the closing of the transaction.

*3 Additionally, Pharmacia maintains that section 10.2 (Buyer Indemnification) and section 1.4 (Assumption of Liabilities) of the Asset Purchase Agreement contractually obligate Hercules 2000 to indemnify Pharmacia for any judgment CP Kelco obtains based on its claims against Pharmacia. [FN13]

FN13. Curiously, Pharmacia spends six of the twenty-three pages in the "Argument" section of its brief in opposition to the motion arguing that Pharmacia properly joined Hercules and Hercules 2000 pursuant to Fed.R.Civ.P. 14(a) and that the third-party complaint provided sufficient notice of the claims against the third-party defendants pursuant to Fed.R.Civ.P. 8, Fed.R.Civ.P. 14, Fed.R.Civ.P. 84, and Form 22-A of the Appendix of Forms. Hercules and Hercules 2000 do not argue in favor of their motion based on joinder or pleading deficiencies. Instead, Hercules and Hercules 2000 argue that accepting the well-pleaded factual allegations in the third-party complaint as true and viewing those facts and all reasonable inferences to be drawn therefrom in favor of Pharmacia, they are, nevertheless, entitled to judgment as a matter of law. As joinder and sufficiency of the pleadings are not at issue, it is unnecessary for the court to address Pharmacia's arguments directed to those topics.

Hercules and Hercules 2000 argue that the third-party complaint's claims against them are not supported by either Pharmacia's contribution or indemnification theory. With regard to Pharmacia's contribution theory, Hercules and Hercules 2000 contend that no allegations have, or can, be made by Pharmacia upon which any joint obligation to CP Kelco by Pharmacia and Hercules or Hercules 2000 could be founded. Absent such foundational basis, it is argued, their contribution toward any award for CP Kelco against Pharmacia would be inappropriate. Furthermore, Hercules and Hercules 2000 maintain that they were the victims of the very same purportedly fraudulent conduct by Pharmacia

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

alleged in CP Kelco's complaint.

With regard to the indemnification theory, Hercules and Hercules 2000 make three assertions as to why Pharmacia's indemnification claims are without merit:
(i) Pharmacia's claims to indemnity for alleged violations of the federal securities laws are precluded as a matter of law;
(ii) Hercules never agreed to indemnify Pharmacia for anything, while Hercules 2000's indemnification obligations unambiguously did not include indemnifying Pharmacia for the fraudulent conduct of which it is accused in this lawsuit; and
(iii) [S]uch indemnification obligations as Hercules 2000 ever did owe to Pharmacia were completely discharged and extinguished when, prior to the closing on the purchase of the biogums business, Pharmacia and the other parties to the Asset Purchase Agreement agreed to a novation whereby CP Kelco was substituted for Hercules 2000 with respect to all of Hercules 2000's rights and obligations under the Agreement.[FN14]

> FN14. Hercules and Hercules 2000's Br. in Support of the Motion for Judgment on the Pleadings, D.I. 106 at 1-2.

Hercules and Hercules 2000 argue, therefore, that Pharmacia's claims against them are deficient as a matter of law and that the court should grant their motion.

## V. Analysis

A prerequisite to any recovery by Pharmacia against Hercules or Hercules 2000 based on the claims set forth in the third-party complaint necessarily requires a judgment against Pharmacia on the CP Kelco complaint. As a threshold matter, therefore, this court must determine whether a judgment for CP Kelco against Pharmacia, based on the particular facts alleged in CP Kelco's complaint, are of a type from which contribution or indemnification would be proper. If the answer to that inquiry is negative, the parties' competing

arguments with regard to whether Pharmacia is entitled to recover under either its indemnification or contribution theory are moot.

### A. Contribution

Pharmacia argues that "[t]he gravamen of CP Kelco's claims against Pharmacia for damages is that CP Kelco was denied information that would have allowed it to assess the true worth of the Biogums Business and, as a result, CP Kelco overpaid Pharmacia for the Biogums Business."[FN15] Pharmacia's claim for contribution, if CP Kelco's alleged harm is adjudicated to have occurred, centers on the fact that for several months before the September 28, 2000 closing, Hercules performed "exhaustive due diligence" during which it had access to both Monsanto/Pharmacia employees and to records of the Biogums Business in the "data room." That fact, Pharmacia reasons, leads to the conclusion that any damages resulting from a lack of information on the part of CP Kelco should be borne by Hercules.[FN16] It was not Pharmacia, it is contended, but Hercules that caused any alleged harm "because (a) Hercules ... performed inadequate due diligence on the Biogums Business; and/or (b) Hercules ... failed to share the information they obtained during due diligence with CP Kelco and/or Lehman Brothers."[FN17]

> FN15. D.I. 128 at 9 (citing D.I. 1 at ¶¶ 173, 214); see also, id. at 5 ("The essence of CP Kelco's claim against Pharmacia is that because CP Kelco lacked certain information, CP Kelco overpaid Pharmacia for the Biogums Business." (citing D.I. 1 at ¶¶ 173, 214)(emphasis added)).

> FN16. In its brief opposing Hercules and Hercules 2000's motion, Pharmacia repeatedly refers to "Hercules and Hercules 2000" performing due diligence. See e.g., D.I. 128 at 4, 5, 6, 9, 17. Both CP Kelco's complaint (D.I. 1 at ¶ 11) and Pharmacia's third-party complaint (D.I. 8 at ¶¶ 17-18, 22) speak of Hercules and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Lehman Brothers, not Hercules 2000, performing due diligence. Although this discrepancy in no way affects the ultimate determination of the contribution issue as to both Hercules and Hercules 2000, in keeping with the mandate of Fed.R.Civ.P. 12(c) to consider the truth of the well-pleaded facts contained in the *pleadings,* this court will refer to only Hercules in its analysis of Pharmacia's contribution argument. This is also consistent with Pharmacia's admonition not to ignore the fact that Hercules, Hercules 2000, and CP Kelco are each separate entities. *See,* D.I. 128 at 4.

FN17. D.I. 128 at 9.

