IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: '318 PATENT | ) | C.A. No. 05-356-KAJ |
| INFRINGEMENT LITIGATION | ) | (consolidated) |
|  | ) |  |

### NOTICE OF DEPOSITION UNDER FED. R. CIV. P. 30(b)(6) TO PAR PHARMACEUTICALS, INC. AND PAR PHARMACEUTICAL COMPANIES, INC.

**PLEASE TAKE NOTICE** that on April 4, 2006 commencing at 9:00 a.m., at the offices of Covington & Burling, 1201 Pennsylvania Avenue, N.W., Washington, D.C. 20004, Plaintiffs Janssen Pharmaceutica N.V., Janssen, L.P. and Synaptech, Inc. (collectively, "Plaintiffs" or "Janssen") will take the deposition upon oral examination of Defendants Par Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc. (collectively, "Par") pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. This deposition upon oral examination will be conducted before an officer authorized to administer oaths and will be recorded by stenographic and videographic means.

Plaintiffs serve this Notice without waiver of its objections to the deficiencies in Par's document production and other discovery responses concerning the subject matter of the instant Notice, and reserve the right to continue this deposition as necessary in light of any subsequent document production by Par.

Plaintiffs will take this deposition upon oral examination through one or more officers, directors, managing agents or other persons designated by Par pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure as the person(s) knowledgeable to testify on Par's behalf concerning the topics identified in Schedule A. Par is requested to provide counsel for Plaintiffs with the identity of the individual(s) who will testify regarding each topic at least

one week in advance of the deposition. The deposition will continue from day to day until

completed with such adjournments as to time and place as may be necessary. You are invited to

attend and examine the witness(es).

ASHBY & GEDDES

/s/ Lauren E. Maguire

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Janssen Pharmaceutica N.V.,
Janssen, L.P., and Synaptech, Inc.*

*Of Counsel:*

George F. Pappas
Roderick R. McKelvie
Christopher N. Sipes
Jeffrey B. Elikan
Laura H. McNeill
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: 202-662-6000
Fax: 202-662-6291

Steven P. Berman
Office of General Counsel
Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Tel: 732-524-2805
Fax: 732-524-5866

Dated: February 21, 2006
166729.1

## SCHEDULE A

### Definitions

  1. As used herein, "Par" shall mean Defendants Par Pharmaceuticals, Inc. and Par Pharmaceuticals Company, Inc. and all of Par's corporate parents, corporate predecessors and past or present subsidiaries, affiliates, divisions, departments, officers, directors, principals, agents and employees.

  2. As used herein, "Par's ANDA" shall mean Par's Abbreviated New Drug Application Number 77-604.

  3. As used herein, "the Generic Product" shall mean the proposed generic galantamine product that is the subject of Par's ANDA.

  4. As used herein, "the '318 patent" shall mean United States Patent No. 4,663,318.

  5. As used herein, "document" shall have the full meaning ascribed to it by the Federal Rules of Civil Procedure and shall include any means for retaining information.

  6. As used herein, "FDA" shall mean the United States Food and Drug Administration.

  7. As used herein, "Paragraph IV notice" refers to Par's May 17, 2005 letter to Plaintiffs attached hereto as Exhibit 1.

  8. "Person" and "persons" mean any natural person and any business, legal, corporate, or governmental entity, association, or organization.

9.    "Alzheimer's Disease" means any diagnosis, illness, or ailment described as being of the Alzheimer's type, including without limitation Senile Dementia of the Alzheimer's Type, and/or Alzheimer's Dementia.

10.    "Galantamine" includes without limitation galantamine, galanthamine, and any salt of galatamine, such as galantamine hydrobromide.

## Topics of Examination

1. Par's Paragraph IV notice including, without limitation, the meaning of, basis for, and any evaluation or analysis concerning the statement set forth in the letter that "the claims of the '318 patent are invalid as anticipated/obvious."

2. Par's Paragraph IV notice including, without limitation, the meaning of, basis for, and any evaluation or analysis concerning the statement set forth in the letter that "all of the claims of the '318 patent are anticipated by Bhasker, 'Medical Management of Dementia.'"

3. The circumstances under which Par first became aware of the P.A. Bhasker article cited in Par's Paragraph IV notice, *Medical Management of Dementia*, including how Par learned of it, who was involved in this first awareness, and any evaluation conducted of it by or on behalf of Par, then or subsequent to the time Par became aware of it.

4. Any evaluation, consideration or discussion conducted by Par to develop the Generic Product, including the names and responsibilities of all persons who were involved in the evaluation, consideration or discussion by Par to develop the Generic Product.

5. The decision to file an application with the FDA seeking approval to manufacture and sell a drug product containing galantamine.

6. Any evaluation, consideration or discussion conducted by Par to market the Generic Product, including the names and responsibilities of all persons who were involved in the evaluation, consideration or discussion by Par to market the Generic Product.

7. The benefits, including revenues and profits, that Par projects, anticipates, expects, or forecasts it will obtain should Par's ANDA receive approval from the FDA.

8. Marketing strategies, marketing plans, and projected sales for Par's Generic Product.

9. Each and every contribution and/or input that Par, or any employee or agent of Par, has made to the preparation, decision to file, filing and/or prosecution of Par's ANDA, including: (a) any information relating to regulatory procedures and strategies for obtaining regulatory approval of the Generic Product of Par's ANDA; (b) any information comprising, relating to or contained in the 21 U.S.C. § 355(j)(2)(A)(vii)(IV) certifications submitted in connection with Par's ANDA; and (c) any information comprising, relating to or contained in the statements of factual and legal basis for invalidity, unenforceability, and/or noninfringement included with the notice of these certifications.

10. The factual basis for Par's proposed assertion that Par's ANDA is indicated for the treatment of mild to moderate Alzheimer's disease.

11. The circumstances in which Par first became aware of galantamine as a treatment for Alzheimer's disease, including but not limited to the date on which this occurred and the people involved.

12. The circumstances in which Par first became aware of the '318 patent, including but not limited to the date on which this occurred and the people involved.

13. Any consideration or evaluation by Par to develop a drug product containing galantamine for the treatment of Alzheimer's Disease.

14. Identification of all individuals, whether employees of Par or third parties, having a role in the consideration or evaluation by Par to develop a drug product containing galantamine for the treatment of Alzheimer's disease that is the subject of Topic 13, and a description of those roles.

15.    Any effort by Par to develop any drug product other than the Generic Product set forth in Par's ANDA.

16.    Identification of all individuals, whether employees of Par or third parties, having a role in the research, development or testing of such a treatment responsive to Topic 15, and a description of those roles.

17.    The factual and legal bases for Par's Second Affirmative Defense that each claim of the '318 patent is invalid for failure to satisfy one or more sections of 35 U.S.C. sections 101, 102, 103, 112 and 116.

18.    The factual and legal bases for Count I of Par's Counterclaim that all the claims of the '318 patent are invalid for failure to satisfy one or more sections of 35 U.S.C. sections 101, 102, 103, 112 and 116 according to its proof elements, including an element-by-element comparison of each asserted claim of the '318 patent to the prior art Par relies upon and the motivation of one of skill in the art to combine any references under 35 U.S.C. §103, as well as a description of any non-prior art defenses such as lack of enablement, insufficient written description, failure to disclose best mode, or claim indefiniteness under 35 U.S.C. § 112.

