# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

IN RE: '318 PATENT                    :
INFRINGEMENT LITIGATION,              :    CIVIL ACTION
                                      :    NO. 05-356 (KAJ)
                                      :    (Consolidated)

- - -

Wilmington, Delaware
Tuesday, July 11, 2006 at 10:00 o'clock, a.m.
TELEPHONE CONFERENCE

- - -

BEFORE:       HONORABLE KENT A. JORDAN, U.S.D.C.J.

- - -

APPEARANCES:


          ASHBY & GEDDES
          BY:  STEVEN J. BALICK, ESQ.

               -and-

          COVINGTON & BURLING
          BY:  GEORGE F. PAPPAS, ESQ., and
               KURT G. CALIA, ESQ.
               (Washington, District of Columbia)

               -and-

          JOHNSON & JOHNSON
          OFFICE OF THE GENERAL COUNSEL
          BY:  STEVEN P. BERMAN, ESQ.
               (New Brunswick, New Jersey)

                    Counsel for Janssen Pharmaceutica
                    N.V., Janssen, L.P. and Synaptech Inc.



                         Brian P. Gaffigan
                         Registered Merit Reporter

EXHIBIT

tabbies

A

```
 1   APPEARANCES:   (Continued)

 2

 3              YOUNG CONAWAY STARGATT & TAYLOR
               BY:  MONTE' SQUIRE, ESQ.
 4
                    -and-
 5
               KIRKLAND & ELLIS, LLP
 6             BY:  EDWARD C. DONOVAN, ESQ.,
                    KAREN M. ROBINSON, ESQ., and
 7                  ANDREW B. KAY, ESQ.
                    (Washington, District of Columbia)
 8
                         Counsel for Teva Pharmaceuticals
 9                       USA, Inc. and Teva Pharmaceutical
                         Industries, Ltd.
10

11             RICHARDS LAYTON & FINGER
               BY:  ANNE SHEA GAZA, ESQ.
12
                    -and-
13
               CAESAR RIVISE BERNSTEIN COHEN & POKOTILOW, LTD.
14             BY:  ALAN H. BERNSTEIN, ESQ., and
                    MONA GUPTA, ESQ.
15                  (Philadelphia, Pennsylvania)

16                       Counsel for Alpharma Pty., Ltd.

17
               PHILLIPS GOLDMAN & SPENCE, P.A.
18             BY:  JOHN C. PHILLIPS, JR., ESQ.

19                  -and-

20             WINSTON & STRAWN, LLP
               BY:  TARAS A. GRACEY, ESQ.,
21                  LYNN M. ULRICH, ESQ., and
                    MUSTAFA A. HERSI, ESQ.
22                  (Chicago, Illinois)

23                       Counsel for Barr Laboratories, Inc.
                         and Barr Pharmaceuticals Inc.
24

25
```

1      MR. BERNSTEIN:  Well, first of all, in regular

2  business activity, you just don't send documents to storage

3  without any record of how to get them back.  Now, in the

4  event that that is what they did, they may as well have

5  thrown them out in the beginning because they're effectively

6  discarded.

7      THE COURT:  All right.

8      MR. BERNSTEIN:  I can make a statement to

9  Your Honor, we have no desire to search all of the

10  1,350 boxes.  Many of the materials, as stated in the

11  letters we received from Janssen's counsel, we are not

12  interested in.  We're not interested in adverse events

13  reports.  We're not interested in raw data.  We're just

14  interested in promotional materials.  Now, I understand

15  there may be 150 documents at one storage facility --

16      THE COURT:  150 boxes.

17      MR. BERNSTEIN:  -- and the other 1,200 are

18  somewhere else.  What I would propose is that somehow

19  our people take a shot at those documents.  They are

20  manageable, although even 150 boxes are a lot of documents.

21      THE COURT:  All right.  Well, here is how the

22  box issue comes out.

23      First, I do view this as primarily on the

24  defendants.  The problem is created by the defendants more

25  than anything else in my review of the history of this.

Page 26

1   It's not enough to say it was Mylan's ball and then by

2   implication to say they blew it.  The defendants wanted to

3   designate Mylan to carry the ball, that's fine, but every

4   defendant had an obligation to keep track of what was going

5   on.  And if they didn't like how it was progressing, to

6   step in and assert their own rights and nobody did that.

7           And so as a consequence, the defendants allowed

8   a record to be created here which the plaintiffs can rightly

9   stand on and say, when they said we want to see them, we

10  said great, let's talk on the phone.  There is a lot of

11  boxes here and we should talk about logistics, and then

12  nothing happens for weeks.  And then there is another letter

13  and there is another response.  Okay.  Good.  Let's talk

14  about it and we'll work it out and then there is nothing.

15          So you guys were all asleep at the switch and

16  that's really pretty much your problem.  If Mylan blew it,

17  you should have been watching what Mylan was doing and

18  making sure that the interests of your separate clients

19  were being looked after appropriately by Mylan.

20          Having said that, I'm not prepared to have the

21  information just go off limits at this point, and so I'll

22  give you a crack, and a very limited crack, at looking into

23  this.  I'll give you two weeks to get something worked out

24  and I'll direct you to do what evidently the plaintiffs

25  were asking for a long time ago:  Get on the phone.

1          It's beyond me how you folks can be sending

2    letters back and forth and e-mail back and forth and

3    evidently on this topic not picking the phone up, even

4    though you are talking to each other all the time on other

5    discovery disputes and at depositions and elsewhere.  It

6    just rings hollow, Mr. Bernstein, for Alphapharm to say,

7    golly, we're prejudiced because they're jerking us around

8    here.  It just looks completely the other way around.  That

9    they had legitimate issues that they wanted to discuss

10   with you and the defendants wouldn't pick a phone up.  So

11   you are getting a break here in getting any time at all to

12   look at this.  So pick the phone up, talk to the other side

13   and arrange to see what you want to see.

14          And as to the indices, I'm prepared to accept

15   the plaintiffs' representation that the index that exists

16   with respect to part of these documents is their work

17   product created index.  Other than your disbelief that there

18   is not another index, I don't have any reason for saying

19   that there is one and so I'm not ordering them to produce

20   the work product index.

21          Your 14 days or 10 business days, that clock

22   starts running today.  So, Mr. Pappas, have you or one

23   of your colleagues on the phone with these guys but,

24   Mr. Bernstein, it's up to you to initiate the call and

25   get done what you think you can get done.

1    that it looks like you got an adequate discovery response.

2          All right.  I almost hesitate to say it but is

3    there anything in the rulings today or any other matter that

4    requires further discussion while we're all on the phone

5    together?  From the plaintiffs' perspective, Mr. Pappas?

6          MR. PAPPAS:  Yes, Your Honor.  Only one issue,

7    and that is with respect to the 1,350 boxes, we will start

8    screening those now.  We're reviewing them for production

9    and will endeavor obviously to review them and turn them

10   over within 14 days, and believe we can do so.  But if we

11   need a couple of extra days, we may have to come back to the

12   Court for that.

13         THE COURT:  Well, that is all right because I

14   said, and am trying to make clear, while I don't think the

15   plaintiffs here are utterly without fault, you could have

16   been doing this screening a long time ago, it certainly is

17   the case that I view the defendants as primarily culpable

18   for the problem that exists.  So if you need more time,

19   within bounds of reason, you take more time.  You guys work

20   it out, and the defense is in a poor position to complain.

