**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: '318 PATENT INFRINGEMENT LITIGATION | ) ) ) ) ) | **REDACTED PUBLIC VERSION** Civil Action No. 05-356-SLR (consolidated) |

**PLAINTIFFS' POST-TRIAL ANSWERING BRIEF**

**APPENDIX I:**
**TRIAL TRANSCRIPT EXCERPTS**

ATTORNEYS FOR PLAINTIFFS

*Of Counsel*
George F. Pappas
Roderick R. McKelvie
Christopher N. Sipes
Kurt G. Calia
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-662-6000

Patricia Clarke Lukens
Office of General Counsel
Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
732-524-2805

*Of Counsel*
For Plaintiff, Synaptech, Inc.
Edward V. Filardi
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
212-735-3060

Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. #3950)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

Date: August 22, 2007

# TABLE OF CONTENTS

## APPENDIX I: TRIAL TRANSCRIPT EXCERPTS

| TAB | WITNESS | TRANSCRIPT PAGE RANGE |
|---|---|---|
| 1 | Dr. Allan Levey | pg. 86 - pg. 354 |
| 2 | Dr. Edward Domino | pg. 366 - pg. 502 |
| 3 | Dr. Bonnie Davis | pg. 680 - pg. 844 |
| 4 | Dr. Joseph Coyle | pg. 845 - pg. 1007 |
| 5 | Dr. Karen Kauffman | pg. 1008 - pg. 1030 |
| 6 | Dr. Kenneth Davis | pg. 1031 - pg. 1062 |
| 7 | Dr. Murray Raskind | pg. 1063 - pg. 1280 |
| 8 | Dr. Marion Stewart | pg. 1299 - pg. 1389 |
| 9 | Other Transcript Excerpts | pg. 1404 - pg. 1418 |
| 10 | Dr. Magid Abou-Gharbia | pg. 1420 - pg. 1449 |
| 11 | Dr. Cheryl Blume | pg. 1450 - pg. 1472 |
| 12 | Dr. Gary King | pg. 1481 - pg. 1512 |

## APPENDIX II: TRIAL EXHIBITS

| TAB | PX/DX | EXHIBIT NUMBER |
|---|---|---|
| 1 | PX | 1 |
| 2 | PX | 2 |
| 3 | PX | 14 |
| 4 | PX | 119 |
| 5 | PX | 121 |
| 6 | PX | 122 |
| 7 | PX | 123 |
| 8 | PX | 153 |
| 9 | PX | 173 |
| 10 | PX | 213 |
| 11 | PX | 214 |
| 12 | PX | 305 |
| 13 | PX | 323 |
| 14 | PX | 329 |
| 15 | PX | 467 |
| 16 | PX | 526 |
| 17 | PX | 586 |
| 18 | PX | 595 |
| 19 | PX | 596 |

| TAB | PX/DX | EXHIBIT NUMBER |
|---|---|---|
| 20 | PX | 631 |
| 21 | PX | 632 |
| 22 | PX | 633 |
| 23 | PX | 653 |
| 24 | PX | 663 |
| 25 | PX | 680 |
| 26 | PX | 704 |
| 27 | PX | 706 |
| 28 | PX | 714 |
| 29 | PX | 719 |

**APPENDIX III:**
**TRIAL EXHIBITS AND ADDITIONAL AUTHORITIES**

| TAB | PX/DX | EXHIBIT NUMBER |
|---|---|---|
| 30 | PX | 727 |
| 31 | PX | 756 |
| 32 | PX | 763 |
| 33 | PX | 810 |
| 34 | PX | 811 |
| 35 | PX | 812 |
| 36 | PX | 818 |
| 37 | PX | 820 |
| 38 | PX | 829 |
| 39 | PX | 833 |
| 40 | PX | 1061 |
| 41 | PX | 1122 |
| 42 | PX | 1181 |
| 43 | PX | 1223 |
| 44 | PX | 1228 |
| 45 | PX | 1245 |
| 46 | PX | 1246 |
| 47 | PX | 1247 |
| 48 | PX | 1248 |
| 49 | PX | 1321 |
| 50 | PX | 1339 |
| 51 | PX | 1350 |
| 52 | PX | 1364 |
| 53 | PX | 1365 |
| 54 | PX | 1366 |
| 55 | PX | 1372 |
| 56 | PX | 1397 |

| TAB | PX/DX | EXHIBIT NUMBER |
|---|---|---|
| 57 | PX | 1398 |
| 58 | PX | 1399 |
| 59 | PX | 1400 |
| 60 | PX | 1401 |
| 61 | PX | 1401a |
| 62 | PX | 1402 |
| 63 | DX | 74 |
| 64 | DX | 483 |
| 65 | DX | 557 |
| 66 | DX | 629 |
| 67 | DX | 651 |
| 68 | DX | 655 |
| 69 | | United States Patent and Trademark Office Memorandum, "Supreme Court decision on *KSR Int'l Co., v. Teleflex, Inc.*", May 3, 2007 |

# EXHIBIT 1

Q. And can you describe to the Court just generally the nature of the disease from the patient's perspective?

A. This disease almost always begins with insidious onset of the memory problems, which progress over time to develop into more serious memory problems, and then begin to affect other higher brain functions, such as judgment and reasoning, such as language ability, such as perception and recognition. It also -- so those are the cognitive aspects of the disease.

But we've known forever that the disease also affects behavioral problems. Alzheimer's first patient was a woman who had paranoid delusions. It's part of the illness. Personality changes are also frequently a part of the illness, as is depression.

So it's a devastating disease that affects, over the course on average of about eight to ten years, individuals' cognitive abilities, their behavior and their functional abilities.

Q. Okay. And is there a variance in the progression of the disease?

A. There is. Just like there's variance in all of our own abilities to start with, this is a disease that affects everybody a little bit differently. The course of the disease is very broad. Again, as I said, it's on average

results in enhancement of cholinergic functioning.

Q. Okay. What is the effect of Razadyne on a patient who receives it?

A. The effect on a patient is that it actually varies. Some patients, first of all, respond. Some people, you know, don't see much of a response.

If you give the drug to a lot of patients, overall, you'll see that there's some stabilization of clinical symptoms for the most part. One might see that -- again, a few patients may show some benefits in memory, in thinking abilities, but for the most part, there seems to be some stabilization of the symptoms over about a six to 12-month period, sort of in one -- what one thinks would happen if the person hadn't been taking the drug.

Q. Is Razadyne the only cholinesterase inhibitor available on the market today?

A. No, it's not. Also available are Exelon (phonetic) and Aricept.

Q. And are any of those preferred at this point?

A. My reference is Aricept and I think that's still the most widely prescribed drug. I guess I should add that I guess tacrine is still theoretically available, though it's not prescribed any more.

Q. All right.

A. It was FDA approved.

Q. The retrieval categories basically confirm the same thing; is that right?

A. That's right.

Q. Now, Dr. Drachman's finding about the importance of acetylcholine in memory function, was that confirmed over the years?

A. Yes, it was. People went -- there were hundreds of studies in humans and animals and in some cases they continue to this day.

Q. Is the finding accepted to this day?

A. Yes, it is.

Q. Let's talk about Alzheimer's disease.

What was the next step in this progression of determining the importance of acetylcholine in Alzheimer's disease?

A. As I mentioned, there really hadn't been much work on Alzheimer's disease at all until about the seventies when it was believed that there was insight to senility. That led people to begin to investigate for the first time in a serious way the possible causes of Alzheimer's disease.

Really one of the first steps that led to insights beyond what was already known in that plaques and tangles was a discovery that there is an acetylcholine deficiency associated with the actual brain disease.

Q. Let's go to the timeline again.

What have you indicated there on the timeline?

- - -

A. One of the first groups was actually Peter Davies. They reported a paper in 1976 in the Lancet.

Q. That should be in your folder. Defendants' Exhibit 139.

A. Yes. I have it.

Q. And can you just identify that by title and author and publication for the record, please?

A. This was the title of the article was, it's a letter to the editor in Lancet published Christmas Day 1976 entitled, selective loss of central cholinergic neurons in Alzheimer's disease.

Q. Was this worked you relied upon in forming your opinions in this case?

A. Yes.

Q. Is it a reliable authority?

A. Yes.

Q. One of the articles relevant to the level of skill in the art relevant to the patent in this case?

A. Yes.

MR. LOMBARDI: I offer it, your Honor.

MR. SIPES: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

A. Well, this was one of the first times I think that the cholinergic hypothesis term was used. And it referred to the idea that a reduction in acetylcholine or the deficiency in the cholinergic containing cells contributes to Alzheimer's disease and the fact that she said functional abnormalities means that it contributes to the functional loss in Alzheimer's disease. I.e., it contributes to cognitive impairment, perhaps behavioral impairment. Just generally it contributes to actual clinical symptoms of the disease.

Q. Acetylcholine contributes to the clinical symptoms of the disease?

A. That's right.

Q. All right. Now, with the cholinergic hypothesis out there, did that lead scientists to think about possible treatments?

A. It absolutely did. That was certainly one of the most compelling aspects of this hypothesis in that the corollary of it was that it should lead one to treatment strategies.

Q. And what's the fundamental -- we'll talk about various strategies, but what's the fundamental idea behind treatment strategies based on the cholinergic hypothesis?

A. The cholinergic hypothesis states that basically

cholinergic function is inadequate or failing and so that the premise is that when one wants to improve or restore cholinergic functioning through whatever strategy possible.

Q. Just so we have this out there, is the cholinergic hypothesis sometimes also referred to as the cholinergic deficit hypothesis?

A. Yes.

Q. Same thing?

A. Same thing.

Q. Let's put the next slide up.

Again, this is our slide of the synaptic region of the brain, and let's go to the next one, please.

The pre-synaptic region. Were there treatment strategies considered relating to acetylcholine in the pre-synaptic region?

A. There were. In fact, they were the first most immediately available ways to try to enhance the cholinergic synaptic functioning was through means that might, that were postulated to be able to increase acetylcholine synthesis and release.

Q. All right. And so when we talk about pre-synaptic treatment involving acetylcholine, what -- what are you talking about doing?

A. What you are really talking about doing for the most part is giving humans oral precursors to acetylcholine.

So we saw that choline is the substrate that gets turned into acetylcholine. You can actually give humans choline like through Lecithin will be --

Q. Lecithin is a drug?

A. Right. Or a nutritional supplement. Some might orally give supplements with the hope that it would raise acetylcholine in the brain.

Q. All right. And next, please.

The post-synaptic. What would be a post-synaptic treatment strategy to try to increase acetylcholine?

A. It's would be to develop drugs had a that would directly stimulate the post-synaptic -- by binding to muscarinic receptors or nicotinic receptors. A direct acting agonist.

Q. What's an agonist?

A. A drug that mimics acetylcholine, will stimulate the receptor.

Q. As of 1986, had there been any successes with the pre-synaptic approach?

A. By and large results were no. Because it was such an immediately available thing to try, there had been some animal studies suggesting, there were probably 15 or so studies that were performed by the early 1980s, mid-1980s, and almost universally, the studies in humans

Q. Okay. And when you say -- when it says partially reverse the memory deficit, what does that indicate to you?

A. Well, it was clear from the get-go, you could measure some improvement in memory and sometimes other cognitive tests. They realized patients were not back to normal. These are people with Alzheimer's disease.

Q. Similar to the way galanthamine works today?

A. Yes. Extremely difficult to see major clinical benefits in most people.

Q. Is there a place in the article that gives a good example of the results that they received in this testing?

A. Yes.

Q. And I will refer you to Page 1422.

A. So there on Page 1422 in the right column is Table 2, which I think nicely illustrates the type of results that they saw and describe clear clearly in their paper.

Q. Okay. Well, let's start. It talks about this being mean percent correct on the recognition memory test.

What was the recognition memory test?

A. The recognition memory test consisted of giving a series of words, for example, or a series of pictures and then asking the patient over and over to learn this long list of words or pictures. Then they would come back after time and show the patient the same words or the same

pictures mixed with words or pictures they hadn't seen before and ask, test the memory of the patient by seeing if they could sort out which ones they had seen from which ones they hadn't seen.

Q. There are ten pages. If you could describe what the results are in the table, please...

A. Sure. Well, first of all, this was what was considered the replication phase of the study, so I should mention that there were two parts to the study.

The first part of the study, they actually tested different doses in each patient as we saw in the abstract, because they wanted to find the dose that was best for any one patient. That turned out to be a very important step in their approach to studying these drugs.

In the replication phase, tested that single best dose that worked for any one patient and compared it with placebo in a double-blinded controlled manner.

Q. And what column here is the column that shows you the result really?

A. Well, the difference is shown between the placebo and on the drug physostigmine is shown by the final column on the right, so the chain.

So you can see among these ten patients who had all responded in the first phase, when they were given this replication phase, eight of the ten patients

was used?

A. That's right. It's just another variation of similar memory task to what we've seen before.

Q. Okay. And what does the table reflect about the results?

A. What it shows is the actual percent change in how much better the memory was or how much worse their memory would be if that were the case on the drug versus placebo.

So, for example, if you look at patient one there, in the first column it says sum of recall. It shows there was a 19-percent improvement in their memory after taking the oral physostigmine. And so what you can see is you just quickly look down that column, every single one of the eight, at least respond errs they showed there, showed that they improved, a positive memory effect with the oral physostigmine.

Same way when you look at another memory task, this is the retrieval for long-term storage of memory, one found again that there were positive -- positive responses on memory that could be measured. So, again, patient one, for example, showed 57-percent improvement in their memory. The number of items they actually recalled was 57-percent higher on the physostigmine compared to the placebo.

And then the third column ask is a different type of memory. It's called intrusions or almost like a

name of which is Tetrahydro aminoacridine. So THA is tacrine.

Q. Okay. And it identifies THA or tacrine as a centrally acting anti-cholinesterase; is that right?

A. Yes.

Q. What does that mean?

A. It means it has the ability to get into the brain so it can affect higher brain functions.

Q. Okay. And that's physostigmine was a centrally acting anti-cholinesterase?

A. Yes.

Q. Galanthamine?

A. Galanthamine is a centrally acting anti-cholinesterase as well. I say cholinesterase inhibitor.

Q. When we say those, when they refer to anti-cholinesterase, what does that mean with respect to cholinesterase inhibitor?

A. It is a cholinesterase inhibitor.

Q. Same thing. Are they used synonymously?

A. Yes.

Q. All right. So what is reflected in this work by summers and colleagues?

A. Well, what they did is they tried giving patients with Alzheimer's disease a -- 12 unselected cases, intravenous tacrine. And then they used some memory

tests and some global sort of staging tests to determine if there is a benefit on memory and what they considered as sort of a global functioning of the patients.

Q. Okay. And what did they find?

A. Well, what they found, as it says here, significant improvement in memory testing occurred in six of twelve subjects and nine of twelve improved in clinical staging.

Q. Okay. And are those results reported elsewhere in the article?

A. Yes.

Q. Okay. Let's go to the next slide and Page 150.

A. So on Page 150 on the top is their Table 2, which is entitled, Maximum Change in Clinical Staging after THA.

Q. Okay. And let me just ask you, when it says clinical staging, what exactly is it referring to?

A. Well, as I mentioned, they did a very global clinical staging, so they had sort of the health care professionals there, nurses and doctors, sort of evaluate these patients and they used this rating scale that they come up with or had been around, staging the patient zero through six. Basically, stage zero means there's no signs of dementia present when they examined the patient. Stage six would be somebody who's bed-bound and completely unresponsive.

So zero is basically no clinically evident disease. Six is the most significant disease you could

and to determine if the addition of an acetylcholine precursor can produce greater improvement in memory than physostigmine alone.

Q. Let's stop there. There's a reference to precursor. What does that refer to?

A. Again, the pre-synaptic approach.

Q. Okay. And had there been success in the pre-synaptic approach by this time?

A. No, there hadn't, but there were questions at the time about whether combining the two might actually be more effective.

Q. All right. And the next sentence, please.

A. Presently, physostigmine has limited usefulness due to its very short duration of action, less than one hour, and the high incidence of peripheral cholinergic side effects.

Q. Do you have an understanding of what peripheral cholinergic side effects refers to?

A. It means the side effects of too much acetylcholine action outside the brain. For example, in the stomach, the nausea and vomiting, effects on the gastrointestinal system. That would be an example of peripheral side effect.

Q. Okay. And in the last line, it says, However, it has served as a useful pharmacological model.

5/21/2007 Final Trial Transcript

that article out, please?

A. I have that here.

Q. Okay. And can you read the title of the article and the authors so we have that in the record, please?

A. This is entitled Reversal of Central Anticholinergic Syndrome by Galanthamine. It's published in JAMA, which is the Journal of the American Medical Association, in 1977.

Q. And JAMA is an authoritative journal?

A. Yes. A very prestigious medical journal.

Q. Is this an article that you have relied upon in coming to your opinions in this case?

A. Yes.

Q. Is it a reliable authority?

A. Yes.

Q. Is it relevant to determining the level of ordinary skill in the art for purposes of this case in 1986?

A. Yes, it is.

Q. Okay. Let's put the article up on the screen, please.

And this is from the abstract. Could you first describe generally the work that's described in the article, please?

A. Okay. Well, there's a medical problem that occurs, not uncommonly, where people get intoxicated or overdosed with drugs that block acetylcholine. Drugs have that certain property and taken too much, can cause toxicity.

It's associated with confusion, delerium, hallucinations, all sorts of things. And this article is about testing whether galanthamine is able to reverse it or correct the problem.

Q. Okay. And so in this case we're talking about ten volunteers were given scopolamine intravenously; is that right?

A. That's right.

Q. Again, this is the same scopolamine we saw referred to when we were talking about studies about memory and acetylcholine; is that right?

A. That's right.

Q. Okay. And so what happened when these ten volunteers were given scopolamine and then galanthamine?

A. What they did is they obviously gave the scopolamine by design rather than intoxication, which sometimes happens clinically, and they gave them medicine so that -- they were actually medical students. They became sleepy, actually hallucinated, things like that.

So they developed anticholinergic syndrome. They demonstrated they could do that.

Measured their brain waves while that was occurring. And then they gave galanthamine, to see if they could make the students better.

Q. Okay. And what happened?

A. This gloomy picture is thoroughly wiped out and a favorable result readily obtained when one of the treatable underlying causes is detected.

So this is the category of dementias that he's calling reversible dementias that we still consider reversible dementias today.

Q. Okay. I'm just being obvious about that, but what's a reversible dementia?

A. He gives the good example that we still search for in every patient today, including B12 deficiency or thyroid hormone deficiency. So if that's causing the dementia, one could find the cause of it, it's possible you could reverse the symptoms by replacing the hormone.

Q. Is another category of dementia referenced in the second paragraph?

A. Yes. The second paragraph discusses the category of dementia that he says can be arrested.

Q. What is arrested dementia?

A. That's when the cause of the dementia can be identified and corrected, but the dementia will not itself get significantly better. So an example of that might be a brain tumor, a head injury, or a stroke. In fact, today multi-infarct dementias is one of the leading causes of dementia, multiple strokes. If you prevent further strokes from happening, the dementia will be arrested and there

will be no further decline. So that's an arrested dementia.

Q. Okay. And then the third paragraph on the screen right now, does that refer to another category of dementia?

A. It does. It refers to the irreversible cases of dementia.

Q. Okay. And what is meant by an irreversible case of dementia?

A. Everything that is not arrestible or reversible. So it's basically all the progressive dementias, which, of course, the bulk of the dementia cases --

Q. Okay. Okay. So let me ask you this: Did those three categories cover the waterfront of types of dementia? Reversible, arrested and irreversible?

A. They do.

Q. Okay. And what category of dementia does Alzheimer's disease fit into?

A. Without a doubt, Alzheimer's disease belongs in the category of irreversible dementias.

Q. Would one of skill in the art in 1974 have known that?

A. Yes.

Q. And would one of skill in the art in 1986 have known that?

A. Absolutely.

Q. Okay. Now let's look at the sentence about

A. I do see that.
Q. Okay. Then it says, They have suggested measures of improving the higher functions in cases of local brain damage like tumor, head injury, infarct, et cetera, by deinhibitory procedures and re-education of the rest of the brain.
A. I do see that.
Q. Okay. Does that sound familiar to you? Does that description sound familiar to you?
A. That's exactly really what was described in great detail in that chapter we reviewed already.
Q. That chapter talked about deinhibition?
A. That's right.
Q. There's a reference to specific brain injury, like tumor, infarct, what do those maladies have to do with dementia?
A. He has already put them in the category of the arrested dementias, so these are conditions that cause arrested dementia as he described earlier in the paper. So they cause problems with higher cortical functions, but they don't get progressively worse.
Q. Okay. But do they show the kind of -- the kind of effect that dementias can have; is that right?
A. That's right.
Q. All right. And the next sentence says, deinhibition

refers to the facilitation of acetylcholine activity by giving small daily doses of cholinesterase inhibitors, neostigmine, galanthamine.
Do you see that?
A. Yes.
Q. What is the reference there?
A. What he's saying is that one could give cholinesterase inhibitors, such as neostigmine and galanthamine, and that by doing so, it could bring back the life of the silent synapses. That's the deinhibition.
What the cholinesterase inhibitor would do, it would facilitate acetylcholine and improve the brain functions through deinhibition.
Q. All right. Now, Doctor, was this an article about local brain damage?
A. It was an article about dementia as the title clearly alluded to and local brain damage as he would clearly give -- can cause a form of dementia, which he considered arrested dementia.
Q. And so what do you take this reference to daily doses of cholinesterase inhibitors like galanthamine to mean?
A. To me, it's absolutely inherent in this paper where he's putting this in context that he's suggesting cholinesterase inhibitors might be tried for treating

dementia, arrested dementia. That one might restore cortical functions, as has been shown to be the case for local brain injury.
Q. All right. And progressive dementias include Alzheimer's disease; is that right?
A. That's right.
Q. Okay. Doctor, if we could go to Slide 59, please. Skip ahead to 59.
Thank you.
Okay. Doctor, let's talk about some of your opinions in this case. I have presented you with a standard for invalidity under the doctrine of anticipation; is that right?
A. Yes.
Q. And ask you to express an opinion based on that.
A. Yes.
Q. Okay. And is this the standard I provided you with?
A. Yes, it is.
Q. So it's a single prior-art reference that discloses either expressly or inherently each limitation of a claim invalidates that claim by anticipation.
Do you see that?
A. I do.
Q. Do you have an opinion about whether using the sciences of ordinary skill in 1986, the Bhasker article

A. Yes, it does.

Q. Why do you say that?

A. Because as we just walked through it, it talked about treatment of patients with progressive dementia, which includes Alzheimer's disease. It's inherent in that.

Q. All right. And referring to the administration to a patient suffering from such a disease, an amount of galanthamine. Does Bhasker make reference to that part of the claim?

A. He clearly does. He talks about administering -- he talks about administering small daily doses of cholinesterase inhibitors, including galanthamine.

Q. All right. Okay. And does Bhasker make reference to administering a therapeutically effective amount of galanthamine?

A. Yes, he does.

Q. And in what way do you believe that Bhasker says that?

A. Well, I think it's -- again, sort of inherent. He's talking about improving cortical functions. And so that is a therapeutically effective amount sufficient to improve brain functions.

Q. Okay. And would one of skill in the art in 1986, based on your review of the art concerning galanthamine, have known what a therapeutically effective amount of

galanthamine would be?

A. Yes.

Q. Okay. So, Doctor, in sum, based on that definition of the standard of anticipation, do you believe that Claim 1 of the '318 patent is anticipated by the Bhasker reference?

A. Yes, I do.

Q. Okay. All right. Have you also arrived at an opinion concerning obviousness, Dr. Levy?

A. I have.

Q. Okay. Let's go to the next slide.

And have I provided you with some standards concerning obviousness as well?

A. You have.

Q. Okay. And this is straight from Section 103(a) of the Patent Code, the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

You understand that is the standard for obviousness?

A. I do.

Q. All right. Now let's go to the next slide.

doubt.

It was clearly -- there was a huge amount of support for a cholinergic deficit hypothesis that the deficiency of acetylcholine contributes to the symptoms. This was hugely investigated, lots of support for that idea.

And then we had the studies from physostigmine and tacrine and multiple studies from really leading investigators in the field, showing that there can be positive effects in patients with Alzheimer's disease that you could measure that occasionally they would be clinically significant. Not always, and that these effects were certainly not a home run like we talked about, but there were certainly still positive benefits.

And then we had that proof of principle from two different drugs in the class, physostigmine and tacrine.

For those reasons, I think one had very reasonable expectation of success that you could use a drug, galanthamine, that was already known to have all the properties and more that also had been compared through its use in Eastern Europe with physostigmine and known to be safe, really well tolerated. Dosing was known. It was very effective to the point that, for the first time, we were seeing people recording benefits on cognitive abilities from the work of Luria, Pernov and Daskalov, all those groups. Hundreds of patients.

refer to?

A. The acetylcholinase inhibitor as well as the nicotinic allosteric modulator.

Q. Do you agree with Dr. Coyle that the dual mechanism of that action remain unsettled?

A. I do.

Q. Let's go to the next slide, please. The next unexpected benefit that plaintiffs raise is, experts raise, is reduction of caregiver burden slash distress.

Are you familiar with plaintiffs allegations in this regard?

A. Yes, I am.

Q. What do you understand plaintiffs' experts to be saying in this regard?

A. The allegation is that by treating the patient with Alzheimer's disease, that the caregivers had a reduced burden and that reduced burden is actually an unexpected reduced burden.

Q. Do you agree that a reduced burden to a caregiver is an unexpected benefit of an Alzheimer's disease treatment?

A. After caring for nearly a thousand patients a year, the answer is definitely no.

Q. Okay. Why do you say that that is not an unexpected benefit?

A. There are all sorts of things that contribute to

caregiver burden. I mean, this is the thing that makes this disease absolutely devastating, that's why it's a 36-hour day for caregivers. People with Alzheimer's need constant supervision when it gets severe. That could be for a variety of reasons. Cognitive loss is certainly one example of caregiver burden.

For example, the patient who cannot stay home alone because they don't know how to pick up a phone and call if they need help or if they're concerned they might wander out of the house and get lost because of their cognitive disabilities, that provides tremendous caregiver burden because they've got to provide round the clock supervision.

Similarly, I think it was alluded to earlier, behavioral problems are the greatest reason that people end up in a nursing home. When somebody has behavioral problems and they can no longer even be managed at home, that leads to institutionalization. That also is a huge source of caregiver burden.

Functionally, people may have functional impairment when -- for example, they need help dressing or they need help toileting. That again provides additional caregiver burden.

What we know with these drugs is that they improve symptoms. They can improve cognitive symptoms.

They can improve behavioral symptoms and they can improve overall functionability.

It's obviously, to me, and I think anybody skilled in the art that if you -- if you reduce the symptoms, the cognitive symptoms that we just went through and somebody can stay home alone or not wander off, that's going to reduce caregiver burden.

So I think that's a very anticipated benefit.

Q. Okay. And actually, are there articles in the art that indicate that caregiver burden is reduced when cholinesterase inhibitors are given to Alzheimer's patients?

A. Yes. I think this has been demonstrated through all the cholinesterase drugs. One can measure the positive effects on caregiver burden.

Q. All right. Let's look at DX-580, please.

And can you identify that document for the record, please?

A. Yes. This is abstract entitled Donepezil reduces the time caregivers spend providing care: Results of a one-year, double-blind randomized trial in patients with mild to moderate Alzheimer's disease. As authors are Mastey and others.

Q. American Journal of Geriatric Psychiatry?

A. Right. In an abstract published in 2001.

A. That's right.
Q. He showed that by blocking the muscarinic receptors, there was an amnesia induced in normals that seemed to resemble Alzheimer's patients?
A. It seemed to resemble age associated memory loss, not Alzheimer's.
Q. That's what was referred to as the scopolamine model for Alzheimer's?
A. Or the scopolamine model for geriatric memory loss.
Q. Was, in fact, scopolamine used as a model for testing Alzheimer's drugs?
A. I believe it was.
Q. The focus again was on the muscarinic receptors?
A. That's right.
Q. As you mentioned, there are two families, the nicotinic family and the muscarinic family?
A. That's right.
Q. And the focus was on the muscarinic family?
A. Yes.
Q. In fact, your research which you conducted in the late eighties and nineties, focused considerably on the muscarinic receptors?
A. That's right.
Q. You were, in fact, involved with Lily in the development of xanomeline?

A. Yes.
Q. Xanomeline was a drug that was intended to overcome the cholinergic deficit in Alzheimer's disease?
A. Correct.
Q. The goal, much like what was achieved with galanthamine, was to improve patient symptoms by overcoming their cholinergic deficit?
A. That's right.
Q. And your idea that you worked with Lily on was to directly stimulate the muscarinic receptor; correct?
A. That's right.
Q. In fact, you were very specific you intended to stimulate a particular type of muscarinic receptor?
A. That's right.
Q. So you very deeply focused down on the muscarinic receptor; is that correct?
A. That's right.
Q. And that was induced in large part because of this link between the muscarinic receptors and memory; is that correct?
A. That's right.
Q. And Lily took it all the way through large-scale phase three trials; correct?
A. They did.
Q. Now, in the late nineties, it failed. It was not

approved as a treatment for Alzheimer's; correct?
A. It -- I would couch that. I would say it failed in terms of FDA approval but it didn't fail as a -- as positively improving symptoms in patients with Alzheimer's disease.
Q. It had certain side effect problems?
A. That's right.
Q. And it's not used as a treatment for Alzheimer's disease?
A. That's right.
Q. And from Lily's perspective of having spent half a billion dollars on clinical trials, it was a failure?
A. That may be the case.
Q. The thing I really want to focus on is this model of the cholinergic deficit was a memory-driven model; is that correct?
A. Yes, it was.
Q. And it was focused on the muscarinic receptors; correct?
A. It was.
Q. Now, the other thing that we hadn't really shown in your diagram --
A. If I could just -- I didn't quite finish the answer. It was memory-driven but also from knowledge of humans, blocking muscarinic receptors specifically caused more

than just memory loss. It caused confusions, hallucinations, behavioral problems, all sorts of cognitive impairment beyond just memory loss.
Q. But the focus was on muscarinic receptor?
A. That's right, because blockers of nicotinic receptors didn't really have any pronounced effects at that time. Really the field, state of the art in 1986, was the vast majority of people thought that muscarinic receptors, the preponderance of evidence was that muscarinic receptors was the class that was most important for the symptomology of Alzheimer's disease.
Q. The conventional wisdom was to focus on the muscarinic receptors?
A. That's correct.
Q. The other thing this diagram isn't really showing, the cholinergic system exists throughout the body and the brain?
A. Correct.
Q. Your muscles, do they rely on the cholinergic system?
A. Yes.
Q. That's their nicotinic receptor?
A. And the muscarinic receptor as well.
Q. The neuromuscular junction, are you familiar with that?
A. Yes.