*4 The court agrees with Pharmacia that the "gravamen" of CP Kelco's claims is illustrated by paragraphs 173 and 217 of the complaint which were cited by Pharmacia for its own characterization of those claims. Unfortunately for Pharmacia, however, and contrary to the entire premise of its argument that the third-party complaint states a valid claim, the complaint does not indicate that CP Kelco is alleging it overpaid merely because it "lacked certain information." Rather, it alleges that the information CP Kelco lacked was missing not because it was discoverable and overlooked or not shared by Hercules but, because material information was fraudulently misrepresented and/or withheld by Pharmacia. Paragraph 173 of CP Kelco's complaint alleges that "Monsanto/Pharmacia *succeeded in deceiving the Buyers* into purchasing the common stock of Kelco Company. That stock was worth substantially less than what CP Kelco paid for it, thereby damaging CP Kelco." (emphasis added). Paragraph 214 of the complaint alleges that "CP Kelco relied on th[e] *false representations and fraudulent non-disclosures* [made by Monsanto/Pharmacia regarding material information] in negotiating the purchase price. The purchase price that CP Kelco paid for the Kelco business was significantly higher than its actual value." (emphasis added). Those allegations do not indicate that CP Kelco "lacked certain information" which would have been discovered with adequate due diligence. Nor do those allegations support a

reasonable inference that the purportedly omitted or misrepresented material information was learned by Hercules during its due diligence review and yet CP Kelco was "denied information" when Hercules, although aware of negative facts about the Biogums Business, "failed to share" that information with CP Kelco. Fairly read, the facts pleaded by CP Kelco, although supporting claims reciting a variety of legal theories as the basis for recovery, all revolve around a central theme-that Monsanto and Pharmacia *fraudulently* misrepresented, omitted, and/or hid material information about the Biogums Business from the purchasers. [FN18] CP Kelco pleads a series of facts supporting this central theme and showing Monsanto/Pharmacia's capacity to hide negative information. It alleges:

FN18. The complaint itself characterizes the basis of its claims as fraud. "A brief overview of what CP Kelco discovered [after the closing] follows. After that, *this Complaint will state in detail the fraud.*" D.I. 1 at ¶ 19 (emphasis added).

• To avoid contradictions with management projections provided to the buyers, "key information was misrepresented or kept hidden." [FN19]

FN19. *Id.* at ¶ 17.

• Although the buyers were told that management projections provided to them were the "only management projections.... There was an entire forecasting system at Kelco, but its existence was kept secret because its results contradicted Monsanto M & A's sales pitch." [FN20]

FN20. *Id.* at ¶ 22.

• The ability to keep contradictory information secret was accomplished through the requirement that, in spite of Section 5.2 of the Asset Purchase Agreement providing that the purchasers were to "have full access to information about Kelco's records and business....[,] requests for information

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and meetings [had to] be made through Monsanto M & A, for coordination." [FN21] Monsanto M & A used its coordinating position "to suppress information and pass on misleading information. Every phone call and every meeting with CP Kelco had to involve someone from Monsanto M & A. Every written communication had to be sent to Monsanto M & A for clearance." [FN22]

> FN21. *Id.* at ¶ 25.

> FN22. *Id.* at ¶ 26, *see also, id.* at ¶¶ 64-66.

**\*5** • The "data room" wherein information on Kelco's business was made available to prospective purchasers was "prepared by Monsanto's M & A group, who made sure that nothing in that room contradicted the misleading picture presented in the Offering Memorandum." [FN23]

> FN23. *Id.* at ¶ 44.

Particular instances of purportedly fraudulent concealment of material information are alleged by CP Kelco. These instances span the entire time-period of the transaction at issue-from initial offer of sale through the closing of the transaction. These facts were not discovered by CP Kelco until the purchase transaction closed. After the closing, CP Kelco finally had access to information allegedly hidden from the purchasers when under Pharmacia's control. For example:
• When a computer model used by Kelco's head of marketing, Eric Meerbergen, indicated significant future price declines for Kelco's products, Kelco President Francisco Diaz instructed "Meerbergen to redo his results and show only a small price decline in 2000. That slight price decline in 2000 went into the Offering Memorandum." [FN24]

> FN24. *Id.* at ¶ 39.

• During purchase-term negotiations with Hercules and Lehman Brothers in February 2000, Diaz

caused a material fact to be hidden from the buyers; "the actual management projections at Kelco were much lower than the projections in the Offering Memorandum." [FN25]

> FN25. *Id.* at ¶ 49.

• The results of a computer model run by Meerbergen-assistant Walter Rakitsky in February 2000 which forecast far lower revenues than reflected in the Offering Memorandum were hidden from the buyers. [FN26]

> FN26. *See, id.* at ¶¶ 50-53.

• Monsanto M & A hid the fact of the existence of Kelco's Sales and Operations Planning Process (S & OP) that, beginning in January 2000, "was producing monthly forecasts far below what Monsanto/Pharmacia was telling the Buyers." [FN27] "[T]he Buyers were told that there was no forecasting system, that the only Kelco management forecasts were the ones that had been give to the Buyers." [FN28]

> FN27. *Id.* at ¶ 54.

> FN28. *Id.* at ¶ 61.

• In April 2000, Kelco controller James Langley told Diaz about the possibility that several million dollars of inventory might be difficult to move. Diaz responded to this negative information by telling Langley that Langley did not need to participate, as previously planned, in a phone call with the purchasers. During that call "Diaz told the Buyers there were no [inventory] problems." [FN29]

> FN29. *Id.* at ¶ 72.

• When lower June 2000 results called into question Kelco's 1999 financial statements, "Monsanto M & A gave CP Kelco revised projections that, although lower than the earlier projections, were still far higher than internal forecasts." [FN30]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

FN30. *Id.* at ¶ 28.

• When actual July results caused estimated sales and profits to drop by millions of dollars, Diaz instructed that this information "was not to be discussed with the Buyers." [FN31] This instruction was given on August 10, 2000, the same day Amendment No. 1 to the Asset Purchase Agreement was signed lowering the purchase price of the Biogums Business as a consequence of, among other reasons, lower-than-expected actual revenue figures for periods prior to July.

FN31. *Id.* at ¶ 100.

**\*6** • On September 26, 2000, during a discussion of notes taken at a September 21-22, 2000 management meeting at which year end sales estimates were at least $22 million below the then-current figures supplied to the purchasers, Diaz instructed Kelco management "not to talk to the Buyers. All contacts would be with Monsanto M & A personnel." [FN32]

FN32. *Id.* at ¶ 128.

Accepting the truth of the facts alleged in the pleadings, as must occur on a Rule 12(c) motion for judgment on the pleadings, leads to the conclusion that Pharmacia has not stated a claim for contribution from Hercules or Hercules 2000. This result is consistent with Pharmacia's own argument that "a claim for contribution rests upon two parties sharing joint liability for a common injury," [FN33] and that "[t]he essence of a joint tortfeasor relationship is 'common liability', either jointly or severally, that the two parties have to the injured party." [FN34] Here, despite Pharmacia's conclusory assertion to the contrary, Hercules could not have been a joint tortfeasor along with Pharmacia. This conclusion is not based on an argument that third-party liability may not proceed on a different theory than that alleged in an original complaint-here inadequate due diligence and fraud, respectively. Rather, the particular allegations of the CP Kelco complaint, if determined to be true, would not establish that any action or inaction by

Hercules injured CP Kelco and, therefore, cannot support Pharmacia's theory for contribution by either Hercules or Hercules 2000. [FN35]

FN33. D.I. 128 at 15 (citing *ICI America, Inc. v. Martin-Marrietta Corp.,* 368 F.Supp. 1148, 1151 (D.Del.1974)).