19.    The identity and location of documents and things concerning the foregoing topics.

20.    Par's document retention policies from 1986 to the present.

21.    Persons knowledgeable about the subject matter of the foregoing topics.

166729.1

# EXHIBIT 1



RECEIVED
MAY 2 5 2005
L & P LLP

May 17, 2005

<u>Via Registered Mail – Return Receipt Requested</u>

General Counsel
Janssen Pharmaceutica
1125 Trenton-Harbourton Road
Titusville, New Jersey 08560

Synaptech Inc.                          Correspondence name and address:
225 Broadway, 42nd Floor               John Richards
C/o Schwartz & Salomon                 Ladas & Parry
New York, New York 10007               26 West 61 Street
                                        New York, New York 10023

                                        Correspondence name and address:
Janssen Pharmaceutica N.V.             Audley A. Ciamporcero, Jr.
Turnhoutseweg 30B-2340                 Johnson & Johnson
Beerse Country, BELGIUM                One Johnson & Johnson Plaza
                                        New Brunswick, NJ 08933-7003

Re:  Par Pharmaceutical, Inc.
     Notice of Paragraph IV Certification
     U.S. Patent Nos. 4,663,318; 6,099,863; and 6,358,527
     <u>Galantamine Hydrobromide</u>

Dear Sirs or Madams:

        Pursuant to 21 U.S.C. § 355(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act (the
"Act") and 21 C.F.R. §§ 314.94 and 314.95, Par Pharmaceutical, Inc. ("Applicant" or "Par")
hereby provides the following information concerning U.S. Patent Nos. 4,663,318 ("the '318
patent"); 6,099,863 ("the '863 patent"); and 6,358,527 ("the '527 patent"):

        1.      Applicant has submitted to the United States Food and Drug Administration
("FDA") an Abbreviated New Drug Application ("ANDA") which contains any required
bioavailability or bioequivalence data or information, and which seeks approval to engage in the
commercial manufacture, use and sale of galantamine hydrobromide; oral ("Par's proposed
product") before the expiration date of the '318 patent, the '863 patent and the '527 patent.

        2.      The ANDA number is ANDA 77-604.

May 17, 2005
Page 2



3.    The established name as defined in § 352(e)(3) of the Act of the proposed drug product is "galantamine hydrobromide tablet; oral; 4 mg base," "galantamine hydrobromide tablet; oral; 8 mg base," and "galantamine hydrobromide tablet; oral; 12 mg base."

4.    The active ingredient of the proposed drug product is galantamine hydrobromide; the strengths are 4 mg, 8 mg and 12 mg, and the dosage form is a tablet.

5.    The '318 patent, '863 patent and the '527 patent were identified to the FDA pursuant to 21 U.S.C. § 355(b)(1). The '318 patent's expiration date is December 14, 2008; and the '863 patent and the '527 patent's expiration dates are each June 6, 2017. No valid claim of the '318 patent, the '863 patent, or the '527 patent will be infringed by the manufacture, use or sale of the product for which the application has been submitted by Applicant.

6.    Pursuant to 21 U.S.C. § 355(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act (the "Act") and 21 C.F.R. §§ 314.94 and 314.95, a detailed statement of the factual and legal bases of Applicant's opinion is attached as Exhibit 1. The detailed statement is being made in accordance with the Act, and Applicant does not waive any attorney-client privilege in providing this statement.

An Offer of Confidential Access to ANDA 77-604, in accordance with 21 U.S.C. § 355(j)(5)(C)(i)(III), is attached as Exhibit 2.

For the attached reasons, neither the '318 patent, the '863 patent, nor the '527 patent will be infringed, either literally or under the doctrine of equivalents, by the manufacture, use, sale or offer of sale of Par's proposed product. Par expressly reserves the right to challenge the validity and enforceability of the '318 patent, the '863 patent, or the '527 patent and/or any assertion of infringement that one or more plaintiffs might make on new, other or further grounds should such grounds become apparent during any ensuing litigation between the parties.

Sincerely,

Thomas J. Haughey
Vice President, General Counsel
Par Pharmaceutical, Inc.
One Ram Ridge Road
Spring Valley, NY 10977
Phone: 201-802-4215
Fax:  201-802-4223



### EXHIBIT 1:
## FACTUAL AND LEGAL BASIS FOR INVALIDITY AND/OR NONINFRINGEMENT OF THE '318 PATENT, THE '863 PATENT AND THE '527 PATENT

### I.

### THE CLAIMED INVENTION OF THE '318 PATENT

The '318 patent relates to a method of treating Alzheimer's disease and related dementias by administering a therapeutically effective amount of galantamine or a pharmaceutically acceptable salt of galantamine. The '318 patent issued with 7 claims, of which claim 1 is the only independent claim. Claims 1-7 read as follows:

1. A method of treating Alzheimer's disease and related dementias which comprises administering to a patient suffering from such a disease a therapeutically effective amount of galanthamine or a pharmaceutically-acceptable acid addition salt thereof.

2. A method according to claim 1, wherein the administration is parenteral at a daily dosage of 5-1,000 mg of galanthamine or a pharmaceutically-acceptable acid addition salt thereof.

3. A method according to claim 2, wherein said dosage rate is 50-300 mg per day.

4. A method according to claim 1, wherein said administration is oral and is in the range 10-2000 mg per day.

5. A method according to claim 4, wherein said dosage rate of 100-600 mg per day.

6. A method according to claim 1, wherein galanthamine is administered at a dosage rate of 0.1 to 4 mg/kg body weight of a patient, parenterally.

7. A method according to claim 1, wherein galanthamine is administered intracerebroventricularly via an implanted reservoir at a dosage rate of 0.01 to 5.0 mg/kg day.



## II.

## ALL CLAIMS OF THE '318 PATENT ARE INVALID

**A.    The Claims of the '318 Patent are Invalid as Anticipated/Obvious**

Under 35 USC §282, a patent is presumed valid. The U.S. Court of Appeals for the Federal Circuit – the court having exclusive jurisdiction over appeals from district court decisions in patent infringement suits – has repeatedly held that a challenger to patent validity always has the burden of overcoming this presumption by "clear and convincing" evidence that a necessary condition to patentability was not met. *See, e.g., Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed. Cir. 1983); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (Fed. Cir. 1983). Although there are numerous conditions for patentability, the ones relevant to the present discussion are (1) novelty under 35 U.S.C. §102; and (2) non-obviousness under 35 U.S.C. §103.

Under 35 U.S.C. §102, an invention must be "novel," i.e. it must have been new at the time the invention was made. The pertinent tests for determining novelty are set forth in 35 U.S.C. §§102(a) and (b) as follows:

> A person shall be entitled to a patent unless—
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States,
> ...

Novelty under Section 102 is determined by comparing the claimed invention with the prior art reference(s). If each and every element of a claim is found in a single reference, that claimed invention is "anticipated" by the prior art and thus fails to satisfy the novelty requirement of Section 102. *See, e.g., Connell,* 722 F.2d at 1549; *Rolls-Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1105 (Fed. Cir. 1986); *Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 771-772 (Fed. Cir. 1983). However, the prior art disclosure does not need to be express in order to anticipate, *Tyler Refrigeration v. Kysor Indus. Corp.,* 227 USPQ 845 (Fed. Cir. 1985), and despite the requirement of identity, anticipation is not a matter of "ipsissimus verbis," *Akzo N.V. v. United States ITC,* USPQ.2d 1241 (Fed. Cir. 1986). Even equivalence may be sufficient for anticipation. *Structural Rubber Prods., Co. v. Park Rubber Co.,* 223 USPQ 1264 (Fed. Cir. 1984).