21         Is there anything else, Mr. Pappas?

22         MR. PAPPAS:  That's it, Your Honor.

23         THE COURT:  All right.  Teva, anything,

24   Mr. Donovan?

25         MR. DONOVAN:  No, Your Honor.  Thank you.

# EXHIBIT B

RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW RLF COM

FREDERICK L COTTRELL III
DIRECTOR

DIRECT DIAL NUMBER
302-651-7509
COTTRELL@RLF COM

July 6, 2006

VIA ELECTRONIC FILING &
HAND DELIVERY

The Honorable Kent A. Jordan
United States District Judge
for the District of Delaware
844 King Street
Wilmington, DE 19801

Re:    In re '318 Patent Infringement Litigation
       Civil Action No. 05-356 (KAJ)

Dear Judge Jordan:

    We write this letter on behalf of Defendant Alphapharm Pty, Ltd in anticipation of the call with the Court on July 10, 2006 at 10:00 a m. This letter relates to Plaintiffs' refusal to allow Defendants to inspect 1350 boxes of documents that are in the possession and/or under the control of Plaintiffs  Plaintiffs have advised that these 1350 boxes contain marketing related documents (e g , adverse event reports, case report forms and voluminous raw clinical data) for the Razadyne® drug product. (See Ex  A – Calia 3/10/06 ltr  at 3)  For months, Defendants have attempted to work with Plaintiffs on the details for beginning the inspection but Plaintiffs have been uncooperative as explained below

    In September 2005, the Mylan Defendants served on Plaintiffs their first set of requests for documents which asked for documents concerning the secondary considerations of non-obviousness and marketing related materials concerning Razadyne®. (Ex. 1 – Mylan Doc. Reqs. 6-15)  Approximately 6 months later, in March 2006, Plaintiffs advised for the first time that they would make available for inspection 1200 boxes or more of marketing related materials without identifying the location or potential dates for the inspection  (Ex A)   Defendants asked Plaintiffs repeatedly to identify potential dates for the inspection and the location of the documents  (See Ex  B – Brody 4/3/06 ltr  at 2, Ex  C – Brody 5/15/06 e-mail, Ex  D – Brody 6/12/06 ltr  at 1)  Plaintiffs, however, repeatedly refused to provide this simple information and stated at times that they needed to know how many Defendants would conduct the inspection and other logistical details of the inspection  (See Ex  E – Calia 4/5/06 ltr , Ex  C – Calia 5/15/06 e-mail, Ex. F – Calia 6/12/06 ltr )  There is no valid reason why Plaintiffs needed Defendants' logistical inspection details to identify potential dates and location for the inspection.  Although Plaintiffs indicated a need for a telephone conference to discuss the inspection (see id ), they did

EXHIBIT

tabbies

B

not initiate one    Defendants reiterated Plaintiffs' delay in allowing Defendants to inspect the documents:

> For instance, Plaintiffs repeatedly have refused to make available 1,200 boxes of documents - documents purportedly related to defendants' request for discovery on Plaintiffs' secondary considerations defense  <u>Defendants have been asking for these documents for months.</u>  So far Plaintiffs only have offered to discuss with Defendants where and under what conditions such documents might be made available for inspection    (Emphasis added)

(Ex  G – Siwik 5/31/06 ltr. at 2)

Finally, it was not until June 15, 2006, and several months after Defendants made a simple request, that Plaintiffs for the first time advised that the documents were located in Titusville and Somerset, New Jersey and the total number of boxes was 1350, not 1200 as Plaintiffs had stated before   (Ex  H – Calia 6/15/06 ltr at 3)   When Defendants approached Plaintiffs again about the inspection, Defendants also inquired into whether Plaintiffs had any indices for the 1350 boxes which would facilitate the inspection process   Plaintiffs refused to produce the indices claiming that it was prepared by outside counsel and therefore the work product privilege applied.  It is hard to imagine that a company would box-up its documents for storage and not have an index or some other type of log prepared so that such documents could be retrieved at a later date if needed.

Plaintiffs also claim that Defendants delayed the inspection process since it was close to the end of fact discovery, June 30, 2006   However, that is not the case since the above correspondence demonstrates that Plaintiffs delayed in responding as to the location of the documents and potential dates for the inspection.  Now Plaintiffs are taking the position that since fact discovery is closed, Defendants are not entitled to the inspection  However, the above correspondence shows that Defendants did not delay and as soon as they learned about these 1350 boxes, Defendants sought relevant information to coordinate the inspection, but Plaintiffs refused  Furthermore, Defendants advised Plaintiffs before the close of fact discovery that they would raise this dispute with the Court.  Therefore, this dispute is timely raised [1]

---

[1] Defendants also would like to discuss with Your Honor Plaintiffs' attempt to take a non-party deposition in Germany on July 24, 2006 in direct violation of the Court's revised scheduling order and this Court's admonition to Plaintiffs last year that they should initiate foreign discovery promptly and have it completed by July 7, 2006  Plaintiffs waited until May to serve its discovery in Germany and are now seeking to take a deposition after the close of non-party fact discovery and during the time set aside for expert reports  It is will be highly prejudicial to Defendants to have to travel to Germany in the middle of expert discovery  Accordingly, Defendants request that Plaintiffs either be prohibited from taking the deposition or from using the deposition at trial

Defendants respectfully request that the Court order Plaintiffs to produce all indices and other search aids available for the 1350 boxes of documents and permit Defendants to inspect these boxes within a reasonable time-frame after review of the indices and/or logs

Respectfully,

Frederick L. Cottrell, III

FLC:csi
cc:    Clerk of Court (by hand)
       All Counsel of Record (by e-mail)

-3-

# EXHIBIT C

**Gupta, Mona**

| | |
|---|---|
| **From:** | Bernstein, Alan H |
| **Sent:** | Friday, July 14, 2006 3:27 PM |
| **To:** | kcalia@cov com |
| **Cc:** | Gupta, Mona |
| **Subject:** | Document searching in Titusville |

Kurt:

There are problems with the lack of cooperation today on the part of your people  First, there are only 2 Covington people at the storage facility These people apparently did no advance screening of the boxes before today or whatever they did was inadequate  I believe they should have been working at the facility as early as Wednesday afternoon  The net result is that my people are sitting around twidling their thumbs waiting for your people to bring in more boxes  My people tried to call them, but their phone is constantly busy and under the rules my people cannot get up and go down the hall to knock on the door. Indeed, we do not even know where they are. My people have been told that your people will not come in over the weekend to build up a supply of boxes that we could start searching at about 9 to 9:15  Thus, unless you intervene immediately, it does not make sense for all of us to arrive on Monday at 9:00 to 9:15 am to sit around and do nothing

If this situation persists, then Monday will be a disaster when I will be there together with our people who are there today  I ask for your immediate intervention  If this condition persists into Monday, I'm sure you can imagine what is going to happen, given the very limited period set by the Judge  I look forward to your immediate response and action to end this very undesirable situation  Indeed as I yype this, Mona told me that a little while ago a few boxes arrived. They have been searched and now my people are sitting around do nothing  They tried to call your people, but, you guessed it the line is busy  How about some cell phone numbers to end this obnoxious situation

**EXHIBIT**

C

# EXHIBIT D

**Gupta, Mona**

| | |
|---|---|
| **From:** | Gupta, Mona |
| **Sent:** | Friday, July 14, 2006 7:26 PM |
| **To:** | Calia, Kurt |
| **Cc:** | Beckmann, Richard; Bernstein, Alan H ; Butcher, Colleen; Somma, Jason T |
| **Subject:** | RE: Document searching in Titusville |



**EXHIBIT**

D

Kurt - You have mischaracterized the situation. Your points are addressed in order below.

First, when we arrived at the Janssen conference room today, there were not dozens of boxes waiting for our review. There were approximately 10 boxes in the room. Now if Rich and Todd had reviewed dozens of boxes before our arrival, that is another matter, but the numbering on the boxes does not reflect that.