Q. Is that a nicotinic receptor?
A. Predominantly nicotinic, but it has muscarinic aspects.
Q. The gut has cholinergic receptors in it?
A. That's correct.
Q. Are those predominantly muscarinic?
A. It's mixed, but many muscarinic effects in the gut.
Q. Cholinergic effects can have effects in the body and the brain?
A. Yes.
Q. Alzheimer's disease is just the brain?
A. That's right.
Q. And you mentioned that physostigmine had a problem with peripheral cholinergic side effects; is that correct?
A. That's right.
Q. The problem is that cholinesterase is in the body and the brain, too; is that correct?
A. That's right.
Q. And so when you give physostigmine, it doesn't just inhibit it in the brain, it inhibits it in the body and the gut. All through the body; correct?
A. That's right.
Q. And when you inhibit cholinesterase where you don't want to, it causes problems; is that correct?
A. It has a potential to. That's right.

Q. In trying to treat Alzheimer's disease, particularly in light of the problems with physostigmine, what people in the art wanted to do was to finds a cholinesterase inhibitor that worked in the brain but not so much in the body; is that correct?
A. Or to block the effects that occur elsewhere.
Q. By administering some other drug?
A. That's what was done in all those trials. For example, people were administered N methyl scopolamine so that you could block the cholinesterase effects in the peripheral tissues and avoid some of those problems.
Q. Sometimes the cholinesterase inhibitor can be given with something to block the unwanted effects?
A. That's right.
Q. For example, when physostigmine, as a cholinesterase inhibitor, is giving to treat curare poisoning?
A. Yes.
Q. All you want from the physostigmine in that case is the nicotinic effects.

But when you want to treat Alzheimer's disease, the thought was to find a cholinesterase inhibitor that acted predominantly in the brain and not in the body?
A. That would be the ideal objective.
Q. Peripheral cholinergic effects were undesirable?
A. Correct.

Q. Now, I think you testified that galanthamine was used principally for myasthenia gravis before 1986; is that correct?
A. I don't know if it was principally, but I know the articles I read, like Pernov, Pernov's specialty was in muscle diseases, so he described over 100 patients with muscle diseases, myasthenia gravis. Others used it predominantly for other types of conditions.
Q. You've relied on Pernov, so let's see what Pernov says.

MR. SIPES: If we could pull up Plaintiffs' Exhibit 1181...

BY MR. SIPES:
Q. I believe you should still have it in front of you.
A. I will in a minute.

(Pause.)

THE WITNESS: Okay.

BY MR. SIPES:
Q. If you will turn to the second page of Pernov under clinical observations. I think that's what you were citing to.
A. That's right.
Q. Let's turn to the second page.

MR. SIPES: If you could just blow it up, the first paragraph under clinical observations... That one.

BY MR. SIPES:
Q. What does he say in the first sentence about clinical observations?
A. Nivalin's therapeutic range of application above all encompasses diseases of the neuromuscular apparatus -- myestenia gravis, dystrophia, et cetera, and diseases of the periphmotoric neuron. Paresis and paralis. Used to treat some diseases which affect the central motor neuron. Infantile cerebral palsy, multiple sclerosis.
Q. Nivalin again is galanthamine?
A. Yes.
Q. So the indication, the therapeutic range that Pernov is teaching for galanthamine, is above all, that's his word, above all, for diseases of the neuromuscular apparatus. Peripheral diseases?
A. That's right.
Q. So what Pernov was saying was that galanthamine has a lot of activity in the periphery; is that correct?
A. That's right.
Q. And in terms of the type of activity he's pointing to, myasthenia gravis is nicotinic; correct?
A. Right. The symptoms of the neuromuscular apparatus were nicotinic. The central motor neurons I suspect are largely muscarinic.
Q. Above all the indications of nivalin, it's

peripheral --

A. It's peripheral musculature.

Q. In terms of a person in 1986 reading this, they would see it as being above all peripheral and nicotinic?

A. Definitely, I would agree.

Q. If we turn to the next page, or actually the page after that, and the middle paragraph I think is what you referred to.

A. 5986?

Q. 5986. Correct. That will -- this issue of the central motor neuron that you pointed to. In fact, what Pernov says is, the findings of treating diseases involving the central motor neuron, a total of 64 cases in all, are less straightforward; correct?

A. That's right.

Q. So the ones that are above all indicated Pernov are peripheral nicotinic.

I want to take a look at what the art was saying about this.

(Pause.)

MR. SIPES: If I could approach...

THE COURT: Certainly.

(Mr. Sipes handed an exhibit to the witness.)

BY MR. SIPES:

Q. Actually, I will ask you to take a look at Plaintiffs'

Exhibit 653.

A. Okay.

Q. This is an article published in Science magazine in 1982 by Raymond Bartus and others entitled The Cholinergic Hypothesis of Cholinergic -- do you see that?

A. Yes.

Q. You've seen this article before?

A. Yes.

Q. In fact, you've cited in article in your expert reports as a particularly influential article when it was given, did you not?

A. I think it is, yes.

Q. In fact, you indicated, you went and researched it, it has been cited over 3,000 times, almost 300 times by 1986; is that correct?

A. I don't remember those numbers.

Q. And Mr. Bartus or Dr. Bartus, I should say, was a leading figure in Alzheimer's disease?

A. Definitely. A leading researcher in memory loss in acetylcholine.

MR. SIPES: I move the admission of Plaintiffs' Exhibit 653.

MR. LOMBARDI: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Plaintiffs' Exhibit No. 653 was received into evidence.)

BY MR. SIPES:

Q. Why don't we begin, if you will turn to Page 414 of this article. And if we could blow up under Directions for Future Research, the title Directions for Future Research and the first half of the patent.

Okay. So Dr. Bartus sets forth in his article some directions for future research, does he not?

A. Yes, he does.

Q. And he begins by noting, a question that is beginning to emerge is why different cholinomimetics seem to produce different results on memory in geriatric subjects.

Do you see that?

A. I do.

Q. Again, you testified that cholinomimetics, that would be a term that encompassed cholinesterase and other --

A. Not all cholinergic agents. Only those that affect --

Q. Agents that enhance cholinergic effects?

A. Yes.

Q. It would certainly include cholinesterase inhibitors?

A. Definitely.

Q. It would certainly include xanomeline?

A. That's right.

Q. And he's noting that there have been very inconsistent results with trying cholinomimetics, is he not?

A. He is.

Q. And he's, in fact, reviewed studies of cholinomimetics in Alzheimer's patients?

A. Yes.

Q. He has seen inconsistent results?

A. Yes.

Q. He's noting, for example, the absence of clear positive effects of choline and Lecithin on geriatric patients?

A. Yes.

Q. Those were the precursor theory?

A. Yes.

Q. He finds that perplexing, does he not?

A. Apparently he did.

Q. But then he reaches a conclusion based on all of the evidence. He says, among the many possible explanations, one that is consistent with all available data is that the more directly one stimulates the muscarinic receptor, the more robust and consistent are the effects on memory performance in aged subjects; correct?

A. That's right.

Q. So he is recommending a focus on stimulating as directly as possible the muscarinic receptor; is that

correct?

A. I'm not sure he's saying focus on that exclusively. I think he's saying one might expect more pronounced effects.

Q. That would lead in the direction of muscarinic agonist to --

A. That's right.

Q. It would certainly lead away from agents that were weak muscarinic agents; correct?

A. That's definitely true.

Q. And, in fact, let's see what he says about agonists versus physostigmine.

If you could turn with me to the bottom of the page before 413...

Now, you'll note, this is in a section which he refers to as facilitation --

A. Yes.

Q. That's his review of the work on agonists and precursors; correct?

A. For geriatric memory.

Q. Correct.

Q. On the right-hand column at the bottom, he notes that in addition to physostigmine, the muscarinic agonist arecoline --

A. Yes.

Q. After receiving a single injection of arecoline, young adult volunteers exhibited significant improvement in ability to recall recently learned verbal material.

Do you see that?

A. I do.

Q. Then he notes, short-term doses of arecoline can also enhance perform performance on a memory test in aged monkeys and Alzheimer's patients?

A. That's right.

Q. He says in the monkey study, direct comparisons revealed that the effects of arecoline were more robust and less variable than when the same monkeys were tested under either physostigmine or choline; correct?

A. I see that.

Q. So Dr. Bartus, in his highly influential science article, was saying that the results on arecoline in Alzheimer's patients and in animal tests were more promising than with cholinesterase inhibitors; is that correct?

A. I'm not sure he said more promising.

Q. He says more robust and less variable.

A. That's right.

Q. Would that be a good thing or a bad thing?

A. That would be a good thing.

Q. So I think we can agree that he's saying that direct

young monkeys.

Do you see that?

A. Yes.

Q. He says, in addition, scopolamine's age-mimicking effects on memory were shown to be at least somewhat specific to its effects on central muscarinic receptors, since similar age-like effects on memory were not obtained with a number of other drug treatments, including dopaminergic and alpha-adrenergic blockers, several nonspecific and catecholaminergic stimulants, nicotinic receptor blockers, and peripheral anticholinergics?.

A. Yes.

Q. This emphasizes what you've testified to. That the focus in 1986 was on the central muscarinic receptor; is that correct?

A. That's right.

Q. In fact, the study which had shown no similar effects from blocking nicotinic receptors led away from drugs that would be weak muscarinic agents and might focus on the nicotinic system?

A. I think that's fair.

Q. And then if you will look to current status of treatment approaches, the section on Page 343. If you look at the top paragraph, he reviews the current status of efforts to treat Alzheimer's disease by cholinomimetics,

Q. In fact, not only does galanthamine not have specificity for its -- its use above all in the literature had been for peripheral nicotinic effect, myestenia gravis?

A. That's right.

Q. So galanthamine is in the exact opposite direction from what Dr. Bartus is saying in his article; correct?

A. I don't think that's really a fair assessment. It was known that galanthamine had muscarinic and nicotinic properties.

Q. But it was not specific for muscarinic effect?

A. That's right. For sure.

Q. And it had, in fact, significant other effects, including nicotinic effects; correct?

A. That's right. Like all cholinesterase inhibitors.

Q. Certainly from where the art was, one wouldn't go to a weak muscarinic agent; is that correct?

A. Probably not. You'd really want to avoid the side effects. That's really what he was talking about, not dealing with potency. The side effects.

Q. If something is a weak muscarinic agent, then all its other side effects are going to be weak?

A. Depending on the dose.

(Pause.)

article.

The bottom of the left-hand column, that paragraphs begins, Acetylcholinesterase inhibitors show more promise as a treatment strategy in senile dementia of the Alzheimer's type than pre-synaptic agents, perhaps because they do not require pre-synaptic neurons to augment the synthesis of acetylcholine.

A. Yes.

Q. By pre-synaptic agents, what doctor Johns is referring to is precursors like choline and Lecithin; is that correct?

A. That's right.

Q. So she's basically saying they're better than the precursors which did nothing; is that correct?

A. That's right.

Q. So a way of reading it is saying it's better than nothing?

A. Okay.

Q. Then she says, both strategies, however, share a fundamental limitation in that they are dependent on an intact pre-synaptic neuron to provide a substrate for their activity.

Do you see that?

A. I do.

Q. What she's saying is that the cholinesterase inhibitor

can't create more acetylcholine in the synapse than is released by the pre-synaptic neuron. It can only help preserve the acetylcholine that's released?

A. That's absolutely right.

Q. She refers to that as a limitation on cholinesterase inhibitor to treat Alzheimer's disease?

A. She refers to that. It's clearly a limitation. A potential limitation.

Q. That was recognized in the art in 1986?

A. Yes.

Q. These problems may be circumvented by administering cholinergic agents which work directly at post-synaptic receptor cites, since the number of post-synaptic muscarinic binding cites is not reduced in SDAT patients as compared to age matched controls?

A. Yes.

Q. She's suggesting one of the limitations could be avoided in treating Alzheimer's disease by instead using a direct muscarinic agonist?

A. That's correct.

Q. The approach that, in facts, you took; is that correct?

A. That's one of the approaches. Correct.

Q. And she notes in facts that, going further down, that significant cognitive improvement was also measured

Q. It failed; correct?
A. It failed to reach FDA approval, that's right.
Q. Is it considered today a treatment for Alzheimer's disease?
A. Today it's not considered a treatment for Alzheimer's disease.
Q. And when were you given SB-202026 to patients? I believe you have your C.V. in front of you if that will assist you.
A. Here it is.
(Pause.)
- - -
A. It was back in 1996 that the trial was performed.
Q. In the mid-nineties you were giving SB-202026 to patients to try to develop a treatment for Alzheimer's disease; correct?
A. Yes.
Q. You were not giving them galanthamine; correct?
A. Correct.
Q. When were you giving patients xanomeline in order to develop a treatment for Alzheimer's disease?
A. That was around that same period of time.
Q. The mid-nineties?
A. That's right.
Q. Both of these, xanomeline and SB-202026, are muscarinic

agents that you were using? It was to overcome the cholinergic deficit in Alzheimer's disease patients?
A. Yes.
Q. They weren't cures for Alzheimer's disease in all cases. You were attempting to develop a drug to provide alleviation of the cognitive decline; is that right?
- - -
A. That's right.
Q. Now, at this time, did you think there was a need for symptomatic treatment for Alzheimer's disease?
A. Definitely.
Q. Was there a need for a drug that would address the cholinergic deficit in Alzheimer's disease?
A. There was definitely a need to improve the therapy as they talked about. We were far from hitting a home run with available drugs. We had modest benefits and we still had only modest benefits and these were definitely attempts to get better symptomatic benefit.
Q. In 1986, there was an even greater need; correct?
A. Greater than what?
Q. Than in 1996 when at least you had tacrine?
A. Okay.
Q. Is that correct?
A. Sorry?
Q. It was a great need for even a symptomatic treatment

for Alzheimer's need?
A. Correct.
Q. It was a very deeply felt need. There were many people working to try to find even a symptomatic treatment; is that correct?
A. That's correct.
Q. Many people, for example, had devoted themselves to try precursors in an effort to alleviate the cholinergic deficit?
A. Yes.
Q. Many people did work with physostigmine in order to alleviate --
A. Yes.
Q. The invention claimed in the patent here, a treatment for Alzheimer's disease that addresses the cholinergic deficit, that addresses the need that people were looking for in 1986; is that correct?
A. I understand.
Q. You agree with that?
A. I agree.
Q. And it has at least in part met that need; correct?
A. Which -- any of the cholinesterase inhibitors?
Q. Correct.
A. Has partially met the need for symptoms. It's not a very poor job. It has met some need.

Q. You prescribed galanthamine and the other --
A. Yes.
Q. Galanthamine has done a better job than, for example, tacrine?
A. That's right.
Q. Because you don't have the safety problems here for tacrine?
A. That's right.
Q. You prescribed galanthamine?
A. I do.
Q. But you don't prescribe tacrine?
A. Correct.
Q. You prescribe galantamine more than Exelon?
A. Yes.
Q. Exelon has some unfortunate side effects; correct?
A. It does.
Q. It causes a lot of vomiting?
A. Causes a lot of gastrointestinal symptoms, more than vomiting.
Q. You prefer galanthamine?
A. I do.
Q. Do you think that the greater tolerability of galanthamine over Rivastigmine, would you expect that before galanthamine was approved in 2001?
A. Not really. And I realize this is my anecdotal

experience. It's not scientific evidence in my hands. I'm just more comfortable using other drugs.

Q. Did you ever, in facts, worry that galanthamine was going to have possibility for peripheral side effects?

A. I wouldn't have expected serious any more than any of the other drugs. We already had proof of what other drugs do. Again from using them for decades.

Q. But, in fact, in your experience, your prescribing experience, it turned out it has fewer side effects than Rivastigmine; correct?

A. In my experience, tend to have less, yes, at higher doses.

Q. In fact, these problems with Rivastigmine with Exelon, they're widely known?

A. I think a lot of people are aware of them.

Q. This idea that it's less tolerable than galanthamine, that's widely shared?

A. As I'm thinking widely known, I think many Alzheimer specialists. In terms of the community of doctors who prescribe these drugs, I don't think it's widely known.

Q. The fact of the matters --

A. Probably the more experienced suspect that's the case.

MR. SIPES: Your Honor, if I could approach the witness...

THE COURT: Yes.

(Mr. Sipes handed documents to the witness.)

BY MR. SIPES:

Q. Dr. Levey, I've handed you Plaintiffs' Exhibit 214, which is an article by Mohammed Saddiqui and Alan Levey titled Cholinergic Therapies in Alzheimer's Disease, a review article published in 1999.

Do you see that?

A. I see that.

Q. Did you, in fact, write this article?

A. I did.

Q. Do you have it on your C.V.?

A. I do.

Q. You tried to be truthful and accurate?

A. Yes, I did.

MR. SIPES: I will move Plaintiffs' Exhibit 214 into evidence.

MR. LOMBARDI: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Plaintiffs' Exhibit No. 214 was received into evidence.)

BY MR. SIPES:

Q. First, let me ask you to turn to the second -- first, let me ask you, this is called cholinergic

therapies in Alzheimer's disease; is that correct?

A. That's right.

Q. Your goal here was to review the status of cholinergic therapies in Alzheimer's disease?

A. That's right.

Q. These were efforts to address the cholinergic deficit in Alzheimer's disease?

A. That's right.

Q. And this was a review you did in 1999; correct?

A. That's right.

Q. If you will turn to the second page, on the left-hand column, the bottom paragraph, which begins, At least 38 acetyl cholinesterase inhibitors are currently being studied worldwide in pre-clinical or clinical studies; is that correct?

A. That's right.

Q. Was -- did you believe that to be true when you wrote that?

A. I certainly did.

Q. So in 1999, there were 38 cholinesterase inhibitors that were being looked at as possible treatments for Alzheimer's disease; is that correct?

A. That's right.

Q. And there are four approved today; correct?

A. That's right.

Q. And of those four, one of them, which had been approved before your article, is not prescribed because it's not safe; is that correct?

A. That's right.

Q. And of the remaining three, one of them, Rivastigmine, people with experience in treating Alzheimer's disease find to have tolerability problems; is that correct?

Is it fair to say that finding the right cholinesterase inhibitor has not proven to be easy?

A. I think it's fair to say that many people have jumped on the bandwagon, are trying to develop cholinesterase inhibitors that are going to overcome the limitations of the existing ones.

Q. Many of them have failed?

A. Many are still ongoing. For example, some of the ones we talked about here, Huperzine A, the Alzheimer disease study group of all the Alzheimer groups in the country, this is a drug that still should be studied.

Q. How long has Huperzine A still been studied?

A. It's in clinical trials now.

Q. Do you know clinical trials have been going on for almost 20 years?

A. The NIH -- phase three trial is just ongoing now.

Q. But there are many prior clinical trials for it?

A. Yes.

A. That's right.
Q. You're talking here about the behavioral benefits that you talked about in your direct testimony from cholinesterase inhibitors?
A. That's right.
Q. In 1999, you described those behavioral benefits as surprising and dramatic; is that correct?
A. That's right. More surprising than I think the general readership would expect.
Q. There were other cholinergic attempts that were made in addition to muscarinic agonists and -- muscarinic agonists and cholinesterase inhibitors?
A. Okay.
Q. You refer, for example, to acetylcholine releasers?
A. That's right.
Q. That's a pre-synaptic approach?
A. That's correct.
Q. So it's not correct to say that in 1986, the pre-synaptic approach was dead; is that correct?
A. Definitely not. I would say almost no approach has been dead. Remember, there's no cure. People were trying lots of things.
Q. There were many different ways being tried, even back in 1986, to try to address the cholinergic deficit of Alzheimer's disease; is that correct?

A. That's right.
Q. And logic led in a lot of different directions; correct?
A. I think that's fair.
Q. And people who worked on muscarinic agonists thought that was the promising way to go; is that correct?
A. I certainly did.
Q. And people who worked on acetylcholine thought that was the logical way?
A. One of the logical ways. Lots of thing can be pursued in parallel. It's a tough disease.
Q. It's a tough disease. Correct.
Q. It's a tough disease?
A. Yes.
Q. There was no right way to address the cholinergic deficit?
A. I think the consensus was many ways should be approached. That was all the consensus about, it's reasonable to try everything that has some scientific rationale.
Q. Reasonable to try everything?
A. That has scientific rationale.
Q. Which included precursors, cholinesterase inhibitors?
A. The more scientific rationale, the more reasonable.
Q. And you thought the most reasonable was direct

muscarinic agonists?
A. I think it had some advantages and I think all of them have their own pros and cons like I do today. So I think until we have a cure, we have to address all the possible pros and cons and do our best.
MR. SIPES: Your Honor, if I could approach the witness...
THE COURT: All right.
(Mr. Sipes handed an exhibit to the witness.)
BY MR. SIPES:
Q. Dr. Levey, I have handed you Plaintiffs' Exhibit 1223, which is a publication by you and a couple of co-authors, Donna Flynn, Gabby Ferraro DeLeo and Deborah Flash, entitled differential alterations in muscarinic receptor subtypes in Alzheimer's disease. Implications for cholinergic based therapies published in 1995.
Do you see that?
A. I do see that.
Q. Did you, in fact, are you an author of this article?
A. I am.
Q. And you list it on your C.V.?
A. I do.
Q. And you tried to be truthful and accurate?
A. I did.
MR. SIPES: I'd move Plaintiffs' Exhibit 1223.

MR. LOMBARDI: No objection.
THE COURT: Thank you.
DEPUTY CLERK: So marked.
*** (Plaintiffs' Exhibit No. 1223 was received into evidence.)
BY MR. SIPES:
Q. First, let me ask you to turn to the summary, really, the last sentence of the summary.
Now, this was written in 1995; is that correct?
A. That's right.
Q. The only approved cholinergic therapy at the time was tacrine; correct?
A. I believe that's correct.
Q. Now, you state at the end of your summary that your findings with regard to muscarinic receptors suggests one possible explanation for the relative ineffectiveness of cholinergic replacement therapies used to date and suggest suspension and new directions for development of effective therapeutic strategies for AD?
A. That's right.
Q. So you thought that tacrine was relatively ineffective; is that correct?
A. Not as effective as one would have liked, for sure.
Q. I think your term was relative ineffectiveness; correct?

A. Okay.
Q. And if you look on the second page, you have a section cholinergic neurotransmission, focus of therapeutic interventions. If we could look at the second paragraph of that...

First, you note, over the past ten years, our laboratory has studied the role of the cholinergic system in pathogenesis and progression of Alzheimer's disease. We have specifically focused on the muscarinic acetylcholinic receptors since they are the primary targets of any cholinergic replacement therapies. Is that true?
A. Yes. It was then.
Q. They're the primary targets in the brain?
A. Certainly from that perspective.
Q. The line timeline for the last ten years, that would be from 1985 on?
A. That's right.
Q. Now, you say our laboratory. You weren't working on that in 1985, or were you?
A. No. Really I think our laboratory referred to the person who actually was the primary author, Donna Flynn, at another university. I think that's where the 1985 came from.
Q. You were still a resident in 1985?
A. That's right.

Q. And when did you start to focus on muscarinic receptors and treatment strategies?
A. About 1990, '91.
Q. The -- the next section is muscarinic receptors in Alzheimer's disease early studies.

Do you see that? That's the next paragraph.
A. What page are you on?
Q. The same page.
A. Sorry.
Q. The next section. Do you see it's entitled Muscarinic Receptors in Alzheimer's Disease: Early Studies?
A. Yes.
Q. And then the sentence, however, In 1985 we re-examined the status of muscarinic receptors in Alzheimer's disease in light of emerging evidence for at least two distinct populations of sites, M-1 and M-2, in the brain with different affinities for agonists.

Do you see that?
A. I do.
Q. Our studies demonstrated a selective loss of pre-synaptic M-2 sites and a relative sparing of the post-synaptic M-1 sites in Alzheimer's disease.

Do you see that?
A. Yes.
Q. You're referring to a publication by Professors Nash

and Flynn in 1985?
A. That's right
Q. You say these findings, that 1985 paper; is that correct?
A. That's correct.
Q. Suggested that non-receptor subtype selected therapies may not be beneficial since their -- do you see that?
A. I do see that.
Q. That's quite a mouthful, but non-receptor subtype selected therapies we've already discussed, that would include cholinesterase inhibitors?
A. That would.
Q. What you are saying, the findings in 1985 about M-1 and M-2 receptors suggested that cholinesterase receptors may not be beneficial since their action at pre-synaptic auto receptors may inhibit further --
A. That's correct. Again, it's -- these drugs were not very effective and so the question is, is that one of the things contributing to limiting the effectiveness.
Q. Your term, in fact, was may not be beneficial in 1985?
A. That certainly was written there. That's right.
Q. That's a rather deep skepticism of cholinesterase inhibitors in 1985?

A. Of any drugs that stimulate all the receptors simultaneously, the effects may not be as effective as perhaps possible with the selective drug.
Q. I understand today what you'd like to say as effective.
A. What I'm comparing it to, if one were able to stimulate one receptor versus all receptors, that's what the relative effectiveness is or the limited effectiveness is.
Q. What you wrote, it suggests in 1985, the cholinesterase inhibitors may not be beneficial.
A. I realize that.
Q. Then you wrote, thus, the pharmaceutical industry began to focus on the development of M-1 selective agonists and M-2 receptor agonists?
A. That's right.

- - -

Q. You wrote in 1985 that the pharmaceutical industry began to focus in attempting to address the cholinergic deficit in Alzheimer's disease with M-1 selective agonists and M-2 selective agonists?
A. It doesn't say exclusively. Clearly as we go, the pharmaceutical industry continued to work on other avenues of cholinergic deficits.
Q. What you wrote was that the pharmaceutical industry

began to focus on them; correct?

A. That's right.

- - -

A. That's right.

Q. And it's certainly correct, for example, that muscarinic M-1 selective muscarinic agonists looked promising?

A. I think they did at that time, that's right.

Q. And there was starting to be a lot of focus on those; correct?

A. That's right.

Q. And we saw, for example, the influential Dr. Bartus was recommending muscarinic agonists?

A. That's right.

Q. Let me ask you -- we've marked the patent in the case. If you could look at the their '318 patent, Plaintiffs' Exhibit 1...

Let's look on Column 1, the first -- the paragraph that begins at Line 11. Further down.

Do you see that? That's a discussion of two papers by Cozanitis; correct?

A. Yes.

Q. And you've reviewed those papers, have you not?

A. I have.

Q. In fact, I think you said that you are relying on a

galanthamine and neostigmine?

A. That's what he says in the next sentence.

Q. Both cholinesterase inhibitors?

A. That's correct.

Q. He says, first, the central action of galanthamine.

Do you see that?

A. I do.

Q. That's referring to the fact that neostigmine acts only on the periphery. Physostigmine both on the --

A. It refers to neostigmine acts preferentially on the periphery.

Q. Second, the fact that physostigmine, according to Salvini, Frosali and Pacetti, is 20 times more potent.

A. I see that,

Q. Which is another way of saying galanthamine is 20 times less potent than neostigmine?

A. That's correct.

Q. Is that an accurate of accurate statement of galanthamine's potency?

A. I can't vouch for that. That's what he says.

Q. Third, that due to the very slight muscarinic effect of galanthamine, no atropinization is necessary.

Do you see that?

A. I see that.

Q. So Professor Cozanitis is describing galanthamine as

having very slight muscarinic effect?

A. Yes.

Q. He's describing it as having predominantly nicotinic effect?

A. I don't see him saying that.

Q. Well, what effect do you understand galanthamine to be if its muscarinic effect is very slight?

A. I think he's just saying it has slight muscarinic effects.

Q. He's describing it as a weak muscarinic agent?

A. Right.

Q. Let me show you one more (handing exhibit to the witness).

I've handed you a copy of Plaintiffs' Exhibit 1350 entitled Clinical Experiences with a New Curare Antidote Galanthamine. Are you familiar with this article?

A. No.

Q. Did you review the prosecution history in this case?

A. I did.

Q. But you don't recall whether Stojanov was cited in the prosecution of the patent?

A. I don't remember that.

Q. Okay. In any event, you recognize this as an article on galanthamine that would be accessible to a person of ordinary skill in the art?

previous paper, for example, I don't remember what effect they are actually measuring, I don't think you mentioned it, and I don't know off the top of my head. Here they are talking about a specific curare effect and this contrasts a little bit with some of the results that some of the other in this group shows where they thought the most potent effects were actually seen for cognition, like memory.

Q. Well, first, what you are saying is that the balance of nicotinic and muscarinic effects of an agent will depend upon the particular use you're putting into?

A. Yes. I'm saying depending on what you're measuring, you may see different effects.

Q. But he's saying that its muscarinic effects are slight?

A. For what he's measuring.

Q. What he's measuring are nicotinic effects?

A. Yes.

Q. He's finding that the nicotinic effects outweigh the muscarinic effects?

A. Yes.

Q. He described the muscarinic effects as slight?

A. That's right.

Q. Now, are there cognitive effects of nicotinic in the brain?

A. There are. Still not very well understood.

Q. The muscarinic connection to memory was better understood than the --

A. Yes. Certainly more prominent. Doesn't mean nicotinic is important. Muscarinic effects were better understood earlier.

Q. Is attention a possible effect of nicotinic stimulation?

A. Certainly. Both muscarinic and nicotinic effects are involved in attention.

Q. So attention can be the result of nicotinic stimulation?

A. It can.

Q. Arousal?

A. It can be.

Q. If somebody is looking at galanthamine and seeing arousal, could be looking at a nicotinic effect?

A. I think arousal is more a muscarinic effect.

Q. Do you know?

A. Pretty sure. Most of the effects of EEG, arousal, muscarinic effects.

Q. Do you agree that the characteristic hallmark of Alzheimer's disease pathologically are plaques and tangles?

A. Definitely and synapse loss and neuron loss.

Q. I'm sorry?

A. And synapse loss and neuron loss and chemical changes.) We view all of those as parts of the pathological changes.

Q. Alzheimer's disease of the senile type are characterized by plaques and tangles?

A. Absolutely right.

Q. Do Downs Syndrome sufferers also develop an Alzheimer's type dementia?

A. They do.

Q. And is that characterized by plaques and tangles?

A. It is.

Q. And would you describe that as an Alzheimer's type dementia?

A. It's certainly an Alzheimer's related dementia at minimum.

Q. What other dementias do you view as being characterized by plaques and tangles?

A. Of the nature, the amyloid plaques we talked about in Alzheimer's disease. We know plaques can occur and tangles can occur in a variety of other conditions, but we restrict the pathological definition to when there are a high abundance of both for Alzheimer's disease.