FN34. *Id.* at 16 (citing *ICI America, Inc.* 368 F.Supp. at 1151 (D.Del.1974); *Furguson v. Davis,* 102 A.2d 707, 708 (Del.Super.Ct.1954)).

FN35. This court makes no determination about either the sustainability of different theories of third-party liability in connection with an original complaint alleging fraud or any other combination of original and third-party liability theories. Such determinations are properly left to an examination of the particular facts and claims alleged if, and when, future parties present that issue to the court.

CP Kelco's complaint alleges that material information was fraudulently misrepresented and hidden during the period the parties were negotiating the purchase of the Biogums Business. It is nonsensical for Pharmacia to argue that if Pharmacia is determined to have fraudulently concealed material information from Hercules during due diligence, and CP Kelco is found to have been damaged by that fraud, then Hercules is liable to Pharmacia for any judgment against it in favor of CP Kelco. Liability thus founded could have the negative effect of encouraging fraudulent behavior. If a bad-acting seller who is very adept at fraudulently concealing material information during the negotiation of a transaction is later found liable for that fraud, the seller could then seek contribution from the entity responsible for the due diligence review of the seller for that entity's failure to discover the fraud. If grounds for contribution under such a scenario could be based on equating failure to discover fraudulently concealed information with culpably inadequate due diligence, there is no reason such logic would not apply equally to a situation where either a separate entity

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(as here) or the buyer itself conducts the due diligence. That could suggest the absurd circular result where a plaintiff-buyer sues and wins a judgment against a fraudulent seller who is then entitled to contribution from the victorious plaintiff-buyer on a theory that the plaintiff-buyer itself is responsible for failing to discover the fraud a court found to have been perpetrated on the buyer. Such can not be the case. There is no material factual issue in dispute here. As explained above, based on undisputed facts of this case Pharmacia has not, as a matter of law, stated a claim upon which it would be entitled to contribution from Hercules or Hercules 2000 if Pharmacia were ultimately found liable on the claims set forth in CP Kelco's complaint.

### B. Indemnification

**\*7** As with the contribution claim, Pharmacia recites its mantra that "Hercules and Hercules 2000" are obligated to indemnify Pharmacia if CP Kelco is awarded judgment against Pharmacia on the complaint. Pharmacia's indemnification argument rests on section 10.2 of the Asset Purchase Agreement but that section applies only to Hercules 2000 and/or CP Kelco. Section 10.2 is titled "Buyer Indemnification ." Amendment No. 2 to the Asset Purchase Agreement first identifies Hercules 2000 as the purchaser under the agreement and next indicates that "Hercules 2000 desires, pursuant to Section 11.4 of the Agreement, to assign Hercules 2000's rights, duties and obligations pursuant to the Agreement to CP Kelco U.S. and CP Kelco U.S. desires to assume such rights, duties and obligations . " [FN36] Finally, Amendment No. 2 states that:

> FN36. D.I. 7, Ex. C (Amendment No. 2 to Asset Purchase Agreement).

Pursuant to Section 11.4 of the Agreement, the parties hereby agree that CP Kelco U.S. shall be substituted for and in place of Hercules 2000 as " *Buyer* " *in all places such term is used in the Agreement* and shall be substituted with respect to all of Hercules 2000's rights, duties and obligations under the Agreement. [FN37]

FN37. *Id.* (emphasis added).

Since it is the "Buyer" who is the indemnitor under section 10.2 of the contract, that indemnitor can only be CP Kelco or Hercules 2000. If, as Hercules 2000 argues, CP Kelco is the indemnitor-Buyer, one would again be presented with a scenario similar to that hypothesized above where Pharmacia would be seeking from CP Kelco indemnification for a judgment against Pharmacia in favor of CP Kelco. Recognizing that as an illogical result and giving Pharmacia the benefit of all reasonable inferences, the court will focus on Pharmacia's arguments as to why Hercules 2000 remains bound by the indemnification clause of the Asset Purchase Agreement.

Pharmacia argues that "Hercules 2000 was not ' substituted' as the buyer until all of two weeks before closing and then only under circumstances that guaranteed that it would remain liable for all of its obligations under the agreement." [FN38] This argument, however, proves too much. Amendment No. 2 purported to substitute CP Kelco for and in place of Hercules 2000 "with respect to all of Hercules 2000's *rights*, duties and obligations under the Agreement." [FN39] If Pharmacia argues that Amendment No. 2 was insufficient to relieve Hercules 2000 of its obligations as the "Buyer" under the Asset Purchase Agreement, and therefore Hercules 2000 is still liable under that document's " Buyer Indemnification" section, then Hercules 2000 must still have *rights* as a "Buyer" under the Asset Purchase Agreement. The majority of the fraudulent conduct alleged by CP Kelco in the complaint concerns the time-period from the original February 22, 2000 execution of the Asset Purchase Agreement naming Hercules 2000 as the "Buyer" to the September 15, 2000 execution of Amendment No. 2 purportedly substituting CP Kelco as the " Buyer." Most of the fraudulent actions alleged in CP Kelco's complaint, therefore, occurred while Hercules 2000 was indisputably the "Buyer" under the Asset Purchase Agreement. If CP Kelco is ultimately awarded damages on its complaint, Pharmacia seeks indemnification from Hercules 2000 for actions that would have been adjudged damaging to the "Buyer" under the Asset Purchase Agreement which occurred while Hercules 2000 *was*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the identified "Buyer." Again, this is an illogical result. Pharmacia cannot have it both ways, either the rights, duties and obligations of Hercules 2000 in connection with the Asset Purchase Agreement were completely assumed by CP Kelco, as the plain language of Amendment No. 2 indicates, or Hercules 2000 maintains its contractual rights, as well as its obligations, and cannot be deemed liable to indemnify Pharmacia if Pharmacia is adjudged to have violated the rights of the "Buyer" under the Asset Purchase Agreement. In either case, as a matter of law, Pharmacia has failed to state a claim for indemnification against Hercules 2000. Finally, Pharmacia accurately makes the point, as noted above, that "CP Kelco, Hercules and Hercules 2000 are separate entities." [FN40] Because Pharmacia can point to no place in the amended Asset Purchase Agreement where Hercules is identified as the "Buyer" or has otherwise contractually obligated itself to indemnify Pharmacia, judgment on the pleadings is also appropriate for Hercules with regard to the indemnification claim.

FN38. D.I. 128 at 7.

FN39. D.I. 7, Ex. C (Amendment No. 2 to Asset Purchase Agreement) (emphasis added).

FN40. D.I. 128 at 4; *see also, id.,* at 17 (reiterating that "CP Kelco is a separate and distinct legal entity from Hercules or Hercules 2000").