If the claimed invention is not anticipated under Section 102, it must then be determined whether the invention would have been obvious under 35 U.S.C. § 103. This section provides, in pertinent part, as follows: —

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

In the landmark decision of *Graham v. John Deere Co.*, 383 U.S. 1 (1966), the Supreme Court explained that obviousness under Section 103 must be determined by considering the following:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Id.* at 17-18.

A showing of "*prima facie*" obviousness of a claimed invention may be made by combining the disclosure of two or more combinable prior art references that together show all of the claimed features. Such a showing then shifts to the patent owner the burden of providing rebuttal evidence, such as *Graham* "secondary considerations," to overcome the presumption. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 291-292 (Fed. Cir. 1985); *see also, Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 771-772. However, references may be combined for the purpose of establishing a *prima facie* case of obviousness only if certain criteria are met. *See, e.g., In re Sernaker*, 702 F.2d 989, 994 (Fed. Cir. 1983); *Ashland Oil*, 776 F.2d at 291-293. In *Ashland Oil*, the Federal Circuit explained that:

> Where the party asserting invalidity must rely upon a combination of prior art references to establish invalidity, that party bears the burden of showing some teaching or suggestion in these references which support their use in combination.

Moreover, the problem confronted by the inventor must be considered in determining whether it would have been obvious to combine the references in order to solve that problem. *Diversitech*



Corp. v. Century Steps, Inc., 850 F.2d 675, 678-679 (Fed. Cir. 1988). The burden of establishing invalidity may be facilitated where the challenger relies on important prior art or information not considered by the PTO; conversely, carrying the burden may be more difficult where the challenger relies on the same prior art and information considered by the Examiner during prosecution of the patent. Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1359-60 (Fed. Cir. 1983); E.W.P. Corp. v. Reliance Universal, Inc., 755 F.2d 898, 905-6 (Fed. Cir. 1985); Atlas Powder Co. v. E.I. DuPont DeNemours & Co., 750 F.2d 1569, 1573 (Fed. Cir. 1984).

Further, it is well settled that a prerequisite to making a finding of obviousness under Section 103 is determining what is "prior art." In re Clay, 966 F.2d 656. 658 (Fed. Cir. 1992). This determination is generally expressed in terms of whether or not the art is analogous. The Federal Circuit has set forth the following two criteria as relevant in determining whether prior art is analogous: (1) whether the prior art is from the same field of endeavor, regardless of the problem addressed, and (2) if the prior art is not within the same field of endeavor, whether it is still reasonably pertinent to the particular problem to be solved. Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 864 (Fed. Cir. 1993).

1.    The Claims of the '318 Patent are Anticipated by Bhasker

All of the claims of the '318 patent are anticipated by Bhasker, "Medical Management of Dementia," The Antiseptic, Vol. 71 (1) pp. 45-47 (Jan. 1974). Bhasker is prior art under 35 U.S.C. §§ 102(a) and (b), and teaches the use of galantamine in the treatment of "irreversible and progressive" dementias in humans. As such, Bhasker clearly anticipates claim 1 of the '318 patent.

Bhasker was not considered during prosecution of the '318 patent. Further, the disclosure of Bhasker is not duplicative to the disclosures of the two Chemical Abstracts references cited during prosecution. Bhasker specifically and explicitly relates to the treatment of progressive and irreversible dementias, and specifically discloses the use of galantamine for this purpose. Further, the two cited references relate to healthy animals, while Bhasker specifically relates to the treatment of humans.

Bhasker clearly defines dementia as a "clinical manifestation resulting from complex or functional changes in the most sophisticated mechanics of the brain" (Bhasker, page 45). Further, Bhasker describes that there appears to be "very little to offer" in the treatment of irreversible and progressive dementias (see Bhasker, page 45). Bhasker states that "[t]he irreversible cases belong to the category of dementias where there is a progressive fall-out of neurons and the course of the illness is rapidly downhill" (Bhasker, page 45). Despite the fact that "restoration of higher cortical functions is difficult," Bhasker teaches, with reference to Luria, that a suitable treatment for such intractable dementias is the use of "deinhibitory procedures" with the "facilitation of acetylcholine activity by giving small daily doses of cholinesterase inhibitors (neostigmine, galanthamine, etc.)" (Bhasker, page 46) (emphasis added). Thus, Bhasker teaches the use of galanthamine in "small daily doses" in the treatment of progressive and irreversible dementias. Thus, the observable symptoms of Alzheimer's disease,



including progressive and irreversible dementias, were well known to those of skill in the art long before the filing of the application leading to the '318 patent, and the claimed invention of claims 1-7 of the '318 patent would have been in the possession of those of skill in the art at the time of the invention of the subject matter of the '318 patent.

Each of claims 1-7 is addressed below:

(a) Claim 1

Claim 1 is directed to a "[m]ethod of treating Alzheimer's disease and related dementias which comprises administering to a patient suffering from such a disease a therapeutically effective amount of galantamine or a pharmaceutically-acceptable acid addition salt thereof." Claim 1 is anticipated by Bhasker, as Bhasker discloses treatment of "progressive and irreversible" dementias with galantamine. Alzheimer's disease is the quintessential "progressive and irreversible" dementia. Further, the "therapeutically effective amount" of galantamine of claim 1 is anticipated by Bhasker's disclosure of "small daily doses."

(b) Claim 2

Claim 2 further defines claim 1 by requiring that "the administration is parenteral at a daily dosage of 5-1,000 mg of galanthamine or a pharmaceutically-acceptable acid addition salt thereof." Under U.S. patent law, the disclosure of a generic term covering a small genus can anticipate a species within that genus, even if the species is not disclosed by the reference. *In re Schaumann et al.*, 572 F.2d 312 (CCPA 1978). As such, Bhasker's disclosure of small "daily doses" anticipates a specific range of milligram dosages of galantamine, such as the "daily dosage of 5-1,000 mg" of claim 2. Further, the "giving" of the small daily doses of Bhasker anticipates the parenteral administration of galantamine required by claim 2. The arguments for claim 1 are applicable here as well. Thus, claim 2 is anticipated by Bhasker.

(c) Claim 3

Claim 3 further defines claim 2 by requiring that the "dosage rate is 50-300 mg per day." Bhasker anticipates this claims as the "50-300 mg per day" of claim 3 is anticipated by the "small daily doses" disclosed by Bhasker. The arguments for claims 1 and 2 are applicable here as well. Thus, claim 3 is anticipated by Bhasker.

(d) Claim 4

Claim 4 further defines claim 1 by requiring that the "administration is oral and is in the range 10-2000 mg per day." Bhasker anticipates claim 4 as the "10-2000 mg per day" dosage required by claim 4 is anticipated by the "small daily doses" disclosed by Bhasker. Further, Bhasker teaches "giving" small daily doses which generally discloses administration to humans, and thus anticipates the oral administration required by claim 4. The arguments for claim 1 are applicable here as well. Thus, claim 4 is anticipated by Bhasker.



### (e) Claim 5

Claim 5 further defines claim 4 by requiring that the "dosage rate of 100-600 mg per day." Bhasker teaches "giving small daily doses." Thus, Bhasker anticipates "100-600 mg per day" dosage rate required by claim 5 due to the small genus of "small daily doses" disclosed by Bhasker. The arguments for claims 1 and 4 are applicable here as well. Thus, claim 5 is anticipated by Bhasker.