Second and third, while it is true that Rich explained to us that it is taking them longer to review the boxes because they have to review each document, that does not explain why only two people were conducting the review when I advised you late Wed night that 3 people would be attending the inspection on Friday. I hope having 5 people screening on Monday will expedite our review process. Your comments about the pace of our review is out of line and not for you decide. We have told you in the past the types of documents we are seeking so the amount of time that it takes us to search for such documents is for us to decide under the time constraints imposed. Your delay arguments are uncalled for since this issue has already been decided by the Court and obviously the Court does not blame Defendants entirely otherwise he would not have allowed the inspection. As I stated in my earlier e-mails, I am not going to re-argue this point since it was already addressed.

Fourth, you are simply wrong about the phone situation. You are also wrong that your colleagues supplied us boxes when it appeared that we were ready because had that been the case we would not have had to constantly call your colleagues on the conference room phone only to hear a busy signal, sometimes for up to a half an hour. When I asked Rich for his cell phone number, he said that he had Sprint and was not getting a signal and then I asked for Todd's cell phone number and Rich refused stating that he was not going to ask Todd to give out his cell phone number. This was especially inconsiderate when we made it known to both Rich and Todd the numerous time that the phone was been busy for extended periods of time and therefore is delaying our review process. Also, under your protocol we were not permitted to leave the conf room without an escort and therefore could not contact your colleague by any other means. Your colleagues supplied us with the boxes when THEY were ready (not when WE were ready), which resulted in us just sitting around for approximately 1 hr with nothing to do and wait for boxes. As for the number of boxes that we reviewed, the count is 46 not 56. There were 10 boxes that were screened and not produced for inspection.

Fifth, we did not violate the protocol under the circumstances. The one situation that Rich brought to our attention was one box that was partially filled with hanging folders. In that situation, your colleagues placed loose sheets of paper for folders/docs that were removed and you can appreciate that since the loose sheets of papers were placed vertically in between the hanging folders, it is natural that during the transportation, some of these loose sheets fell to the

bottom of the box and we had no way of knowing where they were originally placed. Indeed we apologized and my colleague Colleen requested Rich that in such situations Rich place a post-it or some other adhesive material so the sheets do not slip. Rich did not give any affirmative response.

Finally, for Monday's inspection and to expedite matters, we propose that we begin the inspection at 11 am and continue straight through with the inspection until 4 pm with no lunch break. Now Rich indicated that we had to leave the premises for lunch between 12-1 but that I should address this point with you. As such, do we have to leave the Janssen premises from 12-1 or can we continue with the inspection from 11-4 non-stop? Your answer will determine what time we will begin on Monday.

Also, with respect to the documents that we flagged today, we expect that the binder/folder/tab from which they came from will also get copied so that we can keep track of the documents. To the extent that your colleagues have pulled any documents on the basis of attorney-client privilege, we expect that you will be providing us with a privilege log.

Mona

---

**From:** Calia, Kurt [mailto:kcalia@cov.com]
**Sent:** Fri 7/14/2006 5:16 PM
**To:** Bernstein, Alan H.
**Cc:** Gupta, Mona; Beckmann, Richard
**Subject:** RE: Document searching in Titusville

Alan:

You are incorrect on all counts, and I might suggest that before you make assertions such as these, you provide me with the courtesy of a telephone call to discuss them. Also, you should know that your colleagues have violated the protocol that we established for the review of these documents, and it is critical that you give this matter your immediate attention. If you cannot abide by our agreement, indeed we will have a problem. In any event, I will address the points raised in your email in order, and then turn to the instance in which you have deviated from the protocol.

First, we began our pre-review of the documents immediately upon the Court's order, and in fact had dozens of boxes reviewed by this morning when your colleagues arrived at the facility -- no small feat in the two days since the Court's Tuesday Order. Thus, it is simply inaccurate for you to claim, completely without foundation, that there was no advance screening.

Second, I understand that your team has rifled through the production in cusory fashion because you are focused on a very narrow set of documents. Unfortunately, and as I explained to you earlier, our pre-review simply cannot be accomplished as quickly because we are obligated to safeguard our client's privileged and confidential information, and thus must review each document to make sure that it does not contain privileged or other sensitive, non-responsive information. My colleague, Rich Beckmann, explained this to Ms. Gupta and the others in attendance for Alphapharm, who acknowledged that they understood. Frankly, given defendants' delay -- recognized by the Court -- of many months in turning to these documents, your claim of delay rings hollow, and appears designed for some other purpose.

8/15/2006

RE: Document searching in Titusville

Third, we cannot have access to the facility over the weekend. This
should be of no surprise since it is not simply a storage facility, but
an actual business location. And while we are not certain as to how
quickly we will be able to pre-review the boxes so as to facilitate
further inspection Monday morning, we are increasing our pre-review
resources to pick up the pace of the pre-review. We expect to have 5
people conducting this review on Monday, which is a significant
commitment of resources by any objective measure. Again, and as noted
above, your review may move at a faster pace, but that is not a
reflection of our diligence. Indeed, had you bothered to initiate this
process in February when we first identified these materials, none of us
would be in the situation of dealing with this inspection while we
finalize expert reports. But, as the Court stated, the defendants were
"asleep at the switch." It is for that reason that the Court gave you
only a "very limited crack" at reviewing these documents, and further
stated that you are "getting a break . .  in getting any time at all to
look at [them]."

Fourth, as to your claim that your colleagues have had trouble getting a
hold of my colleagues, I do not understand that to have been a problem.
To the contrary, we have been periodically checking in on your
colleagues and have supplied additional boxes for inspection when it
appears you are ready to receive and inspect them. While there may be
instances in which the telephone in our conference room is tied up, the
fact of the matter is that you have had access to and in fact have
inspected a substantial number of boxes today (56, I am told).

In sum, other than your inappropriate email, there's no "obnoxious
situation" to be remedied here. And the unprofessional tone of your
email does nothing to promote the amicable resolution of this matter.

Now, I must bring to your attention a significant issue that has arisen
on your side. As you know, we made clear that the boxes in Titusville
are working files from people at the company that were gathered for
purposes of this case. As such, the order of documents has to be
preserved, or else folks will have documents returned in a manner other
than as they maintain them when the inspection is completed, which would
be highly disruptive to Janssen's business operations. For that reason,
we made clear that the order of the documents could not be altered in
any fashion, and we have specified a protocol of tape flags to identify
the beginning and end of a range to be copied. I have learned that
because of the slipshod manner in which your colleagues are rifiling
through the documents, they're being jumbled out of order. While this
may not seem of consequence to you, it is of significant concern to us.
We have pointed out this deviation of the production guidelines we
agreed upon. Your colleagues agreed that they had done so and even
apologized, but it cannot continue. I therefore ask you to confirm
that you will not alter the order of these documents (or make any other
alterations of them) while you conduct your inspection.

Sincerely,
Kurt G. Calia
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2401
202.662.5602 (v); 202.778.5602 (f)
kcalia@cov.com; www.cov.com
This message is from a law firm and may contain information that is
confidential or legally privileged. If you are not the intended
recipient, please immediately advise the sender by reply e-mail that
this message has been inadvertently transmitted to you and delete this
e-mail and any attachments from your system. Thank you for your
cooperation.