Q. It would be Alzheimer's disease defined as pre-senile dementia and Alzheimer's type in Downes Syndrome?

A. Correct.

Q. Let me ask you to take a look at the Bhasker

article.

A. Okay.

Q. Which is DX-483. There's a statement, with regard to progressive dementia, there appears very little to offer.

Do you see that?

A. I do see that.

Q. And that progressive dementia would include Alzheimer's disease, in your opinion; is that correct?

A. It would.

Q. What else would it include?

A. It would, for example, include the dementia of Downs Syndrome that we just talked about I think would be reasonable. It would include Huntington's Chorea, the multiple strokes. Lewy body disease, Parkinson's disease. It would include cortical basal degeneration. Might include progressive cerebral palsy.

Q. Wernicke-Korsakoff syndrome?

A. We don't view that as a progressive dementia. It might be viewed on that. I guess depending on the patient, it could be.

Q. So it would include a great variety of progressive dementias; is that correct?

A. That's right.

Q. In your opinion, does Bhasker describe galanthamine as a treatment for every one of them?

A. No. He's suggesting I think as a treatment broadly for the category progressive dementia without going into etiology.

Q. A person of ordinary skill in the art in 1986 would read Bhasker as describing galanthamine as a treatment for all progressive dementias?

A. I think one would read this in 1986 as suggesting galanthamine for the treatment of proceeding of dementia as a possible thing to try.

Q. Just so the record is perfectly clear, yes or no?

A. Okay.

Q. Would a person of ordinary skill in the art in 1986 read Bhasker as describing galanthamine as a treatment for all progressive dementias?

A. I suspect no but it would certainly include progressive dementias, since there are so many. Since he doesn't say it, one could conclude.

Q. A person of ordinary skill in the art in 1986 would not read galanthamine as being described as a treatment for all progressive dementias. In that case, why would a person of ordinary skill in the art read it as a treatment for Alzheimer's disease?

A. I think it's absolutely obvious that Alzheimer's disease is really the bulk of the causes of progressive dementia and he's not mentioning specific things, so I





think he's thinking about the specific category of progressive dementias in suggesting that galanthamine be used for that.

Q. Does it describe Alzheimer's disease as the most common dementia?

A. No, but from the eyes in 1986, that is one that anybody of ordinary skill in the art would understand.

Q. So in forming your opinion on anticipation, did you include the additional knowledge about Alzheimer's disease in reaching your conclusion?

A. From the eyes in 1986, I included Alzheimer's disease as something that one of skill in the arts in 1986 would include in that umbrella of progressive dementias that he's was suggesting treatment for, that's correct.

Q. Are you also including the fact that a person of ordinary skill in the art in 1986 was aware that Alzheimer's disease was characterized by a deficiency in acetylcholate function?

A. That's right.

Q. That's not described in the Bhasker article?

A. Right.

Q. The cholinergic deficiency that might link -- something that the person of ordinary skill in the art would have to bring to the article?

A. That's right. That would be known to somebody





skilled in the art.

Q. They would have known that by reading other literature; is that correct?

A. That's right.

Q. The, I think the Whitehouse article, the Perry article, I think the Perry article?

A. That's right.

Q. Would a person of ordinary skill in the art read the Bhasker describing neostigmine as a treatment for Alzheimer's disease?

A. He would view it as somebody suggesting cholinesterase inhibitors. I guess that's right.

Q. But neostigmine does not cross the blood/brain barrier; correct?

A. That's not correct.

Q. It has very weak central effects?

A. I guess that's right, but somebody skilled in the art would have read the reference that he's referring to, Luria, and they did very clear, detailed studies showing that neostigmine also did and it does, in a brain-injured patient, cross the blood/brain barrier. So if you have an injury, it will cross the blood/brain barrier.

What was really important I think for one skilled in the art, it demonstrated that neostigmine and galanthamine both could have central properties but





they also have said clearly galanthamine was better than neostigmine was what was in the literature for central cognitive problems.

Q. So in reaching your conclusion on anticipation, you included the knowledge from the Luria article; is that correct?

A. One doesn't have to, but I knew that is what he was referring to.

Q. So you, in your opinion, you did include the knowledge from Luria?

A. Say that again.

Q. In reaching your conclusion, you included the knowledge from Luria?

A. I included the knowledge he put here in this paper about Luria's article.

Q. He doesn't cite the article itself?

A. He cited Luria's work.

Q. You, yourself, knew that that was a reference to the Luria article; correct?

A. And other articles, yes.

Q. So when you reached your conclusion on anticipation, you included the discussion of galanthamine in the Luria article?

A. No, that's not true. I think what he says here is sufficient.

Q. He doesn't distinguish, Bhasker doesn't distinguish in discussing galanthamine between galanthamine and neostigmine?
A. That's right.
Q. But there's a very important distinction, which is that neostigmine, when the blood/brain barrier is intact, does not have central effects?
A. Again, it may not have prominent ones, but it has some.
Q. So in your opinion would a person of ordinary skill in the arts in 1986 read Bhasker as describing neostigmine as a treatment for Alzheimer's disease?
A. One could have made that interpretation.
Q. Is it your opinion that a person of ordinary skill in the art would read the Bhasker article as describing neostigmine as a treatment for Alzheimer's disease?
A. Yes, among cholinesterase inhibitors, including galanthamine.
Q. Would a person of ordinary skill view that as a reasonable reading?
A. I think so.
Q. Has neostigmine ever been tried as a treatment for Alzheimer's disease, to your knowledge?
A. I strongly doubt it.
Q. Why do you strongly doubt it?

A. Because one skilled in the art then also knew that galanthamine was better able to have central effects than neostigmine.
Q. So of all the 38 cholesterase inhibitors that were tried, that didn't include neostigmine; is that correct?
A. That's right.
Q. Neostigmine would not look like a reasonable candidate?
A. Right.
Q. It's a peripheral agent?
A. It has better peripheral actions because it does not get into the brain as readily.
Q. A person of ordinary skill in the art in 1986 is going to recognize neostigmine is not reasonably construed for being a treatment for Alzheimer's?
A. Correct.
Q. If we read Bhasker as talking about things like head injury and local brain damage, that is as you mention from your reading of the Luria article, neostigmine then could have central effects?
A. It could. Even when it's not damaged. I guess what he's referring to here is using this for deinhibition. That's really what he says precisely and neostigmine did have that property of deinhibition.
Q. That was sort of the restarting of temporarily arrested

neurons?
A. Right.
Q. Not dead neurons. Temporarily arrested neurons?
A. That's right.
Q. That's not Alzheimer's disease; is that correct?
A. Nothing -- nothing improves function of dead neurons. That's right. Even in Alzheimer's disease. We're using these drugs for the same manner. To restore function of injured neurons.
Q. So this deinhibition, that's not directly applicable to Alzheimer's disease because Alzheimer's disease is --
A. It is applicable. We're talking about dead neurons containing acetylcholine.
Q. What Luria described was temporarily arrested neurons; is that correct?
A. That's right.
Q. And temporarily arrested neurons does not describe Alzheimer's disease?
A. He also described them as permanent. Really what he was saying, he coupled the inhibition with education of the brain because they would be permanently silent unless you educated the brain while they were temporarily inactive.
Q. This idea of temporarily inactive, that's not applicable to Alzheimer's?

A. That is right.
Q. You mentioned a number of other functional deficits. I think one was praxic function, a decline in praxic function?
A. That's right.
Q. That's not memory?
A. Sort of a type of memory. Motor memory. Memory for skilled movements.
Q. It's not the amnesia that was the signature feature in Alzheimer's disease?
A. That's correct.
Q. Gnostic function, that's not amnesia either?
A. It's a special type of perceptual amnesia.
Q. Agnosia is distinguished from amnesia?
A. Yes.
Q. So gnostic function is seen as a different function?
A. Yes.
Q. Aphasic symptom, that's different, too?
A. That's right.
Q. That's speech?
A. That's right. It's language.
Q. Let me ask you a few questions about the patent, if I could, because I confess to be a little confused about your caveat with regard to your enablement opinion.
Do you believe, is it your opinion that a person of ordinary skill in the art in 1986, reading the

'318 patent, and bringing to bear whatever else he or she would know from reading the literature, would he or she believe that there was a method of treating Alzheimer's disease and related dementias by administering to a patient suffering from such a disease a therapeutically effective amount of galanthamine?

A. What was the caveat?

Q. A person of ordinary skill in the art in 1986 reading the patent and the available literature, would he or she believe that galanthamine would be a treatment for Alzheimer's disease?

A. Using the available literature, the prior art, assuming obviousness was not thrown out?

Q. Without assuming anything, you wanted to know your opinion based on the knowledge of the literature.

A. Yes.

Q. A person in 1986 reading the patent would believe that galanthamine would be a treatment for Alzheimer's disease; is that correct?

A. That's right.

- - -

Q. And such a person would be able to use galanthamine as a treatment-- could find therapy in an effective dose; correct?

A. Yes, treatment by improving symptoms as was stated in

the patent as the goal.

Q. Improving cognitive symptoms; correct?

A. Correct.

- - -

Q. Did you testify at your deposition that the proof of concept for galanthamine in Alzheimer's disease occurred after the patent?

A. I don't remember that sitting here.

Q. Perhaps we can refresh your recollection.

A. Okay.

A. I still believe it.

Q. You agreed that the proof of concept for galanthamine as a treatment for Alzheimer's disease occurred after 1986; is that correct?

A. I think the proof of concept included lots of things, but I think the highest bar, most definitive evidence came afterward, that's right, meaning the human studies came later.

Q. Let me see if I can just make that as clear as possible. Let me just hand you a copy just to refresh your recollection.

A. Okay.

MR. SIPES: If I my approach...

THE COURT: Yes.

(Mr. Sipes handed an exhibit to the witness.)

BY MR. SIPES:

Q. If you will turn to Page 240 of your deposition, beginning at Line 8, you'll recall I asked you, and was there proof of concept for galanthamine in humans before January of 1986?

Answer: Not proof of concept in Alzheimer's disease.

When did proof of concept for galanthamine in treating Alzheimer's disease first arise, in your opinion?

Answer: I don't know. After the patent.

Do you see that?

A. Yes.

Q. Does that refresh your recollection that that was your testimony at the deposition?

A. That's right. I think I heard your question earlier a little bit different. Here, this was defined for proof of concept for galanthamine in humans. So for humans, certainly, the proof of concept came later.

Q. So proof of concept for treating humans with Alzheimer's disease with galanthamine was after the patent?

A. That's right.

Q. And did you think that the idea of using galanthamine as a treatments for Alzheimer's disease in 1986, was that scientifically reasonable judgment?

A. Definitely.

Q. Now, I believe your counsel asked you to consider the factor of whether a person of ordinary skill would believe without question that galanthamine would be a treatment for Alzheimer's disease.

Do you recall that?

A. I do.

Q. Now, Alzheimer's disease is a tricky disease; correct?

A. It is.

Q. In your opinion, what kinds of tests would be required before a person of ordinary skill in the art would believe, without question, that a drug would work as a treatment for Alzheimer's disease?

A. I think the answer to that is that you really need to see very strong evidence that it works, meaning you need to see trials in humans, multi-center, perhaps clinical trials of patients that are designed with appropriate experimental methods so that you can know the chance of positive or negative results are fairly low, occurring by chance, being negative or positive.

So that's the kinds of evidence I would say that one would really need to accept without question.

Q. So that would be phase three trials?

A. It could be. I think it might depend on the phase

two.

Q. Large clinical trials. Phase two or phase three?

A. That's right.

Q. So to meet the enablement standard your counsel posed to you, you would really want to see phase two or phase three trials with galanthamine; is that correct?

A. That's right.

Q. Do you think Dr. Bonnie Davis could have afforded phase two or phase three trials with galanthamine?

A. Sure. Not by herself. Maybe she's more wealthy than I realize.

Q. Is it the standard in the field where you practice to wait to file patent applications until after phase two or phase three trials are under way?

A. Absolutely not.

Q. Is that contrary to pretty much every drug company which has attempted to find a treatment for Alzheimer's disease?

A. It is.

MR. SIPES: Your Honor, if I may have a moment just to confer with some wiser colleagues...

(Pause while counsel conferred.)

MR. SIPES: Your Honor, with permission to approach, please?

(Mr. Sipes handed an exhibit to the witness.)

BY MR. SIPES:

Q. Dr. Levey, I've handed you a copy of Plaintiffs' Exhibit 756, a document entitled Galanthamine: Another Look at an Old Cholinesterase Inhibitor, by Edward F. Domino that was published in 1988, two years after the patent was filed.

Do you see that?

A. I do.

Q. This was an article, in fact, you cited in your -- your expert report as providing a good summary of galanthamine; is that correct?

A. That's correct.

Q. And I think you may have referred to Dr. Domino as a world famous pharmacologist; is that correct?

A. He is, yes. I did refer to him that way.

Q. And he's, in fact, in the courtroom. He's one of the defendants' experts; is that correct?

A. That's right.

Q. Now, you've testified in your opening that one of the things that would have led a person of ordinary skill in the art to galanthamine from physostigmine was its longer duration of action; is that correct?

A. That's correct.

Q. And one of the articles I think you cited was a Baraka; correct?

A. That's right.

Q. If you will turn to the second -- the third page of Dr. Domino's survey of galanthamine, you'll see a discussion of the Baraka article.

Do you see that?

A. I do.

Q. That's the same article you were discussing; is that correct?

A. That's right. It is.

Q. Let's take a look at the last sentence of the discussion.

MR. SIPES: If you can pull up the whole paragraph...

BY MR. SIPES:

Q. Dr. Domino concludes after his study of the Baraka article in 1988 that, although the authors concluded that galanthamine produced a long-lasting reversal of the anti-cholinergic syndrome, from the study, one could determine that the drug lasted two hours.

A. I see that.

Q. Two hours was the duration of action of oral physostigmine in the '85 paper; is that correct?

A. That's correct.

Q. And, in fact, now, if you will turn to Dr. Domino's conclusions under the summary, Page 301...

A. Okay.

Q. You'll see that there's a summary?

A. I do.

Q. He describes galanthamine as less potent than physostigmine and with a similar duration of action.

Do you see that?

A. I see that.

Q. That was Dr. Domino's conclusion at least in the published literature from his review of galanthamine?

A. I see that.

Q. That it was both less potent and had a similar duration of action; correct?

A. I see that.

Q. Would that appear to be promising, the fact that it was less potent and no longer-acting?

A. If you took that by itself, I would say no, but obviously there's other evidence and other interpretations.

Q. But at least from the world renowned Dr. Domino, that was his conclusion in 1988; is that correct?

A. That's what he wrote. That's right.

MR. SIPES: If you will bear with me...

(Pause.)

BY MR. SIPES:

Q. All right. Let me...

(Pause.)

MR. SIPES: If I may approach the witness, your Honor...

THE COURT: Yes, you may.

(Mr. Sipes handed an exhibit to the witness.)

MR. SIPES: Before I do that, I can't recall if I moved Plaintiffs' Exhibit 756 into evidence, but I will do so now.

THE COURT: Any objection?

MR. LOMBARDI: Domino?

MR. SIPES: Domino.

MR. LOMBARDI: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Plaintiffs' Exhibit No. 756 was received into evidence.)

BY MR. SIPES:

Q. Dr. Levey, I've handed you Plaintiffs' Exhibit 1228, which is an article by Alan I. Levey, entitled, Muscarinic Acetylcholine Expression in Memory Circuits: Implications for Treatment of Alzheimer's Disease.

Do you see that?

A. Yes.

Q. This is from the proceedings of the National Academy of Sciences in 1996, was it not?

A. It is.

Q. That's a very prestigious journal?

A. Prestigious journal.

Q. You tried to be truthful and accurate in this paper, did you not?

A. I was.

Q. And you considered the article very important; is that correct?

A. That's right.

MR. SIPES: Let me move into evidence Plaintiffs' Exhibit 1228, if I may.

MR. LOMBARDI: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Plaintiffs' Exhibit No. 1228 was received into evidence.)

BY MR. SIPES:

Q. First, let me ask you to look on the first page of Plaintiffs' Exhibit 1228, in the right-hand column.

If you look at the sentence, sort of halfway through the first full paragraph... Further down than that.

There's a discussion of tacrine. Do you see that? Tacrine yields dose-related significant improvements in several mechanisms and quality of life substantiating a cholinergic role in the pathophysiology of the disease. That's what you are writing in 1996;

correct?

A. That's right.

Q. Ten years after Dr. Davis' patent; is that right?

A. That's right.

Q. But then you say, yet the overall clinical benefits of this drug are disappointing and may be related to its indirect mechanism of action, which depends on the synthesis, storage and release of acetylcholine by surviving cholinergic neurons. In addition, side effects resulting from the nonspecific activation of cholinary are -- do you see that?

A. I do.

Q. That concern with the pre-synaptic neuron, those are the same concerns that were expressed back in 1985; is that correct?

A. That's right.

Q. But even in 1996, you continued to believe that cholinesterase inhibitors were hampered by that; is that correct?

A. That's right. We had no evidence that any drugs were better yet than the positive effects that we're seeing early on.

Q. And so you were --

A. It's modest.

Q. -- continue to pursue muscarinic agonists?

A. That's right.

Q. And if you will turn to the last page under your conclusions, you'll see -- two pages back. Right under Conclusions, just pull up that whole paragraph under Conclusions.

It says, Presently used, cholinergic compounds suffer from a lack of subtype selectivity and potency, which favor negative peripheral side effects and may limit cognitive effects because of weak and/or opposing actions in brain.

Do you see that?

A. I do.

Q. Now, the presently used cholinergic compounds that you are talking about there are cholinesterase inhibitors among other things?

A. Yes. I think I was referring to the receptors by that statement, really. That the receptors -- receptor agonists available were non-selective.

Q. Well, are cholinesterase inhibitors cholinergic agents as well?

A. Yes.

Q. Do they suffer from a lack of subtype selectivity in potency?

A. Yes, they are. Just as I'm reading this, I'm thinking this paper was about muscarinic receptors. I

think we're talking about agonists primarily, or that's what I had in mind when writing it. Absolutely right. It includes cholinesterase inhibitors.

Q. Did you believe in 1996 that both cholinesterase inhibitors and the then available muscarinic agonists selected from the subtype selectivity and potency?

A. Absolutely. I don't know about potency, but certainly there wasn't -- that one couldn't achieve as high levels in the brain as one might want because of the peripheral side effects.

Q. So that would be a problem with potency, would it not?

A. Not necessarily. It's more selectivity.

Q. And as we've seen, galanthamine is even less potent than physostigmine?

A. Yes.

Q. Galanthamine is no more selective than physostigmine; is that correct?

A. Say that again.

Q. Galanthamine is not selective for the muscarinic receptor; correct?

A. That's right.

Q. In fact, what we've seen is it appears to have weak muscarinic effects?

A. In some conditions and strong in others, yes.

right?

A. That's right.

Q. And you said something about everybody jumping on the bandwagon?

A. I did.

Q. What did you mean by that?

A. Well, what I meant is, I think of the -- as was mentioned, it cost companies sometimes $500 million or more to bring these drugs to clinical trial. One doesn't make that kind of investment without a very good -- without a strong belief that it's likely to be successful. I mean, drugs get whittled down to one or two that can actually get tested by a company.

So the fact that there are 38 in trial means lots of people were making lots of big investments because they believed that already there had been strong proof of principle that cholinesterase inhibitors could be effective treatments in terms of efficacy. That had been demonstrated, I believe, and that's why all these companies invested hundreds of millions of dollars, just the numbers of investigators and companies doing it I think says that very clearly, because everybody realized what you really needed is to overcome the safety issues, the side effect issues. If you could get safer, better tolerated drugs, then not only would it be an effective treatment, but it

also would beat out other drugs and be more likely to be approved by the FDA.

Q. Okay. Now, when counsel asked you questions about those drugs, did he provide you with any information about the state of the art relative to those drugs prior to the time people started to work with them as cholinesterase inhibitors?

A. No.

Q. And we know something about the state of the art of galanthamine prior to the time it was selected as a treatment for Alzheimer's disease; isn't that right?

A. We know a lot about it. That's right.

Q. And what was the state of the art with respect to galanthamine at that time?

A. Well, as we have gone through, we knew that it had been used in humans. We knew that it had been used in humans with cognitive deficits. We knew that it had been able to, some of the cognitive deficits and local brain injury or arrestable dementias, whatever one wants to call the underlying cause, that galanthamine was able to be effective in some of the symptoms most responsible were the cognitive ones, according to the literature.

So we knew that it was safe, well tolerated, able to get into the brain. It had relatively long duration of action. Whatever one wants to conclude the

# EXHIBIT 2

at Page 688, please, Doctor?

Does this indicate what some of the limitations were with physostigmine?

A. Yes.

Q. Okay. Could you describe that for the Court?

A. Well, basically, it says that it's a compound that is short-acting. We know that. Less than an hour, depending on the administration and, in addition, it has a number of peripheral effects, which are objectionable.

Q. In your opinion, Dr. Domino, what would this article have taught a person of skill in the art as of 1986?

A. To go full speed ahead to find another member in the family of reversible cholinesterase inhibitors that penetrate the blood/brain barrier.

Q. As a factual matter, what did happen with respect to research in cholinesterase inhibitors?

A. Well, the field started to explode and a great deal of work was being subsequently developed. And that's why we have what we have today.

Q. Doctor, you just indicated that this article would teach a person of skill to move full speed ahead with looking at other reversible cholinesterase inhibitors.

The qualifications or the characteristics you just described, does that encompass any particular drug?

A. Yes.

Q. What does the prior art tell you?

A. Well, the prior art tells you that galanthamine is a -- is a method to then treat, as stated in Claim 1, with the dosages to be given orally. That is known. And a dose range 10 to 2,000. Well, the low dose certainly was known.

Q. And in 1986, would a person of skill in the art have been motivated to combine, I think you relied on the Rathmann and the Daskalov references. Would a person of skill in the art have been motivated to combine those?

A. Absolutely.

Q. Why?

A. That makes sense. It's your fundamental knowledge, your base of what's going on in the art.

Q. And would a person of skill in the art have had a reasonable expectation of success in '86 that galanthamine could be used orally in dosage amounts disclosed in the patent?

A. Yes.

Q. So based on your review of the prior art, Dr. Domino, what is your opinion with respect to Claim 4 as to whether it's obvious?

A. Well, I think Claim 4 is obvious on the low dose side.

Q. Can you identify it, please?

A. Yes. This is my article called galanthamine: Another look at an old cholinesterase inhibitor.

Q. When did you publish this article?

A. This was published in book form in I believe '88.

Q. When did you begin thinking of writing about this?

A. Well, I know -- I don't remember exactly, but I know that there was a meeting in March of that year and I was invited by Professor Giacobini to present something on choline -- something in my area of expertise and so I must have started doing a literature search to write the article earlier, maybe in '87. I don't remember.

Q. And you said you were invited to a meeting. What meeting were you invited to?

A. Well, this was a meeting to trying to summarize the whole field of cholinesterase inhibitors and their role in, as potential therapies, symptomatic therapies for Alzheimer's disease.

Q. Now, at the time that you wrote your article, did you know if Dr. Davis had a patent on galanthamine for Alzheimer's disease?

A. I had no idea whatsoever.

Q. And when is the first time you learned she had a patent?

5/22/2007 Final Trial Transcript

we're talking about a dose. And, therefore, you get a dose effect curve. So potency refers to the dose.

Q. Okay. And as a factual matter, is galanthamine less potent than physostigmine?

A. Absolutely.

Q. All right. How much less potent?

A. About -- from the data in the literature that I have reviewed, it's in the order of about a tenth of the potency of -- of physostigmine.

Q. So what was -- what were the doses of physostigmine that were being administered up to 1986?

A. Well, you are talking about oral administration as an example. They're generally in the order of .51, something two, something in that range. Particularly the Davises, Ken Davis and in particular his colleagues have done a lot of work in that. Maybe Bonnie was involved. I don't remember.

Q. So what would the equivalent dose have been for galanthamine?

A. Well, easy. Multiply it by ten.

Q. Okay. Now, does the fact that galanthamine is less potent than physostigmine mean that it would be less effective as a cholinesterase inhibitor?

A. Not at all. That's a crucial point.

Q. Why is that crucial?

Q. Is that -- would that have been consistent with a person of skill in the arts view in 1986?

A. Yes.

Q. Now, Dr. Domino, I want to talk about the next skeptical comment, which is that, because the precursor route to treating Alzheimer's disease did not show improvement, at least as of 1986, that that would have discouraged people from pursuing cholinesterase inhibitors.

Do you recall that comments?

A. Yes, I do recall the comment, yes, I do.

Q. Okay. And do you agree with it?

A. No, I do not.

Q. Why not?

A. Because the -- there never was in human beings evidence that the precursor route was, indeed, effective in improving memory or whatever in human beings. I actually lost a year of my life doing work not with Alzheimer's patients, but with normal aged individuals, giving them loads of the precursor lecithin, which is -- that's what makes ice cream smooth when you taste it and swallow it. All I managed to do was get them fat. Too much ice cream and phosphotitocholine with no effect and subsequently, additional work that was done by me, but also by others, using then phosphotitocholine actually in Alzheimer's patients. Again, showed that it

fundamentally was not effective, which caused me to repeat some of the original work reported in the -- and I did it.

There were others that did it in rats that disagreed with Rathmann. I was unfamiliar with that work at that time. I did it in mice. It showed there was no effect.

So I think it was a wonderful, wonderful idea that had no basis in fact.

Q. And did the fact that based on your experience, the precursor route didn't work, did that deter you or deter others from looking at cholinesterase inhibitors?

A. Not at all.

Q. What effect did it have?

A. Well, the effect was you've got to go into other routes or otherwise ways of affecting acetylcholine or acetylcholine function.

Q. And what time period were you doing the work on the precursor route?

A. I was doing the work at the time that Dr. Gershon, a very well-known psychopharmacologist, was Director at the clinic. My recollection is he came in around 19 -- I'm sorry -- 1979, something like that. And I worked with his group until '83, when I then left the Lafayette Clinic.

Q. Now, did you also have experience in the agonist approach at the Lafayette Clinic?

A. The answer is yes.

Specifically with arecoline.

Q. Plaintiffs' experts indicated that because the agonist approach looked more promising it, would have caused skepticism for the cholinesterase inhibitor approach?

A. I don't think it would cause any skepticism. Was just another way of approaching things. There was some studies with arecoline that were positive. Some were negative. We thought our study, I thought, did very well, was negative.

I don't think it would deter anyone from pursuing other ways of enhancing acetylcholine in the brain.

Q. And as a factual matter, did it deter others from pursuing cholinesterase inhibitors?

A. Not at all.

Q. What evidence do you have of that?

A. The best evidence is reading that Giacobini table that he published about all of the cholinesterase inhibitors that a large variety of drug companies were developing and had in human clinical trials.

Q. We'll look at that in a minute.

A. Well, the field exploded with many other compounds being tested by many pharmaceutical companies.

Q. How do you control peripheral side effects? What can you do to control those?

A. Well, the easiest way of controlling side effects is via a good dose.

Q. Was that known in 1986?

A. It's known then and now.

Q. And I want to go to the next category of secondary considerations plaintiffs' experts identified.

Would you identify this for the Court, please?

A. Yes. This is a -- the plaintiffs' experts opinion on failure of others.

Q. Okay. And what do you understand those to be referring to when they say failure of others?

A. Well, that there were many other, or other people that were involved in the field that used a variety of drugs or -- including cholinergic treatments that apparently failed.

Q. Okay.

A. Or did fail.

Q. And did plaintiffs yesterday in opening statement put up a slide that they showed a timeline indicating various treatment approaches, both before and after Dr. Davis' patent?

A. There were different forms. As I remember, I'd have to look it up.
Q. But you do recall it was either oral or parental?
A. Yes, but trouble. Pulse, relax, wait.
Q. And by parental, that's injection; correct?
A. I believe so. I'd have to watch it. I don't know. I'd have to review that schistosomiasis literature.
Q. But the point is it was used sort of in acute fashion rather than chronically?
A. It's a very important point.
Q. It's very important to the question of tolerability of side effects; is that correct?
A. That is correct.
Q. And something that is used acutely may not be safe or tolerable when used chronically; is that correct?
A. Depends on the dose.
Q. The amount of drug given?
A. That is correct.
Q. But also if it turns out as it did with Metrifonate that a drug that appeared safe and tolerable when used acutely was not safe and tolerable for using it chronically in treating Alzheimer's disease; is that correct?
A. That is correct, because it produced the same

effects as a nerve agent.
Q. And of course to treat Alzheimer's disease, you're looking for a chronic treatment; is that correct?
A. That is correct.
Q. Now, you say that some reason to control side effects by dose. The idea is if you lower the dose, you'll have fewer side effects; is that correct?
A. Yes.
Q. That's how you control dose. You use less of the drug?
A. Yes.
Q. Let me talk to you a little bit about your view of physostigamine.

Now, before 1986, physostigamine was used therapeutically; is that correct?
A. Yes.
Q. And, in fact, it continues to be used therapeutically under the trade name antilirum (phonetic); correct?
A. Yes.
Q. That's quite an old trade name. That goes way back before 1986?
A. Yes.
Q. One way it can tell, it almost suggests its use, which FDA doesn't let you do any more?

A. Yes.
Q. The use of antilirum is to reverse the delerium by things such as scopolamine?
A. Yes.
Q. That's an acute use?
A. Yes.
Q. Physostigmine was safe and tolerable in that use?
A. Yes.
A. Yes.
Q. But you agree physostigmine was not safe and tolerable for using in treating Alzheimer's disease; is that correct?
A. That is correct.
Q. In fact, you have admitted that physostigmine was recognized in the art as a failure by 1986; is that correct?
A. From the point of view of a therapeutic agent for the symptomatic treatment of Alzheimer's patients.
Q. And, in fact, it's your opinion that it was well known prior to 1986 that physostigmine had too many peripheral side effects to be used as a treatment for Alzheimer's disease; correct?
A. It was shown by the Davis' and their extensive excellent work that, indeed, physostigmine had a number of side effects, but it was therapeutically effective.

This is an important point, which establishes proof of concept in human beings, that a cholinesterase inhibitor works.
Q. But it -- you say it was shown to have effect, but it was also known to have too many peripheral side effects to be used for the treatment of Alzheimer's disease; correct?
A. As used from a clinical point of view therapeutically, with chronic therapy, but it's crucial that it was an important agent that showed proof of concept.
Q. And the peripheral side effects of physostigmine that prevented its clinical use in treating Alzheimer's disease were what you called the slud syndrome; correct?
A. Salvation, lacrimation, diarrhea, you can add vomiting and a number of other things, ultimately ending up in convulsions.
Q. These were all peripheral cholinergic side effects; is that correct?
A. The first were, not the last.
Q. I don't understand.
A. If you have a seizure, it's essential.
Q. So the seizure was central, but that's bad; correct?