### VI. Conclusion

**\*8** For the reasons stated above, Hercules and Hercules 2000's motion for judgment on the pleadings is GRANTED. An appropriate order consistent with this memorandum will follow.

D.Del.,2002.
CP Kelco U.S., Inc. v. Pharmacia Corp.
Not Reported in F.Supp.2d, 2002 WL 31230812 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:01CV00240 (Docket) (Apr. 11, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*In re: '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

.

# EXHIBIT F
# to Mylan's Rule 12(c) Motion:

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
No. 04-1689 (D.N.J. Apr. 18, 2005)

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ORTHO-McNEIL PHARMACEUTICAL, INC.,        Plaintiff<br><br>v.<br><br>MYLAN LABORATORIES, INC., et al.,<br><br>      Defendants. | Hon. Stanley R. Chesler<br>Civil Action No. 04-1689<br><br><br>**ORDER** |

**CHESLER, U.S. District Court Judge**

**THIS MATTER** comes before the Court upon Defendants' Motion for Judgment on the Pleadings Dismissing Plaintiff's Claim of Willfulness (docket item #16), and Defendants' Motion for Summary Judgment of Non-Infringment(docket item #22). The Court having considered the papers submitted by the parties, having heard oral argument, and for the reasons set forth in the record of oral argument on April 18, 2005;

**IT IS** on this 18th day of April 2005:

**ORDERED** that Defendants' Motion to Dismiss Plaintiff's Claim of Willfulness is **GRANTED**; and it is further

**ORDERED** that judgment is **RESERVED** on Defendants' Motion for Summary Judgment; and it is further

**ORDERED** that the parties are directed to contact the Court to schedule a Markman hearing.

_____s/_____
STANLEY R. CHESLER
U.S. District Court Judge

2

*In re: '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT G
# to Mylan's Rule 12(c) Motion:

Oral Argument Transcript, dated April 18, 2005, in
*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
No. 04-1689 (D.N.J. Apr. 18, 2005)

1

1            UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
2           CIVIL ACTION NO. 3:04-1689 (MLC)

3

4    ORTHO-McNEIL PHARMACEUTICAL, INC.,        ORAL ARGUMENT

5        Plaintiff and
         Counterclaim Defendant,
6
         vs.
7
     MYLAN LABORATORIES, INC. and
8    MYLAN PHARMACEUTICALS, INC.,

9        Defendant and
         Counterclaim Plaintiffs
10   ------------------------------

11             April 18, 2005
               Trenton, New Jersey
12

13

14   B E F O R E:  HONORABLE STANLEY R. CHESLER, USDJ

15

16
     Pursuant to Section 753 Title 28 United States Code, the
17   following transcript is certified to be an accurate record
     as taken stenographically in the above-entitled proceedings.
18

19   JACQUELINE KASHMER
     Official Court Reporter
20

21

22
              JACQUELINE KASHMER, C.S.R.
23             OFFICIAL COURT REPORTER
                  P. O. Box 12
24             Pittstown, NJ 08867
                  (609) 656-2595
25

2

```
1
   APPEARANCES:
2

3     JENNER & BLOCK
      One IBM Plaza - Suite 4000
4     Chicago, IL 60611
      BY:  HARRY J. ROPER, ESQ.,
5         AARON A. BARLOW, ESQ.,
          ERIC L. LOHRENZ, ESQ.,
6     For the Plaintiffs

7

8     LOWENSTEIN SANDLER
      65 Livingston Avenue
9     Roseland, NJ 07068
      BY:  JOHN MIDDLETON, ESQ.,
10      For the Plaintiffs

11

12    HELLER EHRMAN WHITE & MCAULIFFE, LLP
      One East Main Street - Suite 201
13    Madison, WI 53703
      BY:  DAVID J. HARTH, ESQ.,

14
          and
15
      HELLER EHRMAN WHITE & MCAULIFFE, LLP
16    1666 K Street, NW - Suite 300
      Washington, D.C. 20006
17    BY:  SHANNON BLOODWORTH, ESQ.,
      For the Defendants

18

19
      SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC
20    One Gateway Center - 13th Floor
      Newark, NJ 07102-5311
21    BY:  ARNOLD B. CALMANN, ESQ.,
          JEFFREY SOOS, ESQ.,
22    For the Defendants

23

24

25
```

3

1        THE COURT: Ortho-McNeil Pharmaceutical vs. Mylan.

2    Can I have appearances by counsel please.

3        MR. ROPER: For Ortho-McNeil, Harry Roper, Aaron

4    Barlow and Eric Lohrenz.

5        MR. MIDDLETON: And also John Middleton from

6    Lowenstein Sandler, your Honor.

7        THE COURT: Good morning.

8        MR. CALMANN: Arnold Calmann, Saiber, Schlesinger,

9    Satz & Goldstein, for the defendants, Mylan, and with, me

10   your Honor, are my co-counsel David Harth and Shannon

11   Bloodworth from the Heller Ehrman firm.

12       THE COURT: Good morning to you. We will first

13   take the motion to dismiss the willful infringement claim

14   I'll hear from counsel for movant.

15       MR. HARTH: Thank you, your Honor. The motion

16   simply asks the Court to apply recent binding Federal

17   Circuit precedent that the filing of an ANDA application or

18   certification cannot support a finding of willful

19   infringement.

20       The Federal Circuit in the Glaxo case held that

21   wilfulness cannot provide the basis for the filing of an

22   ANDA certification, cannot provide the basis for a

23   wilfulness claim.

24       The plaintiffs here have contended that Glaxo does

25   not apply because in that case the defendant had not filed a

4

1   Paragraph 4 certification, which is what happened here, but

2   the Federal Circuit crafted its holding in Glaxo

3   specifically to cover Paragraph 4 certifications.

4        In that case the Federal Circuit held, quote, "The

5   mere fact that a company has filed an ANDA application or

6   certification cannot support a finding of willful

7   infringement for the purpose of awarding attorney's fees

8   pursuant to 35 U.S.C. Section 271", and the Federal Circuit

9   did so on the basis of the Yamanouchi case, which was a

10  Paragraph 4 certification.

11       Since the Federal Circuit's decision in Glaxo, the

12  precise issue that's presented here was decided by the

13  District of Massachusetts in Aventis vs. King

14  Pharmaceuticals, and prior to the last hearing we had sent

15  Judge Cooper a letter with that case.  Is that in the

16  Court's file?

17       THE COURT:  I do have the Aventis vs. Cobalt

18  Pharmacy.

19       MR. HARTH:  Well, Aventis rejected the very

20  argument that Ortho-McNeil is making here holding that the

21  words "or certification" in the Federal Circuit's Glaxo

22  decision was not mere surplusage, that it did cover

23  Paragraph 4 certification cases, and for that reason there

24  could be no willfulness claim in a Paragraph 4 certification

25  case, either.