### (f) Claim 6

Claim 6 further defines claim 1 by requiring that "galanthamine is administered at a dosage rate of 0.1 to 4 mg/kg body weight of a patient, parenterally." Bhasker teaches "giving small daily doses." Thus, Bhasker anticipates the small genii of milligram dosage ranges and modes of administration, including the dosage amounts and modes of administration of claim 6. The arguments for claim 1 are applicable here as well. Thus, claim 6 is anticipated by Bhasker.

### (g) Claim 7

Claim 7 further defines claim 1 by requiring that "galanthamine is administered intracerebroventricularly via an implanted reservoir at a dosage rate of 0.01 to 5.0 mg/kg day." Bhasker teaches "giving small daily doses." Thus, Bhasker anticipates the small genii of milligram dosage ranges and modes of administration, including the dosage amounts and modes of administration of claim 7. The arguments for claim 1 are applicable here as well. Thus, claim 7 is anticipated by Bhasker.

For these reasons, we believe that claims 1-7 of the '318 patent are anticipated by Bhasker.

## 2.    The Claims of the '318 Patent are Obvious over Bhasker

As Bhasker teaches the use of galantamine in the treatment of progressive and irreversible dementias, it would have been obvious to use galantamine or an acid addition salt thereof in the treatment of Alzheimer's disease and related dementias.

Bhasker is clearly analogous art as it pertains to the field of endeavor of the '318 patent, *In re Oetiker*, 977 F.2d 1443 (Fed. Cir. 1992), i.e. treating irreversible and progressive dementia, of which Alzheimer's disease is the quintessential example.

Further, the disclosure of Bhasker meets the three requirements for establishing *prima facie* obviousness, i.e. suggestion or motivation to modify the reference teachings, a reasonable expectation of success, and teaching or suggesting all of the claim limitations. *In re Vaeck*, 947 F.2d 488 (Fed. Cir. 1991). First, Bhasker teaches the use of "small daily doses" of galantamine in the treatment of Alzheimer's disease without limiting the mode of delivery. This would



motivate one skilled in the art to use various known modes of drug delivery in small amounts. Second, Bhasker's citation of Luria, *inter alia*, provides a reasonable expectation of success, as "Luria and his colleagues have dealt with this problem [i.e. restoration of higher cortical functioning] in great detail" (Bhasker, page 46). Third, Bhasker et al. teaches all of the claimed limitations, as discussed above. Further, one of ordinary skill in the art would know that there are various modes of drug delivery, e.g. oral, parenteral and intracerebroventricular, etc. These modes of delivery have been known for many years prior to the filing of the '318 patent.

Thus, Bhasker renders claims 1-7 of the '318 patent obvious to those of skill in the art at the time of the invention of the '318 patent.

### III.

## PAR'S PROPOSED PRODUCT WILL NOT INFRINGE CLAIMS 2-3 AND 5-7 OF THE '318 PATENT

### A.  Par's Proposed Product

Par's ANDA seeks approval to market tablets ("Par's proposed product") which are "bioequivalent" to Janssen's REMINYL® galantamine hydrobromide tablets. Par's proposed product will be labeled in accordance with the currently approved uses contained in the REMINYL® label. Par's proposed product is a tablet for oral administration.

Par's proposed product will be manufactured in 4 mg, 8 mg and 12 mg dosages. The following Table provides a list of relevant ingredients for the tablet cores of Par's proposed product:



Par's galantamine hydrobromide tablets

| INGREDIENTS | 4 mg Strength | 8 mg Strength | 12 mg Strength |
|---|---|---|---|
| Galantamine Hydrobromide (Galantamine Base) | 5.125 (4.000) | 10.250 (8.000) | 15.379 (12.000) |
| Microcrystalline Cellulose, NF (Avicel PH 101) | 15.000 | 30.000 | 45.000 |
| Lactose Monohydrate, NF (Pharmatose DCL 15) | 12.000 | 24.000 | 36.000 |
| Microcrystalline Cellulose, NF (Avicel PH 102) | 16.707 | 33.414 | 50.121 |
| Total Weight of Tablet Core | 60 | 120 | 180 |

The lactose monohydrate and microcrystalline cellulose of the above formulations are not spray-dried. In addition, each of the Avicel PH 101, the Pharmatose DCL 15 and the Avicel PH 102 is individually added to the tablet mixture during the tablet preparation procedure.

**B.   Par's Proposed Product Will Not Infringe Claims 2-3 and 5-7 of the '318 Patent[1]**

An infringement analysis of patent claims is performed in two steps. First, the claims must be interpreted to establish their meaning and scope. *Markman v. Westview Instruments, Inc.*, 116 S. Ct. 1384 (1996). Second, the claims as interpreted are compared to the product in question. *Id.* To infringe literally, the product in question must contain every limitation of a claim. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d. 1533, 1535 (Fed. Cir. 1991).

If the product does not literally infringe, proof of infringement under the doctrine of equivalents requires that the difference between the claimed invention and the accused product be "unsubstantial." *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1517 (Fed. Cir. 1995) (*in banc*) (*per curiam*), *rev'd on other grounds*, 117 S. Ct. 1040 (1997). The doctrine of equivalents must be applied to individual elements of a claim and not to the invention as a whole. *Warner-Jenkinson Col. v. Hilton Davis Chem. Co.*, 117 S. Ct. 1040, 1049 (1997). It is well established that limitations in a claim cannot be given a range of equivalents so wide as to cause the claim to encompass anything in the prior art. *Senmed, Inc. v. Richard-Allan Medical Industries, Inc.*, 888 F.2d. 815, 821 (Fed. Cir. 1989). The prior art must be examined to assure that the range of equivalents asserted by the patent holder does not encroach upon subject matter in the prior art. This examination involves consideration of what the prior art would have anticipated under 35 U.S.C. § 102, and what the prior art would have made obvious under 35

---

[1] In considering infringement, if a product or method avoids infringement of a claim, it also avoids infringement of all claims which depend from that claim, because the dependent claims include the limitations of the claim which is not infringed under 35 U.S.C. § 112, fourth paragraph. *See, e.g., Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).



U.S.C. § 103, when the patentee filed the original application. *We Care Inc. v. Ultra-Mark International Corp.*, 930 F.2d 1567, 1570-71 (Fed. Cir. 1991).

Under the doctrine of prosecution history estoppel, a patentee can be precluded from recapturing through equivalents claim coverage given up by argument or amendment during patent prosecution. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 564 (Fed. Cir. 2000) (citing *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376-77 (Fed. Cir. 1999)) (*Festo I*), aff'd in part, rev'd in part and remanded, 122 S.Ct. 1831 (2002) (*Festo II*), on remand, 344 F.3d 1359 (Fed. Cir. 2003) (*Festo III*). The estoppel applies to claim amendments made to overcome rejections based on the prior art or any formal rejections that narrow the patent claims. *Festo II* at 1839-40.