8/15/2006

Case 1:05-cv-00356-SLR     Document 302-2     Filed 08/16/2006     Page 18 of 40
RE: Document searching in Titusville
Page 4 of 4

-----Original Message-----
From: Bernstein, Alan H. [mailto:abernstein@crbcp.com]
Sent: Friday, July 14, 2006 3:27 PM
To: Calia, Kurt
Cc: Gupta, Mona
Subject: Document searching in Titusville

Kurt:

There are problems with the lack of cooperation today on the part of
your people. First, there are only 2 Covington people at the storage
facility. These people apparently did no advance screening of the boxes
before today or whatever they did was inadequate. I believe they should
have been working at the facility as early as Wednesday afternoon. The
net result is that my people are sitting around twidling their thumbs
waiting for your people to bring in more boxes. My people tried to call
them, but their phone is constantly busy and under the rules my people
cannot get up and go down the hall to knock on the door. Indeed, we do
not even know where they are. My people have been told that your people
will not come in over the weekend to build up a supply of boxes that we
could start searching at about 9 to 9:15. Thus, unless you intervene
immediately, it does not make sense for all of us to arrive on Monday at
9:00 to 9:15 am to sit around and do nothing.

If this situation persists, then Monday will be a disaster when I will
be there together with our people who are there today. I ask for your
immediate intervention. If this condition persists into Monday, I'm sure
you can imagine what is going to happen, given the very limited period
set by the Judge. I look forward to your immediate response and action
to end this very undesirable situation. Indeed as I yype this, Mona told
me that a little while ago a few boxes arrived. They have been searched
and now my people are sitting around do nothing. They tried to call your
people, but, you guessed it the line is busy. How about some cell phone
numbers to end this obnoxious situation.

# EXHIBIT E

**Gupta, Mona**

| | |
|---|---|
| From: | Gupta, Mona |
| Sent: | Tuesday, July 18, 2006 7:04 PM |
| To: | 'Calia, Kurt' |
| Cc: | Beckmann, Richard; Bernstein, Alan H.; Butcher, Colleen; Somma, Jason T |
| Subject: | RE: Document searching in Titusville |

Kurt - For tomorrow's inspection, we will arrive at 10am and continue with the inspection non-stop until 4pm like we did on Monday. I address each of your points below.

First, if 50 boxes had been pre-reviewed before we had arrived, that does not explain why we had significant amounts of down time waiting for your colleagues to pre-review the boxes. The only reason that we did not continue with the inspection on Tuesday (today) is because of this significant down time and so it only made sense to give your colleagues a day to accumulate boxes so that we would not have to waste our time waiting for boxes to review. I take issue with your characterizing our review of the documents as "rifling" through them. We know the types of documents that we are searching for and therefore can easily spot them.

Second and third, you are with a big firm with multiple offices and can supply additional individuals to pick up the pace. As for your comment that "very little has been flagged," that is subjective and has no correlation to the amount of time that we spend on reviewing the documents. I will not bother responding to the remainder of this paragraph since it was already addressed before and the Court did grant our Motion for inspecting the boxes.

Fourth, although Rich Beckmann told us to direct any issues that we had with you, I don't recall him telling me that I specifically had to call you directly on it. Furthermore, Alan sent you an e-mail before the close of business day setting forth the problems that we were facing. Thus your attempt to make it appear that you were not made aware of the problems until after the close of business day is truly disingenuous. Furthermore, it appears that you prefer e-mails to phone calls because yesterday when we asked Rich to check with you about continuing with the inspection on Wed and not Tues so that your colleagues could accumulate boxes for us to review and avoid the down-time that we were constantly facing, Rich said that he could not convey your response to us and that it had to be put into an e-mail. Granted you did speak with Alan on the telephone and told him that continuing the document review on Wed is fine, the point is that your attempt to make a distinction between a phone call and an e-mail makes no sense. What's important is that we conveyed to you our message about the problems that we were facing before the close of business and whether it was by telephone or e-mail is irrelevant.

Please explain to me by what you mean by I was "just wrong on the box count." I was at the document inspection, you were not. I have a list of the boxes that we went through on Friday and it was 46 boxes. Your colleagues' records on this are probably inaccurate because Rich asked to look at my notes/list to see which boxes were not delivered to us for our review.

Fifth, you do not have to explain to me the purpose of document control sheets. You are wrong that the problem arises when the contents of the boxes are moved by us and this is apparent by your failure to address the situation where there was a half a box of hanging folders with control sheets placed vertically that slipped to the bottom of the box before our review.

If you wish to discuss further, please do not hesitate to call me.
Regards,
Mona

```
-----Original Message-----
From: Calia, Kurt [mailto:kcalia@cov.com]
Sent: Monday, July 17, 2006 12:37 PM
To: Gupta, Mona
Cc: Beckmann, Richard; Bernstein, Alan H.; Butcher, Colleen; Somma, Jason T.
```

EXHIBIT

E

Subject: RE: Document searching in Titusville

Mona

I will address these points in turn. I should also let you know at the outset, that we have arranged for you to be able to work through the lunch hour, and I understand that this will be communicated to you orally by my colleagues.

First, there were in fact about 50 boxes that had been reviewed in advance of your arrival. Not all 50 were included in the review room because it is easier to keep track of a smaller number (in terms of our pre-review, your inspection, and our need to check inspected boxes to make sure that no problems have arisen in terms of the order of materials). Now that we know that Alphapharm's review appears to amount to a very quick rifling through the documents, we are now delivering to you all of the boxes that have been pre-reviewed.

Second and third, you do not disagree (nor could you) that it takes longer to conduct the pre-review than your review. While you appear to be able to skim materials quickly to determine whether there's anything of interest (and we note, very little has been flagged as of interest so far), we cannot review materials quickly because we have to make sure that no privileged, patient-confidential, or other irrelevant, sensitive information is presented to you for inspection. Thus, there's simply no way to avoid the slower pre-review and the time needed to conduct it. Of course, this would not have prevented a problem to anyone had you decided to inspect these documents last February when we first discussed them. And as for the defendants' delay, the Court's comments speak for themselves and I need not repeat them here.

Fourth, given that we're getting you the materials as soon as they're ready, there should be no need for you to call and request additional ones, and so there's no need for us to discuss the phone situation further. Having said that, my colleague Richard Beckmann made clear to you on Friday that should you have any issues, you could call me directly. I did not hear from you about any alleged problems other than by email and after the close of business. If you really had a concern, I would have expected a call. And I also understand that you're just wrong on the box count.

Fifth, your statement that you did not violate the protocol "under the circumstances" is telling -- either you did or you did not, and the fact of the matter is that you did. We added document control sheets -- a standard practice in document production -- to identify areas in which materials that you are not reviewing (e.g., information concerning Razadyne ER or clinical data) have been removed, so that we can return them to the boxes once the inspection is completed and thus maintain the order of the documents. It should not be difficult for you to conduct the review and preserve the order of the contents of the boxes, including the document control sheets. Indeed, by not leaving them where we placed them, it is impossible for us to put back the material we've removed during the pre-screen, and thus impossible for us to maintain the integrity of the boxes when we re-assemble them. As I understand it, the problem arises when contents are moved by your team without regard to where the document control sheets are. Moreover, it is also clear that the problems are not limited to document control sheets. For example, we understand that the box that was being reviewed at the end of the day on Friday was separated into four parts and left that way over the weekend. This morning, when we saw how the review was being conducted and Rich Beckmann asked how you intended to re-assemble that box to preserve the order of documents, your colleagues could not confirm that they could do so. In any event, I certainly hope that this is not an insurmountable problem and that you can handle the files with greater care. If not, I will have no other choice than to ask one of my colleagues to join you in the inspection room to supervise the handling of the documents. My client has authorized me to deny access to you if you're unable or unwilling to maintain the order of these materials. I surely hope it does not come to that, and no doubt the Court would not wish to deal with this inspection issue again. It should not be difficult for you to comply with your commitment to maintain the order of these original documents

Sixth, we've discussed this morning's start, so there's no need to elaborate -- I refer you to my earlier emails.

Lastly, we will comply with our discovery obligations with regard to any privilege log. If you have any questions or concerns, please do not hesitate to call me.