But the rest of them were cholinergic side

effects?

A. That is correct.

Q. Physostigmine was perceived to have too many cholinergic side effects to be used clinically to treat Alzheimer's disease?

A. Yes.

Q. You testified if Forest Laboratories had come to you in 1986 and asked whether they should develop physostigmine as a drug product that became known as physostigmine SR, you would have told them no. Waste of time; correct?

A. Correct, because of the side effects. They are hoping that there would be tolerance to the side effects, but that the therapeutic effects would last. I don't know of any such evidence. Maybe there is, but I was -- I am unaware of it.

Q. But unfortunately, Forest never went to you because, in fact, they did try to develop physostigmine SR as a commercial drug product; correct?

A. They did.

Q. And that did fail; is that correct?

A. It failed for clinical, for FDA reasons that it failed, so that's why I think there has to be a very clear distinction in everybody's mind and especially our Judge on the difference between efficacy, a beneficial effect

versus a failure from a commercial point of view for FDA approval. Unless that is made perfectly clear, then we're not communicating at all.

Q. And just so that we're clear, it was recognized in the art that one of the problems with developing a treatment for Alzheimer's disease that could be used clinically was the problem with side effects; correct?

A. That is correct.

Q. So people knew in the art in 1986 that one of the problems they would have to overcome to develop a treatment for Alzheimer's disease that could be used clinically would be to overcome problems with safety and tolerability; correct?

A. That is correct.

Q. Let me try to look at some of the things that you were doing in the early eighties.

MR. SIPES: May I approach the witness?

THE COURT: Yes, you may.

(Mr. Sipes handed an exhibit to the witness.)

BY MR. SIPES:

Q. Dr. Domino, I've handed you an exhibit that has been marked as DX-557. It is an article by Nunzio Pomera (phonetic), Robert Block, Joy Abraham, Edward F. Domino and Samuel Gershon entitled Combined Precursor Treatment and dihydroergotoxaminemesillate (phonetic) in Alzheimer's

disease.

Do you see that?

A. Yes.

Q. This is an article that you published with some colleagues at the Lafayette Clinic in 1983; is that correct?

A. Yes. I'm proud of it.

MR. SIPES: I will move the admission of DX-557.

MS. ULRICH: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Defendants' Exhibit No. 557 was received into evidence.)

BY MR. SIPES:

Q. Dr. Domino, you published this as indicated in 1983; correct?

A. That is correct.

Q. And this reports on work that you did with colleagues on patients in the Lafayette Clinic?

A. That is correct.

Q. And the patients were patients with Alzheimer's disease?

A. That is correct.

Q. And let's me ask you to read the first sentence.

Let's pull up the first paragraph, if you could, Matt.

It reads, The consistent and selective reductions in the brain activity of cholinacetyltransferase, the biosynthetic enzyme for acetylcholine, have led to numerous attempts at enhancing central cholinergic activity in individuals with Alzheimer's disease by means of cholinergic precursors in the hope of ameliorating the cognitive dysfunction.

Do you see that?

A. Yes.

Q. That's referenced as the precursor to treat Alzheimer's disease?

A. Yes.

Q. That's based on the cholinergic deficit hypothesis?

A. Yes.

Q. The outcome of these therapeutic strategies which have utilized cholinergic precursors alone has been generally disappointing.

Do you see that?

A. Yes.

Q. That was true in your mind?

A. Yes.

Q. You then say, there is, however, a preliminary report from an open trial suggesting increased efficacy from the combination of choline and piracetam, a

pharmacologic agent which is thought to improve neuronal metabolism.

Do you see that?

A. Yes.

Q. You were describing a different way of addressing the cholinergic deficit hypothesis in 1983?

A. Yes.

Q. That's using the agent peracetin combined with a precursor?

A. Yes.

Q. Piracetam was under the category as you previously described a metabolic enhancer?

A. I don't know if I said that word, but that's what it is thought to be.

Q. I think you were with counsel looking at a chart as what you were describing as failures and one category was metabolic enhancers. Do you recall that?

A. Yes.

Q. And one sub-category of metabolic enhancers were the nootropes?

A. Nootropic agents.

Q. Nootropic --

A. That's the wrong way to pronounce it.

Q. The nootropic agents were newly-developed agents thought to boost brain metabolism; is that correct?

A. That's correct.

Q. And they were being used in combination with choline in an effort to address the cholinergic deficit; is that correct?

A. Yes.

Q. So this was yet another strategy to try to address the cholinergic deficit hypothesis; is that correct?

A. Yes.

Q. And, in fact, as of 1983, there was a suggestion of increased efficacy based on an open trial in humans; is that correct?

A. That is what it says.

Q. So that would have been under your lights and encouraging report on piracetam; correct?

A. That's why we did what we did.

Q. And you studied a different metabolic enhancer; correct?

A. Yes.

Q. You studied dihydroergotoxaminemesilate (phonetic); is that correct?

A. Yes. Hydergine.

Q. The trade name is Hydergine?

A. That is correct.

Q. And I think both, to spare both of us and the Court Reporter, why don't we refer to it as Hydergine (phonetic),

its trade name. Would that be all right?

A. Sure.

Q. So you did a study of a precursor with Hydergine to try to treat Alzheimer's disease; correct?

A. Yes.

Q. You did that at the Lafayette Clinic with Sam Gershon and others?

A. Yes.

Q. So at the time, this was thought to be a promising approach to treating Alzheimer's disease; is that correct?

A. It was one of the approaches, yes.

Q. You don't give drugs to patients you don't think are going to work, do you?

A. I thought it was worthwhile to try.

Q. And if you will turn to the conclusions, your conclusion at the end of this -- first, you say, both drug treatments led to some subjective improvement without any consistent improvements on objective psychometric measures as has been previously reported with Hydergine treatment.

A. Yes.

Q. Both treatments you are saying are with Hydergine with or without precursor?

A. Yes.

Q. You were seeing subjective improvements?

A. Yes.

Q. That would be an overall impression of the functionality of the patient; is that correct?

A. Yes. There were some subjective improvements.

Q. That's the same sort of subjective evaluation that for example Dr. Summers was doing with tacrine at the time in his open label tacrine study at the time?

A. Wait a minute. What study are you referring to?

Q. His 1981 study.

A. Could you show me that article? I'd be glad to review it and comment on it.

Q. You don't recall sitting here today whether that was an open or closed trial?

A. I remember that -- I don't remember the details of that trial. I want to compare it to what you're asking me to compare to what we did with our study.

Q. That's all right. I will just ask you about your study, then. That's fine.

So you were reporting subjective improvements in the functioning of patients with Hydergine; is that correct?

A. That says what it says.

Q. And at this time you don't write in your '83 paper suggesting cholinesterase as an alternative, do you?

5/22/2007 Final Trial Transcript

A. Apparently I don't, yes.

Q. You certainly never mentioned galanthamine; is that correct?

A. That is correct.

Q. And neither you nor Dr. Gershon, in deciding what to try with your patients, decided to try cholinesterase inhibitor at this time; is that correct?

A. Well, let me explain that further, if I can, and that is that I did actually a study at the University of Michigan, as I said earlier, with Lecithin alone in normal people that were senile that didn't work. Dr. Gershon knew of that and he thought that we should proceed further. I agreed with the fact that he thought it might be an interesting idea to do combination therapy and that's what we actually did.

Q. It was an interesting idea, but you were treating patients. You were interested in helping patients; is that correct?

A. Of course. That's why we did the study.

Q. Let me --

A. Which was a research award funded by the State of Michigan to do this.

Q. Let me show you another piece of work.

MR. SIPES: Approach the witness, your Honor?

THE COURT: Yes, you may.

like effects as well as for a variety of central nervous system disorders.

A. That is correct.

Q. You described the primary uses of galanthamine at that time as being for myasthenia gravis and as an antagonist of curare?

A. That is correct.

Q. Now, if you will turn to the conclusions -- I'm sorry, to your review of the pharmacokinetics... This is on Page 300 and 301.

A. I have it.

Q. Now, I think you testified that on the basis of your review, you had come up with a serum half-life of about four hours; is that correct? This morning, did you suggest about a four-hour duration?

A. You're confusing human versus rat information. I don't know what you are referring to.

Q. You do describe in your pharmacokinetic section some work by Westra that showed an elimination half-life of 264 minutes; is that correct?

A. That's correct. You divide by 60. That's 4.4 hours. That's from my head.

Q. Right. But that four-hour estimation, that comes by work from Westra?

A. Correct.

Q. Westra was published in 1986, after Dr. Davis had applied for a patent; correct?

A. That is correct.

Q. But even on the basis of that additional information, and we'll need the next page, the last paragraph before summary. Even with that Westra work, you state, Especially clear, however, from their pharmacokinetic analysis is the fact that galanthamine is not a very long-acting compound; correct?

A. That's correct. Still is true today.

Q. And the Westra work that you are citing is work in humans; is that correct?

A. Correct.

Q. Now let's look at the summary.

Your summary is, although less potent than physoshigamine and with a similar duration of action, it is claimed to be less toxic. Galanthamine deserves further study as a possible indirect cholinergic agonist treatment of the cognitive deficits in Alzheimer's disease.

A. Correct.

Q. You viewed it as it has potential drawbacks?

A. I pointed out it's not long-acting.

Q. You pointed out although it has those drawbacks, it's claimed to be less toxic?

This was a brief study, so I don't know --

Q. But the 1971 Cozanitis article that I discussed with Dr. Levy yesterday, that one you did put in your report?

A. That's an important article comparing the two in humans.

Q. And if you will turn to the next page, the Stojanov (phonetic) article on the use of galanthamine as an antidote for curare symptoms, that you also cited; is that correct?

A. Yes.

Q. You cited with I guess the Russian spelling with the Y rather than the J?

A. Yes.

Q. Let me ask you to look at the Bhasker article, which is -- I'm not sure which one. It's DX-483.

You testified at deposition, did you not, that in order to connect galanthamine to Alzheimer's disease with regard to Bhasker, you're going to have to know the whole cholinergic story as it relates to senile dementia of the Alzheimer's type; correct?

A. Yes.

Q. And Bhasker himself never discusses Alzheimer's disease by name; is that correct?

A. I remember the year. '74. What's going on? Put

# EXHIBIT 3

A. Oh, I mean, it was a death sentence. I mean, without even anything we could do to help her to make it any easier.

Q. All right. What did you do after you finished your residency?

A. I did a fellowship in endocrinology and metabolism at Stanford.

Q. And during what period of time did you do your fellowship at Stanford?

A. July of '75 to June of '77.

Q. Now, you used the words endocrinology and metabolism. Let's just focus on endocrinology. What is that?

A. Endocrinology is the study of hormones and glands.

Q. And what is neuroendocrinology?

A. Neuroendocrinology is the relationship of the brain to the pituitary gland, the master gland, which is right behind your nose, between your eyes, and then the pituitary glands control over the other glands farther down in your body.

Q. Now, had your interest in the connection between the brain and hormones and glands in the body existed prior to your fellowship?

A. It existed since I was a child.

Q. And can you date your first experience when you

something I still don't even quite appreciate. You know, understand.

Q. Now, coming forward in time, did you have an opportunity during your fellowship to be involved in a study that was neuroendocrine?

A. Yes, I did a study with the Chairman of the Department of medicine.

Q. Can you describe that, please?

A. He was convinced that there could be men who would have a low testosterone for a reason that had to do with something in their brain, some sort of defeat or depression or something. I think that stemmed from, among other things, a study in military recruits years earlier that showed that their testosterone went down during basic training or the testosterone would go down if they lost a fight relative to another animal.

Q. And did that -- were you able to conclude that study during your fellowship or did you leave your fellowship before it was done?

A. Well, we didn't conclude it, but what we did do was we obtained a hormone from -- we obtained from a drug company a hormone that came from the lower part of the brain, the hypothalmus, that then stimulated the pituitary gland to make luteinizing hormone which goes to the testes and makes testosterone. We

became interested in what you subsequently learned was endocrinology, that connection between the brain and the hormones?

A. Well, either I first learned it in school or I used to take the train by myself into the city and go to the museum of natural history. Maybe 11, 12 years old, I'm not sure. And they had an exhibit there on the pituitary gland and hormone diseases and they said the pituitary gland never secreted more than a teaspoon of anything in its whole life but it had extraordinary effects on people. With too much growth hormone, people could be a giant or they could be a midget if they didn't have the growth hormone.

If the pituitary gland controlled the system and made so much cortisol, they could be curbinol, which meant they had a big round middle and skinny arms and legs. There was picture of a woman who became hypothyroid with her eyes bugging out.

I also used to go when I was there to an exhibit that I think showed evolution from apes until man and there was a series of brains along one wall in a case and I was fascinated to look at the brains because I understood by this point that my brain was made up of nothing but brains, I mean nothing but atoms. And that I appreciated that what the thing I was looking at was

administered that hormone as a trial to a series of men to see how well their pituitary glands were working and how well their testes were working.

So if those things were working right, we could conclude the problem was in the brain somewhere north of the pituitary and, no, we didn't actually get enough subjects to finish the study.

Q. All right. Now, as we begin to get to your patent and your invention, though, can you tell us what is that process in effect you have just described by which a physician attempts to determine from hormone output in the blood what's going on in the brain?

A. Well, the process was partially used in the study that was done at Stanford, but it had been much more used in a study of schizophrenia hormones to try and understand what the chemical was that they changed in the brain and that was called the neuroendocrine window.

Q. And why, I know it's breaking it down a little bit into each of three parts. But why does -- did science come to name that process the neuroendocrine window?

A. Okay. Neuro is neurons. That's the brain. Endocrine is the hormone system. And what we were doing was using the hormones, the hormone system, to try and get a picture into the brain, to see what was happening

to brain chemicals which might be controlling the hormones we could measure.

Q. All right. Now, did there come a time after, either during or after your fellowship in the late 1970s, when you received a request from your husband, let's take it a step at a time, to help with the neuroendocrine window?

A. Yes. Because he was a psychiatrist, he knew about the neuroendocrine window that related schizophrenia drugs to dopamine, the brain chemical of most interest in schizophrenia. He was now studying a new brain chemical, acetylcholine, one that had not been that much studied.

- - -

Q. So we can be clear now, your husband's name?

A. Kenneth Davis.

Q. That's Kenneth Davis that you're married to now?

A. Yes.

Q. He was your husband in the later 1970s; correct?

A. Correct.

Q. What work was your husband doing? And as part of that work as you understood it, did he ask you for help in dealing with your knowledge of the neuroendocrine window?

- - -

A. He wanted to manipulate acetylcholine levels in the brain, but he wasn't sure that the drugs he had to try and do that would really try choline acetyl levels. He said to me if I make acetylcholine go up, can you tell me a way I will know of that without being able to measure acetylcholine in the brain, which couldn't be done. Can you tell me how hormones will change if I really can increase acetylcholine in the brain.

Q. All right. So he was trying to determine what was going on in the cholinergic brain and asked you if you could help him with some tool that would be able to tell if there was activity based on what was going on in hormones that could be measured in blood. Fair enough?

A. He wanted a parallel readout.

Q. All right. Now, before we get to the neuroendocrine window tool that you designed -- oh, by the way, you are not claiming to have invented the neuroendocrine window, are you?

A. No.

Q. But is the neuroendocrine window a tool you used ultimately to make your invention and learn and conceive of the fact that galanthamine could be used to treat Alzheimer's disease?

A. Yes.

So from my point of view, I mean, I thought people were just ignoring an important part of the cholinergic system and a part that, in my experience, probably played an important role in restoring Alzheimer's patients' functions, because I used to smoke.

Q. All right. Why don't I have you resume the stand, then. We're getting a little ahead of ourselves and I will back up now to the tool that you helped you develop for your husband.

(At this point the witness then resumed the witness stand.)

BY MR. PAPPAS:

Q. Now, did you also develop a diagram that would assist us in understanding the neuroendocrine window approach that you used?

A. I did, but can I make one more comment about that?

Q. Absolutely.

A. Alzheimer's isn't a disease of memory. It's a disease of learning.

Q. Okay. Let's stop right there. That's an important concept.

Will you explain to us and to the Court, what do you mean when you say Alzheimer's is not a disease of memory, it's a disease of learning? What does that mean?

A. When -- well, I will tell you about a specific

study. I mean, Alzheimer's patients can't learn new information, but once you get them to learn it, they remember it as well as normal and that's why an Alzheimer's patient can tell you what happened after World War II but can't tell you what they had for breakfast. They didn't have Alzheimer's at the end of World War II. They had plenty of acetylcholine. They could lay down learning and now, even though they don't have acetylcholine, they can remember it. They can access that memory.

That's not true of breakfast because what they had for breakfast, they had no acetylcholine. They didn't lay down the learning. And they can no longer, and so they can't access it. You actually don't need acetylcholine to recall.

Q. So --

A. But memory is a good enough word for that.

Q. That's fine. Memory is the ability to recall something you've learned. Fair enough?

A. Yes.

Q. But is what you are telling us, though, is that attention, which is associated with the nicotinic receptor, is very important to learning?

A. You can't learn if you're not attending.

Q. Or as they used to tell me in class, if I didn't

pay attention, I couldn't get the material; right?

A. Right.

Q. So you're telling us in Alzheimer's, it's the inability to have attention and cognitively learn the information that then prevents you from ever having, being unable to have a memory of something; isn't that true?

A. Well, yes, I think attention is an important part of learning.

Q. All right. Are we ready to move to the neuroendocrine window now?

A. All right.

Q. Okay.

MR. PAPPAS: Can we put that up, please?

BY MR. PAPPAS:

Q. Now let's back up to the tool that you developed at the request of your husband that you then used later to make your invention.

What is disclosed here in terms that will help us understand the basic fundamental principles of the neuroendocrine window?

A. Okay. The purpose of the neuroendocrine window was to be able to draw blood and infer and measure a hormone and infer what had been going on with brain chemicals.

Now, let me see. Okay.

Over here we show blood being drawn, but go back a little ways. We get to the adrenal gland. The adrenal cortex, the outside part of the adrenal gland on top of the kidney makes cortisol. If we find cortisol in the blood, we know it has come from the adrenal cortex.

If the adrenal cortex secretes cortisol, we know it has been stimulated by the pituitary gland, because the pituitary gland makes adrinocorticotropic hormone which then causes cortisol secretion. If the pituitary gland makes ACTH, we know it has been stimulated by the hypothalmus, groups of cells at the base of the brain which made CRF, corticotropin releasing factor. Corticotropin releasing factor has to be stimulated to make ACTH.

We know that a stimulus for CRF secretion is acetylcholine operating via a nicotinic receptor.

So we know that if you give some kind of cholinergic drug and you get cortisol in one arm and you get cortisol in the other arm, it has followed this pathway. That acetylcholine nicotinic pathways have been stimulated.

Q. All right.

A. That's only true for one aspect of cortisol secretion. That's true for basal.

Q. What you ultimately determined on the way to making your invention is that cortisol would be a good marker for whether or not more acetylcholine was active in the brain; right?
A. That's right.
Q. All right.
Q. Now, let's slow down just one second.
Are there different -- I may get the terminology wrong, but are there different types of cortisol in our body?
A. There are different situations under which cortisol is secreted.
Q. Okay. Let's discuss, I think, three of them. All right?
A. Okay.
Q. Okay. What are the three levels of cortisol? And tell us what the significance is of each of those three levels, those three levels of cortisol as a marker for particular activity. Okay?
A. Yes. We always have a low level of cortisol. That's called basal cortisol levels.
If you -- that's under the control of the nicotinic synapse in the brain. If basal cortisol is raised by a drug you give, that has happened based on the nicotinic cholinergic pathways.

Q. This is something you came to learn; is that correct?
A. Right.
Q. All right. So let's back up a slide.
The basal cortisol nicotinic receptor; right?
A. That's right.
Q. All right.
A. It cannot be made to happen with a muscarinic stimulus.
Q. All right. What other level of cortisol?
A. Okay. Another aspect of cortisol secretion is that sometime in the middle of the night, you begin to secrete a little bit of cortisol, which then goes up very high to the time you wake up and remains high for a bit of the morning an then comes down. That is called the diurnal rise of cortisol or the Circadian rise of cortisol.
Q. Do we all have that?
A. We all have that.
Q. All right. And which receptor system is diurnal cortisol associated with?
A. That's due to acetylcholine operating on a muscarinic receptor and it's not an on-line event. Muscarinic blockade six hours before the expected diurnal rise in cortisol wipes it out.
Q. All right.

A. So since we know that muscarinic blockade wipes it out, we know it's mediated through the muscarinic cholinergic system.
Q. What's the third aspect of cortisol that became important to you ultimately making your conception?
A. It's a complicating factor. It's that nonspecific stress can cause cortisol release as -- along with the release of other hormones.
Q. When you say nonspecific, are you saying that is not necessarily associated with activity in the brain?
A. Yes, probably a big operation could do it.
Q. All right. So it could be from stress anywhere in the body? Correct?
A. I would think so.
Q. What about stress caused by a trial? What might be happening to my cortisol level? Is it stress level or one of the other effects?
A. No. I think it's not that stressful for you.
Q. I guess we'll see.
All right. Moving along here, ultimately, let's go back to the neuroendocrine window.
Ultimately, were you able to give your husband the tool, the help that Ken Davis asked for to do his physostigmine experiments, applying the neuroendocrine window, so he could make measurements?

Were you able to do that?
A. Yes.
Q. Okay. How was he able to use your formulation of the neuroendocrine window to assist him in his research? And then we'll get to your invention.
A. He gave physostigmine infusions to young Stanford students to see if he could make them smarter and I told him what to measure in the bloods, what hormones to measure, and we got results that enabled us to assess how much nicotinic cholinergic stimulation physostigmine had produced in those patients, in those students in the brain.
Q. All right. Now, for your research, in connection with your research, in making your invention, what were you able to conclude about what was going on in the brain if cortisol went up?
A. If you simply gave an infusion of a drug and cortisol went up, you had to have completed that whole pathway that you see there. It's the yellow line, starting in one arm where you give the drug. It would have successfully increased acetylcholine in the brain, gone through the nicotinic receptor, ultimately resulted in cortisol you could measure in the other arm. So if we got cortisol out of this arm, we knew we had activity here, acetylcholine and nicotinic receptor in

the brain.

Q. Are you saying I, Bonnie Davis, came to that conclusion myself?

A. I, Bonnie Davis, came to that conclusion myself and then told --

Q. All right.

A. -- other people.

Q. Now, when did it first occur to you that galanthamine would work as a treatment for Alzheimer's disease?

A. In Hawaii, on the morning I was presenting the hormone results from the physostigmine study in Stanford students.

Q. And do you remember a particular event that caused you to begin to, quite frankly, piece together your conception that galanthamine might work for Alzheimer's drugs, for Alzheimer's disease?

A. I read the Cozanitis '74 article on that morning.

Q. All right. Let me ask you to take a look at it. It's Plaintiffs' Exhibit 829.

Do you have it there in your binder or your red well? It will be behind a tab, Dr. Davis, that says 829.

A. Okay.

Q. Do you have it?

A. Yes.

MR. LOMBARDI: What number?

MR. PAPPAS: Plaintiffs' 829.

MR. LOMBARDI: Thank you.

BY MR. PAPPAS:

Q. Do you have it there?

A. Yes.

Q. Take your time.

A. Okay.

Q. All right?

A. Yes.

Q. Is that the Cozanitis paper, Plaintiffs' Exhibit 829?

A. Yes.

Q. All right.

MR. PAPPAS: I don't believe that has been moved into evidence, your Honor, but I would move it in.

MR. LOMBARDI: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Plaintiffs' Exhibit No. 829 was received into evidence.)

BY MR. PAPPAS:

Q. Doctor, I want to take this one step at a time.

Tell us from your review of the Cozanitis

paper, what did Dr. Cozanitis do? Let's just take it one step at a time.

What did he do as reported in this article?

A. He gave galanthamine for its usual use of being given after surgery, to reverse curare. He measured cortisol before he gave galanthamine and then for a period of time afterwards.

Now, half the patients in the study got galanthamine and the other piece got neostigmine, a cholinesterase inhibitor, which does not get into the brain.

Q. All right.

A. Principally doesn't.

Q. And the patients, some of which he gave galanthamine, some of whom he gave neostigmine, were they otherwise normal or were they patients suffering from Alzheimer's disease?

A. They were normal women.

Q. Normal women. Okay.

And what results did he report on giving galanthamine to some normal women and neostigmine to other normal women?

\- - -

A. Galanthamine caused a sustained rising in cortisol which went on for at least six hours. But there was no

rise in cortisol in the women given the neostigmine

Q. What conclusion did Dr. Cozinitis reach, if any, about why some women had their cortisol levels go up?

\- - -

A. He thought it was a stress response.

Q. Now, did he cite in his article to the findings of any other person who had done work prior to him with galanthamine?

A. Yes. He cited Naumenko.

MR. PAPPAS: Can we have up Page 167, Matt? I'm sorry. Page 167. Cozanitis. And can you highlight the portion around Naumenko, Matt. Right here (indicating).

BY MR. PAPPAS:

Q. Now, who is the person who also did some work with galanthamine that's referred to by Dr. Cozanitis?

Highlight it beginning with the word this, please.

Who was that, Dr. Davis?

A. Who was he?

Q. No. Who is the man?

A. Naumenko.

Q. And what had Naumenko done as reported by Dr. Cozanitis?

A. Naumenko thought that the reason cortisol went up

when he gave galanthamine was that galanthamine was stressful to the body.

Q. And --

A. And it was the stress in the body that caused cortisol to go up.

Q. And what study had Naumenko done?

A. Naumenko gave galanthamine and cortisol went up, but he said that's a stress response. So he decided to cut off the body from the brain. He made a cut right through the mid-brain, so that messages from the body could no longer go up to the brain.

Q. So this isn't too gruesome now, Naumenko is doing this to guinea pigs. That's bad enough, but he was working with guinea pigs.

A. Still gruesome.

Q. I agree.

In any event, what did he find?

A. He found that once the mid-brain transection had been done, galanthamine didn't produce much of a further rise in cortisol.

Q. Okay. And so what conclusion did Naumenko draw about why the galanthamine caused arise in cortisol in guinea pigs?

A. He thought it was a nonspecific stress based on stimulation of nerves in the periphery, below the neck.

Q. And what conclusion did Dr. Cozanitis draw about why the cortisol went up in normal women after having been administered galanthamine?

A. He ascribed it to the analeptic or sort of exciting action of galanthamine producing some stress and excitement and so he thought, okay. It's a stress response.

Q. All right.

A. Nonspecific.

Q. All right. Now, so Cozanitis says galanthamine causes cortisol to go up due to stress, in women. Naumenko says its guinea pigs, goes up due to stress. Did you agree with those conclusions?

A. No.

Q. What conclusion did you reach?

A. I knew it was a specific central stimulation of the nicotinic pathway.

Q. Now, how did you know as part of your making your invention that although these men were reporting that galanthamine caused an increase in cortisol due to nonspecific stress, how did you know that it was not that, but that it was actually action through the nicotinic pathway of the brain?

A. Well, I knew that if you took the hypothalmus out of a series of rats and you added acetylcholine to the

little Petri dish in which they were, that that would cause the secretion of CRF, corticotropin releasing factor, which is at the top of the neuroendocrine pathway there. I knew that you could block the effect of acetylcholine with various compounds that blocked specifically nicotinic receptors and I knew that when you tried to get CRF out of those hypothalami in the Petri dish with bethanicol, which is a specific stimulator of muscarinic receptors, it didn't work.

There was also work done in rats in a non-stressed state in which physostigmine was able to raise cortisol and that could be blocked by the same compounds which block only nicotinic receptors, classic nicotinic receptor blockers. They're not all anti-cholinergic. The name seems to be different.

Q. All right. And we have covered already the importance of the nicotinic system to attention; is that correct?

A. Yes.

Q. All right. Now, what was it, then, that caused you ultimately to conclude that galanthamine would be effective in treating Alzheimer's disease?

A. Well, to start with, I was never comfortable with the fact that the field was predominantly muscarinic. Acetylcholine had, to my knowledge, two functions, and

they were both important in cognition, and if a person got Alzheimer's disease and had no acetylcholine, I didn't think it would be enough to simply replace the nicotinic, the muscarinic component. I thought it was very important to make sure that you replaced what was missing, which was both nicotinic and muscarinic aspects of acetylcholine.

And then I saw this drug, therefore, it was a cholinesterase inhibitor, and so it was important to me to use a drug like that.

But this drug worked. I wasn't testing the memory system in brain. I was testing the neuroendocrine system, but this drug got into the brain. It acted on a brain system controlled by acetylcholine. It produced a clear output in a majority of patients. It lasted for an amount of time that would make sense for something that could be a drug, could be a medication. And there was no special comment about using it.

They used this all the time and I thought this this is -- this is the way we need to treat Alzheimer's.

Q. All right. Let's go back to the first drawing. I want to point something out.

I want to follow up on one of your -- parts of your testimony.

You've been here for quite a bit of the -- you've been here since the opening of trial; correct?

A. Yes.

Q. And you heard Dr. Levy testify; correct?

A. Yes.

Q. And you heard him talk about how he has been totally focused on the muscarinic system, muscarinic agonist; right?

A. Yes.

Q. And as of 1986, when you conceived of your invention, where was everybody looking?

A. The field was really focused on the muscarinic system. They had a muscarinic model.

When -- I mean, when I submitted this patent, I certainly wasn't sure, and a lot of other people weren't sure that cholinesterase inhibitors would ever work. They would speculate we may have to go right to agonists if the muscarinic receptor, tests that were developed left out attention.

There was a real predominance of focus on the muscarinic --

Q. It's the analysis you've just given us in your two prior answers, is that what led you to conclude that nicotinic was the way to go?

A. I thought it was very important and we had to cover

it.

Q. Now, can you turn your attention to your patent, Dr. Davis, and specifically there's a description of a scopolamine model in your patent.

Do you see that on Column 1, Lines 29 through 34?

A. Yes.

Q. All right. Now, there has been some testimony in this court about scopolamine induced amnesia model.

Did you believe when you were doing your work that the scopolamine model would help at all in solving Alzheimer's? Was it a good model for Alzheimer's disease?

A. To me, it was missing half the story.

Q. What do you mean, it was missing half the story?

A. Well, it was missing the nicotinic and scopolamine has effects in blocking the muscarinic that you don't see in Alzheimer's patients. Scopolamine causes dilatation of pupils. Alzheimer's patients don't have dilated pupils. It causes sedation. Alzheimer's patients don't have a disturbance of consciousness. People would give scopolamine for a short period of time and see what could reverse it. Blocking a receptor for a few hours is not the same as having a system which is chronically under stimulated.