5

1       We think that the District of Massachusetts got it

2   right. We think that the Federal Circuit's language is

3   unambiguous in that regard and for that reason, the

4   willfulness claim should be dismissed.

5       THE COURT: Let me hear from counsel for the

6   plaintiffs.

7       MR. ROPER: Harry Roper for the plaintiffs, your

8   Honor. I think that our position on this Glaxo case is not

9   controlling. This has not been definitively ruled upon by

10   the Federal Circuit because in Glaxo there was no Paragraph

11   4 certification.

12       Here our whole contention is that the Paragraph 4

13   certification is so baseless and the lawsuit is so baseless

14   that the infringement which is virtually admitted is

15   willful.

16       The Massachusetts case that they cite, of course,

17   is not precedential because the Federal Circuit hasn't ruled

18   on it. So, that being said, your Honor, this is a bench

19   trial. I think this law may develop further in the Federal

20   Circuit and my suggestion is that your Honor defer this

21   entire thing and we see how that law develops.

22       Basically, our contention here is that in light of

23   this case, we are entitled to attorney's fees one way or the

24   other in this case and either it's willful infringement or

25   it's under the statute and we are entitled to them. And we

6

1   are entitled to discovery.  Whether that discovery gets

2   bifurcated or not is not important.  But I think

3   fundamentally we don't see any reason why there can't be a

4   willful infringement case in ANDA litigation.

5        THE COURT:  So, your argument is that the Fed

6   Circuit's opinion in Glaxo vs. Apotex, where they say,

7   quote, "Consequently, as suggested by Yamanouchi, we now

8   hold that the mere fact that a company has filed an ANDA

9   application or certification cannot support a finding of

10  willful infringement for purposes of awarding attorney's

11  fees pursuant to 35 U.S.C. Section 271(e)(4).  The Supreme

12  Court has emphasized that 35 U.S.C. Section 271(e)(2) and 35

13  U.S.C. Section 271(e)(4) create a 'artificial act of

14  infringement' only for a 'very limited and technical

15  purpose' that relates only to certain drug applications."

16       MR. ROPER:  Two reasons.

17       THE COURT:  Why would a poor soul like me working

18  in the trenches conclude that the Federal Circuit didn't

19  mean what they said there?

20       MR. ROPER:  They did mean what they said there.

21       THE COURT:  Okay.

22       MR. ROPER:  And they say the mere fact that you

23  filed ANDA, that's different than filing a baseless ANDA,

24  number one, and it's certainly different than filing a

25  baseless Paragraph 4 certification, which they didn't even

7

1　deal with in that case, so, our facts are different than

2　Glaxo for those two reasons, your Honor.

3　　　　THE COURT: Okay. I must tell you that as

4　interesting as I find your argument, I find that it goes

5　fundamentally against the underlying rationale of the Fed

6　Circuit's decision in the Glaxo case.

7　　　　Their emphasis was on the fact that this whole

8　Hatch-Waxman process exists for a very limited purpose of

9　creating a technical infringement so that a case or

10　controversy under the Constitution can exist whereby United

11　States district courts and other folk who decide these cases

12　can actually decide whether or not the proposed generic

13　drug, if manufactured, would infringe. And as I read the

14　Glaxo case, it's saying where the whole reason that we, in

15　fact, permit a case to go forward as an infringement case

16　because of this technical infringement is to permit the

17　matter to be decided before the drug gets on the market;

18　that the mere filing of that ANDA application or

19　certification can't constitute a willful infringement.

20　　　　What the court in Glaxo makes clear, as I

21　understand, is that doesn't mean that the plaintiff can't

22　apply for attorney's fees but they're not applying for

23　attorney's fees on the basis of a willful infringement.

24　They're applying for attorney's fees on the basis of it

25　being, I believe it would be an extraordinary case. Is that

8

1  correct?

2      MR. ROPER:  Yes, your Honor, that's correct.

3      THE COURT:  And as I understand it, in Glaxo they

4  said, go ahead, go for it under that standard but not under

5  a willful infringement standard.  Correct?

6      MR. ROPER:  Yes, your Honor.  Except that they

7  didn't deal, as I said, with the specific facts that we have

8  here.

9      THE COURT:  Go ahead.  I'm sorry.

10     MR. ROPER:  And your Honor, and indeed, as I said,

11  that our only position here is to preserve our right to seek

12  those attorney's fees one way or the other and, to be quite

13  frank, your Honor, if your Honor would permit, we would

14  withdraw the actual willfulness claim as long as we're

15  permitted to continue to seek discovery and continue to

16  pursue the claim under the statute.

17     THE COURT:  Well, there's no doubt that you can

18  seek to pursue attorney's fees under an extraordinary case

19  standard, I must tell you, all right, but -- and I

20  understand exactly where you're going, all right, and the

21  short answer is no.  Okay.

22     I will tell you, if the issue is can we engage in

23  all sorts of discovery for a willful infringement standard

24  because -- let me put it this way -- because if willful

25  infringement stays in the case, then they're going to assert

9

1    a defense of reasonable reliance of advice of counsel and

2    then we can say we get the right to take a look at all your

3    opinion letters and so on and so forth because there's a

4    reliance on advice of counsel defense.  Correct?

5         MR. ROPER:  Your Honor, can I make a comment on

6    that specifically?

7         THE COURT:  Yes.

8         MR. ROPER:  It's a good point.  Your Honor, there

9    is a dispute right now, a discovery dispute with regard to

10   whether we are entitled to get their counsel's opinion for

11   this reason; that during testimony there was a lot of -- I

12   don't want to argue the motion to get the opinion --

13        THE COURT:  That's good because the magistrate

14   judge is going to be hearing that particular application.

15        MR. ROPER:  And we are going to present -- and we

16   will present that to her.  It's been discussed by the

17   parties but we are going to be presenting it to her and

18   that's for that.  So, and we are satisfied to live with that

19   ruling.

20        I'm not seeking anything other than that.  We would

21   be happy to live with that ruling without regard to

22   willfulness, simply with regard to waiver.

23        THE COURT:  Okay.  First, I'm satisfied that

24   Glaxo's language is not mere surplusage and to the extent

25   that the Glaxo opinion contains the word "or certification"

10

1   is dicta. The Court will regard it as dicta which gives a

2   very clear and forceful direction to the district court as

3   to how the Federal Circuit views this particular claim.

4       The Court is satisfied that the Glaxo opinion of

5   the Fed Circuit, indeed, as interpreted by U.S. District

6   Court for the District of Massachusetts in Aventis Pharma

7   Deutschland GMBH and King Pharmaceuticals vs. Cobalt

8   Pharmaceuticals reported at 2005 Westlaw 289835, in fact,

9   correctly interprets Glaxo and the willful infringement

10  claim is dismissed. Okay.