The Supreme Court in *Warner-Jenkinson*, *supra*, previously held that the reasons for the surrender of the subject matter during prosecution must be probed to determine why the argument or amendment was made. *Warner-Jenkinson* at 33. Where the record does not reveal whether the subject matter was surrendered to avoid the prior art or for unrelated reasons, a rebuttable presumption arises that the amendment and/or argument was made to avoid the prior art and, thus, prosecution history estoppel bars the application of the doctrine of equivalents for that element. *Id.*

*Festo II* upheld this requirement, and added an additional burden on the patentee to show that the amendment does not surrender the particular equivalent in question. *Festo II* at 1842. The Supreme Court noted that "[A] patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Id.* The patentee may only overcome this presumption by showing that, at the time of the amendment, one skilled in the art could not reasonably have been expected to have drafted a claim that would have literally encompassed the alleged equivalent (i.e., the alleged equivalent was not foreseeable, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was "some other reason" suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent). *Festo III* at 1368 (citing *Festo II* at 1831).

The Federal Circuit has indicated that, when a patent applicant argues that a set of limitations distinguish a claim from the prior art, prosecution history estoppel may attach to these limitations collectively. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, (Fed. Cir. 1992). In addition, once an argument or amendment is made regarding a claim term so as to create an estoppel, the estoppel will also apply to the same term used in other claims. *Southwall Technologies v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995). Further, the estoppel will apply even if those other claims originally contained the narrowing limitation added to the amended claims. *Glaxo Wellcome, Inc. v. Impax Laboratories, Inc.*, 356 F.3d 1348, 1356-1357 (Fed. Cir. 2004). It is also well-settled that the arguments and amendments in the prosecution history of one patent in a



chain of patents may be relied upon for estoppel in a later-issued patent in the chain. *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).

1.  **Par's Proposed Product Will Not Literally Infringe Claims 2-3 and 5-7 of the '318 Patent**

As noted above, Par's proposed product will be labeled in accordance with the currently approved uses contained in the REMINYL® label. Accordingly, Par's proposed product will be labeled for oral administration.

Claims 2-3 and 6 of the '318 patent require parenteral administration. Since Par's proposed product will be labeled for oral administration, there is no literal infringement of claims 2-3 and 6 of the '318 patent.

Claim 5 of the '318 patent requires oral administration of galantamine at a dosage rate of 100 to 600 mg per day. The REMINYL® label indicates that "the recommended dose range is 16-24 mg/day." Since Par's proposed product will be labeled in accordance with the REMINYL® label, there is no literal infringement of claim 5 of the '318 patent.

Claim 7 of the '318 patent requires the galantamine to be administered intracerebroventricularly via an implanted reservoir. Since Par's proposed product will be labeled for oral administration, there is no literal infringement of claim 7 of the '318 patent.

2.  **Par's Proposed Product Will Not Infringe Claims 2-3 and 5-7 of the '318 Patent Under the Doctrine Of Equivalents**

Each of claims 2-3 and 5-7 deals with a different mode of administration or a vastly different dosage level than is indicated for REMINYL®. These differences are not "insubstantial." Thus, Par's proposed product would not be considered to infringe any of these claims under the doctrine of equivalents.

**IV.**

**THE CLAIMED INVENTION OF THE '863 PATENT**

The '863 patent relates to tablets comprising galanthamine hydrobromide and a pharmaceutically acceptable carrier. Specifically, the patent discloses a carrier comprising "a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent, and an insoluble or poorly soluble cross-linked polymer disintegrant." The '863 patent issued with 10 claims, of which only claim 1 is independent. Independent claim 1 reads as follows:

1.  A tablet comprising as an active ingredient a therapeutically effective amount of galanthamine hydrobromide (1:1) and a pharmaceutically acceptable carrier, wherein said carrier comprises a spray-dried mixture of



lactose monohydrate and microcrystalline cellulose (75:25) as a diluent, and an insoluble or poorly soluble cross-linked polymer disintegrant.

## V.

## PAR'S PROPOSED PRODUCT WILL NOT INFRINGE THE '863 PATENT[2]

**A.** **Par's Proposed Product Will Not Infringe the Claims of the '863 Patent**

**1.** **Par's Proposed Product Will Not Literally Infringe the Claims of the '863 Patent**

Par's proposed product does not contain a carrier comprising "a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent," as required by the claims of the '863 patent. Further, the specification of the '863 patent teaches that the (75:25) ratio limitation is critical to obtaining the desired result, i.e. a fast-dissolving table for oral administration (see column 3, lines 10-35).

Par's 4 mg, 8 mg and 12 mg proposed products contain 12.000 mg, 24.000 mg and 36.000 mg of lactose monohydrate, respectively; 15.000 mg, 30.000 mg and 45.000 mg of Avicel PH 101, respectively; and 16.707 mg, 33.414 mg and 50.121 mg of Avicel PH 102, respectively. Thus, Par's 4 mg, 8 mg and 12 mg proposed products contain 12.000 mg, 24.000 mg and 36.000 mg of lactose monohydrate, respectively, and 31.707 mg, 63.414 mg and 95.121 mg of microcrystalline cellulose, respectively, for a ratio of approximately 12:32. As such, Par's proposed product does not have a 75:25 ratio of lactose monohydrate to microcrystalline cellulose, as required by claim 1 of the '863 patent. Further, the lactose monohydrate and microcrystalline cellulose in Par's proposed product are not spray-dried.

Since all of the claims of the '863 patent require "a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent," there is no direct infringement of any claim of the '863 patent by Par's proposed product.

**2.** **Par's Proposed Product Will Not Infringe the Claims of the '863 Patent Under the Doctrine of Equivalents**

The finding that Par's proposed product will not literally infringe the claims of the '863 patent requires a comparison of the proposed product with the claims under the doctrine of equivalents. An analysis is required to determine whether the differences between Par's proposed product and the claimed composition are insubstantial and whether the range of the permissible equivalents could properly cover the manufacture, use, offer of sale, or sale of Par's proposed product.

---

[2] A description of Par's proposed product can be found in Section III.A., *supra*, and will not be repeated.
[3] The law regarding patent infringement can be found in Section III.B., *supra*, and will not be repeated.



The specification of the '863 patent teaches that the (75:25) ratio of lactose monohydrate and microcrystalline cellulose is critical to obtaining the desired result, i.e. a fast-dissolving tablet for oral administration. The specification states the following:

> Initial experiments started out using either lactose anhydrous or lactose monohydrate as diluent, and either powdered cellulose or microcrystalline cellulose as disintegrant (see tablet formulations F1 and F2 in the Experimental Part). A particular problem which occurred during feeding the dry blend into the tablet press for direct compression, was segregation of the tablet excipients, thus causing the tablets to have a variable composition. In addition, the tablets formulations F1 and F2 did not comply at Stage 1 with the dissolution specification of Q=80% after 30'. In order to solve the perceived problems, the diluent was substituted for a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25), commercially available as Microcelac™. In addition to having a reduced tendency to segregate during feeding into the tablet press, the dry blend comprising the above diluent was further found to have excellent rheological properties (flowability), as well as to be easily miscible with the active ingredient and other tablet excipients. The dissolution specification was not met, however, unless a disintegrant having a large coefficient of expansion was employed, more in particular, if an insoluble or poorly soluble cross-linked polymer such as, for example, crospolyvidone or croscarmellose was employed. The amount of said disintegrants in the fast-dissolving tablets according to the present invention conveniently ranges from about 3 to about 8% (w/w), preferably about 5% (w/w).

('863 patent, column 3, lines 10-35). Additionally, the importance of this limitation was inherently and implicitly argued during prosecution by the Applicants in the January 24, 2000 Amendment. Specifically, in amending claim 1 to include the recitation of "an insoluble or poorly soluble cross-linked polymer diluent," Applicants argued the following:

> Applicants have amended Claim 1 to require that the disintegrant is an insoluble or poorly soluble cross-linked polymer disintegrant which provides the required dissolution specification of 80% after 30 minutes.