2

# EXHIBIT F

**Gupta, Mona**

| | |
|---|---|
| From: | Calia, Kurt [kcalia@cov com] |
| Sent: | Friday, July 14, 2006 5:17 PM |
| To: | Bernstein, Alan H. |
| Cc: | Gupta, Mona; Beckmann, Richard |
| Subject: | RE: Document searching in Titusville |

**EXHIBIT**

F

Alan:

You are incorrect on all counts, and I might suggest that before you make assertions such as these, you provide me with the courtesy of a telephone call to discuss them. Also, you should know that your colleagues have violated the protocol that we established for the review of these documents, and it is critical that you give this matter your immediate attention. If you cannot abide by our agreement, indeed we will have a problem. In any event, I will address the points raised in your email in order, and then turn to the instance in which you have deviated from the protocol.

First, we began our pre-review of the documents immediately upon the Court's order, and in fact had dozens of boxes reviewed by this morning when your colleagues arrived at the facility -- no small feat in the two days since the Court's Tuesday Order. Thus, it is simply inaccurate for you to claim, completely without foundation, that there was no advance screening.

Second, I understand that your team has rifled through the production in cusory fashion because you are focused on a very narrow set of documents. Unfortunately, and as I explained to you earlier, our pre-review simply cannot be accomplished as quickly because we are obligated to safeguard our client's privileged and confidential information, and thus must review each document to make sure that it does not contain privileged or other sensitive, non-responsive information. My colleague, Rich Beckmann, explained this to Ms. Gupta and the others in attendance for Alphapharm, who acknowledged that they understood. Frankly, given defendants' delay -- recognized by the Court -- of many months in turning to these documents, your claim of delay rings hollow, and appears designed for some other purpose.

Third, we cannot have access to the facility over the weekend. This should be of no surprise since it is not simply a storage facility, but an actual business location. And while we are not certain as to how quickly we will be able to pre-review the boxes so as to facilitate further inspection Monday morning, we are increasing our pre-review resources to pick up the pace of the pre-review. We expect to have 5 people conducting this review on Monday, which is a significant commitment of resources by any objective measure. Again, and as noted above, your review may move at a faster pace, but that is not a reflection of our diligence. Indeed, had you bothered to initiate this process in February when we first identified these materials, none of us would be in the situation of dealing with this inspection while we finalize expert reports. But, as the Court stated, the defendants were "asleep at the switch." It is for that reason that the Court gave you only a "very limited crack" at reviewing these documents, and further stated that you are "getting a break . . . in getting any time at all to look at [them]."

Fourth, as to your claim that your colleagues have had trouble getting a hold of my colleagues, I do not understand that to have been a problem.
To the contrary, we have been periodically checking in on your colleagues and have supplied additional boxes for inspection when it appears you are ready to receive and inspect them. While there may be instances in which the telephone in our conference room is tied up, the fact of the matter is that you have had access to and in fact have inspected a substantial number of boxes today (56, I am told).

In sum, other than your inappropriate email, there's no "obnoxious situation" to be remedied here. And the unprofessional tone of your email does nothing to promote the amicable resolution of this matter.

Now, I must bring to your attention a significant issue that has arisen on your side. As you know, we made clear that the boxes in Titusville are working files from people at the company that were gathered for purposes of this case. As such, the order of documents has

1

to be preserved, or else folks will have documents returned in a manner other than as they maintain them when the inspection is completed, which would be highly disruptive to Janssen's business operations. For that reason, we made clear that the order of the documents could not be altered in any fashion, and we have specified a protocol of tape flags to identify the beginning and end of a range to be copied. I have learned that because of the slipshod manner in which your colleagues are rifiling through the documents, they're being jumbled out of order. While this may not seem of consequence to you, it is of significant concern to us.
We have pointed out this deviation of the production guidelines we agreed upon. Your colleagues agreed that they had done so and even
apologized, but it cannot continue. I therefore ask you to confirm
that you will not alter the order of these documents (or make any other alterations of them) while you conduct your inspection.

Sincerely,
Kurt G. Calia
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2401
202.662.5602 (v); 202.778.5602 (f)
kcalia@cov.com; www.cov.com
This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail and any attachments from your system. Thank you for your cooperation.


-----Original Message-----
From: Bernstein, Alan H. [mailto:abernstein@crbcp.com]
Sent: Friday, July 14, 2006 3:27 PM
To: Calia, Kurt
Cc: Gupta, Mona
Subject: Document searching in Titusville

Kurt:

There are problems with the lack of cooperation today on the part of your people. First, there are only 2 Covington people at the storage facility.These people apparently did no advance screening of the boxes before today or whatever they did was inadequate. I believe they should have been working at the facility as early as Wednesday afternoon. The net result is that my people are sitting around twidling their thumbs waiting for your people to bring in more boxes. My people tried to call them, but their phone is constantly busy and under the rules my people cannot get up and go down the hall to knock on the door. Indeed, we do not even know where they are. My people have been told that your people will not come in over the weekend to build up a supply of boxes that we could start searching at about 9 to 9:15. Thus, unless you intervene immediately, it does not make sense for all of us to arrive on Monday at 9:00 to 9:15 am to sit around and do nothing.

If this situation persists, then Monday will be a disaster when I will be there together with our people who are there today. I ask for your immediate intervention. If this condition persists into Monday, I'm sure you can imagine what is going to happen, given the very limited period set by the Judge. I look forward to your immediate response and action to end this very undesirable situation. Indeed as I yype this, Mona told me that a little while ago a few boxes arrived. They have been searched and now my people are sitting around do nothing. They tried to call your people, but, you guessed it the line is busy. How about some cell phone numbers to end this obnoxious situation.

# EXHIBIT G

**Gupta, Mona**

| | |
|---|---|
| From: | Gupta, Mona |
| Sent: | Thursday, July 20, 2006 10:57 AM |
| To: | 'Calia, Kurt' |
| Cc: | Beckmann, Richard; Bernstein, Alan H.; Butcher, Colleen; Somma, Jason T ; 'Ulrich, Lynn MacDonald'; Gracey, Taras; Hersi, Mustafa |
| Subject: | RE: Document searching in Titusville |

Kurt - I will respond to the contents of your e-mail but first I want to address the remaining boxes in Somerset, NJ   We have decided that we need to begin reviewing these documents as soon as possible.  However, due to the significant down time that we had experienced when your team was pre-reviewing the documents just before delivering them to us, we propose that your team have at least one full day to pre-review the documents before we begin our review.  With that said, we propose that we begin the review on Monday morning(July 24th).  As before, we understand that your team will screen the boxes and not deliver to us documents that contain privileged materials, patient sensitive information or the ER formulation (or other non-Galantamine formulation).  Also as before, you had agreed that your team would screen and not deliver to us boxes or files that contain raw clinical data or adverse events info.

While we understand that the Court ordered that the document review take place in two weeks, at George's request for a couple of extra days if needed to screen the documents, the Court stated that "if you need more time, within bounds of reason, you take more time."  Therefore, I don't see a problem if a couple of extra days are needed to complete the review.

I will provide a brief response to your e-mail below since the review in Titusville has been completed.

I still disagree with your characterization of our document review as "rifling" through the documents.  I am not going to get into you math but there were several boxes that were far from being full so I disagree with your numbers as well as your attempt to guess how much time we spent to review a single piece of paper.  This does not accomplish anything.

As for e-mail correspondence versus a telephone conversation, I stand by what I said earlier.

With respect to the documents that relate only to the ER formulation that we allegedly flagged, please let us know their box number(s) as well as any title of the file folder or binder from which they came from so that we can check our notes.