Q. Did galanthamine have muscarinic effects?

A. Some. Not -- some.

Q. But how would you compare the side effects of galanthamine, if any, with the side effects that were traditionally associated with muscarinic agents? Such as physostigmine?

A. Different. Different side effects.

Q. Describe the side effects on drugs that were primarily muscarinic.

A. Muscarinic drugs make people sweat, have abdominal cramps, have diarrhea, have nausea and I think Dr. Domino told us also urination, defacation, salvation.

Q. And are those side effects typically associated with nicotinic?

A. Those are mostly muscarinic.

Q. All right. And I take it those are side effects you want to avoid if you want to give a drug for Alzheimer's; is that right?

A. Yes.

Q. All right. Now, in 1986, when you made your -- filed for your patent, how did galanthamine compare to other cholinesterase inhibitors in terms of its strength? Weak, strong, neutral? How was it?

A. Galanthamine was in one study that I'm aware of a hundred times weaker than physostigmine in muscle and

about 30 times weaker in brain.

Q. Now, were you concerned that galanthamine was a weak cholinesterase inhibitor, as much as a hundred times less potent than physostigmine?

A. No.

Q. Why not?

A. Because it produced a cholinergic output from brain, because it raised cortisol. And I knew the pathway and so it was -- it could be made to increase cholinergic transmission in brain. I mean, physostigmine didn't do that in the Stanford study. There was no elevation of basal cortisol unless people got sick.

Q. All right. Now, prior to filing for your patent application, had you attempted to get galanthamine, the drug?

A. I had.

Q. All right. Let me ask you to look at Plaintiffs' Exhibit 121.

And while you're at it, Dr. Davis, it might be helpful to take out Plaintiffs' Exhibit 122 and 123, because I'm going to go through them together because they really all are about your efforts.

A. Okay.

Q. Let me know when you have 121.

A. Got it.

Q. Can you identify this document?
A. Yes. It's a letter I wrote to Dr. Cozanitis.
Q. All right. And let me ask you to direct your attention to what I have had marked for identification as Plaintiffs' Exhibit 122. Can you identify that letter?
A. Yes.
Q. And what is that?
A. It's a response from Dr. Cozanitis.
Q. Okay. And what is the date of the response from Dr. Cozanitis to you in Plaintiffs' Exhibit 122?
A. October 8th, 1980.
Q. Okay. I know that Plaintiffs' Exhibit 121 is undated, but does the response from Dr. Cozanitis help you approximate for us the time period of your letter to him asking for galanthamine?
A. Yes. It must have been prior to that.
Q. All right.
MR. PAPPAS: Your Honor, I would move 121 and 122 in.
MR. LOMBARDI: No objection.
THE COURT: Thank you.
DEPUTY CLERK: So marked.
*** (Plaintiffs' Exhibits No. 121 and 122 were received into evidence.)

BY MR. PAPPAS:
Q. What are you asking Dr. Cozanitis in Plaintiffs' Exhibit 121?
A. I'm asking him for information on how to get galanthamine.
Q. And what does Dr. Cozanitis write back to you in Plaintiffs' Exhibit 122?
A. He writes that I should contact Pharmacim in Bulgaria.
Q. And did you do that?
A. I did.
Q. Let me direct your attention to what I've had marked for identification as Plaintiffs' Exhibit 123.
Is that a letter from you to Dr. Jordanov in Bulgaria, dated March 16, 1983?
A. Yes.
MR. PAPPAS: I move it.
MR. LOMBARDI: No objection.
THE COURT: Thank you.
*** (Plaintiffs' Exhibit No. 123 was received into evidence.)
BY MR. PAPPAS:
Q. What do you ask him?
A. I ask him how to purchase galanthamine for use in my research.

Q. And did you ever get a response from Dr. Jordanov?
A. No, I didn't.
Q. Did you make further attempts to get galanthamine?
A. Yes.
Q. And what was your next attempt to get galanthamine?
A. I put $50 in an envelope and sent it to Pharmacim and asked them to send me however much that would buy.
Q. Did you get a response from them?
A. No.
Q. By the way, did you get your money back?
A. No.
Q. To your knowledge, was galanthamine available in the United States at that time and specifically at that time I'm talking about 1985, 1986?
A. To my knowledge, it wasn't.
Q. Did there come a time after your patent application was filed when you were successful in obtaining galanthamine?
A. Yes.
Q. All right. And how did that come about?
A. Sasha Mathe, who was in our group, obtained it from I think Professor Cartovich (phonetic) in Russia.
Q. Is this in 1986 sometime?
A. Yes. Well, yeah. I think so. '86 or early '87.

Q. Certainly.
A. He validated his paradigm with scopolamine.
Q. And what's the significance of that?
A. It wasn't the scopolamine model. You had to show that something worked in scopolamine dementia.
Q. And what did Dr. Coyle report in Plaintiffs' Exhibit 117 in the abstract about the results of his studies on mice? Is there a sentence there particularly that sums it up?
A. The final sentence.
Q. I think that does it.
A. Galanthamine's ability to reverse cognitive deficits induced by NBM lesions and its comparatively long half-life suggests it may be effective in treating the central cholinergic deficits in Alzheimer's disease patients.
Q. How would you characterize the results? Positive, negative or inconclusive?
A. They were clearly positive.
Q. All right. So now that you have your '318 patent that was issued by the Patent Office and the animal results of testing from Dr. Coyle, what did you do next in your attempt to develop galanthamine as a treatment for Alzheimer's disease?
A. I sent out a series of letters to drug companies to assess their interest in licensing.

Q. Well, were you not able, with your husband, to develop galanthamine on your own?
A. That's right. We were not able to develop galanthamine on our own.
Q. Simply put, you didn't have the funds or the wherewithal to spend the kind of money it will take to develop this drug; is that correct?
A. That's correct.
Q. All right. So did you assist my colleagues and I in putting up what we'll call round one of your attempts to find someone who would agree to license the '318 patent from you and pursue the development of galanthamine for the treatment of Alzheimer's disease?
A. I was thinking about something else.
Q. I'm sorry. And my question perhaps suffered as they sometimes do from being long.
Let me try to be briefer.
Did you help me prepare a chart that shows the -- in one form, summary form, all your efforts between 1987 and 1990 to find someone, a pharmaceutical company, that would license the patent?
A. Yes.
MR. PAPPAS: Can we have that chart, please?
BY MR. PAPPAS:
Q. Now, Dr. Davis, we note on the chart that the dates

hypothalmus in a petri dish you could get ultimately corticotropin factors to come out.

- - -

A. (Continuing) If you gave cholinergic drugs to non-stressed animals, block the muscarinic, you could get cortisol under nicotinic conditions. You could increase cortisol with nicotine in humans. And the Cozanitis articles were really very good. They were specific.

Q. All right.

A. They were as good a data in humans as you could have gotten from an animal study and that does not usually happen.

Q. All right. Now, let me move forward in time.

You told us yesterday that you had your conception about use of galanthamine for Alzheimer's disease in Hawaii. Can you give us the date? I forgot to ask you the date yesterday.

A. It was either the end of August, beginning of September 1977, three weeks before my son was born.

Q. Very well.

And how was it that you happened to have Cozanitis and other papers with you on that trip?

A. Yes. Well, that was the problem, because this baby was coming, and so before we left for Hawaii, I put

the crib together and I washed all the baby clothes and I rinsed them an extra time and I put the papers in a suitcase because that could wait and, you know, who knew what would happen in the next few weeks.

Q. Well, was the Cozanitis and all of those other papers part of a much larger group of research you had been doing prior to that time?

A. Recently, but prior to that time.

Q. All right.

A. There were a lot of papers that were reviewed.

Q. Now, let's move forward.

After your conception in 1977 that galanthamine would work, I want to cover the time period between 1978 and 1986, when you filed your patent application. All right? Are you with me in terms of time?

A. Yes.

Q. All right. Now, you have been here in court and heard a lot of testimony about physostigmine studies and papers that were published by your husband in which your name appears. Do you recall that?

A. Yes.

Q. Okay. Were physostigmine studies being done in the late seventies, early eighties, by your husband?

A. Yes. That's when they started.

Q. All right. And did you follow the results of those

studies? Indeed, did you do some work as part of those studies?

A. Which one? I mean, the ones that were done at Stanford, no. I just -- I just -- I just added my section for him.

Q. All right. But thereafter, were you involved in any of the physo studies?

A. Yeah. Then I was involved in a medical way.

Q. All right. Now, we've heard from Barr that your husband was working with physoshigamine and ultimately physostigmine studied in Alzheimer's patients; correct?

A. Yes.

Q. All right. Now, but you've testified that as of 1977, you conceived that galanthamine should be used for Alzheimer's disease; correct?

A. Instead of physostigmine.

Q. All right. Right. Did you follow these physo studies in that period between 1978 and 1986?

A. Yeah.

Q. And --

A. To some degree.

Q. All right. And what, if anything, did they tell you about your invention vis-a-vis what your husband was trying with physostigmine?

A. Oh, that he would have had a much easier time if

he had done it my way.

Q. Well, did his way work?

A. No.

Q. Okay. What happened --

A. After -- that way never worked.

Q. I understand. But to get, quite frankly, a little scientific, what was it in all the discussion you've given us yesterday about muscarinic and nicotinic systems, what was it you found out in these physo studies that did not work?

A. Well, we measured hormones in that first study in Stanford students. Physostigmine never raised cortisol unless the subjects were stressed, in which case -- and threw up, or at least got very nauseated, in which case it raised cotsol, growth hormone and prolactin. And remember prolactin was my checker. And if that went up, then you couldn't describe the rise in cortisol to a specific nicotinic mechanism.

Q. All right.

A. So physostigmine didn't work in the tool that I set up.

The tool was to test does physostigmine increase cholinergic transmission in the brain and using my tool, the test showed, no, it didn't.

Q. And so what lesson did you draw with respect to

your invention from the fact that the physo studies failed?

A. That physostigmine was not good at doing what was needed to treat Alzheimer's.

Q. All right. Now, let's come forward, then, to 1987, when you began to interest pharmaceutical companies in developing -- before I go there. We covered the scopolamine model yesterday. Do you recall that?

A. Yes.

Q. And you told the Judge why you didn't think the scopolamine model was a good model for Alzheimer's. Do you remember?

A. Yes.

Q. All right. Well, what conclusions did you draw in terms of your invention prior to filing for the patent in 1986 by the fact that the scopolamine model did not prove to be a good model for Alzheimer's disease? What conclusions did you draw about your invention?

A. Well, weren't those separate? I mean, the scopolamine model wasn't a good model and, I mean --

Q. And why wasn't it a good model for Alzheimer's disease?

A. Well, as we spoke about, it was purely nicotinic. It was more nicotinic than Alzheimer's disease. I mean, excuse me. I was purely muscarinic and the muscarinic

Q. And did you sign the license on behalf of a company you had then called Intelligen?
A. Yes.
Q. Was it also signed by Doug Watson on behalf of Ciba-Geigy?
A. Yes.
Q. Is this the license agreement that you entered into with Ciba-Geigy in 1990 for the development of galanthamine as a treatment for Alzheimer's disease?
A. Yes, it is.
MR. PAPPAS: Your Honor, I would move Plaintiffs' Exhibit 305 into evidence.
MR. LOMBARDI: No objection.
THE COURT: Thank you.
DEPUTY CLERK: So marked.
*** (Plaintiffs' Exhibit No. 305 was received into evidence.)
BY MR. PAPPAS:
Q. Now, did Ciba do any work pursuant to the license agreement?
A. Yes.
Q. Okay. And what work did they do?
A. They did animal toxicology, one and two year, and they did a clinical study.
Q. All right. And what were the results of those

studies?
A. The toxicology was good and the clinical study indicated to them that the drug would have efficacy.
Q. And when you say the drug, we're referring to galanthamine; is that correct?
A. Yes.
Q. And they were studying it for the use in Alzheimer's disease; correct?
A. Yes.
Q. Now, did there come a time when the relationship with Ciba-Geigy came to an end?
A. Yes.
Q. Let me ask you to take a look at what we previously had marked as Plaintiffs' Exhibit 467.
Can you get it there in your accordion file of exhibits?
A. I have it.
Q. Can you tell us, first, before we -- before referring to any contents, the date of the letter, who it is from and who it is addressed to?
A. The letter is dated November 10th, 1993. It's from Douglas G. Watson of Ciba-Geigy, President, Pharmaceuticals Division. And it's addressed to Intelligen Corporation, which is me.
Q. All right. And I take it you received this letter;

with either the efficacy or the safety of galanthamine. This was a business decision reflecting limited development resources. It was well understood that galanthamine, according to the results of Protocol 01, promises to be an efficacious and, in comparison to other treatments, a safe drug.

Q. Thank you.

Dr. Davis, I recognize here in reviewing my notes, I failed to ask you, with respect to Plaintiffs' Exhibit 173, which was the Mylan letter of rejection, the one we just covered, do you recall that?

A. Yes.

Q. To your knowledge, has Mylan, the same Mylan that's a defendant in this case, ever developed a successful treatment for Alzheimer's disease?

A. Not to my knowledge.

Q. All right. Now, Dr. Davis, in our timeline, we're at what point in time now that Ciba-Geigy has told you they are terminating the studies?

A. The end of 1993.

Q. All right. Now, what did you do?

A. I had to start all over again.

Q. And what do you mean when you say you had to start all over again?

A. I had to look for someone to continue galanthamine's

development.

Q. And did you do that?

A. I did.

Q. All right. Did you assist my colleagues and I in preparing a similar chart that we've seen already as Plaintiffs' Exhibit 1397 that would reflect your efforts to market your invention and interest a pharmaceutical company in developing galanthamine from 1993, when Ciba terminated the license, up till the time you had the license with Janssen?

A. I did.

Q. Okay.

MR. PAPPAS: Can we have on the screen, please, Plaintiffs' Exhibit 1398?

MR. PAPPAS: Your Honor, I realize I had not handed up to your Clerk a copy of Plaintiffs' Exhibit 1397. It wasn't in your folder yesterday (handing document to the Court).

Thank you.

BY MR. PAPPAS:

Q. Now, let me ask you to take a look at what we've had marked for identification at this time, Dr. Davis, as Plaintiffs' Exhibit 1398.

I will ask, first of all, was this prepared in the same manner as the prior chart in terms of

Q. And, to your knowledge, did Marion Merrell Dow develop a successful treatment for Alzheimer's disease?
A. No, not to my knowledge.
Q. All right. Now, can we have Plaintiffs' Exhibit 1398?
I take it from this chart here that we've had admitted that in November 1995, you have an entry here that says Janssen license.
What does that mean?
A. The patent was licensed to Janssen.
Q. All right. Now, Dr. Davis, let me ask you to take a look at Plaintiffs' Exhibit 329 that was admitted yesterday, but it's also in your folder, and let me know when you have it.
A. I have.
Q. Can you take a look at it?
A. Okay.
Q. Do you recognize it?
A. Yes.
Q. Okay. Is this, it was admitted yesterday, but just to move things along, is this the license between Synaptech and Janssen for the development of galanthamine for the use in Alzheimer's disease?
A. Yes.
Q. All right. Now, what work did Janssen do with

respect to galanthamine after this license agreement was signed with Synaptech?
A. I guess the largest amount of work was to pivotal clinical studies.
Q. And do you know what the results of those were?
A. Yes. They were positive.
Q. And do you know whether Janssen was able to obtain FDA approval ultimately for galanthamine as a treatment for mild to moderate Alzheimer's disease?
A. Yes.
Q. Do you know when it was approved by the FDA?
A. February 28th, 2001.
Q. Now, since 2001, can you approximate for us the amount of sales Razadyne has enjoyed in the United States due to prescriptions written by physicians?
A. Yeah. Basing my estimate on what Dr. Boghigian said yesterday about the mid-eight hundreds about a year ago, it would be about a billion now.
Q. All right. In other words, you're bringing the numbers forward from Mr. Boghigian's testimony because he was back in '06; is that correct?
A. Yes.
Q. All right. Now, subsequent to the approval and marketing of Razadyne as a treatment for galanthamine, Dr. Davis, have you, over the course of the last two to

MR. PAPPAS: Can you blow that up for me or highlight it?

BY MR. PAPPAS:

Q. You are referring to the Cozanitis studies here in Column 1 of the patent; is that correct?

A. Yes.

Q. 1974 and 1980; is that correct?

A. Right.

Q. Now, in the patent, it reads, These studies showed an increase in both plasma cortisol and plasma ACTH when galanthamine was administered to patients together with atropine.

Now, what does that tell somebody of ordinary skill in the art who works in this field if they read that with respect to nicotinic or muscarinic? Is it nicotinic or muscarinic?

MR. LOMBARDI: Excuse me. I think that that was a request for an opinion on a level of ordinary skill in the art and this witness was never designated as an expert, so I would object.

MR. PAPPAS: Your Honor, Mr. Lombardi has gone through the patent in cross-examination and asked this witness whether or not nicotinic was disclosed and she told him that while the word wasn't there, the concept was disclosed. I think I am entitled to explore

on redirect just where that disclosure is to one of ordinary skill in the art in her patent.

THE COURT: Well, I think basically that you can explore her understanding and perhaps you can explore what her understanding of one of ordinary skill in the art, but certainly I won't accept this as an expert opinion on what one of ordinary skill in the art would --

MR. PAPPAS: Very well, your Honor. I'm just trying to cover what she believes that's a disclosure of.

THE COURT: Well, you can certainly explore that.

MR. PAPPAS: Certainly.

BY MR. PAPPAS:

Q. What are you disclosing there, Dr. Davis?

A. When you give a cholinesterase inhibitor together with a muscarinic blocker, you have a nicotinic effect.

Q. Is that something you learned in medical school?

A. Yes.

Q. Now, let me ask you to direct your attention to Column 2. Specifically, Lines 45 through 56.

Do you see that?

A. Yes.

Q. All right. And specifically, I want to draw your attention to -- this is a description of the animal model; is that correct?

A. That's right.

Q. All right. And you see the words that were written there, quote, a selective lesion is placed in the subcortical nucleus, parentheses, nucleus basalis of Meynert, close parentheses, with a resultant cortical cholinergic deficiency, similar in magnitude to that seen in early to moderate stage Alzheimer's disease.

Have I read that correctly?

A. Yes.

Q. Now, what are you telling or disclosing there?

A. Well, Alzheimer's patients are missing acetylcholine in the cerebral cortex and we could model that by destroying a nucleus in the brain that made the acetylcholine for that part of the cortex, for the cortex, and it would be about the same diminution of acetylcholine that one would get in early to moderate Alzheimer's disease.

Q. All right. Now, we've heard earlier testimony about the scopolamine model.

Is this different, the model that talks about the nucleus basalis of Meynert?

A. Oh, it's much better.

Q. Is it different?

A. Yes.

Q. So it's different and better?

A. Yes.

Q. All right. Why?

A. Because here you're taking away acetylcholine, so you're taking away all the effects of acetylcholine, muscarinic and nicotinic, and it also has a chronic effect. It's down the way it is in Alzheimer's disease for a long period of time. It's not a one-shot deal.

Q. All right. Now, let me ask you to direct your attention to Plaintiffs' Exhibit 699.

Do you have that up there with you?

(Pause.)

MR. PAPPAS: Your Honor, I don't believe it's in her binder, but this Plaintiffs' Exhibit 699 was admitted into evidence yesterday.

May I approach the give the witness a copy?

THE COURT: Yes.

MR. PAPPAS: 699.

MR. LOMBARDI: Just hold it up. Thank you. I got it.

(Mr. Pappas handed an exhibit to the witness.)

THE WITNESS: Thank you.

# EXHIBIT 4

Q. Have you ever treated Alzheimer's patients?

A. Well, I managed Alzheimer's patients prior to the time I became the Director of the Division of Child Psychiatry in '82. This was primarily during my residency and during my time as a faculty member, running a clinic at Hopkins. I say manage because back then there were no treatments.

Q. Have you ever done any Alzheimer's research?

A. Yes. I started my research in Alzheimer's disease in about late 1978, and that continued to be a major interest in my laboratory, neurobiology of Alzheimer's disease, well into the nineties.

Q. What was the nature of your research?

A. Well, one of my first research interests was in the neurobiology of neurodegenerative disorders, and we discovered a method in which we could selectively kill neurons in the brain in a way that was like neurodegenerative disorders in humans.

The first disorder we looked at was Huntington's disease and then that was in '76, and then the papers came out showing that there was these reductions in the markers for cholinergic neurons in the cortex of individuals who died with Alzheimer's disease.

The source of that innervation, that is

where the cell bodies of those neurons were located, was unknown at the time, although there was some suggestion it might be in the base of the brain, the nucleus basalis. We made the selective lesion in the nucleus basalis in rats and this selected in rats the cholinergic deficits that were seen in the brains of individuals with Alzheimer's disease. That is, this caused these neurons to die.

We subsequently showed in collaboration with David Olten (phonetic) at Hopkins that these animals exhibited deficits in working memory, much like individuals in the early stages of Alzheimer's disease.

This became a particularly attractive model superseding the scopolamine model because, number one, scopolamine only blocked muscarinic receptors.

Number two, it was -- it was a temporary blockade whereas this model literally recreated the degeneration, pre-synaptic cholinergic neurons, which affected any of the receptors, cholinergic and nicotinic receptors, that would respond to acetylcholine.

Q. Did you use this model to test drugs for Alzheimer's disease?

A. We did, we did study with physostigmine -- physostigmine with David Olten and then I was contacted by Bonnie Davis.

8/20/2007 Final Trial Transcript

A. Oh, the first published work came out in the proceedings for the meeting of neuroscience in the fall of 1987.

Q. Have you recently published work?

A. Well, I -- I published a -- a review back in, I think, the year 2001, looking at the possibility that galanthamine might have, of course, altering effects, and I just completed a review that was accepted for publication in the Journal of Alzheimer's Disease on galanthamine as an allosteric modulator of nicotinic receptors.

Q. If you could turn to Tab 1 in the materials in front of you, it should be Plaintiffs' Exhibit 1366.

A. Yes.

Q. Do you recognize Plaintiffs' Exhibit 1366?

A. Yes. It's my curriculum vitae.

MR. SIPES: Your Honor I'd move Plaintiffs' Exhibit 1366 into evidence.

MR. GRACEY: No objection.

THE COURT: Thank you.

*** (Plaintiffs' Exhibit No. 1366 was received into evidence.)

BY MR. SIPES:

Q. Do you believe you could be helpful to this Court in understanding the state of the art with your expertise

with Don Price, who was the head of neuropathology at Hopkins.

Q. When was it published?

A. 1983.

Q. And you're one of the authors?

A. I was the senior author, yes.

Q. Is it a peer-reviewed article?

A. Yes. This is a peer-reviewed article.

Q. Was it an influential article?

A. Well, it has been cited over 2,500 times in scientific literature.

Q. Was it influential before 1986?

A. Yes.

MR. SIPES: I will move Plaintiffs' Exhibit 663 into evidence.

MR. GRACEY: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Plaintiffs' Exhibit No. 663 was received into evidence.)

BY MR. SIPES:

Q. The title of the article is Alzheimer's Disease, A Disorder of Cortical Cholinergic Innervation.

What did you mean by that?

A. Well, this article summarizes the evidence that

among the neuronal systems that degenerate in Alzheimer's disease, the cholinergic neurons appear to be especially vulnerable. And then it goes on discuss the implications of this with regard to potential treatment.

Q. The defendants actually have referred to lots of things called the -- the cholinergic deficit hypothesis of Alzheimer's disease.

A. Right.

Q. How does your article from Science relate to the cholinergic deficit hypothesis?

A. Well, I think it tries to take a balanced and tempered approach. It -- it points out the evidence that there is both cholinergic neurodegeneration and hypo function, particularly in the cortical limbic regions of the brain in Alzheimer's disease and degeneration of these basal for brain cholinergic neurons, but it also summarizes the rather, let's say, unsatisfying results from attempts to enhance cholinergic neurotransmission in Alzheimer's disease.

Q. And let me first turn your attention to the first page, Plaintiffs' Exhibit 663, to the heading, Alzheimer's Disease.

Do you see that?

A. Yes.

Q. And, first, the first sentence is a description of

pre-senile dementia. I wonder if you could read that into the record?

A. Sure. Pre-senile dementia of the Alzheimer's type is a rare disorder in which individuals, typically in their fifth decade, develop a progressive deterioration of cognitive functions clinically indistinguishable from senile dementia.

Q. And this description of pre-senile dementia of the Alzheimer's type, is that an understanding of pre-senile dementia that a person of ordinary skill in 1986 would have had?

A. Yes.

Q. If we could scroll down a little bit, could you read the next sentence into the record?

A. The demonstration that the pathological alterations in the brains of more than half of elderly demented individuals are similar to those found in the brains of patients suffering from the pre-senile form of Alzheimer's disease suggests that these are related disease processes.

Q. Is this sentence referring to what we've in this courtroom come to refer to as senile dementia of the Alzheimer's type?

A. That is right.

Q. And are you describing senile dementia as a

related disease process to pre-senile dementia?

A. Yes.

Q. Is that a view that a person of ordinary skill in the art would have had 1986?

A. I believe that's the case.

Q. Does the next sentence describe what the relationship is between those two diseases?

A. Yes.

Q. Could you explain what the next sentence is saying?

A. It's basically saying that in both diseases, one sees these pathologic stigmata, that is the neuritic plaques and the neurofibrillary tangles.

Q. Now, let me ask you to turn, if you would, to Page 1188 of the article.

In the right-hand column, about -- it's the second full paragraph, there's a discussion of individuals with Downes Syndrome.

Do you see that? The left-hand column. I apologize.

A. Yes. It's halfway through the column, left-hand column.

Q. That's correct.

Could you read the first sentence into the record?

A. Sure. Individuals with Downes Syndrome, Trisomy 21, often experience a progressive deterioration in their limited cognitive abilities beginning at approximately 30 to 35 years of age.

Q. And then the next sentence, if you would?

A. Brains of affected patients show neuropathological changes virtually identical to those in AD, or Alzheimer's disease.

Q. Well, what were you saying about individuals with dementia and Downes Syndrome?

A. Well, this provides a very interesting genetic link at that time. We were trying to figure out why neurons die in -- what do the plaques entangles have to do in Alzheimer's disease and it turns out that the gene that encodes for the protein that ultimately creates the amyloid and the plaques is located on chromosome 21.

And the problem with Downes Syndrome is they have three copies of chromosome 21. And so they have an extra copy of the gene that makes this protein that ultimately is pathologically responsible for Alzheimer's disease.

Just parenthetically, we're able to create mice with the same problem and that helped us understand the molecular mechanisms.

Q. Now, the dementia that individuals with Downes

Syndrome get, is that a related dementia to Alzheimer's disease?

A. Well, it's definitely related at a molecular level and a pathologic level.

Q. So would a person of ordinary skill in the art in 1986 have viewed dementia in Downes Syndrome as a dementia related to Alzheimer's disease?

A. I think those who are on the cutting edge.

Q. And were there any other dementias in 1986 that were characterized by plaques and tangles?

A. No.

Q. Let me ask you, then, to turn back to the first page, on the right-hand column, and in the right-hand column you'll see there's a section, cholinergic neurons and Alzheimer's disease.

Do you see that?

A. Yes.

Q. What are you describing in that section?

A. Well, I'm describing the evidence that implicates hypo function of cholinergic neurons in the path of physiology or the symptomatic manifestations of Alzheimer's disease.

\- - -

Q. Is that the same thing that we referred to as the cholinergic deficit hypothesis?

A. Yes. That's a shorthand for it.

Q. If you would look now on the right-hand column, the bottom paragraph that begins, drugs that block central acetylcholine. Muscarinic receptors have long been known to disrupt higher cognitive function and induce transient amnestic states.

\- - -

A. Yes.

Q. What is the relationship of the drugs that block muscarinic receptors to the cholinergic deficit hypothesis?

A. Well, those drugs are -- are able to induce hypofunction, a component of cholinergic neurotransmission. That is the muscarinic receptors. And so you can pharmacologically induce low muscarinic receptor activity and you can correlate it with these cognitive deficits.

Q. Was -- were the tests using these muscarinic receptor blockers seen as supporting evidence for the cholinergic deficit hypothesis?

A. Yes and no. Strictly speaking, the Drachman and Leavitt paper reports to the memory problems that occur in the aged and so as a strict model for -- for memory impairment, has more to do with what occurs in the aged than specifically with Alzheimer's disease.

Q. Was a connection drawn between aged memory problems and Alzheimer's disease?

A. Yes.

Q. And if you turn to the next page, the bottom -- the last sentence in the paragraph that begins with the discussion of muscarinic receptor blockers, the last sentence reads, Thus, central cholinergic neurotransmission may play a role in the processing of recent memories and abnormalities of this system may underlie some of the symptomatic manifestations of Alzheimer's disease.

A. That's correct.

Q. What is the connection that you are drawing in your article between the tests with muscarinic receptor blockers and some of the symptomatic manifestations of Alzheimer's disease?

A. Well, the -- the -- the centrally active muscarinic antagonists cause impairments in recent or working memory, and that is the type of memory impairment that is seen in the early stages of Alzheimer's disease.

Q. Let me ask you now to turn to Tab 3 in your binder, which is Plaintiffs' Exhibit 653, which I believe has already been admitted into evidence.

A. Yes.

Q. Do you recognize Plaintiffs' Exhibit 653?

A. Yes. 653.

Q. What is this article?

A. Yes, I do.

Q. And the first paragraph, do you see there's a reference to some studies by Dr. Drachman and others involving scopolamine induced memory deficits?

Do you see that?

A. Yes.

Q. Are those the Drachman studies that we heard about over the last two days as forming these early foundations in the cholinergic deficit hypothesis?

A. Yes. That is the case.

Q. Now, if you turn to the next paragraph, do you see that there is a reference to followup studies? Do you see that in the next paragraph, soon after the Drachman study?

A. Yes.

Q. I wonder if you could read the first two sentences into the record?

A. You mean -- beginning with Soon after?

Q. Beginning with Soon after.

A. Soon after the Drachman study, a series of papers was published showing similarly parallel memory deficits in aged monkeys and scopolamine-treated young monkeys. In addition, scopolamine's age mimicking effects upon memory were shown to be at least somewhat specific to its effects on central muscarinic receptors, since

similar age-like effects on memory were not obtained with a number of other drug treatments, including dopaminergic and alpha adinergic blockers, several nonspecific and catecolaminergic stimulants, nicotin receptor blockers and peripheral anti-cholinergies.