11      And by the way, what I was saying is that I

12  sometimes sit and for some reason I'm amazed at what is

13  almost a prurient interest which patent counsel have in

14  looking at the opinions of each other and while I understand

15  the curiosity, the Court nevertheless does not have to

16  encourage it. Okay.

17      MR. ROPER: Thank you, your Honor.

18      THE COURT: Now, we've got a motion for summary

19  judgment. Correct?

20      MR. HARTH: We do, your Honor.

21      THE COURT: All right. And in the first instance

22  that hinges on a Markman interpretation. Correct?

23      MR. HARTH: Yes, your Honor.

24      THE COURT: Okay. Let me hear you.

25      MR. HARTH: This basically is the Markman part of

*In re:* '318 Patent Infringement Litigation,
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT H
# to Mylan's Rule 12(c) Motion:

*Aptargroup, Inc. v. Owens-Illinois, Inc.,*
No. 02 C 5058, 2003 WL 21557632
(N.D. Ill. July 3, 2003)

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 21557632 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

▷

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
APTARGROUP, INC., Plaintiff,
v.
OWENS-ILLINOIS, INC. and Armin Tool and
Manufacturing Co., Defendants.
**No. 02 C 5058.**

July 3, 2003.

MEMORANDUM OPINION AND ORDER

MORAN, Senior J.
**\*1** Defendants move to bifurcate the issues of
liability and willfulness for purposes of discovery
and trial. That motion is granted.

The parties agree on one thing: bifurcation is within
the sound discretion of the court. Each marshalls a
number of cases in support of its opposing position,
with defendants seeking bifurcation and plaintiff
opposing it. A review of those cases discloses such
varied circumstances that an extended analysis of
each case serves little purpose. A few observations
will suffice. The Federal Circuit encourages
bifurcation when a party is faced with what has
come to be known as the "Quantum dilemma": a
choice between the lawful assertion of the
attorney-client privilege and avoidance of a
willfulness finding if infringement is found.
*Quantum Corp. v. Tandon Corp.,* 940 F.2d 642
(Fed.Cir.1991). The support from some of the
professional literature is even stronger. The district
courts are reluctant to bifurcate, however, if there is
not a good reason to bifurcate damages as well, or it
is uncertain that the party faces the "Quantum
dilemma," or legal advice becomes relevant for
other reasons, or prior rulings establish that the
patent holder has a strong liability case (although
this last reason appears to be somewhat of a

make-weight). They divide as to whether or not
intent can ever be relevant to a non-infringement
defense.

Here the "Quantum dilemma" is raised by the
submission of attorney opinion letters *in camera.*
The issue of damages has already been bifurcated,
there appears to be no reason why legal advice
would be relevant to any issue other than
willfulness, and plaintiff's liability case has taken a
real hit from this court's *Markman* construction.
Finally, we think there is a basis for believing that
an "intent" issue mixed up with an infringement
issue will have a tendency to confuse and possibly
prejudice the jury, without any real relevant
evidence benefit.

N.D.Ill.,2003.
Aptargroup, Inc. v. Owens-Illinois, Inc.
Not Reported in F.Supp.2d, 2003 WL 21557632
(N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 23419339 (Trial Motion, Memorandum
and Affidavit) Agreed Motion for Disposition of
Restricted Documents (Oct. 06, 2003)
• 2003 WL 23419335 (Trial Motion, Memorandum
and Affidavit) Plaintiff Aptargroup's Motion to Set
A Scheduling Order (Jul. 08, 2003)
• 2003 WL 23419336 (Trial Motion, Memorandum
and Affidavit) Plaintiff Aptargroup's Motion to
Strike Defendants' Affirmative Defenses (Jul. 08,
2003)
• 2003 WL 23419333 (Trial Motion, Memorandum
and Affidavit) Defendants' Memorandum in
Support of Motion to Bifurcate Issues of Liability
and Willfulness (Jun. 04, 2003)
• 2003 WL 23419334 (Trial Motion, Memorandum
and Affidavit) Plaintiff Aptargroup's Brief
Opposing Bifurcation of Willfulness from Liability
(Jun. 04, 2003)
• 2003 WL 23816942 (Trial Motion, Memorandum
and Affidavit) Defendants' Memorandum in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 21557632 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Support of Motion to Bifurcate Issues of Liability and Willfulness (Jun. 04, 2003)
• 2003 WL 23816944 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Brief Opposing Bifurcation of Willfulness From Liability (Jun. 04, 2003)
• 2003 WL 23816940 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply in Support of Its Motion to Compel Disclosure of Valve Measurement Data (May. 19, 2003)
• 2003 WL 23419330 (Trial Motion, Memorandum and Affidavit) Agreed Motion and Proposed Order Moving by One Day the Time to File Status Reports, and to Reschedule the Status Hearing (May. 02, 2003)
• 2003 WL 23419323 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Reply Brief on Claim Construction (Feb. 25, 2003)
• 2003 WL 23419327 (Trial Motion, Memorandum and Affidavit) Defendants' Response Brief Regarding Claim Construction (Feb. 25, 2003)
• 2003 WL 23816934 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Reply Brief on Claim Construction (Feb. 25, 2003)
• 2003 WL 23816935 (Trial Motion, Memorandum and Affidavit) Defendants' Response Brief Regarding Claim Construction (Feb. 25, 2003)
• 2003 WL 23419318 (Trial Motion, Memorandum and Affidavit) Defendants' Initial Brief Regarding Claim Construction (Feb. 04, 2003)
• 2003 WL 23419320 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Opening Brief on Claim Construction (Feb. 04, 2003)
• 2002 WL 32674603 (Trial Motion, Memorandum and Affidavit) Plaintiff Aptargroup's Response to Defendants' Status Report (Dec. 02, 2002)
• 2002 WL 32452958 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Compel Production of 30(b)(6) Witnesses (Oct. 25, 2002)
• 2002 WL 32674594 (Trial Pleading) Armin Tool and Manufacturing Co.'s Answer and Affirmative Defenses (Aug. 27, 2002)
• 2002 WL 32674587 (Trial Pleading) Owens-Illinois, Inc.'s Answer and Affirmative Defenses (Aug. 21, 2002)
• 2002 WL 32674578 (Trial Pleading) Complaint for Patent Infringement (Jul. 17, 2002)
• 1:02CV05058 (Docket) (Jul. 17, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*In re: '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT I
# to Mylan's Rule 12(c) Motion:

*Sage Prods., Inc. v. Devon Indus., Inc.,*
No. 93-2403 RG(CTX),
1994 WL 791601 (C.D. Cal. Jan. 25, 1994)

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1994 WL 791601 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,C.D. California
SAGE PRODUCTS, INC., Plaintiff,
v.
DEVON INDUSTRIES, INC., Defendant.
**CV 93-2403 RG (CTX).**

Jan. 25, 1994.