(January 24, 2000 Amendment, page 2, second paragraph). However, it is clear from the specification of the '863 patent that both the particularly claimed carrier, i.e. spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent, and an insoluble or poorly soluble cross-linked polymer disintegrant, are required to achieve the fast-acting dissolution profile of "at least 80% after 30 minutes." See the '863 patent, column 3, lines 10-35 (quoted above).



It is also clear from the specification of the '863 patent that mixtures of lactose monohydrate and microcrystalline cellulose were known in the prior art (see, e.g., column 2 of the '863 patent). Attention, in particular, is drawn to U.S. Patent No. 5,312,817 ("the '817 patent). As described at column 2 of the '863 patent, the '817 patent provides three exemplary formulations which have lactose monohydrate to microcrystalline cellulose ratios of (25:75), (25:250) and (25:40). Using directly comparable ratios with a numerator of "25," the ratios provided in the formulations of Par's proposed product are approximately (25:64). Thus, the ratios of Par's proposed product are squarely within the prior art.

Further, in the Notice of Allowability of March 11, 2000, the Examiner indicated in his "statement of reasons for allowance" that:

> ... the prior art does not show nor fairly suggest applicants composition comprised of galantamine hydrobromide (1:1) and a particular pharmaceutical carrier. The particular carrier combination of a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent and an insoluble or poorly soluble cross-linked polymer disintegrant enables the fast distribution of said tablet. Disintegrants having a large coefficient of expansion, such as crospolvidone or croscarmellose enables a dissolution specification of at least 80% of the 30 minutes, which is not recognized in the prior art.

Thus, the Examiner explicitly indicated in the Notice of Allowance that the recitation of both the specific carrier and disintegrant in claim 1 were considered essential to the allowance and issuance of the '863 patent. This statement confirms that the Examiner considered the recited (75:25) ratio of lactose monohydrate and microcrystalline cellulose to be necessary for patentability. Thus, the '863 patentees are estopped from recapturing other ratios of lactose monohydrate to microcrystalline cellulose, such as those described in the '817 patent, as the ratios used in the formulations of Par's proposed product are squarely within the scope of the '817 patent disclosure.

Accordingly, Par's proposed product, containing ratios of approximately 12:32 of lactose monohydrate to microcrystalline cellulose, cannot be said to be equivalent to a composition that has a ratio of 75:25. Microcrystalline cellulose predominates Par's proposed product, whereas lactose monohydrate predominates in claim 1 of the '863 patent.

For at least these reasons, Par's proposed product will not infringe the claims of the '863 patent under the doctrine of equivalents.



## VI.

### THE CLAIMED INVENTION OF THE '527 PATENT

The '527 patent relates to a method of treating dementia, mania or nicotine dependence by administering a tablet comprising galanthamine hydrobromide and a pharmaceutically acceptable carrier. The '527 patent also relates to a fast dissolving galanthamine hydrobromide tablet made by a particular process of dry blending and compressing with optional steps of mixing a lubricant, and/or film-coating the compressed tablet. Specifically, the patent discloses that the tablets require "a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent." The '527 patent issued with 6 claims. Independent claims 1 and 6 read as follows:

> 1. A method of treating a disorder selected from dementia, mania or nicotine dependence in a patient in need thereof comprising administering to the patient a tablet comprising as an active ingredient a therapeutically effective amount of galanthamine hydrobromide (1:1) and a pharmaceutically acceptable carrier, wherein said carrier comprises a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent, and an insoluble or poorly soluble cross-linked polymer disintegrant.

> 6. A fast-dissolving galanthamine hydrobromide (1:1) tablet made by (i) dry blending the active ingredient, an insoluble or poorly soluble cross-linked polymer disintegrant and an optional glidant with a diluent comprising a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25); (ii) optionally mixing a lubricant with the mixture obtained in step (i); (iii) compressing the mixture obtained in step (i) or in step (ii) in the dry state into a tablet; and (iv) optionally film-coating the tablet obtained in step (iii).

## VII.

### PAR'S PROPOSED PRODUCT WILL NOT INFRINGE THE '527 PATENT[4]

**A.    Par's Proposed Product Will Not Infringe the Claims
of the '527 Patent[5]**

**1.    Par's Proposed Product Will Not Literally Infringe
the Claims of the '527 Patent**

---

[4] A description of Par's proposed product can be found in Section III.A., *supra*, and will not be repeated.

[5] The law regarding patent infringement can be found in Section III.B., *supra*, and will not be repeated.



Par's galantamine hydrobromide tablets do not contain a carrier comprising "a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent," as required by the claims of the '527 patent. The specification of the '527 patent teaches that the (75:25) ratio limitation is critical to obtaining the desired result, i.e. a fast-dissolving table for oral administration (see column 3, lines 10-35).

Par's 4 mg, 8 mg and 12 mg proposed product contain 12.000 mg, 24.000 mg and 36.000 mg lactose monohydrate, respectively; 16.707 mg, 33.414 mg and 50.121 mg Avicel PH 101, respectively; and 16.707 mg, 33.414 mg and 50.121 mg of Avicel PH 102, respectively. Thus, Par's 4 mg, 8 mg and 12 mg proposed product contain 12.000 mg, 24.000 mg and 36.000 mg lactose monohydrate, respectively, and 31.707 mg, 63.414 mg and 95.121 mg microcrystalline cellulose, respectively, for a ratio of approximately 12:32. As such, Par's proposed product does not have a 75:25 ratio of lactose monohydrate to microcrystalline cellulose, as required by independent claims 1 and 6 of the '527 patent. Further, the lactose monohydrate and microcrystalline cellulose in Par's proposed product are not spray-dried.

Since all of the claims of the '527 patent require "a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25) as a diluent," there is no literal infringement of any claim of the '527 patent by Par's proposed product.

2.    **Par's Proposed Product Will Not Infringe the Claims
of the '527 Patent Under the Doctrine of Equivalents**

The finding that Par's proposed product will not literally infringe the claims of the '527 patent requires a comparison of the proposed product with the claims under the doctrine of equivalents. An analysis is required to determine whether the differences between Par's proposed product and the claimed composition are insubstantial and whether the range of the permissible equivalents could properly cover the manufacture, use, offer of sale, or sale of Par's proposed product.

The specification of the '527 patent teaches that the (75:25) ratio limitation is critical to obtaining the desired result, i.e. a fast-dissolving tablet for oral administration. The specification states the following:

Initial experiments started out using either lactose anhydrous or lactose monohydrate as diluent, and either powdered cellulose or microcrystalline cellulose as disintegrant (see tablet formulations F1 and F2 in the Experimental Part). A particular problem which occurred during feeding the dry blend into the tablet press for direct compression, was segregation of the tablet excipients, thus causing the tablets to have a variable composition. In addition, the tablets formulations F1 and F2 did not comply at Stage 1 with the dissolution specification of Q=80% after 30'. In order to solve the perceived problems, the diluent was substituted for a spray-dried mixture of lactose monohydrate and microcrystalline cellulose



> (75:25), commercially available as Microcelac™. In addition to having a
> reduced tendency to segregate during feeding into the tablet press, the dry
> blend comprising the above diluent was further found to have excellent
> rheological properties (flowability), as well as to be easily miscible with
> the active ingredient and other tablet excipients. The dissolution
> specification was not met, however, unless a disintegrant having a large
> coefficient of expansion was employed, more in particular, if an insoluble
> or poorly soluble cross-linked polymer such as, for example,
> crospolyvidone or croscarmellose was employed. The amount of said
> disintegrants in the fast-dissolving tablets according to the present
> invention conveniently ranges from about 3 to about 8% (w/w), preferably
> about 5% (w/w).