Thanks,
Mona

-----Original Message-----
From: Calia, Kurt [mailto:kcalia@cov.com]
Sent: Wednesday, July 19, 2006 1:13 PM
To: Gupta, Mona
Cc: Beckmann, Richard; Bernstein, Alan H.; Butcher, Colleen; Somma, Jason T.
Subject: RE: Document searching in Titusville

Mona

I understand that the inspection has been completed, and so there's little to be gained from a lengthy email exchange on the subject, but we are compelled to respond to some of your points as distortions of the record.

Your team reviewed 128 boxes in Titusville within a week of the Court's Order-- documents that we made available to you the day after that Order.  Given that the average box contains about 3,000 pages of documents, you have managed to review about 384,000 pages of documents in about 13.5 hours of review time, which breaks down to about 28,444 pages per hour, 474 pages per minute, or nearly 8 pages per second.

**EXHIBIT**

G

# EXHIBIT H

```
                                                              ┌─────────────────────┐
                                                              │      EXHIBIT        │
Gupta, Mona                                                   │                     │
                                                              │ ᵗᵃᵇᵇⁱᵉˢ˙    H       │
                                                              └─────────────────────┘
```

| | |
|---|---|
| **From:** | Calia, Kurt [kcalia@cov.com] |
| **Sent:** | Thursday, July 20, 2006 5:00 PM |
| **To:** | Gupta, Mona |
| **Cc:** | Beckmann, Richard; Bernstein, Alan H ; Butcher, Colleen; Somma, Jason T ; Ulrich, Lynn MacDonald; Gracey, Taras; Hersi, Mustafa |
| **Subject:** | RE: Document searching in Titusville |

Mona:

We're surprised to receive this request about your desire to inspect the approximately 1,200 boxes of documents in storage at the Iron Mountain facility.  As you are no doubt aware, Alan and I spoke about these documents on Monday, and I indicated that he would confer with you about whether you desired to do so and get back to me later that day. Your email this morning was the first request for access to the Iron Mountain materials since the hearing on July 11  So yet again defendants have delayed addressing the inspection of documents.

More importantly, your email does not address the point I raised with Alan on Monday, which concerns Alan's representation to the Court that Alphapharm wished to inspect the approximately 150 boxes of documents in Titusville but not the 1,200 boxes at Iron Mountain.  Specifically, I refer you to the following exchange:

     MR. BERNSTEIN: I can make a statement to Your Honor, we have no desire to search all of the 1,350 boxes. Many of the materials, as stated in the letters we received from Janssen's counsel, we are not interested in.  We're not interested in adverse events reports.  We're not interested in raw data.  We're just interested in promotional materials.  Now, I understand there may be 150 documents at one storage facility --

     THE COURT: 150 boxes.

     MR. BERNSTEIN: -- and the other 1,200 are somewhere else.  What I would propose is that somehow our people take a shot at those documents.  They are manageable, although even 150 boxes are a lot of documents.

See July 11, 2006 Hearing Tr. at 25.  Accordingly, Alphapharm pursued an inspection of only the Titusville documents -- a strategy reflected in the Court's Order which set a limited period of two weeks to complete that inspection (which Alphapharm completed yesterday).

Plaintiffs' view is, of course, entirely sensible and consistent with the Court's Order. With approximately 1,200 boxes in storage (at various Iron Mountain facilities), assuming about 3,000 pages of documents per box, there are approximately 3.6 million pages of documents in storage -- a quantity that could not be pre-screened and inspected in the two-week window set by the Court (indeed, it would take months to accomplish that task). The comments during the hearing by my colleague, George Pappas, concerned the additional time that might be needed to pre-screen the Titusville documents.  You will recall that those remarks occurred near the end of the hearing and after the statement by Alan Bernstein quoted above.  It would be manifestly unreasonable to interpret George's statement that we might need only a few days to screen 1,200 boxes of documents, no matter what resources were dedicated to that task.  As it turned out, we were able to make the Titusville documents available to you the day after the hearing with the Court (Alphapharm chose not to begin its inspection for another two days, appearing first on Friday, July 14).

Accordingly, we do not believe that Alphapharm is entitled to inspect the 1,200 boxes in storage at Iron Mountain -- an inspection that could not be completed (or even begun in earnest) by the July 25 deadline.
And we are unwilling to ignore the Court's Order and let the inspection slip into the future.  As you will recall, the Court made clear that the parties cannot adjust the schedule set by the Court, which would include the two-week inspection window.

To respond to your other inspection-related question, we will identify the boxes from

1

which you flagged ER-only material as promptly as we can, so that you can determine whether anyone had taken notes on that material and, if so, destroy them.

Sincerely,
Kurt

Kurt G. Calia
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2401
202.662.5602 (v); 202.778.5602 (f)
kcalia@cov.com; www.cov.com
This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail and any attachments from your system. Thank you for your cooperation.


-----Original Message-----
From: Gupta, Mona [mailto:monagupta@crbcp.com]
Sent: Thursday, July 20, 2006 10:57 AM
To: Calia, Kurt
Cc: Beckmann, Richard; Bernstein, Alan H.; Butcher, Colleen; Somma, Jason T.; Ulrich, Lynn MacDonald; Gracey, Taras; Hersi, Mustafa
Subject: RE: Document searching in Titusville


Kurt - I will respond to the contents of your e-mail but first I want to address the remaining boxes in Somerset, NJ. We have decided that we need to begin reviewing these documents as soon as possible. However, due to the significant down time that we had experienced when your team was pre-reviewing the documents just before delivering them to us, we propose that your team have at least one full day to pre-review the documents before we begin our review. With that said, we propose that we begin the review on Monday morning(July 24th). As before, we understand that your team will screen the boxes and not deliver to us documents that contain privileged materials, patient sensitive information or the ER formulation (or other non-Galantamine formulation). Also as before, you had agreed that your team would screen and not deliver to us boxes or files that contain raw clinical data or adverse events info.

While we understand that the Court ordered that the document review take place in two weeks, at George's request for a couple of extra days if needed to screen the documents, the Court stated that "if you need more time, within bounds of reason, you take more time." Therefore, I don't see a problem if a couple of extra days are needed to complete the review.

I will provide a brief response to your e-mail below since the review in Titusville has been completed.

I still disagree with your characterization of our document review as "rifling" through the documents. I am not going to get into you math but there were several boxes that were far from being full so I disagree with your numbers as well as your attempt to guess how much time we spent to review a single piece of paper. This does not accomplish anything.

As for e-mail correspondence versus a telephone conversation, I stand by what I said earlier.

With respect to the documents that relate only to the ER formulation that we allegedly flagged, please let us know their box number(s) as well as any title of the file folder or binder from which they came from so that we can check our notes.

2

# EXHIBIT I

**Gupta, Mona**

**EXHIBIT**

I

| | |
|---|---|
| From: | Gupta, Mona |
| Sent: | Thursday, July 20, 2006 6:45 PM |
| To: | Calia, Kurt |
| Cc: | Beckmann, Richard; Bernstein, Alan H ; Butcher, Colleen; Somma, Jason T ; Ulrich, Lynn MacDonald; Gracey, Taras; Hersi, Mustafa; Cottrell, Frederick; gaza@RLF com |
| Subject: | RE: Document searching in Titusville |

Kurt - Needless to say that we disagree with your characterization of the situation.

If Alan had told you that he would get back to you on Monday of this week about searching the documents at the Iron Mountain facility, that was probably under the expectation that we would have finished the inspection on Monday since you had additional people on your team for the pre-review process and we had an additional person (Alan) compared to Friday's inspection. However, because we experienced significant down time due to waiting for your team to pre-review the boxes, we were not able to finish reviewing the boxes on Monday and had to give your team a full day to pre-review the boxes so that they could accumulate a sufficient inventory of boxes for us to review. We had to finish reviewing the boxes at Titusville before we could determine whether there was a need to move to the next location. Since we finished reviewing the boxes yesterday, my e-mail to you this morning about reviewing the documents at Iron Mountain was timely.