Q. These studies, were they viewed as relevant to drug development in the Alzheimer's field?

A. Yes.

Q. What was the relevance that was perceived of these studies to Alzheimer's drug development?

A. They provided pharmacologic, we'll call them pharmacologic targets. Where are you going to direct your drug development and also directs you away from where you're going to invest your time and effort.

So if you don't see effects with drugs that interact with specific neurotransmitter systems or receptors, you're unlikely to pursue that line of investigation.

Q. Let me draw your attention to discussion that similar age like effects on memory were not obtained with nicotinic receptor blockers.

Do you see that?

A. Yes.

Q. What would that fact say to a person of ordinary skill in the art in 1986 about the importance of

nicotinic stimulation in the brain versus muscarinic?

A. Well, number one, they didn't see any effect.

Number two, at that time, it was very unclear what nicotinic receptors were doing in the brain.

Q. And what would this series of studies, looking at the different types of ages to find an age -- a memory deficit, say to a person of skill in the art with regard to prospects for a drug that was known to be a weak muscarinic agent but to have nicotinic effects?

A. I think that would not encourage one to pursue that drug.

Q. It would be discouraging?

A. Yes.

Q. Let me ask you to turn to Page 343.

A. Okay. I've got it.

- - -

Q. Do you see the section titled, current status of treatment approach?

A. Yes, I do.

Q. Let me ask you. Dr. Bartus, was he a well-informed scientist?

A. He was one of the leaders at the time.

Q. Would he have been aware of all these studies on physostigmine that the defendants have been bringing to the Court's attention?

there will be so many other side effects that are associated with the drug, because it interacts with these other -- other cites and other functions, that the treatment is simply intolerable.

So a treatment with too many side effects is intolerable and therefore is not a treatment.

Q. Was, in the field in 1986, in attempting to develop a method of treating Alzheimer's disease, were researchers worried about side effects?

A. Yes, they were.

Q. Was one of the problems that was perceived that had to be overcome to find a method of treating Alzheimer's disease a problem with side effects?

A. Yes, it was.

Q. Was there perceived to be a problem as well with finding a drug that could be tolerable for chronic use?

A. Yes.

Q. And is that the problem that Dr. Wurtman is referring to in that sentence?

A. Yes. And I should point out that most of the studies that were done were done with very short periods of exposure. We're talking about a disorder that's going to affect an individual for the rest of their lives, not -- not minutes, not hours, not days, not weeks, but years.

Q. So would that make the problem with side effects even worse?

A. Well, it certainly raises it to a higher level, yes, of concern.

Q. Is Dr. Wurtman suggesting that physostigmine could be used clinically in that sentence?

A. No.

Q. Is he saying the reverse, that physostigmine could not be used clinically, in his view?

A. He's -- I think he's pointing out it's unlikely physostigmine would be a tolerable treatment.

Q. And this problem with specificity, were -- were there cholinesterase inhibitors that were known at the time to be specific for that?

A. Well, there was -- I mean, there were cholinesterase inhibitors that didn't get into the brain, so they were selected for the periphery like neostigmine, which is as Domino pointed out, quaternary amine. Its charge doesn't get into the brain.

There were others that get in the brain and it had to do with relative distribution between the brain and the periphery.

Q. And was galanthamine at the time thought to be specific for the brain and to focus on the brain?

A. Well, I think most of the studies -- it's not even

studies. Most of the reports from that middle European literature on galanthamine used it as treating disorders of the neuromuscular junction, like myestenia gravis, or to terminate the polarizing effect of anesthetic agents at the neuromuscular junction. I mean, most of it was pointing towards the periphery.

Q. So would the concern that Dr. Wurtman identified with specificity, would that appear to a person of ordinary skill in the art in 1986 to apply to galanthamine as well?

A. Well, that would be specificity pointed in the wrong direction.

Q. So galanthamine would appear to be moving in the wrong direction?

A. Right.

Q. Let me ask you to turn your attention to the next page, to the sentence right before Item 5, that begins, similar arguments can be adduced.

A. I'm just -- I'm trying to get myself oriented here.

In the middle? Oh. Yes. Excuse me.

Similar arguments can be adduced for the wisdom of providing a supplemental source of choline to patients receiving acetylcholinesterase inhibitors like physostigmine. These drugs, by slowing the hydrolysis of intra-synaptic acetylcholine, diminish the amount

of free cholines available for re-uptake into the terminal and for acetylation back to acetylcholine.

Q. What is he saying about the possible effects of cholinesterase inhibitors in that sentence?

A. When acetylcholinesterase is released, it's broken down, after it hits the receptors, broken down,. The cholinergic neurons have a transporter to bring the choline back in so it can be recycled to make more acetylcholinesterase. It's incredibly high. And if the acetylcholinesterase isn't hydrolyzed so it diffuses away, then the cholinergic terminal actually becomes deficient in choline to make more acetylcholinesterase and this would cause it to cannibalize its own membranes that generate choline.

So the concern he was raising was the cholinesterase inhibitors, while they may inhibit the function of acetylcholinesterase, could theoretically lead to further degeneration of cholinergic neurons.

Q. Was there a concern in 1985 that cholinesterase inhibitors by -- could reduce the available acetylcholinesterase to be released back into the synapse?

A. Well, it could interfere with the regeneration of acetylcholinesterase by preventing the hydrolysis in the synapse and, as I said, could also lead to

cannibalization of the cholinergic terminal.

Q. How would that concern relate if one in instead used a highly specific M-1 agonist?

A. Well, it leaps over the hurdle. It doesn't depend on pre-synaptic cholinergic activity. It does not even depend on pre-synaptic cholinergic activity which we know is impaired in the disorder.

Q. Would the concerns like those expressed by Dr. Wurtman lead one in the direction that the defendants' expert, Dr. Levey, went in towards highly specific muscarinic agonists?

A. Yeah. That turned out to be a major target for many of the pharmaceutical companies.

Q. Has any highly specific muscarinic agonist succeeded as a treatment for Alzheimer's disease?

A. Not that I'm aware of. We actually tried one of them in the Leechin model, which is oxotremorin and unfortunately causes the grossest thing I've ever seen, bloody tears, so we just got out of that.

Q. But, to your knowledge, there are no --

A. No.

Q. And have any muscarinic agonists yet succeeded as a treatment for Alzheimer's?

A. Not that I'm aware of.

Q. Let me direct your attention to Tab 7, which you

will recognize is the '318 patent.

A. Okay.

Q. If you will turn to Column 2 of the patent, beginning at Line 45...

A. Okay. Column 2, Line 45. The following test.

Q. Yes.

A. Do you want me to read that?

Q. Well, it might be useful to read at least the first sentence.

A. Okay. The following test provides a good animal model for Alzheimer's disease in humans. A select lesion is placed in a subcortical nucleus, known as the nucleus basalis of Meynert, with a resultant cortical cholinergic deficiency, similar in magnitude to that seen in early to moderate stage Alzheimer's disease.

\- - -

Q. Did you do any work relating to that model?

A. We developed it.

Q. Let me ask you first before we get to your work with galanthamine.

How did that model, selective lesion model, compare to the scopolamine model in terms of modeling Alzheimer's disease?

A. Scopolamine is a drug that blocks muscarinic receptor.

\- - -

A. (Continuing) It has nothing to do with the functional integrity, functional integrity of cholinergic neurons. Rapidly reversible. Disappears when the drug is metabolized.

Alzheimer's disease is a disorder of degeneration of cholinergic neurons, among others but, in particular, cholinergic neurons and nucleus basalis. This lesion causes that degeneration and that pathology was identified in the nucleus basalis in individuals who died with Alzheimer's disease as a consequence of that lesion.

We went across the street, to see Don Price, Head of Neuropathology, let's look at the brains of individuals who died of Alzheimer's disease, and on the basis of this lesion, we were able to show they had the same lesion.

So this is mimicking the structural loss of cholinergic neurons in Alzheimer's disease and therefore it does three things. Number one, it reduces the number of cholinergic terminals, which is the real-life situation in Alzheimer's disease.

Number two, it exposes the muscarinic receptors.

Number three, it exposes the nicotinic

receptors.

Q. So we've heard testimony before that the scopolamine model was focused on the muscarinic system. Does this selective lesion model have the same focus on the muscarinic system?

A. No. It -- it allows you to determine what happens when you lose cholinergic terminals, what happens to nicotinic receptors, what happens to muscarinic receptors.

Q. Did you carry out any work with galanthamine using the model that is set forth in the '318 patent?

A. Yes, I did.

Q. And how did it come about that you did that work?

A. As I started telling you before, but I will go back. In the late spring, early summer of 1986, I got a call from Bonnie Davis, and she said that she had a very interesting drug and a potential treatment for Alzheimer's disease.

And as I can recall, she said the drug was -- had already been in humans, it was tolerable, and it had the peculiar effect where it looks like it enhanced nicotinic receptors.

A couple of things to put in context. Number one, at that time, there was no treatment for Alzheimer's disease and, having worked on this model and being very interested in the area and the human toll it causes,

this sounded very intriguing.

Number two, she didn't know this, but we had actually just finished a study looking at nicotinic receptors in the brains of individuals that died with Alzheimer's disease, with Peter Whitehouse. And what we found, that unlike muscarinic receptors, which appeared to be spared, there was substantial losses in nicotinic receptors in the cortex of hippocampus. And this had never been shown before.

So I don't take up research projects lightly in my lab. I had a stellar student coming and I thought, aha, this could be very interesting. We'll take a look.

Q. And who was that stellar student?

A. Joann Sweeney, now Joann Berger Sweeney, who's the Associate Dean at Wellsley College.

Q. That work you talked about with the nicotinic receptor that you did with Professor Whitehouse, was that published before January of 1986?

A. No. No. It was -- it was published later in '86.

Q. When Dr. Bonnie Davis approached you and asked you to carry out some animal tests on galanthamine, did you think that her proposal was simply a guess?

A. No. I mean, the -- her neuroendocrine signal was intriguing to me. There were a number of things that were intriguing. The neuroendocrine was intriguing.

And acetylcholine seemed to be intriguing, given what was going on with physostigmine and tacrine.

Q. Did her proposal seem to you scientifically well grounded?

A. The rationale was well grounded and -- and it fit in very nicely with the lesion model because that was the model where you could really see if there was a contribution of nicotinic receptors to -- you know, to the effects of acetylcholinesterase inhibitors.

Q. Did you think at the time it was obvious to use galanthamine as a treatment for Alzheimer's disease?

A. I wish I had thought of it.

Q. Do you tend to do obvious science in your lab?

A. No. And this became Joann Sweeney's thesis project, thesis projects at Hopkins. We have a committee that oversees them, that reviews them. If -- if somebody came in with an obvious research question, they would go back to the drawing boards and come up with something better, and their mentor would look rather silly. So this was not obvious.

Q. And I take it Dr. Berger Sweeney did, in fact, get her Ph.D. and move on in her career?

A. Yes. She has been -- she has been very successful.

Q. Let me --

A. Continues to collaborate with me.

Q. Let me ask you to turn to tab eight, Plaintiffs' Exhibit 1308.

A. Okay.

Q. Would you identify Plaintiffs' Exhibit 1308 for the record?

A. Yes. This is a -- an abstract that we prepared for a presentation to be given at the society, the annual meeting of the Society for Neuroscience. The Society for Neuroscience is -- is the, capital T-H-E, meeting in neuroscience in the world. About this time 20,000 members, now 40,000, and where you want to show your research.

Q. And is this an abstract that was prepared in the course of your conducting research at Hopkins?

A. Yes. This was the first report of our studies with galanthamine in the lesion model.

Let me just say two things about our work. We had never done behavioral work in our laboratory. We had collaborated with Dave Olten in rats, and so we had Joanne Sweeney come in. We had to set this whole thing up de novo, and we also had to demonstrate our bona fides as a report from a laboratory that had not been generally known for doing behavior.

So the report is really extremely detailed for a -- the abstract is extremely detailed for an

abstract citing neuroscience, where you typically, you know, publish one or two facts.

Q. And is the abstract archived so that it can be referred to by people working in the field?

A. Yes, absolutely. This is where you plant the flag scientifically, so to speak, because it's archived, meaning it's in the libraries and people can cite it. You can set precedence with it.

MR. SIPES: I would move into evidence Plaintiffs' Exhibit 1308.

MR. GRACEY: No objection.

*** (Plaintiffs' Exhibit No. 1308 was received into evidence.)

MR. SIPES: Would you pull that up now?

BY MR. SIPES:

Q. Let me draw your attention to the first paragraph.

A. Yes.

Q. The last sentence reads GHB. That's galanthamine hydrobromide?

A. Yes.

Q. GHB has an in vivo half-life of approximately six hours, making its effects longer than most previously tested acetylcholinesterase inhibitors.

Do you see that?

A. Yes.

1986.

Q. Well, I note there's one article, Thornton and Gershon, 1988. What is that article?

A. Which one?

Q. Is that a review article?

A. Yes.

Q. All the information in the chart, is that information that would have been known to a person of ordinary skill in the art in 1986?

A. In 1986.

Q. Is that a yes?

A. Yes.

Q. Will you take me through the chart, tell me what the chart shows?

A. What I tried to do is a comparison among galanthamine, physostigmine and tacrine, and as of 1986, as far as I know, physostigmine and tacrine were the two acetylcholinesterase that had been looked at most closely in Alzheimer's disease and in some people's minds might ultimately be the basis for treatment.

And so I'm just looking at the characteristics.

So if you look at potency, and generally in drug development, we tend to want to have drugs that are more potent than less potent. And I -- Dr. Domino gave

an excellent discussion of efficacy. Efficacy is very important, but the less potent a drug is, the more likely -- that means you have to use more of it, you know. 50 milligrams versus two grams, and the more of it you have to use, the greater likelihood that the drug is going to interact with some other processes and cause side effects.

So potency is generally conceived as being positive.

So galanthamine, from the literature we know, is a relatively weak acetylcholinesterase inhibitor, much weaker than physostigmine and much weaker than tacrine.

Receptor specificity. So if you inhibit acetylcholinesterase, you increase acetylcholinesterase levels, and one would suspect that since that's pre-synaptic, you shouldn't see any post-synaptic receptor specificity. So physostigmine and tacrine should enhance acetylcholine at both -- both at nicotinic and muscarinic receptors.

Oddly enough, what comes up in the literature with galanthamine is it's described as weekly muscarinic in terms of its side effect profile in those series of Middle Eastern studies discussing its use. And, in addition, it -- it appears to be more nicotinic because

it was used primarily for treating issues around the nicotinic neuromuscular junction. And Bonnie's findings suggest that it had central nicotinic effects.

Some say inhibition of butyrylcholinesterase in addition to acetylcholinesterase will give you more bang for your buck. Other people have concerns that inhibiting both of them may allow acetylcholine to diffuse so broadly that it would increase side effects. I should point out Rivastigmine is a butyrylcholinesterase inhibitor and appears to have more side effects.

Galanthamine select for acetylcholinesterase whereas physostigmine and tacrine inhibit both acetylcholinesterase and butyrylcholinesterase mechanism.

The acetylcholine binds to a site on the enzyme where it's broken down. A competitive inhibitor would bind to that same site and compete against acetylcholine. And the advantage of that is that the higher the concentration of acetylcholine you get, then the lesser inhibition one would see with the competitor, which may dampen potential side effects.

So galanthamine is competitive. I see that as good. Physostigmine is competitive. Well, that's one good aspect of physostigmine. Tacrine is not competitive, which means it inhibits the enzyme regardless of how much acetylcholine is there.

Duration of action. Now, reading -- my reading of the literature is that -- that it was perceived that galanthamine was relatively short-acting. Not a good thing if you want to use it clinically to treat a chronic disorder.

Clearly, physostigmine has very short action. At best, two hours. And that's why ultimately people try to develop slow release physostigmine, so they can have it hang around long enough. You don't want to be -- especially if you are demented and your memory is impaired. You don't want to be on a regimen that requires taking drugs every four hours.

And the tacrine had the advantage of being long-acting.

What was the agent used for -- you know, what was it used for? So galanthamine, looking at the literature, was primarily used for disorders of the peripheral nicotinic cholinergic system perceived to have weak muscarinic effects. It had some central effects, but that was not a major focus.

Physostigmine was clearly seen as a centrally active acetylcholinesterase inhibitor as was tacrine, which would be good if you want to develop drugs for treating Alzheimer's disease.

So in sum, in terms of the treatment for

Alzheimer's disease, clearly, you'd want to look at tacrine very seriously except for what it does to the liver.

Physostigmine could be a contender except for its very short duration of action and a lot of its side effects.

And I would think galanthamine would not be on anyone's list who was, as they say, skilled in the art.

Q. Let me try to go by that one by one. In terms of the perspective now of a person of ordinary skill in the art in 1986, what would the weak potency of galanthamine tell the person of ordinary skill in the art in 1986 with regard to galanthamine's prospects as a treatment for Alzheimer's disease?

A. That would -- it would be a poor prospect.

Q. And why would it appear to be a poor prospect?

A. Because, generally, the weaker the drug, the lesser the specificity.

Q. Now let's go to receptor specificity.

What would a person of ordinary skill in the art in 1986 make of the fact that galanthamine appeared to have pronounced nicotinic effects and was described as a weak muscarinic agent?

A. Well, two things one that's somewhat surprising.

But the second thing is that, as we -- as we saw looking at the work of Bartus among many others and where the industry went, they went towards drugs that would have muscarinic effects because of the scopolamine model and preferably directly activate muscarinic receptors.

Q. Now, let me come to the next one. Enzyme specificity. You receive to both acetylcholinesterase and is it butryl --

A. It's an artificial substrate they use. Acetylcholinesterase can't metabolize. It's a way for measuring the other enzyme.

Q. So butyrylcholinesterase. Did you refer to it as pseudo cholinesterase?

A. Yes.

Q. In Alzheimer's patients, what was known about levels of acetylcholinesterase in Alzheimer's patients in 1986?

A. Well, acetylcholinesterase is in part located on the cholinergic neurons and the levels fall in Alzheimer's disease.

Q. And what was known about the levels of butryl cholinesterase in Alzheimer's patients in 1986?

A. I think the activity went up, to my recollection.

Q. So what would a person of ordinary skill in the

art in 1986 think about the prospects of galanthamine as a treatment for Alzheimer's disease given the fact that it did not inhibit butryl cholinesterase?

A. Well, back in 1986, I did make some comments about specificity, but I think back in 1986, one would be -- one could be interested in the possibility that hitting butryl cholinesterase may give you more bang for the buck.

Q. So an inability to inhibit butryl cholinesterase in 1986 could seem discouraging?

A. It could be, yes.

Q. What would be thought about the inability to inhibit butryl cholinesterase today? Have we learned more about butryl cholinesterase?

A. Yes. As I said, Rivastigmine is one of the -- one of the three acetylcholinesterase inhibitors out there to treat Alzheimer's disease. It's the one that's pretty effective at butyrylcholinesterase and, as Dr. Levey pointed out, that makes it his third choice, because of the side effect profile, presumably related to butyrylcholinesterase, but, you know.

Q. And so today, has -- is the fact that galanthamine does inhibit butyrylcholinesterase, is that an advantage of galanthamine?

A. Today, it is.

Q. And I think you've probably gone over the rest of them. Let me just take the -- following the principal prior therapeutic use. The use of galanthamine was peripheral, what would that tell a person of ordinary skill in the art in 1986 about the prospects for galanthamine?

A. Well, obviously, Alzheimer's disease is a disease of central cholinergic neurons and as a drug that works -- is perceived to work primarily in the periphery would not -- not be an attractive candidate.

Q. Let me ask you to look at a few of the exhibits that have been discussed by defendants' experts and I believe at Tab 23 --

A. Just a second.

Q. -- you'll find Plaintiffs' Exhibit 1181.

A. Tab 23? I've got nothing in 23.

(Pause.)

BY MR. SIPES:

Q. Why don't we pick up another topic while we're trying to sort through the confusion there. Then we can come back to that.

Let me ask you, you mentioned the somewhat surprising fact that -- that galanthamine has pronounced nicotinic effects and is weak muscarinic.

Do you have an understanding now of why that

is?

A. Not really.

Q. Is there any mechanism for galanthamine that might explain why it would have more nicotinic than muscarinic effect?

A. Oh, sorry. I had a little TIA there.

Actually, yes. I'm sorry.

Galanthamine has been shown to be a positive allosteric modulator of nicotinic receptors.

Q. Could you explain what that means?

A. Yes. So there's -- there is a site on the nicotinic receptors to which galanthamine binds and when it binds to that site, it makes the receptors much more responsive to acetylcholine. There's clear precedence for this in pharmacology. Benzodiazapines, for example, which are anti-anxiety agents, bind together receptors and enhance their response together. That's a mechanism that has been known for 25 years.

This mechanism of galanthamine was discovered in the late 1990's by Edison Albuquerque (phonetic).

Q. Was it known in 1986 that galanthamine was a modulator of the nicotinic receptor?

A. No.

Q. Was it suspected that it would be a modulator --

A. No. What I would say that Dr. Davis' finding with

A. (Continuing) And that suggests that there is some additional mechanism of action of galanthamine that can account for this equal efficacy.

So this is inferred to be clinically meaningful. I would say it's very difficult to determine unequivocally that that -- that's the case. But there is no question that galanthamine is an allosteric modulator of nicotinic receptors.

Does that answer your question?

Q. I believe so.

Let me try to break that down by starting with the abstract. So let's look at the abstract of the art, if we could. Galanthamine is a rather weak acetylcholinesterase inhibitor currently approved for the symptomatic treatment of Alzheimer's disease, with possible additional allosteric potentiating effects at the nicotine ACH receptor.

Do you see that?

A. Yes.

Q. Early data from in vitro biochemical tests suggest that donepezil --

A. Yes.

Q. Is this correct galanthamine is a rather weak cholinesterase inhibitor?

A. Yes. We just discussed that.

Q. So the prior art was right there. Galanthamine is not very potent; is that correct?

A. That is correct.

Q. Is this article an attempt to understand, then, how galanthamine can have therapeutic effects despite its lack of potency?

A. Well, this gets us back to Dr. Domino. Potency and efficacy. And what they are pointing out is that it's efficacious at less acetylcholinesterase than -- it's not a matter of being weak. It's that you can get the same response with less acetylcholinesterase. And so the question is: How can that be? It's got to have another action.

And, you know, the most parsimonious thing in terms of thinking about cholinergic function is the nicotinic, allosteric modulate modulating effect.

Q. Let's turn now to the very last page of text of the article and to the last paragraph of the summary.

Do you see that the last two sentences -- could you read the last two sentences, beginning with If in --

A. Yes. If in such studies, both compounds have the same in vivo effect, this argues strongly for an additional mechanism of action for galanthamine to

make up for the difference in acetylcholinesterase inhibition. Allosteric modulation of nicotine ACH receptors by galanthamine is a prime candidate for this effect.

Q. The two compounds that are being talked about there, do you know what they are? Is that galanthamine and donepezil?

A. Yes.

Q. What are they proposing for galanthamine as opposed to donepezil?

A. Galanthamine has an allosteric effect and donepezil does not.

Q. Are they proposing this is compensating for the weak cholinesterase inhibition in order to give similar type effects to donepezil?

A. There's a little more implicated in there. It points to a more potent nicotinic effect. Remember when I had my little TIA and you said what's different and that is that when you look at the pharmacology in the old -- in the older studies, it comes up looking much more nicotinic and less muscarinic and how can that be if you're inhibiting acetylcholinesterase that should not differentiate between the two receptors, and I think this provides an explanation.

Q. And the explanation is allosteric modulation of

the nicotinic receptor?

A. Yes.

Q. Do you believe that it's a scientifcally reasonable conclusion that allosteric modulation of the nicotinic receptor is responsible for at least part of the therapeutic effects of galanthamine?

A. I think it's a reasonable scientific inference, yes.

Q. Do you think it is the best inference in light of all the data?

A. It certainly is consistent with how it works at a molecular level and how it behaves in vivo.

Q. And the authors refer to it as the prime candidate for the explanation.

Would you agree with their conclusion?

A. Yes.

Q. Let me ask you to turn to Tab 12.

A. What was that last --

Q. Tab 12.

A. Just a second. Tab 12.

Q. And --

MR. SIPES: Your Honor, I note it's almost 12:14. I could get started on this document, if you'd like, or we could take --

THE COURT: Well, we started at 10:20, so if you want to go to 12:20...

Q. Do you agree that there is scientific evidence for that statement?
A. Yes. Actually, I wrote a review article that reviewed this and other studies, I think published in 2001, looking at potential course-altering effects of galanthamine.
Q. And what is your conclusion about the best scientific understanding of whether or not galanthamine has an effect on the progression of Alzheimer's disease?
A. Well, in our review, there was actually two things that were seen.
One is what Murray found in his study on patients continuously, on galanthamine over 36 months, where the -- the rate of decline slowed in patients on galanthamine versus historical placebo controls.
The second is the results of studies that show if you have bad patients and you put one on a placebo arm and the other on a galanthamine arm and you take them out I think it's to a year, I can check the paper, and then the ones that are on the placebo arm go on to galanthamine, they do not go up to the levels of cognitive improvement that are seen with the individuals that were continuously on galanthamine.
So that also suggests that being on the drug somehow alters the course of the disease. And, now, I'm

not -- I'm not a geriatrician, but it is my impression that this is encouraging people to treat early as opposed to delaying treatment.
Q. And why would that encourage people to treat early rather than delaying patients?
A. Well, if you have a course altering effect, as I just said, if you compare the ones that aren't treated for a year to the ones that are treated for a year, when you put the untreated ones on, they don't go up to the level that the ones that are being continuously treated.
So it looks -- it looks as if not being treated results in further deterioration.
If I could say parenthetically, in the area of schizophrenia, it turns out the longer you don't treat psychosis, the worse the outcome is when you start treating it. So I think these disorders are bad for your brain.
Q. And if the disorders are bad for the brain, then treating the disorder could, in fact, prevent the brain from getting worse faster?
A. Well, again, these treatments are considered symptomatic. They are just dealing with a deficiency of a neurotransmitter. Acetylcholine in this case.
But I think we have to recall that

neurotransmitters are not simply messengers in the brain for information processing. They do a whole variety of other things. And especially acetylcholine through nicotinic receptors can have trophy effects on neurons and can alter the processing of this APP to generate A beta.
So, you know, there's -- there are actions that have been demonstrated in the test tube, in the Petri dish with acetylcholinesterase inhibitors, among them galanthamine, that suggest potential mechanisms for course-altering effects.
So they may not only affect cognition, they may indirectly affect some fundamental aspects of the disorder.
Q. And if we turn to page -- go to the next column, you'll see the paragraph that begins, Enhancement of cholinergic neurotransmission might slow progression in AD patients by several possible mechanisms.
Do you see that?
A. Yes.
Q. Is this proposing some neurochemical mechanisms by which galanthamine might slow the progression of Alzheimer's disease?
A. Took the words right out of my mouth, yes.
Q. And could you explain what the proposed mechanisms

are?
A. Okay. So working through muscarinic receptors, and can favor the processing of this protein APP, amyloid precursor protein, in a way that directs it against making A beta, the bad protein. It can affect phosphorylation of these tau proteins that contribute to the formation of neurofibrillary tangles.
As I mentioned, there's evidence that activation in nicotinic receptors can have neuroprotective effects. They can make neurons less sensitive to the toxic effects of A beta.
So there's a number of different mechanisms that could come into play that, through which enhancement of cholinergic neurotransmission and, more specifically, nicotinic neurotransmission could have disease-altering effects.
Q. Do you think the neurochemical mechanisms that are proposed for galanthamine to slow disease progression, are those scientifically reasonable?
A. I think they're plausible, yes.
Q. Have they been endorsed by experts in the field?
A. Yes.
Q. And is it correct that this slowing disease progression has never been proved by a double-blind clinical trial?

A. Well, it's -- it's -- it's very difficult, if not impossible, to do at the present time, from my perspective, because no one would ethically put individuals with Alzheimer's disease on a placebo for three years now to see if they -- if they lose their nerves faster than those that get treatment.

That's the problem you really face in terms of asking some of these very important, but difficult questions now that we have treatments.

Q. So could -- is it ethically possible to prove this slowing of disease progression through the sort of double-blind studies that we use for FDA to prove the effects of drugs?

A. Again, repeat -- I'm repeating myself. No, I don't think it's ethically feasible to do that now that we have treatments.

There may be ethical reasons for doing short placebo controlled trials, but the type of trial that would really demonstrate disease altering effects would be -- would require non-treatment for way too long.

Q. But do you believe the proposal that galanthamine slows the progression has been accepted by treating physicians enough that they now move to treat patients as soon as possible?

5/23/2007 Final Trial Transcript

blood/brain barrier isn't working.

Q. Might that be, for example, cases of local brain damage?

A. That would be a case of say tumor, local brain damage from trauma.

- - -

Q. Would a person of ordinary skill in the art believe it a reasonable reading of a scientific article to read it as suggesting neostigmine as treatment for Alzheimer's disease?

A. You could read this in two ways. You could read it and say that it played in the central activity of acetylcholinesterase with acetylcholinesterase inhibitors and that he doesn't know what he's talking about.

- - -

A. (Continuing) So he doesn't know what he's talking about. Or you could read it in the other way in terms of his reference to Luria, which means he's talking about traumatic brain injury, which has nothing to do with Alzheimer's disease.

MR. SIPES: I believe I have no further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. GRACEY:

Q. Good afternoon, Dr. Coyle.

A. Good afternoon.

Q. As you may recall, my name is Taras Gracey of Winston and Strawn.

A. Yes.

Q. Here on behalf of Barr Labs.

Dr. Coyle, would you agree, or are you willing to state here today in open court, that to a reasonable degree of scientific certainty, the nicotinic allosteric modulator has a proven clinically meaningful benefit?

A. I think what I said is a reasonable scientific inference that the allosteric modulatory effect of galanthamine could contribute to its therapeutic effect.

Q. I appreciate, Doctor, but I'd like you to answer

shown, to use your words, proof of principle, and yet you're saying that knowing all of that and knowing all about galanthamine, also being in the same class, being safe, being used in humans, being a cholinesterase inhibitor, you're standing here today or sitting here today and willing to state it wouldn't have been obvious to at least try?

A. I'm saying it wouldn't be obvious in terms of what was going on over here. It was not -- that is in the United States. And the -- in the research community, I don't think galanthamine was on the horizon anywhere, so that's another reason it's less likely to be used.

But, again, as a scientist, you would look at what are the properties you would want, and when I look at the literature on galanthamine, ignoring what Dr. Davis saw there, from her neuroendocrine perspective, I would say galanthamine would not be very high on the list. I think it would be very low down the list of drugs to look at in Alzheimer's disease.