William M. Lee, Jr., Jeffrey Robert Gray, Lee
MannSmith McWilliams, Sweeney & Ohlson,
William T. Cahill, Phelan Pope Cahill & Devine,
Chicago, IL, for plaintiff.
Robert C. Weiss, Kenneth H. Ohriner, David A.
Randall, Lyon & Lyon, Los Angeles, CA, Mitchell
D. Raup, Mayer Brown & Platt, Eric F. Greenberg,
George Edward Bullwinkel, Bullwinkel Partners
Ltd., Chicago, IL, for Devon Indus. Inc.

Memorandum and Order Granting Defendant's
Motionfor Partial Summary Judgment and Motion
for Bifurcation.

GADBOIS, District Judge.

*I. Background*

**\*1** Plaintiff Sage Products, Inc. ("Sage") produces
receptacles for safe disposal of used syringes,
scalpels, and other hazardous medical waste, called
"sharps disposal containers". Sage owns U.S. Patent
Re 33,413 ('413), which covers the disposal
container shown in Figure 1.



**Figure 1**

As Figure 2 shows, the '413 system consists of an
outer enclosure and an inner container. The outer
enclosure is a simple box structure, permanently
mounted on a hospital wall, with a swinging door.
When the door is open, hospital staff can place the
inner container inside the outer enclosure.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 791601 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**



**Figure 2**

When the inner container is in place and the outer enclosure door closed, hospital staff drop sharps and other medical waste through the opening in the outer enclosure. Once the inner container is full, it is removed, and then usually autoclaved (heated under pressure) to neutralize infectious waste, or simply incinerated. Figure 3, taken from a Sage brochure, shows how the system is used.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 791601 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**



**Figure 3**

Defendant    Devon    Industries,    Inc.    ("Devon")

manufactures    inner    containers    compatible    with
Sage's '413 system. Sage alleges that Devon
contributorily infringes the '413 patent by selling

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 791601 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

replacement inner containers to hospitals. On January 10, 1994, Devon moved for partial summary judgment, contending that its inner containers are used for permissible repair, not infringing reconstruction, of the '413 system.

Devon also moved for bifurcation, seeking to have the issues of damages and willfulness tried separately from the issues of validity and infringement.

## II. *Jurisdiction*

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338(a).

## III. *Analysis*

### a. *Defendant's Motion for Summary Judgment.*

Replacement of worn or spent parts of a patented combination is permissible repair of the combination, not infringing reconstruction. *Everpure, Inc. v. Cuno, Inc.,* 875 F.2d 300, 303 (Fed. Cir. 1989), *cert. denied,* 493 U.S. 853 (1989); *Porter v. Farmers Supply Serv., Inc.,* 790 F.2d 882, 886 (Fed. Cir. 1986). Defendant argues that once the inner containers are filled with waste, they are spent. Therefore, it contends, replacing the containers is permissible repair of the '413 system, not infringement. *See Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 341 (1961); *Everpure,* 875 F.2d at 303 (holding that replacement of a disposable cartridge, which housed a filter, constituted repair, not reconstruction).

Sage replies that the inner container is neither spent nor worn when it is filled with waste, but rather merely in need of emptying. Hanifl aff. ¶ 5. Sage contends that filled inner containers are perfectly salvageable, and therefore, replacing them is impermissible *reconstruction* of the '413 combination.

This Court rejects this argument. Emptying and reusing filled inner containers defeats the purpose

of the '413 combination -- safe disposal of hazardous waste. Sage itself recognizes this, and encourages their customers to dispose of the inner containers for safety's sake. Hanifl Dep. 119:11-22. In fact, Sage's own inner containers are labeled " Single Use Only", and ominously warn of the biohazard within. See Figure 4.



**Figure 4**

**\*2** By its own estimate, Sage's safety campaign has been successful: "90 something percent" of the inner containers are destroyed and replaced after their first use. Hanifl Dep. 119:12-15. That some users may imprudently empty and reuse the inner containers does not, without more, create a genuine issue of material fact. The Federal Circuit has not said that a component is spent only when it is *impossible* to continue to use it. Rather, the Federal Circuit suggests that a component is spent when continued use is "neither practical nor feasible".

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1994 WL 791601 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

*Everpure,* 875 F.2d at 303. Given the extremely hazardous nature of this medical waste, not to mention Sage's safety-conscious efforts to encourage disposal of filled inner containers, a reasonable jury *must* conclude that filled inner containers are spent within the meaning of *Everpure.* FN1 Therefore, this Court finds that replacing inner containers is permissible repair of the '413 combination. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986) ("[T]here must be evidence on which the jury could *reasonably* find for [the opposing party]."). Since the hospitals are not directly infringing the '413 patent, defendants are not liable for either contributory nor induced infringement; thus, this Court GRANTS defendant's motion for partial summary judgment. *Aro,* 365 U.S. at 341; *Everpure,* 875 F.2d at 302; *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed. Cir. 1986). FN2

### b. *Devon's Motion for Bifurcation.*

### 1. *Liability and Willfulness.*

To defend against Sage's charge of willful infringement, Devon intends to rely on several attorney opinion letters. *See* Devon's Exh. A, B, C. Devon is trapped in a catch-22, however. These letters detail Devon's tactical defenses and legal strategies. Thus, if this case is not bifurcated, Devon will be forced to either waive the attorney-client privilege early in the litigation, or retain the privilege and expose itself to a charge of willfulness. To avoid this dilemma, Devon asks this Court to separate the willfulness issue from the issues of validity and infringement under F.R.Civ.P. 42 (b), which allows bifurcation "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." The Federal Circuit encourages bifurcation in these cases, noting that the issue is of "great importance not only to the parties but to the fundamental values

sought to be preserved by the attorney-client privilege." *Quantum Corp. v. Tandon Corp.,* 940 F.2d 642, 643-44 (Fed. Cir. 1991). *See also Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1572 (Fed. Cir. 1988) (dicta) (suggesting that bifurcation "may be useful in meeting the attorney-client privilege problem").

**\*3** A brief *in camera* review of Devon's opinion letters demonstrates that Devon does indeed face the dilemma discussed in *Quantum.* Although bifurcation may result in some duplication of effort, it will allow Devon to retain the privilege without sacrificing its willfulness defense. Therefore, this Court GRANTS Devon's motion, and orders a separate trial on the issue of willfulness.

### 2. *Liability and Damages.*

Devon also moves to bifurcate trial of infringement and damages. Devon argues that bifurcation of liability and damages will save effort if Devon prevails on liability, and will avoid confusing the issues. Sage responds that bifurcation will result in duplication and delay. They note that proof of damages and liability overlap. For instance, Sage will use Devon's sales figures to prove commercial success, which in turn proves nonobviousness. These sales figures, of course, are relevant to prove Sage's damages as well.