('527 patent, column 3, lines 10-35). Additionally, the importance of this limitation was
explicitly argued during prosecution by the Applicants in the March 7, 2001 Amendment.
Specifically, Applicants argued the following:

> Applicants submit that US '318 does not teach a method of treating a
> disorder selected from dementia, mania or nicotine dependence by
> administering a pharmaceutically composition wherein the
> pharmaceutically acceptable "carrier comprises a spray-dried mixture of
> lactose monohydrate and microcrystalline cellulose (75:25) as a diluent,
> and an insoluble or poorly soluble cross-linked polymer disintegrant" as is
> required by the instant claims.

(March 7, 2001 Amendment, page 2, fourth paragraph). It is clear from the specification of the
'527 patent that both the particularly claimed carrier, i.e. spray-dried mixture of lactose
monohydrate and microcrystalline cellulose (75:25) as a diluent, and an insoluble or poorly
soluble cross-linked polymer disintegrant are required to achieve the fast-acting dissolution
profile of "at least 80% after 30 minutes." See the '527 patent, column 3, lines 10-35 (quoted
above).

It is also clear from the specification of the '527 patent that mixtures of lactose and
microcrystalline cellulose were known in the prior art (see, e.g., column 2 of the '527 patent).
Attention, in particular, is drawn to U.S. Patent No. 5,312,817 ("the '817 patent"). As described
at column 2 of the '527 patent, the '817 patent provides three exemplary formulations which
have lactose monohydrate to microcrystalline cellulose ratios of (25:75), (25:250) and (25:40).
Using directly comparable ratios with a numerator of "25," the ratios provided in the
formulations of Par's proposed product are either (25:32) or (25:64). Thus, the ratios of Par's
proposed product are squarely within the prior art.

Further, claim 6 (claim 16 during prosecution) was amended during prosecution to read
as follows:



16. (Amended) A fast-dissolving galanthamine hydrobromide (1:1) tablet made by (i) dry blending the active ingredient, an insoluble or poorly soluble cross-linked polymer [[the]] disintegrant and an optional glidant with [[the]] a diluent comprising a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25); (ii) optionally mixing [[the]] a lubricant with the mixture obtained in step (i); (iii) compressing the mixture obtained in step (i) or in step (ii) in the dry state into a tablet; and (iv) optionally film-coating the tablet obtained in step (iii).

(August 22, 2001 Amendment, paragraph bridging pages 1-2). In the remarks, Applicants emphasized that the following:

... Claim 16 has been amended to more particularly point out and distinctly claim the subject matter which Applicants regard as the invention. More specifically, Claim 16 has been amended to include the limitation that the disintegrant is an insoluble or poorly soluble cross-linked polymer and the diluent comprises a spray-dried mixture of lactose monohydrate and microcrystalline cellulose (75:25).

(August 22, 2001 Amendment, page 3, first paragraph). In response, the Examiner allowed the application.

Under *Festo II*, Applicants have lost the advantage of the doctrine of equivalents as to the equivalents in question in all of the claims of the '527 patent after amending claim 6. Other ratio amounts of lactose monohydrate and microcrystalline cellulose were clearly foreseeable in view of the specification of the '527 patent and its discussion of the '817 patent. As noted above, the ratio amounts of lactose monohydrate and microcrystalline cellulose of the formulation of Par's proposed product are within the range of the ratio amounts used in the '817 patent.

Further, the rationale underlying the amendment of claim 6 (claim 16) to recite the 75:25 ratio of lactose monohydrate to microcrystalline cellulose bears a very strong relation to an equivalent in question, i.e., the use of other ratios of lactose monohydrate and microcrystalline cellulose, including those used by the formulation of Par's proposed product as: (1) the inclusion of the 75:25 ratio amount for lactose monohydrate and microcrystalline cellulose as a limitation in claim 6 was deemed necessary by the Examiner to meet the enablement requirement under 35 U.S.C. § 112, first paragraph; and (2) this limitation was, in any event, likely to be necessary in order to distinguish over the '817 patent, which was noted in the specification of the '527 patent.

Other ratio amounts of lactose monohydrate and microcrystalline cellulose, including those of the formulation of Par's proposed product, are not "insubstantially" different, as they would either be non-enabled by the specification of the '527 patent or within the prior art as evidenced by the '817 patent.



Accordingly, Par's proposed product, containing a ratio of approximately 12:32 of lactose monohydrate to microcrystalline cellulose (see above Table), cannot be said to be equivalent to a composition that has a ratio of 75:25. Microcrystalline cellulose predominates Par's proposed product, whereas lactose monohydrate predominates the claims of the '527 patent.

For at least these reasons, Par's proposed product will not infringe the claims of the '527 patent under the doctrine of equivalents.



## OFFER OF CONFIDENTIAL ACCESS TO APPLICATION

Par Pharmaceutical, Inc. ("Par") hereby offers Synaptech Inc. confidential access to Abbreviated New Drug Application ("ANDA") No. 77-604 as required under 21 U.S.C. § 355(j)(5)(C)(i)(III). Par hereby stipulates that the following restrictions shall govern this Offer of Confidential Access to Application ("Offer") and any information or documents accessed, and/or the use and disposition of any information or documents accessed, under this Offer:

1. As stated by 21 U.S.C. § 355(j)(5)(C)(i)(III), "[a] request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract."

2. For purposes of the access and/or inspection, the application for ANDA No. 77-604, and any other accompanying documents and materials, shall be considered as containing Confidential Information.

3. As stated by 21 U.S.C. § 355(j)(5)(C)(i)(III), Confidential Information disclosed under this Offer shall be used only for the sole and limited purpose of evaluating possible infringement of U.S. Patent No. 4,663,318 ("the '318 patent"), U.S. Patent No. 6,099,863, ("the '863 patent") and/or U.S. Patent No. 6,358,527 ("the '527 patent"), the patents that are the subject of the certification under 28 U.S.C. § 355 (b)(2)(A)(iv) and shall not be disclosed by the recipient to any person or entity other than:

(a) Outside Counsel for Synaptech Inc. and members and associates of counsel's law firms, and legal assistants and clerical employees of those firms actively engaged in evaluating possible infringement of the '318 patent, the '863 patent and/or the '527 patent, the patents that are the subject of the certification under 28 U.S.C. § 355 (b)(2)(A)(iv).



(b)    In-house counsel and business representatives of Synaptech Inc. who are actively engaged in evaluating possible infringement of the '318 patent, the '863 patent and/or the '527 patent, the patents that are the subject of the certification under 28 U.S.C. § 355 (b)(2)(A)(iv). With regard to in-house counsel, it is expressly required that these individuals shall be acting in their capacity as lawyers and not as business advisors, and that no Confidential Information will be used in connection with any business advice rendered by such in-house counsel to their clients nor revealed to non-lawyers employed by any party.