As for your citation to the July 11th hearing transcript, you have taken the words out of context. Alan never represented that he was withdrawing his request for inspecting the 1200 boxes at the second location Our letter motion made it clear that we were seeking inspection of all 1350 boxes, and that is what the Court granted. When Alan said that he was not interested in searching all of the 1350 boxes, he was referring to NOT searching the boxes that contained raw clinical data or adverse events data.

You are clearly wrong that the additional time that George requested was with respect to pre-screening the Titusville documents. In fact, George made is abundantly clear that he was asking for additional time to pre-screen all of the 1350 boxes, which the Court granted provided it was "within bounds of reason" and the Court noted that Plaintiffs could have began the screening a long time ago:

```
 6        MR. PAPPAS:  Yes, Your Honor.  Only one issue,
 7   and that is with respect to the 1,350 boxes, we will start
 8   screening those now.  We're reviewing them for production
 9   and will endeavor obviously to review them and turn them
10   over within 14 days, and believe we can do so.  But if we
11   need a couple of extra days, we may have to come back to the
12   Court for that.
13            THE COURT:  Well, that is all right because I
14   said, and am trying to make clear, while I don't think the
15   plaintiffs here are utterly without fault, you could have
16   been doing this screening a long time ago, ...
```

(See July 11, 2006 hearing tr. at 36, lines 6-16)

You state that the 1200 boxes are in storage "at various Iron Mountain facilities" - are all of these facilities in Somerset, NJ? I note that your June 15, 2006 letter to Amy Brody stated that the boxes are in two locations, about 150 of them are in Titusville and "about 1200 of them are at an Iron Mountain storage facility in Somerset, NJ." Such language indicated to me that the 1200 boxes are in one location in Somerset. Please explain.

You have mischaracterized the availability of the documents for inspection on July 12th, the day after the hearing. You sent me an e-mail around noon on July 12th stating that the documents in Titusville are available for our inspection. How did you expect us to review documents on July 12th with such little notice, at a site that is approximately 1 hr from Philadelphia with the further restriction that we had stop the inspection at 4pm? Further, you did not send us the protocol for the document inspection until approximately

1

7pm on July 12th stating that we needed to agree to the protocol before the inspection. We did not begin the inspection on July 13th because we were afraid that we may experience down time so we were hoping that your team would have built up a sufficient inventory of boxes for our review on July 14th, but to our dismay that did not happen causing significant down time for us.

If you do not reconsider your position and allow us to begin the inspection at the Iron Mountain facility on Monday, then you will leave us no alternative other than to seek the Court's assistance. I look forward to an early response to my e-mail.

Regards,
Mona


-----Original Message-----
From: Calia, Kurt [mailto:kcalia@cov.com]
Sent: Thursday, July 20, 2006 5:00 PM
To: Gupta, Mona
Cc: Beckmann, Richard; Bernstein, Alan H.; Butcher, Colleen; Somma, Jason T.; Ulrich, Lynn
MacDonald; Gracey, Taras; Hersi, Mustafa
Subject: RE: Document searching in Titusville

Mona:

We're surprised to receive this request about your desire to inspect the approximately 1,200 boxes of documents in storage at the Iron Mountain facility. As you are no doubt aware, Alan and I spoke about these documents on Monday, and he indicated that he would confer with you about whether you desired to do so and get back to me later that day. Your email this morning was the first request for access to the Iron Mountain materials since the hearing on July 11. So yet again defendants have delayed addressing the inspection of documents.

More importantly, your email does not address the point I raised with Alan on Monday, which concerns Alan's representation to the Court that Alphapharm wished to inspect the approximately 150 boxes of documents in Titusville but not the 1,200 boxes at Iron Mountain. Specifically, I refer you to the following exchange:

    MR. BERNSTEIN: I can make a statement to Your Honor, we have no desire to search all of the 1,350 boxes. Many of the materials, as stated in the letters we received from Janssen's counsel, we are not interested in. We're not interested in adverse events reports. We're not interested in raw data. We're just interested in promotional materials. Now, I understand there may be 150 documents at one storage facility --

    THE COURT: 150 boxes.

    MR. BERNSTEIN: -- and the other 1,200 are somewhere else. What I would propose is that somehow our people take a shot at those documents. They are manageable, although even 150 boxes are a lot of documents.

See July 11, 2006 Hearing Tr. at 25. Accordingly, Alphapharm pursued an inspection of only the Titusville documents -- a strategy reflected in the Court's Order which set a limited period of two weeks to complete that inspection (which Alphapharm completed yesterday).

Plaintiffs' view is, of course, entirely sensible and consistent with the Court's Order. With approximately 1,200 boxes in storage (at various Iron Mountain facilities), assuming about 3,000 pages of documents per box, there are approximately 3.6 million pages of documents in storage -- a quantity that could not be pre-screened and inspected in the two-week window set by the Court (indeed, it would take months to accomplish that task). The comments during the hearing by my colleague, George Pappas, concerned the additional time that might be needed to pre-screen the Titusville documents. You will recall that those remarks occurred near the end of the hearing and after the statement by Alan Bernstein quoted above. It would be manifestly unreasonable to interpret George's statement that we might need only a few days to screen 1,200 boxes of documents, no matter what resources were dedicated to that task. As it turned out, we were able to make the Titusville documents available to you the day after the hearing with the Court (Alphapharm chose not to begin its inspection for another two days, appearing first on Friday, July

# EXHIBIT J

## Gupta, Mona

| | |
|---|---|
| **From:** | Calia, Kurt [kcalia@cov.com] |
| **Sent:** | Friday, July 21, 2006 2:29 PM |
| **To:** | Gupta, Mona |
| **Cc:** | Beckmann, Richard; Bernstein, Alan H ; Butcher, Colleen; Somma, Jason T ; Ulrich, Lynn MacDonald; Gracey, Taras; Hersi, Mustafa; Cottrell, Frederick; gaza@RLF com |
| **Subject:** | RE: Document searching in Titusville |

Mona:

It would appear that we have a different understanding of what documents Alphapharm represented to the Court it would inspect.  We dismiss any suggestion that our pre-review process has been in any way deficient.
As you know, we inspected approximately 334,000 pages of documents in a matter of a few days to enable Alphapharm to complete its inspection at Titusville in advance of the Court-ordered deadline, and as we have made clear, our pre-review of privileged and non-responsive, sensitive documents simply must be more careful that Alphapharm's rifling through the documents at a pace of about 8 pages per second.  Under the circumstances, there is simply no basis for you to complain that our pre-review, which we have always maintained would be required, was inappropriate.

Moreover, your email fails to explain why if Alphapharm was truly interested in (or entitled to) the Iron Mountain documents it delayed until 9 days after the meet-and-confer to seek to inspect them.  Surely Alphapharm would have understood the need to devote substantial resources to the inspection of 1,200 boxes of documents, and it would be manifestly unreasonable not to run inspection efforts at the two locations in parallel (with a much greater number of lawyers than the 3 you dedicated to that task) if your request and the Court's Order have extended to the Iron Mountain documents as well.  Your email does not explain why the review of Titusville had to be completed before you could inspect the Iron Mountain documents.  Under the circumstances, your belated request to inspect them coming only 3 business days before the close of the inspection period set by the Court simply makes no sense.  And Alan's representations to the Court speak for themselves and I will not repeat them again here.