Q. And yet you did the animal model?

A. I did the animal model for two reasons.

Number one, she said this drug -- well, three reasons.

Number one, she said, I have identified a drug that is tolerable in man and I knew the literature

on physostigmine and tacrine for treatment of Alzheimer's disease, and there was no treatment. Sounds good to me.

The second thing she said was it has this very unusual property of -- of acting at nicotinic receptors, enhancing nicotinic receptor function.

Number three, I had just -- I had just got done with a study with Peter Whitehouse for the first time showing there was striking reductions in nicotinic restrictors. The first time that was demonstrated as far as I know.

And that was in the face of normal muscarinic receptors.

So as I said, we don't do trivial experiments. We don't do obvious experiments. This seemed to me -- she had a proposal that connected the dots that raised very interesting questions and worth the effort to check it out in a model in which there is degeneration of cholinergic neurons in both nicotinic and muscarinic receptors would come into play.

Q. And the dots she connected, galanthamine, safe, humans will tolerate it, cholinesterase inhibitors; right?

A. Galanthamine in humans safe and well tolerated. Cholinesterase inhibitor, selective nicotinic effects,

and very modest muscarinic receptor side effects.

Q. Well, let's talk a little bit about the muscarinic and nicotinic receptors, but let me first ask you this: You, on your chart here, you have galanthamine as a weak inhibition of acetylcholinesterase; is that right?

A. I would say relatively -- it's relatively weak vis-a-vis physostigmine and tacrine.

Q. Now, this is under the term potency; right?

A. Yes.

Q. And you heard Dr. Domino yesterday say that when you have a weak inhibitor of acetylcholinesterase, you give a higher dose. That's it. It's got nothing to do with efficacy; isn't that right?

A. I answered that question before. I said there are two issues here. One is potency and one is efficacy and the lower the potency, the higher dose of an agent you have to give, and that raises the risk that that agent is going to interact with other things that cause side effects.

So generally, in drug development, one likes to go for increased potency to lower the risk of secondary adverse interactions.

Q. You know what the therapeutic window for galanthamine was? It was quite large, wasn't it?

A. On experimental animals it was maybe like

Q. Would a person of ordinary skill in the art understand galanthamine to be necessarily related to palagra in reading this?

A. It would be confusing.

Q. Is Alzheimer's disease one of the key words in this index?

A. No.

Q. Is senile dementia of the Alzheimer's type mentioned there?

A. No.

Q. Now, I gather that reference at 2358, that's the jump to the abstract from Excerpta Medica?

A. Yes.

Q. Let's take a look at that.

A. I did.

Q. Second page of the exhibit, medical management of Bhasker.

Do you see that?

A. Yes.

Q. In the abstract, is there a reference to galanthamine at all?

A. There is no reference to galanthamine.

Q. Is there a reference to deinhibition?

A. No.

Q. The is there a reference to restoration of

cortical function?

A. I don't think so.

Q. Or to be clear, is there any reference to restoration of higher cortical function?

A. Not that I'm aware of.

- - -

Q. Is there a reference to progressive dementia?

A. Let me see. I read this in before.

With regard to progressive dementia, there appears to be very little to offer, only management, no treatment is possible.

Q. Would a person of ordinary skill in the art searching for a treatment for Alzheimer's disease who read the Excerpta Medica abstract, would he or she think to look in Bhasker for a treatment for Alzheimer's disease?

- - -

Q. From a scientific perspective, do you believe that the best interpretation of the evidence we have so far is that the allosteric modulation of the nicotinic receptor does have clinical benefit?

A. That's what I was saying. Some of the scientific evidence supports this, this inference. It's not -- there's not a lot of contradictory stuff out there. It's pretty linear and a -- and it's supported at a molecular level. It's supported at an enzymatic level and it's supported at a behavioral level.

Q. Let me ask you a few questions about potency.

Mr. Grace see reminded you have Dr. Domino's testimony that to deal with potency, you can just increase the amount of drug that would be administered. Do you recall that?

A. Yes.

Q. Do you recall Dr. Domino also testified yesterday if you were concerned about side effects, the solution was to lower the dose?

A. That's right.

Q. Can you simultaneously raise the dose to get efficacy and lower the dose to avoid side effects?

A. It's a bit of a conundrum.

Q. Is the issue of trying to take a cholinesterase inhibitor like galanthamine which is weak, what would a

person of skill in the art think about overcoming issues of getting muscarinic, the duration of action, would that appear to be a simple test?

A. Well, I mean, given what was published in that literature about low muscarinic efficacy and given what the belief at the time, I'm talking about 1986, based on Bartus and many other articles, you'd want to have something that was really very potent at muscarinic receptors. You'd look at galanthamine and say if I get high enough to really hammer the muscarinic receptors, I'm going to have a lot of nicotinic receptor side effects.

MR. SIPES: I have no further questions, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness excused)

- - -

MR. SIPES: Your Honor, I will try to clear off the stand.

(Pause.)

MR. CALIA: Your Honor, plaintiffs would like to call Dr. Karen Kauffman to the stand.

- - -

# EXHIBIT 5

Q. And about how many clients have you had in that period of time?

A. Since 1999, approximately 250.

Q. Generally speaking, what triggers somebody who contacts you for your long-term care consultant services?

A. Most often, it's when the caregiver burden becomes so great that the care being provided in the home is no longer possible, and this usually occurs when behavioral symptoms become so -- so difficult to manage. The other triggering factor is incontinence, which is bowel and bladder, inability to control bowel and bladder.

And the other is when someone is requiring assistance to carry out the activities of daily living two to three, at least. Those activities of daily living are bathing, grooming, dress, eating and toileting.

Q. You mentioned you have two employers, yourself being one of them. Who's your other employer?

A. I'm a full-time faculty at the University of Maryland School of Nursing.

Q. And what's your appointment there?

A. My appointment, my rank is Associate Professor.

Q. Okay. And do you have any other responsibilities aside from being Associate Professor?

A. I'm also Program Director of Community Public

# EXHIBIT 6

MR. LOMBARDI: It looked okay to me earlier.

MR. PAPPAS: Your Honor, just out of curiosity, I'm not sure of the lighting in the courtroom. Is there a way just to dim the lights in one part but not all?

THE COURT: Yes. We got that down.

(Videotaped deposition played as follows).

"Question: Dr. Davis, can you state your name for the record?

"Answer: Kenneth Leon Davis.

"Question: Can you provide your current home address?

"Answer: 160 Cold Spring Road, Syosset, New York.

"Question: Can you give us your current business address?

"Answer: 1425 Madison avenue, New York, New York.

"Question: Dr. Davis, who is your current employer?

"Answer: Mount Sinai Medical Center.

"Question: Okay. And how long have you been employed by Mount Sinai?

"Answer: Since 1979.

Question: Dr. Davis, are you employed by either Janssen -- I will break this up.

an understanding as to why your wife would have thought that galanthamine would have been included in the grant application.

Answer: No.

Question: Do you have any understanding as to why your wife said that she was surprised that galanthamine was not included in the application?

Answer: No.

Question: So, to the best of your recollection, it was never a possibility that galanthamine was going to be included in the grant application that you sought?

Answer: Never the most remote possibility, never even close.

Question: The first time that you had a conversation --

Answer: Yes.

Question -- with your wife about the possibility of her applying for a patent to use galanthamine for the treatment of Alzheimer's disease, do you remember the substance of that discussion?

Answer: Yes.

Question: And what was that?

Answer: I told her, to paraphrase, to stop bothering me about this drug, that it would have no

value unless she got a use patent.

Question: Dr. Davis, do you, yourself, have any patents?

Answer: No, not that I'm aware of.

Question: How did you come to have a knowledge about the existence of use patents?

Answer: During the eighties, I started to consult to a lot of drug companies and began to learn about intellectual property through helping them develop various compounds.

Question: Why haven't you prescribed a dose of 2,000 milligrams of galanthamine hydrobromide to a patient?

Answer: There's no approval at that dose range and there has been no experience at that dose range.

Question: Would you have considered or do you consider tacrine to be effective in the treatment of Alzheimer's disease?

Answer: I?

Question: Yes. After the testing was completed, did you consider tacrine to be effective in the treatment of Alzheimer's disease?

Answer: Again, you have to help me more with effective. By effective, do you mean useful?

Answer: My wife told me that.

Question: Do you recall when your wife told you?

Answer: No.

Question: Did you know that physostigmine crossed the blood/brain barrier at the time of your grant application?

Answer: Yes.

Question: Was crossing the blood/brain barrier a factor in your deciding to work with physostigmine?

Answer: Yes.

Question: Was this factor important for your decision to work with physostigmine?

Answer: Yes.

Question: At the time of your writing the physostigmine grant, did you have any markers of physostigmine CNS activity?

Answer: Yes.

\- - -

Question: What were those markers?

Answer: Cortisol secretion. That was Bonnie's discovery.

Question: So, in fact, Bonnie discovered that

# EXHIBIT 7

disease?

A. Yes.

Q. Do you consider yourself an expert in the treatment, treating drugs?

A. Yes.

MR. SIPES: I offer this witness as an expert in the clinical testing and development of antidementia drugs including drugs for Alzheimer's disease.

THE COURT: Any objection?

MS. ULRICH: No objection.

THE COURT: Thank you.

BY MR. SIPES:

Q. We've heard a lot about Alzheimer's disease over the last couple days. Could you very briefly describe the symptoms of Alzheimer's disease?

A. Yes. Alzheimer's disease is a disorder characterized by the insidious onset and inexorable, albeit, almost always gradual progression of impairment in first recent memory, then more general memory problems, and accompanied by the onset and progression of deficits in other cognitive symptoms.

These include deficits in language of a particular type. They develop a fluent aphasia. Difficulty with executive function, performance of complex tasks. Difficulty coordinating motor activities

with the idea that needs to be performed motorically, known as apraxia, and this constellation of symptoms is often not recognized for a year or even two years by the family, and often even longer by the patient, because another symptom is loss of insight, inability to recognize that one has, indeed, started to suffer loss of very important cognitive functions.

And as the disease progresses, there is what one might call secondary, complicating signs and symptoms, that are more in the classically psychiatric realm. These include depression, agitated behavior, and by that I mean irritability, uncooperativeness with necessary care, anger outbursts, disruptions in -- in the ability to sleep and rest, often a pressured need to move and these all -- these secondary symptoms, though we call them secondary, are primary causes down the road, after five, six, seven, eight years or even more, of caregiver exhaustion, which has been discussed earlier, in earlier testimony, and often leads to long-term care institutional placement.

Q. The term caregiver burden --

A. Yes.

Q. -- could you define what that means?

A. Yes. As a patient with Alzheimer's disease gets more and more impaired, they need more and more support

and supervision, both to keep them safe, to keep them nourished, to keep them clean from those who have been their lifelong partners, usually their spouse.

And I think it was put well by Peter Ravens. This really produces for the caregiver a 36-hour day, you know. It's not just 24 hours a day. It's even more.

These patients with Alzheimer's, as the disease progresses, really need constant supervision and what is so heartbreaking is that as the caregiver provides more and more support, the person with Alzheimer's disease is able to provide less and less affection, interest, support for the caregiver, because the parts of one's brain that subsume these functions is also gradually deteriorating.

Q. You heard of Peter Ravens' The 36-Hour Day. What is that?

A. That's a book that describes and also offers suggestions for caregivers that Peter and a colleague at Johns Hopkins wrote now probably 15 or 20 years ago, which has really become the Bible of the -- of the caregiver support movement. And the -- some of my work with the Alzheimer's association, which was really founded by caregivers in deep distress because of this horrible situation they were in is to try to get them together in group settings or educational settings, to

develop support for them as well as educate them in perhaps better approaches that we in the field as professionals have developed or better approaches that often arise from caregivers own experience that they can share with others.

\- - -

Q. Have efforts been made to measure the caregivers' burden?

A. Yes.

Q. Can you describe that?

A. Well, there are really several actual rating scales, and most of them have tried to quantify the amount of time that caregivers need to spend supervising their -- I'll use the term loved one.

It's remarkable how much love exists between caregivers and the loved one who is unable to return their love to the caregiver.

\- - -

MS. ULRICH: No objection.

THE COURT: Thank you.

DEPUTY CLERK: So marked.

*** (Plaintiffs' Exhibit No. 1321 was received into evidence.)

BY MR. SIPES:

Q. If you will turn to the second page, Dr. Raskind, you'll see a heading, Demography.

A. Yes.

Q. And the -- if you could read into the record the first sentence of the section on demography...

A. Starting with, By most estimates?

Q. Yes.

A. By most estimates, Alzheimer's disease is the cause of serious confusion and forgetfulness in some 2.5 million American adults.

Q. Was that believed to be true by those in the Alzheimer's field in 1986?

A. Yes. And I think that was a conservative estimate even then.

Q. All right.

A. This is five times the estimate that appeared in the literature ten years ago, when the National Institute on Aging began its first studies in this area. Are there so many more victims now than then? Is there an

Alzheimer's epidemic?

Q. What was the belief of those skilled in the art in 1986 whether there was an Alzheimer's epidemic?

A. There was a belief there was an epidemic, although part of the vast majority of increased cases was our ability to recognizing what we had previously been calling senile dementia, which we attributed to a natural consequence of the brain aging process, was, indeed, a specific disease, Alzheimer's disease.

Q. And was there an understanding of how the incidence of Alzheimer's disease increases with age?

A. Yes, there is.

Q. How does it increase with age?

A. Well, it -- it increases or it doubles approximately every five years after the age of 60.

Q. And what are the odds of -- do you know what the odds of having it roughly at the age of 80 or '85?

A. Well, the estimates all are very high. They vary somewhat, but if one is fortunate enough to live to 85, at that point and I don't know, your risk is at least 30 percent. And some estimate it's as high as 40 percent or even 50 percent.

Q. And then if you will look at the next section, which is the cost of Alzheimer's disease, did the NIA estimate what the cost of, or did they report an estimate of the

cost of Alzheimer's disease to our society?

A. Yes, they did.

Q. And what was their report?

A. They estimated that $35 billion was spent last year. I'm presuming that's 1985, on the care of Alzheimer's patients. This includes the cost of nursing home and other long-term medical care, but does not begin to account for the emotional and social costs of the disease and also probably didn't account for what were called the indirect costs, if you will, of -- and that's addressed in the next paragraph when NIA health economist Dr. William Cartwright suggests that 35 billion, just quoting him, is the tip of the iceberg.

Dr. Cartwright and his colleagues, Dr. Wang of Howard University in Washington, D.C. and Dr. Hu of Pennsylvania State University in State College, Pennsylvania, estimate the special services required by dementia patients might cost more than $38 billion, with another $39 billion for what the investigators call indirect costs.

That's the value of the time of informal caregivers. That's the family. Not so informal. The family is dedicating to this effort.

Q. At the time, was there, then, a sense of the -- that the Alzheimer's disease epidemic was imposing

tremendous costs on society?

A. Right. A tremendous cost then and an ever-increasing one.

Q. And what was the response of the medical community to this growing epidemic?

A. Well, the -- the response of the medical community was -- it was, I think, interesting, putting myself back at that time and I did spend a lot of time with the general medical community. They recognized the problem, but were I'm not sure if cynical is the right word, but were skeptical that there was really anything we could do.

They were supportive of general research, trying to find something, but they were really skeptical that we had anything to offer that was worth, worth the cost and the effort.

Q. Were there any approved treatments for Alzheimer's disease at the time?

A. There were none.

Q. Were there any drugs that were perceived as treatments for Alzheimer's disease?

A. There were none.

THE COURT: Mr. Sipes, I've got a 4:30 criminal proceeding. We're taking a half an hour break, coming back at 5:00 o'clock.

MR. SIPES: Thank you.

Q. Who was Dr. Leber?
A. Dr. Leber was the Director of the Peripheral and Central Nervous System Division or Neuropharmacology Division of the FDA.
Q. Is that the division that has responsibility for antidementia drugs?
A. Yes.
Q. Would that be the division that had responsibility for drugs to treat Alzheimer's disease?
A. Yes.
Q. So would Dr. Leber be somebody who was knowledgeable in the field about the treatment of Alzheimer's disease?
A. Yes.
Q. If you will turn to Page 10, you'll see, beginning at Line 2, the statement, at this point in time, even a safe and effective symptomatic treatment for some cardinal sign and symptom of Alzheimer's would constitute a substantive therapeutic advance.
Do you see that?
A. Yes, I do.
Q. Was that a widely held view that in 1989, even a safe and effective symptomatic treatment for some cardinal sign and system of Alzheimer's would constitute a substantive therapeutic advance?

A. Absolutely. I think that view is universal.
Q. The reference for some cardinal sign and symptom of Alzheimer's, what would that refer to?
A. I think above all, memory impairment.
Q. And if you will turn to Page 17, at the bottom, beginning on Line 21, you'll see a statement, My colleagues and I have sought to reassure those interested in developing antidementia drugs that the lack of an approved antidementia drug is a reflection of the inadequacies of the drugs so far tested, not of our assessment methodologies or implied regulatory biases.
What was Dr. Leber saying there?
A. What Dr. Leber was saying -- and I totally believe that he felt this wholeheartedly -- that he and the FDA were as much concerned about bringing an effective, tolerable and safe treatment for Alzheimer's disease to the public as anybody else, but that the feeling that the FDA was somehow setting barriers to doing that was misguided.
Q. And do you see his reference to the inadequacies of the drug so far tested?
A. Yes.
Q. Would Dr. Leber have been knowledgeable about the work done on physostigmine?
A. Yes, he would have. He was a, and still is, a man

Q. Was it a widely-shared view at the symposium that, in your opinion, there were no lead drugs for Alzheimer's disease?
A. Yes.
Q. And in your opinion, did that pose challenges for developing drugs for Alzheimer's disease?
A. Well, I think it posed a challenge simply because if you -- if you don't have something that appears promising, it's hard to know where to go at least in clinical trials in people. You have to start at ground zero.
Q. I will ask you to turn to Page 37. You'll see there's, beginning at Line 20, some testimony by Dr. Drachman.
A. Yes.
Q. Who is Dr. Drachman?
A. Dr. David Drachman was a prominent neurologist interested in geriatric neurology at the University of Massachusetts.
Q. And is that the same Dr. Drachman that has been cited as doing some of the early work on developing the cholinergic deficit hypothesis for Alzheimer's disease?
A. Yes, at least for -- of cognitive loss in normal aging and by extrapolation of Alzheimer's disease.
Q. If you will turn to Page 38, beginning at Line 2,

you'll see the statement by Dr. Drachman: We don't have any drugs that are really doing a hell of a lot.
Do you see that?
A. Yes. I not only see it, but I can actually hear him saying it.
Q. Do you recall him saying that?
A. I do.
Q. Did you understand Dr. Drachman to be expressing skepticism about the currently available drugs that were in development for Alzheimer's disease?
A. Yes.
Q. On Page 39, you'll see, beginning at Line 17, there's testimony by Dr. Wurtman.
A. Yes.
Q. Who was Dr. Wurtman?
A. Dr. Wurtman was a neuroscientist at the Massachusetts Institute of Technology.
Q. Is that the same Dr. Wurtman that we heard about earlier today, who published a paper reviewing the various theoretical ways in which the cholinergic deficit in Alzheimer's disease might be addressed?
A. Yes.
Q. If you will look at Page 40, beginning at Line 3, you'll see testimony from Dr. Wurtman. We have no lead drug that has been shown to affect the patients and to

core symptom?

A. Yes.

Q. In 1986, with regard to a person of ordinary skill in the art, is that how they would have understood the core symptom of Alzheimer's disease?

A. Yes.

Q. And, by the way, when Dr. Thal refers to dementia there in the course of memory, did you understand him to be referring to a specific kind of dementia?

A. No.

Q. Let me ask you to turn to Page 95, beginning at Line 18. You'll see a statement, secondly, you need to say something about what is happening to that patient in an overall global sense or in activities of daily living, and that the drug must show improvement in both areas. If you can't show cognitive improvement, and you can't show improvement in overall functioning, you don't have a drug to treat dementia.

Do you see that?

A. Yes.

Q. Was that a widely-shared view about what it meant to treat dementia?

A. Yes, it was.

Q. Would that have been the understanding of what it meant to treat dementia in 1986 by those of ordinary

skill in the art?

A. Yes.

Q. Could you explain what Dr. Thal is saying about the need to show both cognitive improvement and an improvement in overall functioning?

A. Well, he's saying that if one shows a modest improvement on some cognitive reading or performance scale, but there is no evidence that the drug is also improving overall daily function, either in activities of daily living or the observational judgment of the caregiver or another person living with the patient, that, yes, indeed, they are doing better in their day-to-day activities and life, then you don't have a drug which can be considered effective.

Q. If a drug were to show a patient having improvement in a memory test but not in overall functioning, would that be considered a treatment of dementia by a person of ordinary skill in the art in 1989?

A. It would not.

Q. Let me ask you to turn to the next page, Page 96. There's a statement by Dr. Thal beginning at Line 3: All of the drugs that we are currently testing are really drugs designed to induce acute improvement in patients. But they are not designed to change the natural history of the disease.

A. No.

Q. Let me ask you to turn to the category of drug therapy, metabolic enhancers.

Would you explain what that category is referring to?

A. Yes. Well, the neurons in Alzheimer's disease were obviously decreasing in number because they were becoming, if you will, sick, and dying. And the hope was that the neurons that were still alive might function better if they were able to produce more energy. So if an individual neuron produced energy more efficiently, then it could do its job of communicating with other neurons to produce what we see clinically as memory function and other cognitive functions.

Q. So were the metabolic enhancers, were they attempted as a cure for Alzheimer's disease?

A. No.

- - -

Q. They were a symptomatic treatment like the cholinergic strategy?

A. Yes.

Q. If you would look to the discussion of the ergoloid mesylates...

What drug is that referring to?

A. That is referring to a drug that was marketed under

A. Yes.

Q. What was viewed as promising?

A. There were some anecdotal case series reports that it was helpful and even some placebo controlled data with subjective rating scales, if I'm recollecting correctly, that suggested that there was some improvement with this -- this drug's administration to patients with Alzheimer's disease.

Q. And is it correct that there were several pharmaceutical companies developing newer homologs of piracetam?

A. Yes.

Q. Do you recall what some of those homologs were?

A. The one we were involved in studying was oxyracetam and I believe Ciba-Geigy launched a major multi-center trial to determine if oxyracetam were indeed an effective managed treatment for Alzheimer's disease.

Q. So you were involved in the trial?

A. Yes. We participated in that trial.

Q. And when was this that oxyracetam was tried as a treatment for Alzheimer's?

A. This was I think in the late 1980s.

Q. And when you participated in the trial, did you view it as a promising treatment for Alzheimer's?

A. Yes, I did.

Q. And was it a symptomatic treatment or a cure?

A. Symptomatic.

Q. Did oxyracetam succeed as a treatment?

A. No.

Q. Did you view it as a failure?

A. Yes.

Q. Was the failure of oxyracetam, would that have been predictable to a person of ordinary skill in the art in 1986?

A. No.

Q. I take it when you decided to participate in the trial, did you predict it would fail?

A. No, we did not.

Q. As a general matter, when you participate in a clinical trial, do you make any judgment about the possibility of success before deciding whether or not to participate?

A. Well, we have hope, based on often the animal studies, the pre-clinical studies that are done that show improvement in cognitive function and in species other than humans, and also data supporting the potential safety of the drug. Hope springs eternal, so we keep trying.

In the clinic, we were discouraged, but we were discouraged because we didn't have anything that worked. And that meant energy should be put into

which are just being recognized at that time as, in fact, meeting all the criteria for neurotransmitters.

And, finally, neuronal protectors. Could you find ways to enhance the resiliency of neurons so that whatever the basic pathogenic process was that was attacking neurons in Alzheimer's disease, the neurons would be more resistant or able to compensate or maybe enable to build new processes that had been destroyed.

Q. And the different types of -- the various types of attempts, were those attempts at cures for Alzheimer's disease or attempts at symptomatic treatment?

A. They were attempts at symptomatic treatment.

Q. And I notice there's a whole list of them.

Did any of the ones that were tried before 1986 succeed?

A. No.

Q. Did they all fail before 1986?

A. Well, many of them continued to be studied for substantial periods of time after 1986.

Q. And by 1986, would a person of ordinary skill in the art in January 1986 be able to predict which of these -- well, predict that all of them would fail?

A. No. They would not. And, you know, all of them individually had their proponents.

We heard that at the -- in Detroit, at the

Lafayette Clinic, they were looking at a combination of Lecithin and one of the nootropic drugs.

And so there was, A, no consensus, but, B, lots of opinion.

\- - -

Q. Were there people who tried neuronal protectors after 1986?

A. Yes.

Q. Were there people who tried neuropeptides after 1986?

A. Very much so.

Q. Were there people who tried amines after 1986?

A. Yes.

Q. Were there people who tried the cholinergic approach after 1986?

A. Yes.

Q. Were there people that tried metabolic enhancers such as nootropics after 1986?

A. Yes.

Q. Were there people that tried neurotransmitter enhancers after 1986?

A. Yes.

Q. Were there various ways, including blood?

A. Yes.

\- - -

Q. Were various ways of increasing blood flow to the brain tried after 1986?

A. Yes.

Q. A person of ordinary skill in the art in 1986 confronted with all of these different ways of trying to provide symptomatic relief to a patient with Alzheimer's disease, could he or she predict which of these approaches would succeed?

A. No, he or she could not.

Q. Let me ask you to turn back to the Swaab and Fliers article and look at Page 419, where the heading is Neurotransmitter Substitution.

MR. SIPES: I've been asked to identify that as Exhibit 1401 and to offer to the Court in its discretion as a summary of the treatment attempts that we will promise to offer in smaller form.

THE COURT: Are we back to figuring out which demonstratives come out?

MS. ULRICH: I'm a little confused, because the copy of the demonstrative I received, it looked like what was up on the screen but now it looks like this. I'm kind of confused what was up on the screen.

MR. SIPES: Why don't we try to work it out and get I resolved by tomorrow. I'm afraid there was

Q. Let me ask you to turn to Swaab and Fliers' conclusion about cholinergic substitution therapy. Would you look at Page 419, the paragraph on the right-hand column?

A. Yes.

Q. Again, to be clear, this includes precursors, cholinesterase inhibitors, and agonists on the category of cholinergic substitution therapy?

A. That's right. They also talk about cholinesterase inhibitors as well.

Q. Could you read that into the record, the paragraph, in conclusion?

A. Yes. In conclusion, although some clinical improvement can occasionally be seen, and they quote Barbeau in 1978, a satisfactory treatment of the cognitive impairment of Alzheimer's disease by means of pharmacological substitution for deficits in the cholinergic system seems at present not to be feasible.

Q. Do you understand Swaab and Fliers to be expressing skepticism for prospects?

A. Yes.

Q. Using cholinergic agents to cure Alzheimer's disease or to treat --

A. No. To treat Alzheimer's disease.

Q. They're skeptical that cholinergic will even be a

treatment?

A. That's correct.

Q. Let me ask you to turn to Page 421. At the top of the left-hand column of 421, you see there's a statement, There are also some general considerations that make neurotransmitters substitution an enterprise with only a limited chance of success.

Do you see that?

A. Yes, I do.

Q. And again the reference to neurotransmitter substitution, that would include cholinergic agents?

A. Yes.

Q. Do you have and understanding of what are the considerations Swaab and Fliers were saying what gives a strategy only a limited chance of success?

A. Yes.

Q. Could you describe what they are?

A. They, I think, describe accurately that there's not just a single, simple cholinergic system but, rather, there are multiple components of this acetylcholine using group of neurotransmitter systems and that, you know, as we learn more about the neurochemistry of the brain, you know, we recognize that, you know, there are cholinergic nuclei in the -- in the septal nuclei as well as in the nucleus basalis and

A. Yes.

Q. What would that tell a person of ordinary skill in the art about the location in the body of galanthamine's principal effects?

A. These are all disorders of the body outside of the central nervous system, outside of the brain.

Q. And what would be described as -- what would a description of galanthamine above all for diseases of the body as opposed to the brain, what would that say to a person of ordinary skill in the art about the prospects for using galanthamine as a treatment for Alzheimer's disease?

A. It would diminish interest because in terms of strategies to enhance any neurotransmitter system and certainly the cholinergic system and certainly for cholinesterase inhibitors, we were trying to find compounds that had substantially more activity in the brain, where we wanted to get therapeutic effect on memory and other cognitive functions, with low or hopefully minimal effect on the periphery, because the periphery is where we experience these side effects that made these drugs so difficult to use.

Q. Now, if you will turn to the fourth page, it doesn't have page numbers, but it's Mylan Bates number 05986.

A. Got it.

Q. There's a -- the middle paragraph that begins, The findings.

A. Right.

Q. Let's blow that up. It begins, The findings from treating diseases involving the central motor neuron, a total of 64 cases in all, are less straightforward.

A. Yes.

Q. Then there's a discussion of infantile cerebral palsy.

A. Yes.

Q. Do you recall defendants' experts pointing to this discussion of infantile cerebral palsy as support for galanthamine's use in Alzheimer's disease?

A. Yes. Yes, I remember. I didn't follow the logic, but I remember the statement.

Q. In your opinion, does that discussion of galanthamine's use in infantile cerebral palsy, would that suggest a person of ordinary skill in the art to use galanthamine for Alzheimer's disease?

A. No.

Q. Why not?

A. Multiple reasons. First of all, this is cerebral palsy, which is a disorder of the upper motor neurons, critical neurons that control movement. This is not a

cognitive disorder.

Now, admittedly, some children, and we're talking about children here, so childhood Alzheimer's disease is extreme extremely rare. As a matter of fact, has not yet been reported. But be that as it may, when you have children who have usually neonatal hypoxia causing cerebral palsy, sure, some of these kids may have subtle changes or deficits in cognitive function, but basically they're talking about motor function here. And even though they talk about the central motor neuron, what they are seeing and they're observing, I don't know -- it's not compared to placebo. I don't know if there's any validity to these observations, actually a result of the drug.

The first one they list is improvement manifested in diminished spasticity.

Now, spasticity is something that the physical medicine and rehabilitation doctors who take care of people with cerebral palsy treat, you know, they treat with some medications. Most of these are muscle relaxants. They also use actual physical therapy, physical exercise and stretching of the joints and the muscles to get improvement.

So this -- you know, this is really talking about applying this medication, galanthamine, to a

disorder, to the -- to the outside of the brain physical manifestations of cerebral palsy.

Q. And are you -- is there any connection in terms of pathology between infantile cerebral palsy and Alzheimer's disease?

A. No.

Q. Would a person of ordinary skill in the art in 1986 that saw something being used as a treatment for infant cerebral palsy, would they think it would have relevance to Alzheimer's disease?