However, since willfulness and damages can be combined into a single proceeding, bifurcating damages and liability carries little marginal cost. The overlap cited by Sage is minimal, and bifurcation will limit jury confusion and avoid needless work if Devon prevails at the liability stage. Consequently, this Court GRANTS Devon's motion to bifurcate damages and liability. Damages and willfulness will be tried together.

### IV. *Conclusion*

There is no genuine issue as to the nature of inner container replacement -- it is repair, not reconstruction. Therefore, this Court GRANTS defendant's motion for partial summary judgment;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1994 WL 791601 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

defendant has not contributorily infringed or
induced infringement of U.S. Patent No. Re. 33,413
. Devon has also demonstrated that a separate trial
of the willfulness and damage issues is appropriate;
therefore, this Court GRANTS Devon's motion for
bifurcation; the issue of liability for patent
infringement is bifurcated from the issues of
damages and willful infringement. Liability will be
tried first. Discovery of Devon's opinion of counsel
is stayed until further order.

IT IS SO ORDERED.

> FN1. At least one recent case supports this
> conclusion. In *Surgical Laser*
> *Technologies, Inc. v. Surgical Laser*
> *Products, Inc.,* 25 USPQ.2d 1806 (D. Pa.
> 1992), plaintiff sued for infringement of its
> patent covering a two-piece disposable
> laser delivery system, used in laser
> surgery. Plaintiff encouraged customers to
> discard one of the components after
> surgery, thereby reducing the chance of
> infection. *Id.* at 1807. While it was not
> *impossible* to reuse both components of the
> system, the court held that replacing the
> delivery system was repair, not
> reconstruction. *Id.* at 1808-09.

> FN2. Granting defendant's motion
> promotes public safety. If this Court held
> that replacing inner containers is
> reconstruction, Sage would have a
> monopoly (albeit a legal one) over the
> inner container market. However, since
> replacing filled inner containers is
> permissible repair, the market for inner
> containers will be competitive. With
> competitive prices, more consumers will
> replace filled inner containers rather than
> risk emptying and reusing them.

C.D.Cal. 1994
Sage Products, Inc. v. Devon Industries, Inc.
Not Reported in F.Supp., 1994 WL 791601
(C.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 2:93cv02403 (Docket) (Apr. 26, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*In re:  '318 Patent Infringement Litigation,*
*C.A. No. 05-356 (KAJ) (consolidated) (D. Del.)*

# EXHIBIT J
# to Mylan's Rule 12(c) Motion:

*aaiPharma, Inc. v. Barr Labs., Inc.*,
No. 7:01-CV-150-F1, slip op.
(E.D.N.C. Sept. 9, 2002)

F I L E D

SEP 9 2002

DAVID ... CLER...
U.S. ...
E. ... ...

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

aaiPHARMA, INC.,                  )
          Plaintiff,              )
                                  )
     v.                           )    Civil Action No. 7:01-CV-150-F1
                                  )
BARR LABORATORIES, INC.,          )    Exxob #27,05·4
PAR PHARMACEUTICAL, INC., DR.     )
REDDY'S LABORATORIES, LTD., and   )
REDDY-CHEMINOR, INC.,             )
          Defendants.             )

───────────────────────────────

aaiPHARMA, INC.,                  )
          Plaintiff,              )
                                  )
     v.                           )    Civil Action No. 7:01-CV-202-F1
                                  )
BARR LABORATORIES, INC.,          )
PAR PHARMACEUTICAL, INC., DR.     )
REDDY'S LABORATORIES, LTD., and   )
REDDY-CHEMINOR, INC.,             )
          Defendants.             )

───────────────────────────────

aaiPHARMA, INC.,                  )
          Plaintiff,              )
                                  )
     v.                           )    Civil Action No. 7:01-CV-208-F1
                                  )
BARR LABORATORIES, INC.,          )
PAR PHARMACEUTICAL, INC., DR.     )
REDDY'S LABORATORIES, LTD., and   )
REDDY-CHEMINOR, INC.,             )
          Defendants.             )

## ORDER

This matter is before the court upon the following motions:[1]

───────────────────────

[1]  "DE # __" refers to the docket number of the document in the lead case file,
No. 7:01-CV-150-F1.



(1) by Barr Laboratories, Inc. ("Barr") (DE # 54)[2]

    (a)  to bifurcate aaiPHARMA's (DE-54-1)
        (i)  willful infringement and damages claim from
        (ii)  the patent issues of validity, enforceability and infringement; and
    (b)  to stay discovery as to the willful infringement and damages claims.
        (DE #54)

(2) by aaiPHARMA

    (a)  to bifurcate (DE # 63-1)
        (i)  all patent related claims, defenses and counter-claims from
        (ii)  Barr's state law counter-claims; and
    (b)  to stay discovery as to the state law counter-claims (DE #63-2).

The issues have been fully briefed, and the motions are ripe for disposition.

The court views these motions as addressing case-management -- rather than substantive -- issues, and therefore deems it neither necessary nor productive to expend judicial resources producing a detailed written order. Rather, having fully and carefully considered the arguments presented by the parties, the court is persuaded on the facts of the instant case that in order to avoid jury confusion, the possibility of unfair prejudice to the parties' litigation rights, prejudice impacting from the resolution of state law claims upon the determination of patent issues, and to enhance the possibility of settlement, the following bifurcation is warranted:

It hereby is ORDERED that this litigation is BIFURCATED into two phases.

**Phase I** will resolve the issues of patent validity, enforceability, and infringement only.

---

    [2]  Barr's co-defendants Par Pharmaceutical, Inc., Dr. Reddy's Laboratories, Ltd., and Reddy-Cheminor, Inc. join in Barr's motion. *See* DE #66; DE #73.

**Phase II** will resolve the willfulness of such infringement, if any, as has been determined in Phase I, as well as the damages, if any, arising therefrom. Phase II also will address all state law claims asserted by defendants (unfair trade practices, tortuous contractual interference, and damages arising therefrom).

It further is ORDERED that discovery is STAYED *as to the issue of willful infringement only*; discovery relating to all other matters at issue shall proceed according to the rules and schedules applicable in this court and to this case. The Clerk of Court is DIRECTED to schedule and notice the trial of all Phase II issues approximately six months following the conclusion of Phase I.

Therefore, Barr's Motion to Bifurcate and to Stay Discovery **(DE #54)** is ALLOWED in part and DENIED in part, as set forth in detail herein. Similarly, aaiPHARMA's Motion to Bifurcate and to Stay Discovery **(DE #63)** is ALLOWED in part and DENIED in part, as set forth in detail herein.

SO ORDERED.

This the ___9___ day of September, 2002.

_James C. Fox_
James C. Fox
Senior United States District Judge

3