(c)    Independent non-employee experts retained for the purpose of evaluating possible infringement of the patents that are the subject of the certification under 28 U.S.C. § 355 (b)(2)(A)(iv). Prior to gaining access to any Confidential Information acquired under the Offer, such experts must receive and read a copy of this Offer and agree to be bound thereby by executing an affidavit in the form attached hereto as Exhibit A.

(d)    Such other persons upon whom Par expressly agrees in writing.

(e)    Such other persons as a Court may approve after notice and hearing.

(f)    A Court.

4.    Prior to disclosure to any person designated pursuant to Paragraph 3(c) hereof of the Confidential Information, such person shall be furnished with a copy of this Offer and shall be required to execute an affidavit in the format attached hereto as Exhibit A (or a substantially similar declaration) certifying that he or she has read this Offer, understands it and agrees to be bound by the terms thereof.

5.    Par agrees to provide access to ANDA No. 77-604 upon the receipt of a request for access from Synaptech Inc.. However, Par retains the right under 21 U.S.C. § 355(j)(5)(C)(i)(III) to redact the application for ANDA No. 77-604 to remove any information of no relevance to any issue of patent infringement.



6.    Upon receipt of Confidential Information provided pursuant to this Offer, Synaptech Inc. shall maintain such Confidential Information in a secure and safe area and shall exercise due and proper care with respect to the storage, custody and use of all Confidential Information.  There shall be no reproduction of any Confidential Information except that, as required in the evaluation of possible infringement of the '318 patent, the '863 patent and/or the '527 patent, copies, excerpts, or summaries may be shown or given to those persons authorized pursuant to Paragraph 3 above.  Except as otherwise provided above, all Confidential Information shall remain in the custody of the initial recipient of the Confidential Information.

7.    In a reasonable time after a determination of possible infringement of the '318 patent, the '863 patent and/or the '527 patent is made, preferably within sixty (60) days, all Confidential Information furnished pursuant to the terms of this Offer, any drawings related to and notes taken based on said Confidential Information, and all copies thereof, which are not in the custody of a Court, shall be returned to Par or destroyed (and certified under penalty of perjury as having been destroyed) by Synaptech Inc..

8.    The restrictions set forth in the preceding paragraphs shall not apply to Confidential Information which (a) is or becomes public knowledge not in violation of this Offer; (b) is from a third party lawfully possessing and lawfully entitled to disclose such information; or (c) is disclosed by a third party with the approval of Par.

9.    Nothing contained in this offer shall restrict the use or disclosure of Confidential Information by Par.

10.    In the event anyone shall violate or threaten to violate any term of this Offer, Synaptech Inc. agrees that Par may immediately apply to obtain injunctive relief against any such person violating or threatening to violate any of the terms of this Offer and, in the event Par shall do so, the respondent person subject to the provisions of this Offer shall not employ as a defense thereto the claim that Par possesses an adequate remedy at law.  Further, the respondent



person must agree to subject themselves to the personal jurisdiction of the United States District Court for the jurisdiction in which they reside for this purpose.

11.   The obligation to maintain confidentiality embodied in this Offer shall survive the termination the evaluation of possible infringement of the '318 patent, the '863 patent and/or the '527 patent, and any related proceedings.

Thomas J. Haughey
Vice President, General Counsel
Par Pharmaceutical, Inc.
One Ram Ridge Road
Spring Valley, NY 10977
Phone:  201-802-4125
Fax: 201-802-4223


Synaptech Inc.
225 Broadway, 42nd Floor
c/o Schwartz & Salomon
New York, New York 10007

cc:   John Richards
      Ladas & Parry
      26 West 61st Street
      New York, NY 10023

**)PAR**
PHARMACEUTICAL

EXHIBIT A

_____

_____          AFFIDAVIT OF

_____                    _____

_____

STATE OF _____ )
                                           ) ss
COUNTY OF _____ )

1.    My name is _____ . I live at _____ . I am

employed as _____ by _____ .

2.    I am aware of the Offer for Confidential Access to Application ("Offer") from Par

Pharmaceutical, Inc. to Synaptech Inc., and a copy thereof has been given to me.

3.    Confidential Information disclosed to me under the Offer will be used by me <u>only</u>

in connection with my role in the evaluation of possible infringement of U.S. Patent No.

4,663,318, U.S. Patent No. 6,099,863 patent and/or U.S. Patent No. 6,358,527, which are the

subject of a certification under 28 U.S.C. § 355 (2)(A)(vii)(IV) and for no other purpose.

4.    I will not disclose or discuss such Confidential Information with any person other

than my staff or counsel, their assistants and staff, or other outside persons assisting counsel

who have also signed affidavits undertaking to preserve the confidentiality of such

Confidential Information.

**)PAR**
PHARMACEUTICAL

5.     I understand that any use of Confidential Information in any manner contrary to the provisions of the Offer may subject me to sanctions by a Court, and I hereby agree to subject myself to the personal jurisdiction of the United States District Court for the jurisdiction in which I reside for this purpose.

_____
Signature

Subscribed and sworn to before me, this _____ day of _____, 200__.

_____
Notary Public

My Commission Expires: _____

## IV.    <u>CONCLUSION</u>

The foregoing provides the detailed factual and legal bases in support of Reddy's position that the '527 patent, the '863 patent and the '318 patent are invalid, unenforceable or would not be infringed by the manufacture, use, sale, offer to sell, or importation into the United States of the Reddy Galantamine Hydrobromide Tablet Products.

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February, 2006, the attached **NOTICE OF DEPOSITION UNDER FED. R. CIV. P. 30(b)(6) TO PAR PHARMACEUTICALS, INC. AND PAR PHARMACEUTICAL COMPANIES, INC.** was served upon the below-named counsel of record at the address and in the manner indicated:

John W. Shaw, Esquire                                                        HAND DELIVERY
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

Daniel F. Attridge, P.C.                                                     VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
655 15th Street, N.W.
Washington, DC  20005-5793

Mary B. Matterer, Esquire                                                    HAND DELIVERY
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801

William A. Rakoczy, Esquire                                                  VIA FEDERAL EXPRESS
Rakoczy Molino Mazzochi Siwik LLP
6 West Hubbard Street, Suite 500
Chicago, IL  60601

Richard L. Horwitz, Esquire                                                  HAND DELIVERY
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899

Stuart D. Sender, Esquire                                                    VIA FEDERAL EXPRESS
Budd Larner, P.C.
150 John F. Kennedy Parkway
Short Hills, NJ  07078

John C. Phillips, Jr., Esquire                                    HAND DELIVERY
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE  19806

Lynn M. Ulrich, Esquire                                    VIA FEDERAL EXPRESS
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL  60601

Richard D. Kirk, Esquire                                    HAND DELIVERY
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE  19899

Robert J. Gunther, Jr., Esquire                            VIA FEDERAL EXPRESS
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4802

Frederick L. Cottrell, III, Esquire                        HAND DELIVERY
Richards, Layton & Finger
One Rodney Square
Wilmington, DE  19801

Alan H. Bernstein, Esquire                                 VIA FEDERAL EXPRESS
Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd.
1635 Market Street, 12th Floor
Philadelphia, PA  19103

Philip A. Rovner, Esquire                                  HAND DELIVERY
Potter Anderson & Corroon LLP
Hercules Plaza
Wilmington, DE  19801

Barbara S. Wahl, Esquire                                   VIA FEDERAL EXPRESS
Arent Fox PLLC
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5339


                                          /s/ Lauren E. Maguire
                                          _____
                                          Lauren E. Maguire