As to George Pappas' statement, we note that when you quote the hearing transcript, you omitted important text that undermines your position.
As you know, the Court went on to state (after the ellipsis on your email) that "it certainly is the case that I view the defendants as primarily culpable for the problem that exists.  So if you need more time, within bounds of reason, you take more time.  You guys work it out, and the defense is in a poor position to complain."  Your request to begin the inspection of 1,200 boxes of documents with only 2 business' days notice and to begin the day before the Court's deadline is not within the bounds of reason, and you are in a poor position to complain.

To address your question about the number of Iron Mountain facilities, we respond that the documents are spread among various facilities, but the process for review will require them to be pooled at a single Iron Mountain facility in Somerset, NJ where there is a conference room in which to conduct the inspection.  The point I was making in my earlier email is that we simply cannot snap our fingers and make available 1,200 boxes of documents, for this reason as well as for the reason of the need to conduct the pre-review.

In any event, we do not believe that Alphapharm is entitled to inspect the Iron Mountain documents and your email does not warrant a different conclusion.

Sincerely,
Kurt G. Calia
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2401
202.662.5602 (v); 202.778 5602 (f)
kcalia@cov.com; www.cov.com
This message is from a law firm and may contain information that is confidential or



**EXHIBIT**

J

1

# EXHIBIT K

**Gupta, Mona**

| | |
|---|---|
| **From:** | Calia, Kurt [kcalia@cov com] |
| **Sent:** | Monday, July 24, 2006 12:06 PM |
| **To:** | Bernstein, Alan H ; Gupta, Mona |
| **Subject:** | In re: '318 Patent Infringement Litigation |

Mona

Concerning our earlier telephone conversation concerning the document inspection, I again ask you to explain why Alphapharm delayed 9 days (from July 11 when we first conversed on the inspection until your July 20 email) before seeking to inspect the documents at Iron Mountain (to which we believe you are not entitled in any event based on your representations to the Court). During our telephone call, you refused to explain that delay, and you refused to explain what you had in mind for inspecting the Iron Mountain documents when you emailed me on Thursday (seeking inspection today and tomorrow, the last day of the inspection period).  As I stated during our call, your refusals do not help the parties reach an understanding as to the nature of this dispute.

In any event, as to the reasons for Janssen's position, I again refer you to my earlier emails.

Sincerely,
Kurt G. Calia
**Covington & Burling LLP**
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2401
202 662 5602 (v); 202.778 5602 (f)
kcalia@cov com; www.cov.com
*This message is from a law firm and may contain information that is confidential or legally privileged  If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail and any attachments from your system  Thank you for your cooperation*

**EXHIBIT**

tabbies

K

8/15/2006

# EXHIBIT L

**Gupta, Mona**

| | |
|---|---|
| **From:** | Gupta, Mona |
| **Sent:** | Monday, July 24, 2006 4.08 PM |
| **To:** | 'Calia, Kurt'; 'sbalick@ashby-geddes com'; 'jday@ashby-geddes com' |
| **Cc:** | Bernstein, Alan H.; Cottrell, Frederick; 'Gaza, Anne'; Ulrich, Lynn MacDonald; Gracey, Taras; 'Hersi, Mustafa'; 'jcp@pgslaw com'; 'bef@pgslaw com' |
| **Subject:** | RE: In re: '318 Patent Infringement Litigation |

Kurt – You are wrong that I refused to explain Alphapharm's reasons for the inspection at Iron Mountain. In fact, I have explained to you our reasons and you have refused to accept them. For example, I have explained to you that we needed to finish the document inspection at Titusville before moving on to the next location. Your refusal to accept this explanation is not our fault and does not create a delay on our part in moving forward with the inspection at Iron Mountain. Your attempt to inquire further into why we had to complete the inspection at Titusville before moving to Somerset was an intrusion upon work product. We learned during the inspection at Titusville that the documents we were reviewing are the "working files" of the Janssen employees Therefore any earlier versions of the types of documents that we are seeking probably exist at the Iron Mountain location and we are entitled to conduct an inspection for such documents. Furthermore, the defendants have served on plaintiffs requests for documents that cover marketing related materials and we are entitled to inspect such documents

Further to our meet and confer today, we have contacted the Court and have been provided with the following dates:

     (1)     August 14th at either 11 am or 2 pm
     (2)     August 18th at either 9 am or 4 pm

We prefer to hold the telephone conference with the Court on August 14th at 11 am. Please let us know your availability

Regards,
Mona

**From:** Calia, Kurt [mailto:kcalia@cov.com]
**Sent:** Monday, July 24, 2006 12:06 PM
**To:** Bernstein, Alan H.; Gupta, Mona
**Subject:** In re: '318 Patent Infringement Litigation

Mona

Concerning our earlier telephone conversation concerning the document inspection, I again ask you to explain why Alphapharm delayed 9 days (from July 11 when we first conversed on the inspection until your July 20 email) before seeking to inspect the documents at Iron Mountain (to which we believe you are not entitled in any event based on your representations to the Court). During our telephone call, you refused to explain that delay, and you refused to explain what you had in mind for inspecting the Iron Mountain documents when you emailed me on Thursday (seeking inspection today and tomorrow, the last day of the inspection period). As I stated during our call, your refusals do not help the parties reach an understanding as to the nature of this dispute.

In any event, as to the reasons for Janssen's position, I again refer you to my earlier emails.

Sincerely,
Kurt G. Calia
**Covington & Burling LLP**
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2401
202.662.5602 (v); 202.778.5602 (f)

EXHIBIT

L

8/15/2006

# EXHIBIT M

**Gupta, Mona**

| | |
|---|---|
| **From:** | Calia, Kurt [kcalia@cov com] |
| **Sent:** | Wednesday, July 12, 2006 6:41 PM |
| **To:** | Gupta, Mona |
| **Cc:** | Bernstein, Alan H |
| **Subject:** | RE: '318 patent case |

Mona (and Alan):

I did get Alan's message, and I understand that you plan to review the documents that we have made available to you today starting on Friday, July 14.  You can begin the review with the understanding that the restrictions described below will apply (which are required given that the inspection will be at a Janssen facility).

Document Review Protocol:

1.  We will need the names of all attendees (attorneys, paralegals, etc.) prior to the inpsection.  Only those individuals who have been identified to us a business day in advance will be allowed entrance into the building.   You will be permitted access from 9:00 AM to 4:00 PM.

2.  You will be allowed access to the facility and documents only when accompanied by a Janssen designee.  We will set aside a room for the inspection and provide the boxes to you.  You will be accompanied by an escort at all times, and are required to leave the building for lunch.

3.  No cameras, video cameras or recording devices of any kind will be allowed into the building.  This includes computer laptops or any other device that can record electronically stored materials (which may be included in the materials for inspection).  If you wish to review media (CD, DVD, Video, etc.) that is being insected, it needs to be tagged for copying but should not be viewed on the premises and copying is not permitted.

4.  Specific instructions as to how to mark documents for copying as well as an ample supply of copy tags will be provided.

5.  Copying will be done by a J&J approved vendor in a reasonable period of time.

6.  The party requesting copies will bear the cost of copying.

Assuming  that these conditions are acceptable to you, we will plan to see you on Friday.  Please confirm.

Sincerely,
Kurt G. Calia
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2401
202.662.5602 (v); 202.778.5602 (f)
kcalia@cov.com; www.cov.com
This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail and any attachments from your system. Thank you for your cooperation.


-----Original Message-----
From: Gupta, Mona [mailto:monagupta@crbcp.com]
Sent: Wednesday, July 12, 2006 4:22 PM
To: Calia, Kurt
Cc: Bernstein, Alan H.
Subject: RE: '318 patent case

Kurt - There was a typo in my e-mail, I meant July 14th.

EXHIBIT

tabbies

M