A. No.

Q. Have you ever seen, in your research on Alzheimer's disease, have you ever seen the Pernov article cited as a relevant source for Alzheimer's disease?

A. I have not.

Q. And let me ask you to turn to the section on application and dosage.

A. Yes.

Q. If you can pull up the bottom paragraph there.

Do you recall actually defendants' counsel earlier today referring to this reference to the daily dose of giving two to three times at intervals of twelve or six hours?

A. Yes.

Q. I think defendants' counsel was suggesting that

5/23/2007 Final Trial Transcript

would have a bearing on the duration of action of galanthamine?

Do you recall that? Do you recall that?

A. Yes, I do.

Q. Do you believe that -- well, first of all, what sort of action is being described in this paragraph?

A. I don't have a clue. You know, I've looked, tried to look carefully at that and it's not at all clear what the readout is, what the end point is that would suggest how long a drug is working. They simply say this is what they do. And, you know, I think that's -- this is an interest in terms of toxicity, because they don't seem to be stating that there's toxicity when they give, you know, children 15 to 30, up to 30 milligrams per day. But it certainly doesn't say anything about duration of action because we don't know what the action is.

Q. Would a person of ordinary skill in the art reading this in 1986, would he or she be able to conclude anything about the duration of action of galanthamine from that paragraph?

A. No, they would not.

Q. In your opinion, are there other sources in the prior art that would tell a person of ordinary skill in the art that the duration of action for galanthamine was shorter than twelve or six hours?

A. Yes.

Q. What sort of reference?

A. I think, you know, actually, for central nervous system effects, the best source is Cozanitis.

Q. And what duration does that show?

A. Well, he looked at the readout was electroencephalographic changes to photic stimulation and also changes in disruption of, or reinstitution of alpha rhythym. And he had a duration of action that was less than 30 minutes.

Q. And --

A. In the specific system.

Q. And do you recall Dr. Domino's 1988 review of the literature of galanthamine for purposes of considering its use for Alzheimer's disease?

A. Yes, I do.

Q. And --

A. I thought it was an excellent review.

Q. And do you recall his conclusion for that use in 1988 being that galanthamine had a duration of action similar to physostigmine?

A. Yes.

Q. Do you believe that a person of ordinary skill in the art in 1986 would have come to the conclusion, as Dr. Domino did, that galanthamine had a duration of action

galanthamine?
A. Well, my observation is that this drug is -- is helpful in stabilizing the progression of Alzheimer's disease. It's the impression both of myself and our group that persons on galanthamine as well as perhaps other cholinesterase inhibitors, have a slower rate of deterioration compared to our practice before galanthamine and other cholinesterase inhibitors were introduced.
Q. Now, I note that the study that you were referring to is USA one study group.
A. Yes.
Q. What does that refer to?
A. That was one of the large multi-center trials that were carried out in drug --
Q. How many were carried out?
A. My understanding is that there were four.
Q. And what were the results of the other trials?
A. The other trials were all consistent with this trial. All the trials showed benefit compared to placebo in cognitive function as well as overall global assessment of function.
Q. And which domains of cognition did the other trials show improvement in?
A. They showed, I think the ADASC. That focuses substantially on memory.

the same as it had been at baseline, one year earlier, so there was a stabilization for 12 months of cognitive function with galanthamine.

The second finding, and this was actually unexpected because we all believed that this was a symptomatic treatment that merely would rev up the ability to use cognitive function but not affect the course of illness.

The second finding was that persons who were started on placebo, who were then switched to galanthamine six months later, who we predicted when they switched to galanthamine would catch up to the level of cognitive function of those who had been started on galanthamine six months earlier, in fact, failed to catch up.

They seemed to, during that six months placebo, have lost something, so that their potential to improve with galanthamine was reduced. Now, they did improve when they were placed on galanthamine, but their improvement was not to the level of persons who had already been on galanthamine six months earlier.

Q. Did you do any further extension studies to examine this effect?

A. Yes. Well, I thought it was very interesting and the -- the company decided to, as rigorously as they could, follow people on open label galanthamine long term. And I think their original motivation, if I recall correctly, was

THE WITNESS: I had a sense I was going to fall down the stairs. Comic relief here.

(At this point the witness then stepped down from the witness stand.)

BY MR. SIPES:

Q. Could you please explain what Figure 1 shows?

Doctor Raskin, please be sure to keep your voice up because you're away from the mikes.

A. I will do my best using my pointer.

This is the figure from the manuscript, and I think the first thing to understand is that the six-month placebo data are here (indicating), from the original study, and this is the six-month data from the long term -- from the open label six-month extension.

So we have 12 months of data and that simply again shows that at 12 months -- and this is a very important thing for persons with Alzheimer's disease and their families. They have no deterioration at 12 months compared to baseline.

And then the study is carried out for 36 months. And we got additional Alzheimer's disease assessment cognitive subscale ratings at two years, 24 months, and then at three years, 36 months.

So we have the ability to look at the slope or the -- or the degree of change in these persons.

And then, for comparison, we did, and this was something I pushed hard for people to do. We did the best we could in determining placebo, and we have really three types of placebo data. But before I go into it, they all fall on exactly the same line or at least the same line projected out.

So I think and many other people think that all of these placebo data are representative of the natural history of untreated Alzheimer's disease.

The first data are the six month data from the year 2000 study in neurology.

Then we had data from a failed study that was done by Janssen, oh, two or three years before, with a drug called sibelusol (phonetic), which was supposed to decrease neurofibrillary tangle formation, but that's another story.

In that study, that study was started before any cholinesterase inhibitor had been approved, so institutional review boards said it's okay to keep people on placebo for a full year. Donepezil was approved, then Institutional Review Board said there really is available treatment. It's not ethical to keep people on treatment for that long.

But we had this sabeluzole from people with Alzheimer's disease who were socioeconomically almost superimposed on the group with galanthamine. When you look

across Alzheimer's studies in this country, the data look very similar, from one study to another. So actually they are fairly comparable.

So we had one year. As you can see, compared to six months, the difference between galanthamine and placebo starts to become greater, even at this point.

Then we used a mathematical projection, which is really what I call a kind of wait list control group. So in studies of psycho therapy today, the control -- you can't put a person who's being studied with psycho therapy on a placebo pill because they're not getting an active pill, so they often use things like a waitless control. They have people wait to enter psycho therapy for a period of time. They get the natural course of illness. Then they compare it to what happens with psycho therapy.

Here, we have data which was collected actually at Mount Sinai by Dr. Davis, Dr. Mohs' group, on persons on the ADAS cog, because that's where the ADAS cog was developed at Mount Sinai by psychiatrist LaRosa.

They collected data every six months on these people who were untreated because there was no treatment at that time. And using this large database, a resident, Dr. Stern, developed a mathematical projection.

So if you had an ADAS cog at 20, at some point you would be able to predict every year how much you would

deteriorate. And the prediction he came up with when you had a mental state around 30 -- I'm sorry -- the ADAS cog around 30, which was about the baseline in these, you'd decline about seven points every year over the next three years. And that's plotted out here (indicating).

And this has been validated multiple times by the Alzheimer's disease cooperative study. Our studies -- everything from estrogen to prednisone. Seven points a year on the ADAS cog for people at this stage of Alzheimer's disease is a pretty darn good estimate.

So this is placebo group projected out two years, so a waitless placebo. And you would predict someone would decline 20 points on the ADAS cog or actually increase in 20 points, because on the ADAS cog, higher is worse, whereas if one stayed on galanthamine, the decline was really cut in half.

And these data are, to me, very telling. I mean, what you want to do in most chronic degenerative diseases, no matter what part of the body they affect, is to slow the rate of decline. That's really what we do with statins. Lipitor. You look at the advertisement on television. You figure you take Lipitor and your coronary arteries are going to open up and you're going to be able to run a marathon even though you have trouble walking around the block. But in reality, what Lipitor does is the very same concept. Lipitor

slows the rate of decline in the size of our coronary arteries over years. So if you take Lipitor, and I'm very close to this issue myself, not to overshare, but you actually don't cure or reverse coronary artery disease, you simply slow the rate of progression of narrowing of the coronary artery.

And that's exactly, I submit to the scientific community, what we're seeing with this cholinesterase inhibitor and perhaps other cholinesterase inhibitors as well although the data aren't quite as impressive for the other two that are currently used.

Q. Let me ask you to turn to the next page to look at Figure 3.

A. I should go back?

Q. No.

A. Stay here?

Q. Figure 3. If you can explain what that shows?

A. Yes. So, you know, when I first saw the data that were on the previous slide, I said, I know what's going on here. This is really an artifact, because, you know, over time we had some dropouts. You always have some dropouts in a study and I felt that it was possible that the persons who had the inherently more aggressively deteriorating course would drop out, they would get discouraged or the families would get discouraged, which would leave a group of persons who were

inherently slower decliners, if you will, and that's what would kind of artificially move the curve upward.

So I said I'm not getting involved in this situation unless you look at the data from the dropouts while they were still on galanthamine, before they dropped out, to see if their rate of decline was steeper than the persons who hung in there for the full three years.

And we had the data, at least up to two years, obviously on the dropouts, and the dropouts are the dotted line. You can't get data at the end because they dropped out somewhere along the line.

But it turned out, in fact, that the rate of decline of the dropouts, while they were still in the galanthamine study, was exactly the same as the rate of decline of those who hung in for the full three years of the study.

\- - -

A. (Continuing) So I think these findings are real and as rigorous as one can do, given the ethical constraints of doing long-term controlled placebo study in Alzheimer's disease.

\- - -

(At this point the witness then resumed the witness stand.)

BY MR. SIPES:

Q. And let me look on the first page in the summary under conclusions.

Doctor, if you could just read your conclusions...

A. Cognitive decline over 30 signals months of continuous galanthamine treatment was substantially less than the predicted cognitive decline of untreated patients with mild to moderate dementia. Thus, the cognitive benefits of galanthamine seemed to be sustained for at least 36 months. These findings suggest that galanthamine slows the clinical progression of Alzheimer's disease.

Q. Do you still agree with those conclusions?

A. Yes, I do.

Q. Do you think those conclusions are accepted as good science in the field?

A. Yes, I do.

Q. Have you seen the behavior of doctors change with regard to when they prescribe cholinesterase inhibitors as a result of these sorts of studies?

A. Yes. Slowly, but inexorably, the prescribing of cholinesterase inhibitors has done two things: One, doctors

are starting earlier, and they're also hanging in there.

There was some very misleading, in my opinion, misleading advice from some parts of the scientific community that if you don't see improvement on a cholinesterase inhibitor after six months, you should stop the drug.

Well, you don't see improvement because we don't have a marker going back to the Lipitor analogy, we don't have a marker like blood cholesterol. What keeps people enthusiastic about their statin drug is that their cholesterol drops and you can measure this very easily, but Alzheimer's is a disease of the brain and the brain is inside the skull. It's very difficult to take a sample. It's not reflected in think biologic marker.

So people were saying, well, a person is not getting better. But even though the drug was working to slow the rate of decline, which was -- it really seems to me what the actual target of treatment is, but now I think that the ship is turning around in terms of the conception of what we're doing with these drugs.

Q. And let me ask one question just to clarify the record. You refer to a Dr. Davis as having developed this placebo. There have been several Dr. Davises in this case.

A. Yes.

Q. And what you since learned about tolerance to galanthamine?

A. Well, it's well tolerated in terms of adverse effects or anything.

Q. Now, you recall that defendants' experts have testified about the ability of a doctor to find a dose.

A. Yes.

Q. The dosing from the patent?

A. Yes.

Q. Have you looked at the dosing in the patent?

A. Yes, I have.

Q. In your opinion, would a person of ordinary skill in the art be able to administer galanthamine in a therapeutically effective dose in 1986, a person of ordinary skill in the art?

Let me start that question over. I think I reiterated it about three times.

Would a person of ordinary skill in the art in 1986 reading the patent be enabled to administer galanthamine in a therapeutic dose?

A. Yes, they would.

Q. How would he or she do so?

A. Well, they would start at a low dose, as described in the patent, and then they would gradually titrate the dose upward to a point where they either saw therapeutic effects

or the patient developed adverse effects, which were troublesome enough to stop any further increase of the medication.

Q. And was that technique of titration, was that well-known to a person of ordinary skill in the art in 1986?

A. Yes. In geriatric medicine, the mantra is start low and go slow, but go.

So we often make a mistake in geriatric medicine, because we're so worried about side effects, starting with a low dose and then forgetting to titrate. That's one of the things that we constantly have to keep in mind. You know, it's always a balance between therapeutic effects and adverse effects, but you have to remember that you are trying to get therapeutic effects.

Q. And does the patent anywhere describe the technique of titration?

A. Yes, it does.

Q. Where does it do so?

A. So on -- on the left-hand column on the first page, Line 64 and 65, it may be necessary to begin at lower doses than are ultimately effective. And to me, that really applies to titration.

Q. And would a person of ordinary skill in the art reading the patent understand that to refer to titration?

A. Yes, they would.

Q. Now let me ask you, generally, would a person of ordinary skill in the art in 1986 reading the patent be enabled to practice the claimed invention by administering galanthamine as a treatment for Alzheimer's disease?

A. Yes.

Q. Let me now turn you to what a person of ordinary skill in the art would understand from what the patent is saying. And let's start with the background.

MR. SIPES: If you could put the first paragraph under background up...

BY MR. SIPES:

Q. Do you see that first paragraph? There's a discussion of two Cozanitis articles?

A. Yes.

Q. And then there's a conclusion that these studies show an increase in both plasma cortisol and plasma ACTH when galanthamine was administered to patients together with atropine?

A. Yes.

Q. Would a person of ordinary skill in the art in 1986 know about the drug atropine?

A. Yes.

Q. What would he or she know about atropine?

A. It's a classic muscarinic cholinergic antagonist.

Blocks the effects at one of the two major receptors.

Q. Would a person of ordinary skill in the art in 1986 know that?

A. Yes.

Q. What would a person of ordinary skill in the art in 1986 understand about galanthamine from the first paragraph?

A. Well, they would understand -- several things. The first was that because ACTH is centrally regulated, and its release is -- is regulated by the brain and by -- through a cholinergic mechanism, that galanthamine had to be able to cross into the brain to release ACTH and cortisol.

\- - -

A. (Continuing) The second thing is that the receptor type of two major receptors, the nicotinic and muscarinic receptors that galanthamine was acting upon was the nicotinic receptor because atropine was administered first. Atropine is a blocker in the blood and takes out the ACTH, the muscarinic receptors.

If you get release of the ACTH and release of the cortisol, you have to be acting at the nicotinic receptors in the central nervous system.

\- - -

Q. And just so the record is clear, would a person of ordinary skill in the art in 1986 understand from the paragraph at Column 1, Line 11 to 21, therefore, that Dr. Davis was saying that galanthamine was enhancing central nicotinic cholinergic function?

A. Yes.

Q. Okay. Let me then turn to the second paragraph in Column 1, which is from Lines 22 to 25.

Do you see there's a description of -- let me try, Ilyuchenok and the appearance of --

MS. ULRICH: Your Honor, I'm sorry to interrupt, but I have an objection to this.

Nothing that Dr. Raskin just testified about with respect to the nicotinic receptors and what the art would teach was disclosed in his expert report, so we object. This is outside the scope and it's the first time that, frankly, we're hearing this.

MR. SIPES: Your Honor, we disagree. There's an extension section on enablement on the way in which a person of ordinary skill in the art would understand what the patent teaches.

THE COURT: Well, as I've always -- as I have come to deal with expert reports and testimony at trial, I will let it in. If an opposing party believes that it truly

is outside the scope of both the report and the deposition and that they were truly surprised, it will be brought up in post-trial, and the party proposing the testimony is at risk, obviously, for any retrial that might have to happen.

So you can certainly go forward, but I think that my standard has been clearly explained.

MR. SIPES: Thank you, your Honor.

BY MR. SIPES:

Q. Let me ask you, what would a person of ordinary skill in the art understand from the paragraph describing Ilyuchenok about galanthamine?

A. Well, this, as -- this is animal data in rabbits in, from which one can infer that peripherally administered into the vein, intravenous galanthamine, crosses the blood/brain barrier and affects brain waves.

Q. And let me then turn to the third paragraph. There's -- the third paragraph, which is Column 1, Lines 26 to 28, is a discussion of Krauz.

What would a person of ordinary skill in the art in 1986 understand from the discussion of Krauz?

A. That the -- that galanthamine, when, again, when administered to -- in an animal model, in this case, to a dog, increased short-term memory, which obviously is the cardinal symptom of Alzheimer's disease.

Q. And let me turn to the next paragraph in Column 1,

the brain. That is damaged in Alzheimer's disease. And this model damages the site of origin of these pre-synaptic acetylcholine neurons, which are indicated in the nucleus basalis of Menert, and therefore, with damage to the pre-synaptic cholinergic neurons in this nucleus, you get an acetylcholine deficiency in the thinking parts of the brain, in the hippocampus and the -- and the neocortex.

And this really does, if you will, at least in part, mimic the cholinergic deficiency in Alzheimer's disease. Either gets at the basic, the basic lesion in -- at cholinergic system in Alzheimer's disease.

Q. Now, which part of the central cholinergic system does scopolamine block?

A. It blocks the post-synaptic system, the muscarinic receptor in the thinking part. So it ignores the whole other part that's damaged in Alzheimer's disease.

Q. And is the model that is set forth for Alzheimer's disease in the patent, is that limited to the muscarinic part?

A. No.

Q. What else does it include?

A. Well, it real really will affect all parts of -- all receptors for acetylcholine in the brain, because you're taking away acetylcholine, so all receptors will see less acetylcholine and will be stimulated less.

Q. Would it include the nicotinic receptor?

A. Yes.

Q. Would a person of ordinary skill in the art in 1986 recognize these differences between the model being proposed for Alzheimer's disease in the patent and the scopolamine model?

A. Yes.

Q. Would a person of ordinary skill in the art in 1986 recognize that the model for Alzheimer's disease set forth in the patent includes the nicotinic as well as the muscarinic function?

A. Yes.

Q. Let me draw your attention to the reference to numerous behavioral deficits, including the inability to learn and retain new information, characterizes this lesion. Does this reference nicotinic and muscarinic function?

A. Yes.

Q. Would a person of ordinary skill in 1986 reading that recognize that?

A. Yes.

Q. And how does that description differ from the earlier scopolamine model?

A. Well, the scopolamine model is -- is just one-half, if you will, of the -- of the cholinergic system, and it is one that -- you know, doesn't mimic Alzheimer's disease,

but does show you what happens when there's not enough acetylcholine in the brain in terms of the functions of the muscarinic side of the cholinergic system.

Q. And then the next sentence says, drugs that can normalize these abnormalities would have a reasonable expectation of efficacy in Alzheimer's disease.

Do you see that?

A. That is a reasonable inference.

Q. Now, we have gone over earlier the evidence about galanthamine as presented in the patent.

Would any of that evidence bear on whether or not galanthamine would be expected to succeed in this model to a person of ordinary skill in the art in 1986?

A. Yes.

Q. Could you explain that?

A. The -- the earlier parts of the patent describe that galanthamine gets in the brain, it's a cholinesterase inhibitor.

So we know that it's going to increase the amount of acetylcholine in the synapse that both types of receptors see, but it -- it also -- the earlier part of the patent would assure that the nicotinic part of the cholinergic system would not be ignored by this drug, because this drug has been demonstrated to affect the cholinergic system and has to be at the nicotinic site when the muscarinics are

taken out of the picture by administering atropine.

Q. So would a person of ordinary skill in the art in 1986 reading the patent believe that the assertion in the patent that galanthamine is a treatment for Alzheimer's disease was supported by the evidence presented for the effects of galanthamine and the model for Alzheimer's disease presented?

A. Yes.

Q. I believe you heard defendants' experts suggest that Dr. Bonnie Davis' invention was just a guess. Did you hear, I think it was Dr. Levy said, if the Court rejected his obviousness testimony, then his testimony was that it was a guess. Do you recall that?

A. Yes.

Q. Do you believe a person of ordinary skill in the art in 1986, reading the patent and its description of galanthamine and its description of a model for Alzheimer's disease, would view the invention as just a guess?

A. No.

Q. What -- how would they see it?

A. Well, I tell you how I saw it as a person in the art. I certainly wouldn't have come up with this. I was impressed that Dr. Davis did.

I think that the way it looks to me is that what happens -- what happened here is what happens in science so

many times. If you bring knowledge from one area, in this case, endocrinology, as Dr. Bonnie Davis really brought endocrinology expertise, to another area, in this case, neuropsychiatry, and the two, you know, don't talk that much on a daily basis, but here they were.

And so she brings insights from another area to neurology neuropsychiatry and says, gee, you know, here's -- oh, the neuropsychiatrist teacher that -- there's this thing called Alzheimer's disease and it is occurring in the brain and it is marked by a cholinergic deficit, and she knows from her endocrinology that, wow, there's this drug that has been used in anesthesia that crosses into the brain and increases acetylcholinergic activity. Not only does it do that, but it seems to have a broad spectrum of action. Particularly it has this nicotinic effect. Looks like a good -- a good go for Alzheimer's disease.

Q. So would a person of ordinary skill in the art in 1986 view Dr. Bonnie Davis' invention as set forth in the patent as scientifically grounded?

A. Yes.

Q. Okay. Let me then try to finish up by bringing up a few things from yesterday.

You recall we talked about one of the old Eastern European articles we're relying on, Pernov?

A. Yes.

BY MS. ULRICH:

Q. Do you see that, Doctor?

A. Yes, I do.

Q. Okay. I wish my voice was louder. It's not.

A. Your voice is fine.

Q. You can hear me?

A. Yes.

Q. Good. So this is your second expert report. Does this look familiar?

A. Yes, it does.

Q. Okay. And is this the section where you opined on enablement?

A. Yes.

Q. Okay. And it STATES, Dr. Domino and Dr. Levy asserted that the '318 patent does not meet the enablement requirement of patent law because quote it would not inform one of ordinary skill in the art that galanthamine would be a therapeutically effective treatment for Alzheimer's disease, close quote.

Do you see that?

A. Yes.

Q. You say I disagree?

A. Yes.

Q. You go on to explain why you disagree?

A. Yes.

Q. Do you see that?

A. Yes.

Q. This is what you said when you did your expert report: The '318 patent states directly that galanthamine is a therapeutically effective treatment for Alzheimer's disease. By that you mean it claims a therapeutically effective treatment for Alzheimer's disease?

A. Yes.

Q. That's just what the claim says?

A. Yes.

Q. You say, it outlines an approach for Alzheimer's disease researchers to confirm the efficacy and tolerability of the invention by providing the steps appropriate for confirming Dr. Bonnie Davis' insight concerning galanthamine -- most significantly, the manner of carrying out animal testing to confirm the proposed efficacy.

Do you see that?

A. Yes, I do.

Q. And you made a point of saying, most significantly, it was the animal model; is that right?

A. Yes.

Q. Okay. And nowhere in this paragraph do you indicate that the prior art would have actually given a person of skill in the art the expectation that this would work, do

you?

MR. SIPES: Objection, your Honor. That's very misleading.

THE WITNESS: It says it would be an effective treatment for Alzheimer's disease.

BY MS. ULRICH:

Q. Based on the animal model. That's what you say here.

A. Yes.

Q. Okay.

A. Yes.

Q. All right. I want to talk about the Cozanitis article that you reference in this patent. Go to the background art section.

MS. ULRICH: Please put up PX-1.

BY MS. ULRICH:

Q. Dr. Raskin, this is the '318 patent; is that correct?

A. That's correct.

Q. Can you see that, Doctor?

A. I do.

Q. Okay. Now, as I understand your testimony, you say that anybody, a person of skill in the art would have known the Cozanitis' reference to atropine would necessarily indicate that you were blocking the muscarinic receptors and therefore this must be having a nicotinic effect?

A. That's a reasonable interpretation.

to use galanthamine for peripheral conditions and not central?

A. Peripheral.

Q. Peripheral?

A. Yes.

Q. Okay. And what about potency? Is it your opinion that galanthamine is not as potent as physostigmine?

A. That's my opinion.

Q. Okay. And those three things combined would have led somebody away from choosing galanthamine. Is that your testimony?

A. Yes. That's -- that's what the field was feeling at the time.

Q. Okay. Because a person of skill in the art wouldn't recognize that a drug that was less potent, of equal duration of action as physostigmine and had been used peripherally would be expected to work in Alzheimer's disease; correct?

A. Would be expected to work?

Q. Would not be expected to work.

A. Well, it's certainly less likely than physostigmine and physostigmine didn't seem to be working, so why choose galanthamine.

Q. Right. You claim that physostigmine wasn't working as of 1986; right?

Q. If you would like --
A. Yes.
Q. -- to have it in front of you.
A. Yes.
Q. Column 1, the first page of text.
You'll recall that Ms. Ulrich asked you a number of questions about each of the pieces of prior art that is described in the patent, taken one by one. Do you recall that?
A. Yes.
Q. And I think one of the things she pointed out, do you recall, was that, for example, atropine, depending on how it's administered, may have different effects; correct?
A. Yes.
Q. And that somebody reading Cozanitis alone might not recognize the nicotinic effect of galanthamine. Do you recall that?
A. That was the implication.
Q. And I believe, in fact, you'll recall the testimony from yesterday I think from Dr. Bonnie Davis, that, in fact, Cozanitis himself thought it might be a stress response. Do you recall that?
A. Yes.
Q. But now I want to ask you, take the description of

the Cozanitis articles in the patent in the context of the patent, in the context of all the other art assembled in the patent and the description of the animal model in the patent.
What would a person of ordinary skill in the art understand the inventor to be saying about galanthamine as described in the Cozanitis papers when it's assembled this way?
A. Well, it -- it's saying that in a reasonable model for Alzheimer's disease, cholinergic deficit, galanthamine would account for the nicotinic side of the cholinergic system.
Q. And would a person of ordinary skill in the art, seeing a model described that was a cholinergic deficiency model for Alzheimer's in a patent that also cited Cozanitis, would they be -- would they be inclined -- how would they read the Cozanitis results in light of its presentation of patent that sets forth the cholinergic model?
A. It suggests that it's a nicotinic receptor stimulating compound.
Q. And let me ask you, generally, would the reading, a person of ordinary skill in the art, a teaching that a person of ordinary skill in the art would take away from the evidence about galanthamine in the papers under

background art, would that be affected by the presentation of the art all assembled together like this along with a model for Alzheimer's disease that was the selective lesion model?
A. Yes. I mean, this would -- this would do it.
Q. Let me ask you, Ms. Ulrich asked you a couple of questions about all of the other failed attempts that you testified to other than the cholinergic attempt, the ones to the left and all the ones to the right.
A. Mm-hmm.
Q. She asked whether or not those were the same, I guess, category of attempts as in the '318 patent. Do you recall that?
A. Yes.
Q. Let me ask you this: Were all of those attempts to find symptomatic treatments for Alzheimer's disease?
A. Yes.
Q. Now, she also suggested that they may have had other logic. But let me ask you: Was there an attempt to use piracetam in combination with a precursor to address the cholinergic deficit hypothesis?
A. Yes.
Q. Would that use of piracetam be following the same logic -- well, would that attempt be another attempt to address the cholinergic deficit hypothesis?

Q. Did you -- did you do that with an expectation -- did you do that with a hope for success?

A. Yes.

Q. All right.

Q. You recall Ms. Ulrich asked you a few questions about Dr. Domino's 1988 paper?

A. Yes.

Q. Now, do you recall that Dr. Domino testified that he was actually asked to do the talk in the spring of '88 that led to the paper later that year?

A. Yes.

Q. By a Doctor Ezio Giacobini?

A. Yes.

Q. Are you familiar with Dr. Giacobini?

A. I am.

Q. Is he an expert in cholinesterase inhibitors?

A. Yes.

Q. Does he keep up with the literature on cholinesterase inhibitors?

A. Yes.

Q. In your experience with him, does he intend to be very knowledgeable about cholinesterase inhibitors?

A. Extremely.

Q. Now, in 1988, is it correct that both the '318 patent and Dr. Coyle's preliminary results on

galanthamine in the lesion model for Alzheimer's had been published?

A. Yes.

Q. Now, I think you asked repeatedly for the 1985 paper in which the physostigmine results in their full entirety were published.

A. Yes.

Q. Do you recall that?

A. That's correct.

Q. If you could look behind Tab 30...

A. Yes, I have it.

Q. You'll see this is Plaintiffs' Exhibit 698, a document entitled Clinical Studies of the Cholinergic Deficit in Alzheimer's Disease.

Do you see that?

A. I do.

Q. Is this the paper that you were referring to?

A. It is.

Q. And it's published in the Journal of the American Geriatric Society in 1985?

A. Yes.

MR. SIPES: I move Plaintiffs' Exhibit 698 into evidence.

MR. GRACEY: No objection.

THE COURT: Thank you.

# EXHIBIT 8

REDACTED

# EXHIBIT 9

plaintiffs have produced evidence that indicates how everyone was and, frankly, still is, to some extent, struggling to unravel the mysteries of Alzheimer's.

Defendants have produced evidence that the scientific community was focused on the cholinergic deficit theory and that galanthamine was an obvious drug of choice in that context.

On the issue of enablement, however, plaintiffs have produced evidence that the handful of scientific papers cited in the '318 patent is a clear explanation of the inventive process and that titration was a well-known methodology of -- in terms of administering the drug. And there is other evidence in the record, however, that Alzheimer's was so little understood in 1986, that the '318 patent explained little, if anything, to the scientific community, and, further, because everyone was looking for the kind of miracle drug that dopamine was, that titration would be very tricky with galanthamine because there are no immediate effects, just a slowing of an inevitable decline.

So the bottom line is you've left me with a complicated record, albeit a most interesting one, and I look forward to seeing how you all sort out the record in your post-trial briefing.

# EXHIBIT 10

REDACTED

# EXHIBIT 11

# REDACTED

# EXHIBIT 12

# REDACTED

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of August, 2007, the attached **REDACTED PUBLIC VERSION OF APPENDIX I: TRIAL TRANSCRIPT EXCERPTS** was served upon the below-named counsel of record at the address and in the manner indicated:

John C. Phillips, Jr., Esquire
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE 19806

VIA ELECTRONIC MAIL

Lynn M. Ulrich, Esquire
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601

VIA ELECTRONIC MAIL

Frederick L. Cottrell, III, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

VIA ELECTRONIC MAIL

Alan H. Bernstein, Esquire
Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd.
1635 Market Street, 12th Floor
Philadelphia, PA 19103

VIA ELECTRONIC MAIL

*/s/ Tiffany Geyer Lydon*

Tiffany Geyer Lydon