1    that also lack biological markers.

2            If so, how do you deal with them?  Can we learn

3    something from your criteria for efficacy in dealing with

4    drugs for those diseases that might help us in thinking about

5    Alzheimer's?

6            DR. KATZ:  I think, if I can start to answer that

7    for the Agency, there are a couple of distinctions I want to

8    make.   First of all, my understanding of the trial design

9    issues for other psychiatric illnesses, those, generally

10   speaking, tend to all be well-controlled, usually placebo-

11   controlled, trials.

12           The issue of how one measures outcomes in those

13   diseases, as compared to Alzheimer's, is one that might crop

14   up in later discussions and later panels in this symposium.

15   I think we are going to spend a lot of time on how does one

16   assess outcomes in patients with Alzheimer's disease.   I

17   don't know that they are, necessarily, directly analagous to

18   how one does it in other psychiatric conditions.

19           DR. WURTMAN:  I think it would be helpful if, when

20   we have those discussions, we can have some insights as to

21   how you do it for other behavioral diseases that lack lead

22   drugs and biological markers.

23           DR. KATZ:  I agree.   I think the lack of biological

24   markers, to hone in on that particular point, isn't necessar-

25   ily a major problem.   Also, just to back up for a second,

1    there are other effective drugs in other conditions.

2        DR. THAL:  I would just like to comment on the

3    issue of biological markers.   It is true there is no

4    biological marker for Alzheimer's disease, but as I will

5    demonstrate to you in one slide, we are not bad in making the

6    diagnosis.   If you were to, now, look at the pathological

7    series that have been published in the last seven years, the

8    diagnostic accuracy rate based on a clinical examination and

9    a neuropsychological evaluation averages sensitivity and

10   specificity of about 85 percent.

11       If one uses NIN, CDS, ADRDA diagnosis of probably

12   Alzheimer's disease, diagnostic accuracy is about 92 percent

13   compared to pathology.   So we certainly can pick out the

14   populations who had Alzheimer's disease and nothing but

15   Alzheimer's disease for our clinical drug trials, and these

16   trials will be contaminated by about an 8 percent incorrect

17   diagnostic rate.

18       I think that is actually pretty good.

19       DR. WURTMAN:  The question, though, Leon, is can

20   you pick out a 15 percent improvement in a patient with

21   diagnosed Alzheimer's disease.

22       DR. THAL:  You can pick out an improvement of any

23   magnitude, given you are willing to study enough patients.  I

24   will show you some extrapolations and figures of actually how

25   many patients you need.   It simply depends on the sensitivity

at

1    of your test instrument and its standard deviation.

2        I will give you an example.  We are not dealing

3    with stroke studies, but I attended a meeting on stroke

4    methodology a few months ago.  Most of our Alzheimer's

5    trials deal, often, with about 200 to 300 patients.  I

6    thought that was a large number until I attended a meeting

7    dealing with stroke.

8        Stroke is a much more variable disease.  First of

9    all, it occurs acutely and some patients get better in a

10   matter of a few minutes or hours because they have had TIA's

11   and not strokes.  That is a very large contamination if you

12   want to do an acute stroke intervention.

13       The recovery rate from stroke is highly variable.

14   Some people become completely normal, and some are left with

15   a fixed neurologic deficit.  To deal with these statistical

16   issues, current stroke trials that are being carried out in

17   the United States and Europe are now employing upwards of

18   2000 to 3000 patients in order to design trials that can

19   produce answers because of the variation in the patient

20   population.

21       We are not dealing with anything near that issue.

22   The course of Alzheimer's disease, although highly variable,

23   when placed in perspective to stroke, is relatively predic-

24   table.

25       DR. KATZ:  Let me also say one thing about the lack

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

44

1    of biological markers.    I don't believe that we consider it,

2    from the regulatory point of view, necessarily an impediment

3    to the development of drugs.    There are many conditions for

4    which there are no biological markers, and the law allows us,

5    or perhaps obliges us, to focus on clinical phenomenon.

6          There are the problems, as you enumerated them,

7    with how does one measure the relative clinical phenomenon.

8    Nonetheless, specifically with regard to biological markers,

9    I don't know that that is really a problem for us.

10          DR. DAVIS:    I just want to take us in a slightly

11    different direction and elaborate on some of the questions

12    that Peter raised in his initial conversation.    I think few

13    would have any doubt that double-blind controlled trials are

14    the standard of the field, the only way to establish efficacy.

15    The real question, however, for this field is the one that

16    Peter raised, and that has to do with heterogeneity.

17          If we have a condition that affects 2 million plus

18    people in the U.S. and in equal number in Western Europe, and

19    we have a treatment that might only affect 20 percent of

20    them, that is still a very substantial number of people that

21    can have a real public health impact.

22          The question becomes, what kind of design can we

23    use that might reliably identifiy that subgroup and show

24    that, in fact, they are responding.    It's a very difficult

25    problem.

1          It has been approached in some methodological

2  treatises by multiple crossover designs to show that people

3  are repeatedly responding.   It has been approached in

4  studies that are going on in our field by some a priori

5  stratification and identification, or enrichment.

6          I think these are the tough issues that we have to

7  face, and I am sure there won't be any consensus.   But it is

8  certainly a conundrum for the field at this point.

9          DR. WHITEHOUSE:   I think this heterogeneity issue

10  is key, too, Ken.    I think, as you suggested, there are some

11  pre-hoc things that you can do like stratification.    The

12  issue of rechallange, I think, is something that is talked

13  about a lot but not done.    So, if you do identify 20 percent

14  of your group that responded, then the next thing to do is

15  take them off and then put them back on, and see if the same

16  20 percent reponds, or see if it is a different 20 percent.

17          DR. DAVIS:   And that would seem reasonable except

18  for the problem that in a degenerative disease, it is

19  conceivable that responsivity will change over the course of

20  the illness which makes it, again, equally complex.

21          There are no simple solutions, but clearly,

22  rechallenge is something that we could do a lot more of and

23  it relates back to, I think, David's initial point which is

24  that if we move immediately from animal studies to double-

25  blind, parallel-controlled, investigations, we make a big

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C. 20002

at

1   mistake.

2       We make the mistake of being able to identify,

3   early on, some hint of whether the drug is doing something

4   preliminary to ever thinking about NDA application, clearly.

5   But I think companies might save themselves a lot of money by

6   getting some reflections at a few good centers of whether an

7   agent in which there is unlikely to be false positive

8   response has any responsivity at all.

9       DR. FERRIS:  To follow up on that issue in terms of

10  what, in recent years, has been a major gap between what is

11  discovered preclinically, generally in rodent models, and

12  then jumping right into full-scaled Phase III trials, there

13  is an awful lot in between.   It doesn't just involve,

14  necessarily, small human trials.

15      A lot can be done at the preclinical level in terms

16  of looking at just what the drug is doing in rodents, moving

17  to primates, and, furthermore, in early human trials, at

18  least trying to look at similar kinds of processes and

19  functions in man that were apparently showing drug effects in

20  animals.

21      I will have a little more to say about that later

22  this afternoon.

23      DR. KATZ:  To address something that Dr. Davis had

24  mentioned, and others, the notion of starting out small,

25  small pilot studies, perhaps uncontrolled studies, what is

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002

at

1    the likelihood, or what is the evidence, for that matter,

2    that you will see something meaningful in such studies.

3         If you are not going to see anything large, and so

4    far we haven't in large well-controlled trials, what is the

5    value of starting off small, a few patients, where the

6    results would be unreliable, at best or, for that matter, in

7    which a promising treatment might be rejected because it just

8    couldn't be picked up in a small trial.

9         DR. DRACHMAN:  I would like to make a comment about

10    that which is that you don't have any idea of the patient

11    population that will respond.  In the drug study that I

12    alluded to that is underway, patients who have severe

13    Alzheimer's disease are being eliminated right from the very

14    beginning.  As far as I know, it is the vegetative patient

15    in the nursing home who would profit the most from this drug.

16    I don't have any idea.

17         It isn't clear from rats that run a maze that you

18    identify a Mini-Mental State of 13 to 23 as the ideal

19    population to treat with a particular drug.  It isn't clear,

20    even from a population like that, that what you want is

21    individuals under a certain age, over a certain age, with a

22    certain degree of deficit, with a certain type of deficit,

23    those with obstreperous behaviors, those who are behaving

24    perfectly normally.

25         So if there is a drug which is psychoactive and

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

1  which has some -- I use that word with apologies, by the way,

2  but which has some reasonable effectiveness, and you don't

3  hvae any idea of the group of individuals who could benefit

4  the most from it, you have to try to find out.

5       The second part of your question which is suppose

6  it has a very tiny benefit, which is one of my favorite

7  problems in this field; that is, suppose thousands of

8  Alzheimer's patients could benefit by a single point on their

9  IQ scale, using the WAIS, would that be of value as compared

10  with a few hundred patients who could improve their IQ's by

11  20 points.  That is, the precise level at which you set your

12  threshold for success will determine whether or not a drug

13  can, in fact, be tested other than with a very rigorous trial

14  in order to get an idea of who seems to be benefitting from

15  it so you can then zero in and do the double-blind study with

16  parallel structure later.

17       But you need clues, I think.

18       DR. THAL:  I want to make one point coming back to

19  the issue of subgroups.  That is always somewhat of a

20  disturbing issue because the issue of subgroups makes the

21  assumption that there is something biologically different

22  about the disease in different patients.

23       I think that is perfectly viable if you can

24  actually show a biological difference.  However, I caution

25  people that, to my point of thinking -- and I am going to

at

1    take an extreme point of view for point of argument's sake.

2    This is like saying that a person that has polio involving

3    his left foot is different than a person that has polio

4    involving his right arm.

5        They look different but they are both caused by the

6    same disease, and I don't think that I would look for two

7    different types of treatment for these two individuals with

8    polio.

9        To my mind, at this particular point, Alzheimer's

10   disease does appear to be a unitary disease process.   I am

11   taking an extreme point of view.   You are all entitled, and

12   will undoubtedly disagree with me.   But until somebody is

13   able to convincingly demonstrate, from a biological point of

14   view, that there are multiple etiologies of Alzheimer's

15   disease or that the biology is clearly different, I think we

16   should be very careful about biological subgroups.

17       Secondly, while I think it is perfectly reasonable

18   to look for subgroups for treatment, one also has to remember

19   that once a drug is marketed and labeled for treatment of

20   Alzheimer's disease, it is going to be used by essentially

21   all patients with Alzheimer's disease.

22       You may think that is a good idea or a bad idea,

23   but that is what is going to happen.   And I think that is

24   worth some discussion as well.

25       DR. WURTMAN:   I think the problem with Alzheimer's

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002

50

1   is not multiple etiology, the problem is finding one etiology

2   for starters.    I think that analogy to polio, unfortunately,

3   isn't very good.    At this point, ten years into it, I think

4   we know less about the etiology of Alzheimer's than we

5   thought we knew five or six years ago.

6        One is reminded of the situation with cancer thirty

7   years ago when there were people who said it was caused by

8   viruses, and people who said it was caused by toxins, and

9   people who said it was caused by genes, and people who said

10  it was caused by waves.    Of course, they were all right,

11  weren't they, as it turned out, in retrospect.

12       I think that with Alzheimer's disease, one can make

13  the strong case that dementia does not, necessarily, equal

14  Alzheimer's disease in all patients, that Alzheimer's is not

15  necessarily one disease, that the underlying biologic

16  theories we have had that Alzheimer's is related to the death

17  of neurons may not be correct.

18       Certainly, at this point, as my colleague next to

19  me, I'm sure, will agree, one could say the loss of choline

20  acetyltransferase can no longer be taken as evidence of the

21  death of the neurons that had contained it.  We can no longer

22  say that the plaques and tangles that Dr. Alzheimer saw are

23  necessarily related to the pathogenesis of the disease.

24       In fact, it has been suggested that they may

25  reflect just the opposite, namely, an attempt on the part of

at

1    neurons to grow faster.

2         So I think, at this point, we really know next to

3    nothing about the etiology, whether it be 1, 2 or 6 of

4    Alzheimer's disease and the likelihood of it being heterogen-

5    eous, I would say, is far better than it being a homogeneous

6    entity.

7         So there are two rather polar views.

8         DR. REISBERG:  I would like to response to some of

9    David's comments regarding finding drugs that work, and also

10   some of Ken's comments regarding methodology.

11        It seems to me that we are, today, at a point of

12   tremendous potential opportunity in terms of Alzheimer's

13   research.  I am thinking back to what Paul said, the dictum

14   "rarely to cure, sometimes to treat, always to comfort."  It

15   seems very clear, from my standpoint today, that there are

16   many symptoms in Alzheimer's disease, and David was alluding

17   to some of these symptoms, which are, clearly, likely to be

18   amenable to pharmacologic intervention.

19        I am speaking of symptoms such as agitation and

20   verbal outbursts and violence and axieties and obsessive

21   behaviors.  And it seems very clear to me regarding the

22   reserach on Alzheimer's that many of these potentially

23   remediable symptoms are, clearly, a major source of burden

24   for caregivers of the Alzheimer's victim.  They seem to be a

25   cause of premature institutionalization.

1     They also seem to be a cause of increased morbidity

2  in the Alzheimer's victim.

3     The methodology exists today.  This is a very, very

4  important part, I believe, of the meeting here today, to

5  separate out these probably potentially remediable behavioral

6  symptoms, sometimes to treat, from other symptoms, cognitive

7  symptoms, which may not, today, be amenable to pharmacologic

8  intervention.

9     Clearly, there is a need to treat the primary

10  cognitive symptoms of the illness process.   Indeed, this is

11  the reason that many of us are here today.

12     However, there has been a tragic historic error

13  made in Alzheimer's disease research and that is that the

14  cognitive symptoms in the illness have been mixed with the

15  behavioral symptoms in the illness.   The result has been

16  that treatments have been promulgated which have very, very

17  subtle effects on behavior.

18     These subtle effects on behavior have translated

19  into equally-subtle effects on cognition.   Of course, these

20  very subtle effects on cognition have been deemed to be of

21  enormous significance.

22     There is some tendency -- and I think this is very

23  important for us here today, in terms of our methodologic

24  discussions -- there is some tendency today, also, to mix

25  these symptoms together.   It seems to me that if we continue

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

53

1   to do this, we will have a plethora of treatments which truly

2   do nothing to relieve the burden of the caregiver, nothing to

3   relieve the illness in the patient.

4          These ineffective treatments will draw resources,

5   enormous resources, from the search for truly effective

6   behavioral interventions and truly effective cognitive

7   interventions.    And we will, eventually, proceed to methodo-

8   logic discussions, but I will simply say that there is

9   methodology today for separating the cognitive and the

10  behavioral symptoms.

11         Some of David's comments regarding the range of

12  patients relates to this.    At a certain range, early in the

13  disease, you can get patients and exclude patients who have

14  any behavioral disturbances, and look at cognition very, very

15  carefully using many different measures, and show whether or

16  not a drug does anything cognitively.

17         At the other end of the spectrum, as David was

18  alluding to, there are other patients who are very, very

19  agitated.    We need to study the agitation in those patients

20  and see what the effects of any medications are in cognition.

21         It seems to me that the hope and promise of this

22  meeting is that it will bring us closer to the very modest

23  solution that Paul invoked; sometimes to treat.

24         But I also think there is a danger in this meeting

25  today.    There are methodologies which are extant, which will

at

54

1  bring us further away from the solution and we may end up

2  with a plethora of treatments which really do nothing.

3        DR. KATZ:  I think that the methodology to study

4  the specific symptomology is something that we will get into.

5  I want to bring back the discussion a little bit towards the

6  original focus, the need for clinical trials, controlled

7  trials, and to combine it with something that is gaining some

8  credence here, the notion of the small pilot trial in the

9  development of a trial.

10        How does that jibe with what Dr. Whitehouse was

11  talking about, which I believe is a very real phenomenon;

12  that is the public's perception of the role of clinical

13  trials, the necessity to have drugs available right away with

14  a glimmer of hope?  How does the small, possibly encouraging,

15  pilot trial -- what does that do to the formal, definitive

16  clinical trial in the public's mind and in the mind of the

17  community?

18        DR. WHITEHOUSE:  To answer that question, I think

19  the public doesn't have a sense of when there is a small

20  trial and when there is a large trial.  That is the whole

21  problem, not understanding the whole process of development.

22  That is the responsibility of people who publicize small

23  trials as if they are definitive trials.

24        I would, again, like to stay within the heart of

25  what I think the focus of this session is, and focus on the

at

55

1    natural history control because the law allows that kind of a

2    control group as included in the same category as providing

3    efficacy.

4         I don't consider that in the same category. I

5    consider a natural history control as more akin to these

6    kinds of small -- it doesn't have to be small in terms of

7    number -- but, at least, lower rank in terms of being able to

8    convince me of efficacy.

9         But I wonder if we can get some consensus on that

10   from this group as to whether natural history controls are in

11   the same standard of providing evidence for efficacy, but

12   also wondering whether, as we learn more in Marshal's center

13   and Ken's center and David's about the natural history,

14   whether on a site-specific basis, natural history controls

15   can, in fact, become a second-rank but more effectively-used

16   way of screening medications.

17        I don't consider them in the same rank, even though

18   they are in the legislation.  But I wonder if there is more

19   of a role once we understand the natural history a bit more,

20   at least at specific sites recognizing that the heterogeneity

21   across sites is quite great, whether that is something that

22   should be explored further.

23        DR. KHACHATURIAN:  I would like to put a slightly

24   different spin on the discussion and identify the problem

25   slightly differently; that is, I think it is similar to the

at

56

1    points that Peter alluded to.    The issue, as I see it, is
2    trying to find a balance between two conflicting needs.

3        One is the regulatory need to determine safety and
4    efficacy, which is the law, through controlled trials.    I
5    think that speaks for itself.    I think there is a need for
6    it.    I don't think that should really be challanged.
7    Perhaps we can improve the process.    The other is the need
8    of the patients.    There is something like 4 million people
9    affected by this disorder in one way or another, and there is
10   a need for immediately dealing with that problem.

11       I am wondering whether there is a possibility to
12   examine whether those two needs, conflicting needs, could be
13   met, that is to carry on the controlled clinical studies as
14   has been done in the past with other drugs.    I don't think
15   that should change, but, at the same time, to find a way where
16   the needs of the patients are so desperate could be met.

17       After all the public that is really raising
18   questions about the clinical trials is coming from that
19   pressure, that the patient has some problem now, they are not
20   being included in the trial, they see the need for immediate
21   relief.

22       DR. KATZ:    I have my own thoughts on that, as I'm
23   sure you know.    I would like to open that particular
24   question to the panel.

25       DR. KHACHATURIAN:    I was going to suggest some

at

1    solutions.    At the present time, we have the means to do

2    both, I think, because we have the centers, a large number of

3    other programs supported by NIMH and other groups where we

4    have access to patients.    Perhaps when a new agent becomes

5    available, when a trial is being proposed, a first screening

6    could be done of all the eligible patients that are going to

7    be likely to be included, that meet the criteria for the

8    trial.

9            Once that has been done, there should be a second

10    segment of patients that are not likely to be included in the

11    trial that still could benefit from the trial.    Perhaps

12    these could be put in the --

13            DR. KATZ:    Excuse me; benefit from the drug or

14    benefit from the trial?

15            DR. KHACHATURIAN:    Presumed drug that in the minds

16    of the clinicians perhaps could benefit.    A parallel study

17    that is less controlled could go on, but without really

18    interfering with the results of the clinical trial.

19            If this kind of an approach, perhaps, could address

20    the needs of the FDA and the scientific community as well as

21    the community out there that is really desperately for some

22    resolution.

23            DR. KATZ:    This is a real problem, and it has been

24    proposed in other contexts besides Alzheimer's disease.    As

25    I say, I have my own strong feelings on it, but I would be

at

1    interested to know what the panel thinks about that.

2                DR. FERRIS:  I think this really is a problem, and

3    I have some serious concerns about whether there really is a

4    feasible way to do this that would not ultimately overwhelm

5    the process we are most interested in.

6                Peter spoke briefly about the issue of placebo

7    response in Alzheimer's studies.   He mentioned one very

8    critical aspect of that placebo response, and that is the

9    placebo response of the patient's family.   I think anyone

10   who has done studies with Alzheimer's patients, whether they

11   have documented this phenomenon or not, have seen it over and

12   over and over again.

13               The patient will suddenly remember something.  It

14   might be the only thing they have remembered in years, and

15   that is suddenly taken as a dramatic improvement by a family

16   member.   It actually can infect the professionals doing the

17   trial.   It is a potential contaminant of one sort or another

18   leading to, perhaps, a placebo response on the part of the

19   investigators.

20               My fear is that to the extent that there would be,

21   in parallel with the kind of trials we all want to see, less

22   desirable experience with the drug in terms of scientific

23   rigor.   There would be, I think, potentially be so much

24   feedback of information from those trials, particularly into

25   the media, for example, that it could really destroy the real

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002

at

1    scientific investigation of a compound.

2            And I really see this whole issue of the attack on

3    the process we all seem to agree is essential, namely placebo

4    controlled trials, as a very serious one.  It reminds me

5    somewhat of the Animal Rights movement and so forth which is,

6    perhaps, coming out of a different context but, nevertheless,

7    when there is an upsurge of public response of one sort or

8    another, I think that the people that know better, the people

9    here in this room, including the industry people, need to

10   properly respond.

11           I am just seconding what Peter said in his opening

12   remarks.  I think it is very important for all of us, in a

13   concerted way, to defend the slide that Peter showed.

14           DR. FOLSTEIN:  I would just like to briefly support

15   Zaven's position but with a slight spin of my own on it.

16   First of all, I think that there is absolutely no question

17   that clinical trials more than other scientific endeavors are

18   a social process as well as a logical process, and that the

19   social process of clinical trials in Alzheimer's disease is

20   very critical.

21           One of the functions of critical trials is to

22   maintain hope.  We have been talking about giving false

23   promises, but in fact a physician's responsibility is to

24   maintain hope.  Really having a trial maintains hope and is

25   good for the patients, and it generates a lot of other

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

60

1    research.

2            So I would be in support of finding some way of

3    having more controlled clinical trials.    I would probably

4    not want to have them be less stringent, but one example that

5    I could think of would be to find a way of permitting trials

6    of safe substances in Alzheimer's disease.    I think Hydergine

7    is a perfect example of it, not to bring up all the baggage

8    that goes with Hydergine, but you could logically think of

9    lots of kinds of compounds that would be safe.

10           For example, antioxidants or aspirin; you could

11    think of a pharmacological rationale for using them even

12    though you don't expect the possible payoff to be very high.

13           But the initiation of such trials, in and of

14    themselves would be productive of hope in the patients and

15    would relieve some of this pressure that everyone feels that

16    operates these centers.    I mean, on every visit, the patient

17    says, "Well, is there a new drug yet?"

18           And we say, "Well, no.    We are just following you

19    longitudinally."    That's not very helpful to them.

20           So we really do need more trials.    But I think

21    that we don't want to lower our standards as far as the

22    controls are concerned, but rather we should increase the

23    possibility of using more safe substances.

24           DR. DRACHMAN:    I would like to follow up on what

25    Zaven said and second it and, perhaps, put a little other

at

1   emphasis on it.   Clearly, we are trying to deal with the

2   science of determining the validity of a drug for the

3   treatment of Alzheimer's disease here.   But it is equally

4   clear that that isn't what we are doing at all.

5         What we are really doing is fending off the

6   supposed and real attacks from the media, demands from the

7   public, the  -- shall I use the negative term -- avarice of

8   those who might even profit from some things as drugs have

9   worked in this sphere so that, at the same time that we are

10  trying to make a scientific decision about precisely how we

11  can determine the success of drugs, we are really dealing

12  with a whole lot of other problems simultaneously.

13        I frequently visualize -- Paul, I haven't told you

14  this -- but I frequently visualize Paul as Horatius at the

15  Bridge.   I'm sure some of you remember that scene, Lars

16  Porsena of Clusium, "By the nine gods he swore," and it is

17  clear that such an event is always hovering in the background.

18        How we deal with trials is influenced both posi-

19  tively and negatively by our perception of how the public,

20  the media, the drug companies, the individual investigators

21  who want their names in lights, even for fifteen seconds on

22  Twenty-Twenty, or whatever it is.   All of these things are

23  really influencing how we respond.

24        I think we should take them apart.   I think we

25  should deal with them one at a time.   How do you determine

at

62

1    the effectiveness of a drug is one.   How do we deal with the

2    legal requirements it two.   How do we keep the media off our

3    backs is three.   How do we work with a type of drug industry

4    which, as I have frequently told people, has profits that

5    make the crack industry look trivial at times, is four.

6         So, frankly, I think we do need to separate these.

7    I am often in the center of this, as many of you are well

8    aware.   Every time something like this comes out in the

9    press, or threatens to, my phone rings -- until October,

10   anyway when I no longer am in the role where I have to

11   respond to every such claim.

12        But I do believe that we have to separate these

13   when we deal with how a drug works.   Does it work?   Can you

14   test it this way?   What do you release to the press?   What

15   becomes an official accepted drug?   Separate issues.

16        DR. WURTMAN:   The problem you articulated very

17   well.   The FDA seems to have a dual responsibility; one is a

18   certification responsibility.   I sense universal agreement

19   that there should be no dilution of the scientific criteria

20   that the FDA uses to certify drugs.   The second is basically

21   almost a political-administrative-economic-social respon-

22   sibility acting on that certification and determining what is

23   what is not allowed to go public.

24        Perhaps what we need is a separation of these

25   responsibilities in which is either some second body assists

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002

at

1    in allowing for exceptions or a new category of drug allowance

2    develops in which a drug, based on inadequate certification,

3    could be made available, let's say, for a year or two and

4    then, after massive use during that time, a reassessment

5    based on clinical grounds could determine whether making that

6    drug available has been politically, socially, and maybe even

7    scientifically, useful.

8        DR. KATZ:   I want to say that there are mechanisms -

9    - the whole regulatory mechanism for the development and

10   regulation of drugs is fairly flexible.    There is a specific

11   mechanism known as the treatment IND which allows a wider

12   exposure to a drug which has not yet met the regulatory

13   requirements for approval, but about which we know a great

14   deal, including the fact that it works.

15       There is strong evidence from control trials that

16   it works and that it is reasonably safe.    So I don't know

17   that there needs to be a special mechanism that allows -- but

18   again, it allows it late in the process and there are

19   defensible reasons for that.

20       DR. DAVIS:  We, sadly, have to deal with the media.

21   The political reality is Alzheimer's disease affects many

22   people.  Now, it is not necessarily a bad thing that our

23   constituency wants to be informed because that constituency

24   are the very people who make possible the funding for the

25   kinds of breakthroughs that then go ahead and stimulate drug

1    development.

2        If we are dealing with cholinergic drugs, it is

3    because there was funding that demonstrated what the neuro-

4    chemical defects are and when, in the next decade, we deal

5    with drugs that may change the processing of the amyloid

6    precursor protein, that will be directly related to the

7    extraordinary increase in funding that we have seen for

8    Alzheimer's disease that, in fact, is a result of mobilizing

9    constituencies who have an interest, appropriately, in

10    finding a treatment.

11        The question for us becomes this: we need them.

12    They deserve the information.    How can we perform our role

13    and still inform them.

14        I think we can't run away from them, but we just

15    have to stand up for what we believe is the necessity for

16    rigorous science.    But I don't think it is appropriate to

17    believe that when Twenty-Twenty calls, or when the phone

18    rings off the hook, that we can run away from them.

19        DR. RASKIND:  Do I have to be as entertaining as

20    the other panelists, or should I just do my own thing.    I

21    just want to address the topic.    Our group at the University

22    of Washington just published a very small placebo-controlled

23    trial of an antidepressant drug in patients with Alzheimer's

24    disease who met criteria for depression.

25        To our shock and surprise, the antidepressant

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1   worked very nicely and the placebo worked equally as well.

2   This is in a non-cognitive type of symptom, the type that

3   Barry has referred to.   But it was surprising to me how many

4   people were upset at this finding because everybody was sure

5   that in their practice, when they treated unhappy or depressed

6   Alzheimer's patients with tricyclics, these drugs were

7   effective.

8          In fact, I was actually mad at myself, because I

9   had the same feeling.   I am now totally convinced that no

10  matter what aspect of Alzheimer's disease you wish to treat,

11  a controlled trial is absolutely necessary.   Furthermore, if

12  you base your judgment of efficacy on large clinical ex-

13  perience after several years, all of these drugs will be

14  effective.

15         Everybody believes, especially if they have a

16  convincing care provider, that whatever is being given to

17  them is working somehow, at least the care providers do.

18  And I think that is dangerous.

19         Final point; these trials which I think are very

20  important for the Alzheimer centers and for the community of

21  Alzheimer care providers and victims are also extremely

22  expensive, not only financially expensive but expensive in

23  the time which investigators who, perhaps, could be dis-

24  covering something important about the processing of the

25  amyloid precursor protein, in case that turns out to be

1    important, are, in fact, performing these clinical trials.

2          I think there is going to be a point at which the

3    morale issue is going to be somewhat self-defeating.   If

4    these trials are not producing, over time, and a lot of

5    effort goes into them, both the investigators and the

6    Alzheimer's victims and caregivers who are participating are

7    going to start questioning what we are doing.

8          I am not giving any answers, but I think that

9    trying everything in huge trials is something to be avoided.

10         DR. KATZ:  I would ask the speakers to speak close

11   and directly into the microphones.

12         DR. REISBERG:  Of course, as Peter underlined

13   repeatedly, controlled trials are necessary in medical

14   research, generally, but also -- and this is really an

15   extension of the point that you were just making, Murray,

16   there are various reasons why controlled trials are par-

17   ticularly necessary in Alzheimer's disease research.

18         One of these reasons is the horizon phenomenon;

19   that is, that in Alzheimer's disease today, we are literally

20   at the horizon.   There have been no treatments which -- and

21   I think any of us will stand up and say they believe -- have

22   been convincingly been shown to be effective in alleviating

23   either the primary cognitive symptoms of Alzheimer's disease,

24   and even as we both know well from our reviews of this

25   literature, even the other symptoms of Alzheimer's disease,

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1  the behavioral symptoms.

2         These statements apply both over the short term and

3  over the long term, and also prophylactically.   This horizon

4  phenomenon places us at a point of tremendous opportunity

5  because if we get anywhere with anything on any symptom, then

6  we are a little bit off that horizon.

7         However, this horizon phenomenon also presents us,

8  and I think we have all experienced this, with an enormous,

9  enormous pitfall; that is, that any deviations off the

10  horizon, if they are real, immediately assume enormous

11  significance.   And we can only distinguish, for the various

12  reasons that have been alluded to here, because of effects on

13  family members was translated into effects on clinicians and,

14  indeed, may translate into effects on patients, as well, the

15  care that they give the patients.

16         We can only distinguish these very important issues

17  with very, very carefully structured controlled trials.

18         DR. THAL:   I would just like to refocus on Peter's

19  question.   I think everyone has agreed that to definitively

20  release a drug, one needs a controlled trial.   What about

21  the issue of what do we do with those patients that are not

22  in clinical trials, but who want access to the drug?   To

23  what extent should the drug be made available to them outside

24  of clinical trials, and how should that be done?

25         DR. DAVIS:   I will try that, Leon.   Most people

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C. 20002
(202) 546-6666

at

1    who come to centers don't enter trials because of exclusion

2    criteria.    Most people, in our experience, who then come to

3    the center and even enter trials ultimately are disappointed.

4    So we have a large cadre of people who are either not getting

5    drugs because they have other system disease and can't get

6    them, or get drugs and then when the trial is over, except

7    for an occasional member, say, "So what?"

8            Disappointment is what is our stock and trade.    I

9    see very little that we can do about that unless we have

10    agents that are so safe we can distribute them to everybody.

11    However, the question of the treatment IND is very important

12    and, perhaps, sometime in the next two days, we should spend

13    some time discussion when is there enough promise that a drug

14    can be extended to a treatment IND and it can be broadened to

15    include individuals who otherwise may not be available to

16    trials.

17            DR. WHITEHOUSE:    What I do if somebody is not

18    eligible for a study is, in fact, set up a mini kind of study

19    for them with either Hydergine or lecithin with an idea that

20    they would, at least, be participating in a process of

21    looking at something that in both those case is safe.

22            I think there is a great danger in creating other

23    studies that would be time consuming and expensive to study

24    drugs that we are really only interested in giving to people

25    to assuage their need to be in a big study.

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002

at

1        Again, I go back to my main focus that we need to

2   educate people about how the process occurs.   So much of the

3   desire to be in studies is, I think, based on misinformation.

4   And it is based on, also, a degree of selfishness.   It is

5   kind of like a question that I was asked yesterday; it is the

6   ultimate question for a doctor.   "If it was your mother who

7   had the disease, which study would you have her in?"

8        And I said, "I would feel not obligated to have her

9   in any," but I would like to have her in something so that she

10  could participate in the process that as a society we are

11  going through trying to develop an effective medication.

12       So rather than try to have people be motivated to

13  get in these studies on misinformation and kind of a selfish

14  need to get the latest thing, let's try to educate them about

15  the process and about how they can participate.   Even if

16  they are in the placebo group, they are still making a

17  contribution and they are still fighting this illness.

18       I really thing that long-term -- and it is long-

19  term -- that having people understand what we are doing a

20  little bit better is ultimately the key.   I also object to

21  some of the comments that I have heard here that are negative

22  towards the media.   Just as we have to educate the media, we

23  have to learn from the media and learn what their needs and

24  desires are, as well, because we can, more effectively, work

25  together.

at

1          To create an adversarial situation is not a good

2    idea.

3          DR. THAL:  I would like to return back to the

4    original question before we run out of time; that is the need

5    for clinical controlled trials.   Every one of you has come

6    up with the position that you agree that we do need controlled

7    clinical trials.   We haven't, I don't think, fully discussed

8    the control issue.

9          We have had some discussion of placebo controlled

10   trials.   We have had some discussion of historical controls.

11   Can I get a little bit more discussion on the types of

12   control groups that are appropriate for these trials?   The

13   question is, does anyone feel that anything other than a

14   placebo controlled group is appropriate, so that we can at

15   least reach some closure on the issue, if possible.

16          DR. RASKIND:  I would be happy to start and maybe

17   finish.   I'm a sorter when it comes to Alzheimer's disease

18   as far as course of illness.   The more patients you see, the

19   more you are impressed that the progression of the disease is

20   not homogeneous, at least in the period of two, three or four

21   years, or two years, say, we are talking about.   So I think

22   historical trials are very dangerous in this area.

23          I don't think they can be interpreted.

24          DR. KATZ:  Are there no subpopulations of patients

25   with the disease, either in terms of their symptomatology

1    and/or their severity of their illness for whom the natural

2    history is so well-defined that they could possibly be

3    amenable to study in an historical control?

4            DR. DRACHMAN:  That isn't quite true, of course.

5    But I think that deals with a ridicula ad absurdum.  If there

6    were a patient who was in a nursing home and non-verbal, who,

7    given a drug, woke up and spoke in an intelligent fashion, I

8    don't think we would need a great many placebo controls to

9    recognize that this is somewhat beyond the ordinary effectiv-

10   eness of lecithin, shall we say.

11           So part of the argument involved here has to do

12   with the order of magnitude of the effect that one is

13   attempting to discover as to whether or not you truly need

14   placebo controls.  We are talking, as was so nicely put,

15   about the horizon effect.  I would agree that if we are

16   looking for barely-detectable improvements in minutiae of

17   behavior, we certainly do need placebo controls.

18           In fact, every drug that we have been able to study

19   so far, we clearly need placebo controls.  But should there

20   be a different kind of drug, I think we could consider the

21   alternative of historical or experiential controls.

22           DR. FERRIS:  This raises another issue, of course,

23   or another distinction that needs to be made.  I think if

24   you start thinking about the possibility of natural history

25   type of control situations, you are really beginning to need

at

1    to separate what the target of treatment is; namely, the

2    distinction between improving symptoms during a relatively

3    short period of days or weeks or a few months versus possibly,

4    down the road, putative treatments that show the course of

5    further progression, further deterioration, of the patient.

6            I think in what we are all basically doing now,

7    namely attempting to reverse symptoms in the relatively short

8    term, the placebo control is going to be indispensable

9    because there isn't really much to look at in terms of

10   distinctions and in change in symptoms or downward course of

11   symptoms over relatively short periods.

12           On the other hand, if we were talking about a study,

13   which virtually hasn't been done, to look at the effect of a

14   compound over two, three, four, five years, where we have a

15   pretty good idea what kinds of changes would occur, at least

16   on a group basis, over a three, four, five year period in 100

17   Alzheimer's patients who were properly diagnosed.

18           I think, then, there are opportunities to not

19   necessarily have to be as rigorous in terms of placebo

20   control.

21           DR. KATZ:  Which brings me to a question I want to

22   raise.  We don't have much time, and it may be discussed in

23   the next session, but what do people feel is the appropriate

24   duration for a trial in Alzheimer's disease?   From a

25   regulatory point of view, if a bona fide drug effect could be

at

1    shown in a very brief period of time, that would meet the

2    letter of the law, but what would the pane think, again

3    briefly, about what is an appropriate duration of time?

4              DR. DAVIS:  I had early on, based on some of the

5    studies that we had done, that effects could be shown very

6    quickly.   I have come to change that view.   The reason I

7    have is twofold.  The first, when one considers some of the

8    animal models, for example, in the Pass Avoidance Task, a

9    very short-acting drug is given at one point and a behavioral

10   effect is noted 72 hours later.

11             In people dealing with issues like memory, it may

12   be that the brain can function marginally better for some

13   time before there are obvious behavioral changes of what are

14   a marginal increment in the neurobiology.

15             That has been borne out to me by my clinical

16   observations which my bias was that it would be a short time,

17   but my clinical observations are, now, that some of the

18   larger effects happen towards 6 weeks.   So I don't know how

19   long it could be.   It might be longer than we have ever been

20   doing.

21             DR. WURTMAN:   There is a corollary question.

22   This is, should the duration of treatment be long enough so

23   that the placebo group will show a deterioration, and how

24   many months does it take before one gets a statistically-

25   significant deterioration in the placebo group?   And, if they

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

74

1    don't get a deterioration, or if most of them don't, perhaps

2    did they really have Alzheimer's disease.

3            DR. THAL:  I will answer that question in the next

4    session with some data.   What I would like to do is open it

5    for questions or comments from that audience.

6            DR. LEBER:  I want to raise an issue very rapidly

7    with you because I think everyone agrees that control trials,

8    at least on this panel, are necessary for the confirmatory,

9    regulatory decision.   But you are leaving the audience with,

10   perhaps, the perception that it is not unreasonable to use

11   small, open trials that rely upon clinical judgment to

12   determine whether or not a new drug is an appropriate lead.

13           I think that that is something that you all

14   recommend, but I would like to ask you what evidence you had

15   that that really works.   I understand that serendipity in

16   the prepared mind has been a very appealing thing, and that

17   clinicians like to promote what some statistician once called

18   the myth of clinical judgment.

19           Just look at the strategy.   You are dealing with a

20   situation in which you are arguing that the low prevalence of

21   a trait which allowed someone to respond to a drug is what

22   you are seeking to find.

23           If you were dealing with this in a situation where

24   you had two urns, one with ten black marbles out of a

25   thousand, the other with two black marbles out of a thousand,

at

1   and your job was to find which urn had more black marbles,

2   would you sample five at a time, ten at a time, or five-

3   hundred at a time?

4          That is almost the thrust of what I am getting at.

5   Even though this is appealing on the surface, it may, in

6   fact, be self-defeating to suggest that small samples,

7   because of sampling error, sampling strategies, and the low

8   prevalence will detect anything other than, perhaps, satisfy

9   your fancy.

10         DR. WHITEHOUSE:  When Collisions found penicillin,

11  there were no controlled studies.   They didn't need them.

12  So it depends, Paul.   It depends on a lot of factors.   If

13  you think that you have got something that is really very

14  good, you can do it in one patient.

15         (Inaudible question from the audience.)

16         DR. THAL:  That is a controlled trial that you are

17  describing.   You are simply describing a crossover controlled

18  trial.   There certainly have been lots of crossover con-

19  trolled trials done in dementia for a number of drugs, yet

20  they have not demonstrated efficacy.

21         So that is an acceptable form of a controlled

22  trial.   It has drawbacks, but it is an acceptable form.

23         DR. KATZ:  Lets take one more question.   It would

24  be useful if you could come to a microphone and ask your

25  question into the microphone so all the people could hear it

at

1  and it could be recorded.

2      MR. GREG HILLMAN:  I am Greg Hillman, the Ernest

3  Hillard Foundation.   I was wondering of the panel could

4  address the question of at what point do you think it is

5  unethical to continue randomizing patients in any trial?

6      DR. THAL:   Is the question randomization or is the

7  question continuing treatment, or withholding treatment from

8  the placebo-controlled group?

9      MR. HILLMAN:   The question is withholding treatment

10 from the placebo control group; at what point do you think

11 you have enough improvement in the group receiving the drug

12 that you consider it to be unethical?

13      DR. KATZ:   Let me say that stopping rules, so-

14 called, for clinical trials are more or less well-established

15 and there are different ones.   Those are, in fact, contin-

16 gencies that are often built into protocols.   I don't think

17 you can say, a priori, what is enough, or how much of an

18 effect in how many patients. It needs to be worked out.

19      I think it is time for the session to end.   I want

20 to thank all our panelists.   I think we have reached at

21 least a consensus that for definitive efficacy requirements,

22 placebo-controlled trials are required.

23      The discussion was, indeed, far reaching.  It would

24 be useful if everyone could be back here for the next session

25 at exactly 11 o'clock.

at

1          [A break was taken from 10:50 to 11 o'clock.]

2      SESSION II:  GUARANTEEING EXTERNAL AND INTERNAL VALIDITY

3          DR. LEBER:  Welcome back.   This is the start of

4   Session II which has the interesting title of External and

5   Internal Validity.   The one thing I like about validity is

6   that there are so many of them.

7          There are validities that deal with the content of

8   areas of information.  There are concurrent validities which

9   basically mean that people can agree on things.   There are

10  construct validities which mean we think we know what we are

11  talking about.  There are many private idiosyncratic defini-

12  tions of validity, so I have to explain what the intent of

13  this particular panel and session actually is.

14         We are making the assumption that I was prescient

15  enough to figure out what the vote would be during the

16  session, and I think I was, that most experienced clinicians

17  and investigators and neuroscientists recognize that, at

18  least for the definitive answer on whether or not a drug is

19  effective, one has to rely on the controlled clinical trial.

20         Controlled clinical trials are simply a nominalism.

21  You can't describe them unless you describe them in detail.

22  Obviously, a controlled clinical trial is more than something

23  listed in the compiled Federal Register, 21 CFR 314.126.  It

24  is not just five types of controlled clinical trials that the

25  Agency would accept.

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002

at

1              It involves everything from the nature of the

2      patient sample that we are going to intend to recruit to be

3      representative of the illness that we wish to extrapolate the

4      results of our experiment to, issues that were brought up,

5      for example, by Dr. Drachman earlier; shall we narrowly focus

6      on a particular range of the Folstein, Folstein and McHugh

7      Mental Status exam?   Should we pick on people who are

8      already in pelvic curl and see whether we have a drug with a

9      Lazarus effect?

10             Should we be looking at people who are early in the

11     predictive stage, if you will, or possible stage of dementia

12     and may not have it and we will have to wait for time to pass

13     to determine retrospectively whether, in fact, they are

14     demented?   So: issues of sample which are critical to issues

15     of validity, probably more to external than internal validity,

16     but that, in itself, is an arguable point.

17             What about the question of design issues?   How is

18     it that you do a study which is really based on an age-old --

19     I mean, I am not going to be upstaged with historical

20     references no matter how eloquent and entertaining the are.

21     You know, this whole idea of doing controlled trials is

22     really from John Stuart Mill.   There are various ways to

23     prove things.   There are methods of agreement which don't

24     work to well because there are a lot of jokes about that, and

25     I won't get into them.

at

1      There is the method of difference which is really

2  the method we all rely upon.    One applies two interventions.

3  One sees with result with and without the intervention, and

4  if there is a difference between them, we conclude we have a

5  drug effect, or whatever other effect we are looking for.

6      In a sense, that is what all clinical trial

7  methodology of the type we are talking about is really

8  dealing with.  But, what way to do it?  When we talk about

9  prospective, randomized controlled clinical trials, what are

10  the details.  In addition, what kind of interval are we going

11  to be observing?   Under what conditions?  Should they be in

12  patients who are already hospitalized, which has not happened

13  very often, by the way, to Alzheimer's patients because of

14  the game in which I could describe third-party payers handle

15  the problem?

16      Shall we deal with nursing-home patients?   Shall

17  we deal with ambulatory patients who are afraid that they

18  may, in fact, be Alzheimer's?   Those kinds of questions

19  always emerge?

20      How long?  This was a question that Dr. Katz tried

21  to bring up in the last session and there wasn't enough time.

22  It is not simply the pharmacodynamic/pharmacokinetic problem

23  of how long this drug will hang around.   It is conceivable

24  as Dr. Davis was pointing out that the plasticity of the

25  nervous system lags well behind the administration of the

at

80

1    drug.

2            For all we know, it is a light switch that, once

3    thrown, takes a long time to produce or light up, as somebody

4    used in a recent meeting I went to, the image of turning on

5    the light switch in a gym.   You know those lights that take

6    a long time to get to maximum brightness.   The application of

7    the treatment?   There is a dwell time and then the full

8    flower of the response is seen.

9            If you don't study it long enough in that sense,

10   you may have missed it.

11           But that is not all.   Somebody was pointing out

12   earlier, you can't step in the same river twice.   Therefore,

13   we have questions of just how long a clinical trial ought to

14   go to capture something meaningful.   An effect that lasts

15   two days that does disappear, as Dr. Davis suggested, might

16   be, in effect, not worth looking at.   Maybe it is only a

17   first treatment effect and doesn't persist beyond the first

18   week.

19           It is an arguable proposition that one would want

20   to approve a drug of that sort because what benefit will

21   accrue if you continually treat someone with a drug that

22   works only for three days and then never works again?   So

23   issues of how long and how to prove how long the drug works

24   are important and not from a strictly regulatory point of

25   view, but from a sensible, public-health dollar compassionate

at

1    reason as well.

2         What happens to the drug has some risk.   It is has

3    been our experience -- not just mine, but certainly collec-

4    tively, that there are darned few drugs in the armamentarium

5    that are very powerful that aren't, in some way, dangerous to

6    somebody.

7         The example of using aspirin was mentioned earlier,

8    but I am struck by the fact that people who do NSAID studies

9    are always aware that a certain percentage of the patients, I

10   think over 1 percent, probably have a GI bleed and many more

11   may have non-detectible GI bleeds.

12        So the drugs that we attribute innocence to, that

13   we are so familiar with, may, in fact, on a public-health

14   scale be quite dangerous.   Once again, there is the issue of

15   risk and benefit; how long, for how much, and is that doable?

16        We have all sorts of other questions which,

17   obviously, have to be addressed.   When we get through doing

18   a particular study, we may, in fact, have an internally-valid

19   result; that is, using the method of John Stuart Mill, we

20   have compared, contra rotula, and we find a difference

21   internally.   We conclude that in this particular experiment,

22   the drug is effective, but to whom is the result extrapolated?

23   Just how far can we go?

24        Are we going to talk about all demented, pre-

25   demented, Alzheimer's insipio, or whatever we want to call

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C. 20002
(202) 546-6666

at

1   it, people afraid they may have it, and so on?   In our

2   societies, you know, once the drug is on the market, the

3   physician is left to his decision or her decision to decide

4   just what other individuals can be exposed to it.

5          So we bear a responsibility in approving any drug

6   for how it will also be used even though it is not the

7   Agency's responsibility.   I would argue it is the respon-

8   sibility of the academic and medical, and actually, the whole

9   society, to discern what we are doing when we do it.   We

10  ought to consider things beyond labeling.

11         At least in terms of the moral and ethical judgment,

12  at least I hope that people external to the Agency will give

13  us their thoughts about.

14         That is sort of our hope for this session.

15  Clearly adequate and well-controlled trials, or adequate and

16  well-controlled trials in the sense they allow valid con-

17  clusions -- that word again -- that can be extrapolated to

18  labeling claims that will allow sponsors to market their

19  products profitably and successfully, but truthfully.

20         Let me now turn to the opening presentation on this

21  issue.   We are lucky enough to have as a Chair of our

22  Advisory Committee an individual who is an expert, literally,

23  in the field of drug development in dementia.   Although we

24  have not seen a proven success in his area, I am sure he

25  believes that he is well on the way to having successes that

at

1  will serve as the first robust example of how to do it and

2  how to do it right.

3         Once that is there, I think our task will be

4  easier.  At any rate, Dr. Thal, in addition to working in

5  cholinomimetic therapies is a neurologist.  He has been

6  involved with the Agency over a long period of time before he

7  was on our Advisory Committee, perhaps in a more adversarial

8  way, arguing about the conditions of his actual use of

9  clinical trials.

10         But it has been a delight through the decade that I

11  have known him and dealt with him to be able to listen to

12  what he has had to say and learn from him.  And so today, I

13  am delighted to have him come forward and offer his comments

14  on external and internal validity.

15         Dr. Thal.

16         DR. THAL:  Thank you.

17         [Slide.]

18         I am only going to touch upon a couple of the

19  points and items that I am actually scheduled to discuss with

20  you, but I also want to deal with some of the issues that we

21  are not dealing with currently; that will have to do with

22  some of the design considerations for future drug trials

23  which include some understanding of our knowledge about the

24  rate of change in this disease, and to present you with some

25  early observations and some information that may prove to be

at

1  useful for you.

2          The definition that we all use of dementia is very

3  straightforward and simple.   This is really the DSM-3

4  definition.    We are all familiar with it and it is really

5  nothing new to any of us.

6          When we start out looking at a population to carry

7  out a given drug trial, this is the kind of initial definition

8  that we will use in order to come up with a population

9  suitable for study.  And we are defining dementia as a

10 deterioration in intellectual functioning which impairs

11 cognitive or social performance.

12         Obviously, we are interested in the core symptom

13 which is memory.

14         [Slide.]

15         We have further honed down our diagnostic criteria

16 so that for most of the clinical drug trials that are

17 currently underway, we are interested in patients with

18 Alzheimer's disease.  The groups of Alzheimer's patients that

19 are available to study have really been categorized further

20 into three groups; those individuals who have definite

21 Alzheimer's disease, meaning biopsy proven, who we have

22 essentially none of for our studies.

23         We have a second group of patients who meet the

24 NIN, CDS, ADRDA criteria for probably Alzheimer's disease.

25 These are really a relatively clean group of patients and in

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

85

1    most of the Alzheimer's centers make up about 70 percent of

2    the patients that we see.    These are individuals that have a

3    clear-cut deficit in two or more areas of cognition, who have

4    an insidious onset of disease and progression, normal level

5    of consciousness.

6         If two neurologists, or a neurologist and a

7    psychiatrist saw the patient, in general, we can all agree on

8    the diagnosis.    Indeed, in our own center, several in-

9    dividuals review the charts on these patients, and the degree

10   of consensus is really quite remarkable.    We think we have a

11   pretty good handle on this diagnosis, and on a relatively

12   pure group.

13        [Slide.]

14        We then end up with another group of patients whom

15   we often end up diagnosing as having possible Alzheimer's

16   disease.    These are individuals who, indeed, look like that

17   have Alzheimer's disease but something else is going on.

18        For example, this is the patient who presents with

19   a visual agnosia as the first presentation of their disease,

20   turns out to have a memory deficit.    We think that the

21   patient has Alzheimer's disease, but we are not certain.    Or

22   there is the patient who has a concomitant medical condition

23   such as a thyroid disease or some other medical illness that

24   may produce dementia, but in the clinician's point of view is

25   not responsible for the dementing illness.

at

1    The question is, what should we do with this group

2    of patients; should they be included in our drug study?

3    Should they not be included in the drug studies?  If we don't

4    include them, what happens when we have carried out a drug

5    study on a group of patients who met the diagnosis of

6    probable Alzheimer's disease.    The drug is now released.  Is

7    it suitable to extrapolate from our very, very pure sample

8    population to a less pure population to a less-pure population

9    and apply the drug, and expect to see the same kind of

10    therapeutic effect.

11    This is a question I am not going to answer for

12    you, but one that I think we should come back to in discus-

13    sions at the panel.   So diagnostic criteria are one con-

14    sideration.

15    [Slide.]

16    The second consideration, really, has to do with

17    the issue of how severe a patient should we include in our

18    trial and what should the range be.   One could span the

19    spectrum and say, "Well, I'm only going to include patients

20    who score between 20 and 23 on the Mini-Mental State," or,

21    "I'm going to take all Alzheimer's patients regardless of

22    stage of disease because this is the group that I ultimately

23    intend to treat with the drug."

24    In reality, we end up doing neither of these, and

25    we end up compromising on some very practical grounds.   We

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1    end up compromising on practical grounds because we design a

2    drug and we need to test that drug.    We need to use instru-

3    ments, and all of the instruments that we deal with have some

4    degree of flaw or ceiling effect, so that if we use a

5    Selective Reminding Task, that is an inappropriate task to

6    use in a nursing home patient population.

7            On the other hand, for a highly-functioning lawyer

8    who is having some mild memory problems, it is probably

9    insufficient to look at a simply behavioral rating scale and

10   say this individual has or has not been improved.

11           And so we tend to pick patients that we can examine

12   with the clinical scales that we have available to us.  This

13   captures a particular slice of the population and, once

14   again, if a drug is marketed, we then are going to expand the

15   use of the drug from the narrow slice of population to

16   patients with varying stages unless, of course, the regulatory

17   agency says that one has proven the drug to be effective only

18   in a certain stage of disease and cannot be used for in-

19   dividuals who do not fall within that stage.

20           Of course, that will never meet the test of

21   clinical practice, since as Dr. Leber pointed out, it is up

22   to the clinician to make the decision about what condition to

23   use a drug for once that drug has been marketed.

24           So I think that becomes a very important issue, and

25   I think our initial approach to dealing with it is that, yes,

1    initially we wish to use as pure a population as possible for

2    two reasons; one, we wish to answer the question as to

3    whether or not the treatment will effect and change Alz-

4    heimer's disease alone uncomplicated by other conditions and

5    that once that is proven, we need to expand the scope of the

6    clinical trial and include other patients that have other

7    concomitant diseases in order to determine whether or not the

8    drug will still have efficacy in a more complicated state.

9         And similar statements can be made for the degree

10   of disease; that is, we pick a fairly narrow group that we

11   can test and later on, if the drug is going to be used across

12   the board, we need to expand the scope and range of the

13   dementing population that we chose to treat.

14        [Slide.]

15        Dr. Wurtman raised the issue about how accurate our

16   diagnosis is without the holy grail of a glucose tolerance

17   test or a biological marker.   I would like to return to that

18   issue because there are now about seven or eight neuropatho-

19   logical series that have been published showing a relatively

20   good accuracy in making the diagnosis of Alzheimer's disease.

21   This is a series which I simply picked because it has a

22   reasonable number of patients who reached autopsy.

23        These are 65 patients at the Western Ontario site

24   published by Hachinski and Wade.   39 of these individuals

25   met the clinical criteria for the diagnosis of either

at

89

1    possible or probable Alzheimer's disease and, indeed, at

2    autopsy, 33 actually turned out to have Alzheimer's disease

3    and nothing but Alzheimer's disease.

4         If you compute sensitivity and specificity, it is

5    about 85 percent sensitive and about 85 percent specific.

6    You say, "Well, what happens if you break it down by probable

7    and possible?"

8         It turns out if you break it down by those categor-

9    ies and you use probable Alzheimer's disease, the diagnostic

10   accuracy is about 92 to 93 percent.   For just possible, the

11   diagnostic accuracy drops to about 78 percent, but overall

12   about 85 percent.   I think that is pretty good.   That is not

13   bad.

14        That means that even if we include both probable

15   and possible Alzheimer's disease patients in our clinical

16   trials, we will have a misdiagnosis rate of only about

17   15 percent.   I think that is, certainly, acceptable.

18        One may then ask the question, "Well, these are

19   being done at university medical centers where patients are

20   intensively evaluated.   What is going to happen when the

21   same kinds of criteria are applied by clinicians in the

22   community?"   This was actually answered in a study that was

23   published within the last year in which a large series of

24   brains collected by practitioners in the Massachusetts area

25   were sent to a group of investigators in Boston for patholog-

at

1    ical confirmation.

2          It turned out that just the general practitioner

3    practicing anyplace in the state of Massachusetts was also

4    about 85 percent correct in making the diagnosis of Alz-

5    heimer's disease.    So I think we are not going to be dealing

6    with a huge degree of contamination, and we can, indeed, turn

7    up with patient populations that are suitable for study.

8          [Slide.]

9          Peter Whitehouse talked about the issue of trial

10    design.    I only want to touch upon it for a moment.    These

11    are, clearly, the kinds of features that we are interested in

12    in a good trial design; randomization, adequate blinding,

13    sample size.    And I would like to emphasize the issue of a

14    few outcome variables.

15          I think there is a major problem with clinical

16    trials that are put together and have a total of 10 or 15 or

17    20 outcome measures because when I read that trial, I really

18    don't know quite what to do with it.    By chance alone, if

19    you have 20 outcome measures at the .05 level, one will one

20    positive outcome.    I think this is a major issue.

21          The last issue is the issue of a meaningful

22    relationship between the test variable and the clinical

23    outcome.    If we measure a one-point change on a verbal

24    learning task, does that mean anything in terms of the

25    relationship between that change and the way a patient lives

at

1    his life, or the natural history of the disease.

2            I think we must link the kinds of changes that we

3    are looking at on these scores to what is actually going on

4    either in terms of the way the patient lives his life,

5    meaning in Activities of Daily Living Scales, or we must link

6    it to the progression of the disease in order for this to be

7    a meaningful outcome from the clinical point of view.

8            I will give you some information about how we can

9    actually accomplish that task.

10           [Slide.]

11           We have heard some mention before about the use of

12   crossover studies from an individual in the audience, and I

13   think that crossover studies can be useful.  But crossover

14   studies suffer from the problem of a series of assumptions;

15   and the most important assumptions are, really, the following

16   two: No. 1, that there is no carryover effect across treatment

17   periods.

18           By carryover effect, I don't only mean the fact

19   that the drug has cleared from the body.  There can be other

20   medical carryover effects, or there can be psychological

21   carryover effects.   All of these are assumed to be absent if

22   one uses a crossover study.

23           The second major assumption underlying a crossover

24   study is that the treatment response is the same in both

25   periods.  If one is dealing with a rapidly progressive

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

92

1  disease, this is clearly not the case.   That will never

2  happen.

3      If one is dealing with a very slowly progressive

4  case, that assumption may be met.   And one can argue about

5  whether the treatment effect will be the same or not in both

6  periods in patients with Alzheimer's disease.   The main

7  advantage of a crossover study is that it saves money and you

8  recruit fewer patients.

9      But there is a very nice paper published by Brown

10  in 1980 in an obscure journal to me called Biometrics which

11  deals with the efficacy and the cost saving of carrying out

12  crossover trials.   It turns out that if you have much more

13  than about a 15 percent contamination rate, then economic

14  considerations dictate that it is better to do a double-blind

15  parallel trial up front and not to bother with a crossover

16  trial.

17      So, yes, a crossover trial can be effective.   It

18  can save money, but it will not necessarily do so unless the

19  assumptions underlying it are met.   The major assumption

20  underlying a parallel study is that you have equal randomiza-

21  tion and that patients enter the two groups in an equal

22  fashion and that there are no underlying differences.

23      That, indeed, is the only underlying assumption in

24  demonstrating the efficacy of a parallel design study, and

25  the reason that most of us have chosen that type of a design.

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C. 20002
(202) 546-6666

at

93

1    It simply makes fewer assumptions.

2              [Slide.]

3              Dr. Leber made mention of some other weird type of

4    designs that have been used in the recent past.  I would like

5    to show you another type of design and throw it open for

6    discussion and bring up some of the problems with this type

7    of a design.  This is the design that is being used in the

8    current THA trial of which Ken Davis is the principal

9    investigator and is here in the audience and on the panel.

10             In this particular design, we introduced a dose

11   titration phase initially consisting of four doses, now two,

12   in an attempt to find a specific dose to which patients would

13   respond.  Now, I happen to think, and other people involved

14   in this design, happen to think that this is a necessary step

15   in a cholinomimetic agent because there are numerous, both

16   animal and human, studies indicating that cholinomimetic

17   agents have a fairly narrow therapeutic window.

18             One probably needs to seek this out.  The question

19   is whether one needs to seek this out for a group as a whole;

20   and one could define a single one or two doses to which all

21   patients would respond, or whether one needs to seek out an

22   individual dose for every single patient.

23             I think that is an unanswered question.  We will

24   have more information about that when this trial has been

25   completed.  Obviously, that type of design is not applicable

at

1    to other drugs.    There are many other compounds that will

2    produce an effect that does not show that type of phar-

3    macological response, and where a dose titration is not

4    necessary where the more you give probably the better a

5    response you will see until the response plateaus off and

6    where there is no associated toxicity with that drug, or

7    where the therapeutic window is so broad that it is not

8    necessary to carry out any type of a dose titration phase,

9    where this can be carried out on a sample before the trial is

10   undertaken.

11        In this particular design, we then have chosen to

12   discard patients that did not respond during the dose

13   titration phase in an enrichment design.   Is this a good

14   idea or a bad idea?   Well, we thought it was a good idea

15   because it gives us an enriched population in which to carry

16   out a double-blind parallel trial.

17        Ultimately, it may turn out that there are problems

18   with this and, perhaps, titration is not sensitive enough,

19   and we are discarding potential responders.   In addition,

20   there are other problems with this design such as the

21   imposition of the placebo in the last period.

22        We, too, are making the assumptions in the dose-

23   titration phase that there is no carryover and that a person

24   who responds, for example, to 80 mg of this particular drug

25   has washed out completely when tested in placebo during the

at

1    last period.  This may, indeed, be an unwarranted assumption.

2    So I don't want people to look at this and say, "Well, this

3    is the way all drugs should be tested."

4            This was a specific design for a specific clinical

5    drug in a specific clinical trial.   And I hope it will

6    answer our questions, but there are certainly criticisms of

7    this design and there may turn out to be a series of problems

8    that this design has not met.

9            [Slide.]

10           I mentioned a small number of clinical outcome

11   measures.   In many of the trials that I am currently

12   involved in, I have tried to minimize the number of measures.

13   I do think that in any Alzheimer's trial, however, you need

14   to have at least two measures.  One is you need to say

15   something about cognition in that patient on your favorite

16   local scale, and that scale must have validity with respect

17   to something about the disease process.

18           Secondly, you need to say something about what is

19   happening to that patient in an overall global sense or in

20   activities of daily living, and that the drug must show

21   improvement in both areas.   If you can't show cognitive

22   improvement, and you can't show improvement in overall

23   functioning, you don't have a drug to treat dementia.

24           On that point, I will be fairly emphatic.

25           [Slide.]

at

96

1    I now would like to turn away from the issue of

2    treatment of symptoms to talk about types of treatments that

3    we are going to contemplate for the future; that is, all of

4    the drugs that we are currently testing are really drugs

5    designed to induce acute improvement in patients.  But they

6    are not designed to change the natural history of the

7    disease.

8    They are not even designed to change the rate of

9    decline.   Before we can design drugs to look at the change

10   in the rate of decline, we have to define the natural

11   history.  And I would like to spend the last few minutes on

12   that issue.

13   [Slide.]

14   This is a series of data that Bob Katzman and I put

15   together looking at rate of change in a simple test called

16   the Blessed Information Memory Concentration Test that most

17   of your are familiar with.   You can ignore most of the

18   numbers and I will bring you through it.

19   What we did was to simply administer the Blessed

20   test to a large number of individuals at four different sites

21   and in four different stages of dementia; a nursing home

22   population who were fairly demented, a private-practice group

23   who were only mildly demented, a group of individuals in the

24   Bronx Aging study which is a prospective study of individuals

25   who enter the study non-demented and are followed prospec-

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1    tively for the development of dementia, and the Alzheimer

2    Disease Research Center in San Diego.

3            What we found on this very simple instrument is

4    that, roughly, patients declined by approximately four points

5    per year on the Blessed Information Memory Concentration

6    Test, although when we further divided this into cortiles on

7    the test, there seemed to be some ceiling effect or some

8    slowing for the most demented patients, probably a ceiling

9    effect.

10            But the bottom line is that patients deteriorated

11    by roughly four points per year on this test with a standard

12    deviation of four points.   So we have some measure of

13    change.

14            [Slide.]

15            This type of analysis has also been carried out by

16    Ken Davis and Richard Mohs on the Alzheimer Disease Assessment

17    Scale, and we have similar measures on this scale so that we

18    know something about the rate of decline for this particular

19    instrument.

20            [Slide.]

21            What I also wanted to show you, however, is the

22    wide variability.   This is a subset of just one of those

23    four groups of patients in which I have simply plotted the

24    initial -- actually, I want to make a couple of more points

25    about the previous slide.

1    When we carried out a further analysis of these

2  groups to state, "Well, what were the predictive factors

3  predicting rate of change?" it turned out that the rate of

4  change was independent of sex, age, age of onset, site,

5  ethnicity, socioeconomic status, amount of underarm deodorant

6  you used and virtually anything else that we were able to

7  look at, and that it seemed to be a relatively biological

8  constant.

9    Much against my own clinical judgment, it turned

10  out that, for example, young patients whom I had always felt

11  deteriorated more rapidly than old patients did not deterior-

12  ate more rapidly, that their rate of decline was identical.

13  It was also unaffected by positive family history for

14  Alzheimer's disease.

15    So the rate of decline on this particular instrument

16  seemed to be essentially a biological event, unaffected by

17  all of the other factors that we looked at.

18    What I do want to point out is that even though it

19  is relatively constant for a group, there is a tremendous

20  amount of variability within these patients.

21    This is a subset, one of the groups of patients, in

22  which we simply plotted the initial Blessed score versus the

23  rate of change in points per year.   The only point I want to

24  make is that there is a lot of variation.   Here is an

25  individual who starts off making about eight errors on the

at

1   Blessed when he is first seen and progresses by one point per

2   year.

3           Here is another patient who starts off with eight

4   points per year, but progresses by twelve points per year.

5   So this patient has creeping dementia.   This one has

6   galloping dementia.  But I, in advance, cannot tell you who

7   will be in which group.

8           Here is a patient who presents with about twenty

9   points and progresses almost not at-all.  Had I treated this

10  particular patient with my mother's chicken soup, I would be

11  able to conclude that the rate of progression in this

12  particular patient was extremely slow thanks to her excellent

13  cooking.

14          That might be an incorrect conclusion.

15          [Slide.]

16          We have also, more recently, looked at a group of,

17  in this particular instance, 92 probable Alzheimer's disease

18  patients.  And we have looked at three particular instruments;

19  the Blessed Information Memory Concentration Test; the

20  Dementia Rating Scale of Mattis, and the Mini-Mental State

21  Examination.

22          In the past, we have demonstrated good correlations

23  between the Mini-Mental State and the Blessed.   Again, these

24  correlations were redemonstrated in this cohort of 92

25  patients.   The real question we wanted to ask, however, was,

at

100

1  "How do these tests change and, if we know the rate of

2  decline between Points 1 and 2, can we, during the one year

3  of disease, predict the rate of decline in the following

4  year?"

5        [Slide.]

6        We computed the rate of decline between the first

7  year and the second year, and then said, "Does the rate of

8  decline between Year 1 and Year 2 predict the rate of decline

9  between Year 2 and Year 3?"    And these are the r values.

10  They are exceedingly disappointing, again indicating both the

11  variability of the disease and the variation that we see in

12  our own test instruments.

13        So we are going to be dealing with test instruments

14  that have fairly large standard deviations compared to the

15  natural course of the disease process.    I think this point

16  should be kept in mind.

17        [Slide.]

18        How big a group of patients do you need to see a

19  drug effect?  Well, it is really pretty easy to calculate

20  and you can eyeball it. ' It really depends only on the ratio

21  of the standard difference to your standard deviation so that

22  if you have a drug that has a pretty good effect, that can

23  alter a change on a scale by one standard deviation, your

24  standard difference would be 1.

25        If we are going to look for a change on the

at

1    Blessed, and you have a drug that can cause a four-point

2    change on the Blessed and your standard deviation is 4, your

3    standard difference is 1 and, by God, you can get by with

4    about 30 patients per group, not a very big trial.

5         But if you are going to try and reach for very

6    small differences like a quarter of a standard difference,

7    you are going to end up somewhere out here and you are going

8    to need several hundred patients per difference.

9         [Slide.]

10        Now, I would like to extrapolate that to a set of

11   assumptions about a drug trial that someone in the audience

12   might think about designing for the future, that we want to

13   change the rate of decline in patients with Alzheimer's

14   disease.

15        I will just give you two sets of numbers.  These

16   are simplistic numbers that I derived myself, and we now have

17   a drug that we are going to try in a group of patients, in a

18   double-blind parallel study.  We will administer the drug to

19   patients and placebo to the placebo group.  And we are going

20   to make some assumptions.

21        In this case, we are going to look at, say, the

22   Blessed score.  It doesn't really matter what test instrument

23   we use.  We are going to say that we know that on the average

24   these patients declined by four points per year, that the

25   standard deviation of that test is about 4.  The alpha failed

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1    to appear.  An alpha of .05, two-sided test, with an 80

2    percent power and one year of follow up; how many patients do

3    we need in each group in order to show an effect?

4         Well, we have a great drug, we think, and it is

5    going to show the rate of decline from four points per year

6    to one point per year.   By God, we only need 28 patients per

7    group.   We would like to look at a less potent drug, one

8    that will decrease the rate of decline from 4 to 3, only a 25

9    percent decrease, and we are now up to 251 patients per group

10   or a total of 502.

11        So now we have to sit back and say, "Well, what is

12   the smallest change in the rate of decline that we think is

13   of any value?"   We are clinicians, not statisticians.   How

14   small an effect would you like to see, how small an effect in

15   the rate of decline would be a clinically-significant change?

16        I won't answer the question.   We will come back to

17   it at the panel.

18        I think that is the end of the remarks that I would

19   like to make and I think we will just reconvene the panel and

20   try and answer some of the questions that I posed.

21        DR. LEBER:   I would like to thank you for a very

22   data-rich presentation.   You nicely parsed out some of the

23   things we are going to have to think about carefully before

24   we plan anything.   Let's get started on that.

25        I am going to come down a little bit to the end of

at

103

1  the table because I noticed sitting in the audience before

2  that one of the risks of being on the end was we thought we

3  would be able to look across and see people down the table.

4  But there is the risk of missing those in the middle.

5        So if you actually looked at the number of points

6  of discussion made, the people at the very apex of this curve

7  were seriously underrepresentative until the very last

8  minute.   So I am going to try to watch for them.

9        Without further ado, I will invoke the Katz rule

10  that the cochairs will only intervene if things seem to be

11  lagging beyond our tolerance.   That changes the rules

12  slightly because you have adjustments for individuals.

13        Where are we?   What is a valid trial today?

14  Notice the enthusiasm.   Is there a gold-standard study?

15  Let's assume we want to approve a drug and get it out there

16  for the treatment of dementia, unmodified, unqualified, and

17  we want to market it tomorrow.   We think we have for some

18  good basic science reasons a candidate drug, and let's

19  assume, for the moment, that we are past the stage we were

20  worried about before.

21        We now have preliminary clinical evidence that it

22  probably will be effective.   Would someone like to talk

23  maybe about how they would design the study?   Was the

24  tacrine study good enough?   Should it be de rigueur?   Elkan?

25        DR. GAMZU:   One of the things I think we should

at

1    answer is, in series, some of the questions that you had.

2    We could talk about specific trials.   But I would have to

3    agree with Leon that the trials should dependent on the

4    nature of the compound, and the knowledge basis that you have

5    at any given point.

6         I think that to try to even come up with the ideal

7    trial is probably an error.   But one of the things that you

8    mentioned, and it was one of the comments that I get asked,

9    certainly, and I'm sure many of the members of the panel get

10   asked, and that is why don't we just treat patients who are

11   at the very early stage of the disease because they are the

12   ones who are most likely to respond.

13        They have the most intact cells left, the least

14   damage.   They are more likely to function with some improved

15   pharmacology.   I think that is something that we should talk

16   about.   I, personally, used to think that that was not an

17   unreasonable thing.

18        I would now concur with what Leon suggested, and

19   that is that you should use as broad a population as possible

20   and that from the sponsor's prospective, the labeling is

21   going to be, presumably, Alzheimer's and I think that we

22   would like it to be Alzheimer's and not just a narrow

23   indication.

24        I think that we tend to take upon ourselves burdens

25   that are unreal because we don't have a standard compound and

at

105

1    that if we looked in the areas of depression, epilepsy, and

2    other areas, we know that the compounds that are out there

3    are effective only in a small percentage of the population.

4    We do not go looking for those patients with epilepsy who

5    respond to sodium channel blockers or have certain other

6    aspects of it, nor do we usually do that sort of sorting for

7    patients with depression.

8            Given the results that Leon showed just now, and

9    that is the rate of decline until the patients are really not

10   testable, that we should, in fact, try to be as broad as

11   possible within the constraints of not allowing concurrent

12   illnesses and concurrent medications.

13           So I think that that is a theoretical reason, and I

14   would just argue from a pragmatic perspective that the

15   outcome measures that we do have that we all agree are

16   general global outcome measures are designed to look at the

17   spectrum of decline from non-demented to totally-demented

18   patients, and that there is only a narrow portion of those

19   either at the top or the bottom of whichever scale you are

20   using and that if you choose patients who are highly function-

21   al, that the probability of showing a numeric improvement is

22   low.

23           That is just a statistical, pragmatic perspective,

24   but I think there are some theoretical things.  And I think

25   that is one of the questions that gets answered, and it is

at

1   one of the things that is bandied around.  It would be nice

2   to hear what the experts think.   Are we focusing incorrectly

3   by taking in as many patients as possible as long as they are

4   testable?

5        DR. LEBER:  The one thing that I would like to try

6   to do this time is let's try to stay on this particular theme

7   for a while.   The question, if I can recapture it in a

8   different way, is there any kind of maneuver that will enrich

9   the population, making the population sample more likely to

10  respond in an experiment.

11       That is really what the question is about because,

12  in a way, the cholinergic challenge was an enrichment design.

13  You want to enhance the likelihood of getting a treatment

14  effect.   Now, if you know you have such a stratification

15  variable, you can do it.

16       So the question before the Committee is do you know

17  of anything that would allow you to reliably suggest that you

18  can increase the efficiency of sampling for antidementia drug

19  trials.

20       DR. FERRIS:  In my view, the answer is that there

21  is very little data on that issue in an objective sense.

22  Even if we look at the THA trial, it is being assumed that

23  there is an enrichment, but we don't really know.   If fact,

24  what occurred to me in looking at Leon's slide outlining the

25  design is that, with the wisdom of hindsight, there could

at

1  have been a very nice test of that by not dropping the people

2  who didn't show best dose, and randomizing them to different

3  best doses and seeing if there was any difference in outcome

4  between those you would have dropped and those that you

5  didn't, which would have been not that pertinent to the

6  question of efficacy but certainly pertinent to the question

7  of whether you really succeeded in your goal of enrichment.

8         I think that a lot of the difficulty in whether

9  there is an appropriate enrichment strategy has a lot to do

10  with how much of the more basic kinds of studies, both

11  preclinically and clinically, are done prior to getting into

12  a real large-scale trial.

13         I think one of the purposes of, say, early clinical

14  trials, certainly done in controlled fashion, is to try and

15  zero in a better way rather than having to analyze a huge

16  amount of data later on whether there are particular subtypes,

17  at least in this context in terms of severity of disease, the

18  milder patients, the more severe patients, or the whole issue

19  of the appropriateness of individual dose.

20         I think that kind of thing can be ironed out,

21  perhaps expensively, but in a series of Phase II type trials.

22         That also relates to the issue of numbers of

23  outcome measures.  I don't think anyone would disagree with

24  Leon's suggestion that in these large, multi-center trials,

25  when you are hoping that that is the data base that is going

at

1   to lead to an NDA application, that you want to plan in

2   advance to minimize the number of outcome measures.

3         On the other hand, if you don't really know in

4   advance what kinds of outcome measures are sensitive to the

5   effects of a particular compound, it means that, at least in

6   early trials, you need to cast a much wider net with respect

7   to outcome measures and hope that by using a variety of,

8   perhaps, measures that are more sensitive to small effects,

9   some of these more global measures might not be as sensitive

10   to small effect, that could help you design that later trial.

11         DR. LEBER:  So your vote is really for not only a

12   broad net on the population but a broad net on the observa-

13   tional outcome measure.

14         DR. FERRIS:  At least in the early stages of the

15   development.  I wouldn't suggest that in the final, big,

16   multicenter trial.  I hope you would have information

17   gathered before you design that final trial.

18         DR. LEBER:  Before we go down that alley, one thing

19   Leon said, which I think is very provocative.  He said you

20   can't have an antidementia drug unless it produces an effect

21   on some cognitive vector; I will put it that way.

22         Does the Committee agree with that, because that

23   has a lot to do with your screening policy?  If you say it

24   only has to be cognition or memory, you don't need as wide a

25   net.  Does everyone agree that that is the sine qua non of

at

1    an antidementia drug, or is that arbitrary, capricious and

2    absolutely unsupportable?

3              DR. MOHS:   I agree, by and large, because the fact

4    is that those are the defining features of what dementia is,

5    in the absence of impairments in those areas, you don't have

6    a demeting condition.   The one possible exception, I think

7    -- and this came up in the earlier panel -- is it is conceiv-

8    able that there are agents that are available, maybe even

9    currently, that would be of some use in the medical management

10   of cases of Alzheimer's disease that don't treat the primary

11   symptoms of the disease but, nevertheless, are useful adjunct

12   to treatment.

13             However, to have a real treatment that is specific

14   for dementia, what defines dementia and makes it different

15   from other neuropsychiatric illnesses is the cognitive

16   impairment.   So if you had a drug that was specific for

17   dementia, it would seem that it would almost have to treat

18   and produce some improvement in memory and cognition.

19             DR. LEBER:   Let me play devil's advocate with you

20   and ask you a question.   Let's assume for the moment that

21   there is a real -- and this is prejudging something that will

22   come up later -- effective syndrome unique to dementia and it

23   doesn't respond to classic antidepressants.

24             But let's say it responds because it is free

25   frontal-lobe pathology to some increase in dopaminergic tone,

at

1  L-dopa.   You might be able to document that the reason that

2  you get an antidepressant response is conditioned by the

3  presence of dementia.   Isn't that a legitimate antidementia

4  drug effect?

5        DR. WHITEHOUSE:  I think so.  I think it is quite

6  possible that the biological basis of some of the very

7  disturbing and important clinical behavioral manifestations,

8  non-cognitive manifestations, are dementia-specific in some

9  sense and it would be unfortunate to assume that we are

10  really merely treating other things that are the same in

11  cognitively-intact people, anxiety disorders and depression,

12  in the same way.

13        So I agree with you.  I think it is dangerous to

14  make that assumption.

15        DR. LEBER:  I didn't say anything, you know.   I

16  was just raising a question.

17        DR. CROOK:  I would say that would not be suffi-

18  cient.  Given all the problems with pseudospecificity, I

19  think it may be a drug that is effective for treating

20  depression in dementia, or some other secondary symptom, but

21  it would seem to me that Leon is right that if it is truly to

22  be an antidementia drug, it has to have some effect on memory.

23        My problem, I guess, with Leon's slide had to do

24  with the clinical, global improvement.   If, in fact, you

25  must have a change in clinical, global improvement, then you

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1    could argue that it is not worth testing at all.

2        I think I have problems with that in several

3    respects; one, going back to Peter's point which I don't

4    think was fully resolved, about the active placebo.    I

5    wonder whether some of the trials that are underway now and

6    some that, no doubt, will be undertaken are, in fact, blind

7    and whether, where the measure is an assessment by the

8    clinician, by the family, whether that can be affected by

9    perceived drug side effects, or whether it is truly a blind

10   rating.

11       Secondly, those are, generally, very insensitive

12   ratings.    Are you going to require that, or if a drug has an

13   effect on an objective measure of cognition, of memory or

14   some other important variable, is that enough in the absence

15   of a clinical, global improvement measure given that you can

16   measure, particularly in the earlier patients, cognitive

17   variables in a much finer way, in much smaller gradations,

18   that you can on a five-point or seven-point rating scale from

19   perfect to absolutely impaired.

20       DR. THAL:  I would like to respond to that.    When

21   I used clinical, global impression, I am not referring only

22   to the clinical, global impression of change.    I should

23   really expand that to say that it has to be a clinically-

24   observable effect by someone and that if you increase the

25   point score of a dementia patient on any cognitive test that

at

112

1   you show, but that neither a clinician nor a family member

2   nor another member of society can discern that effect on that

3   individual, then it is not worth releasing that drug.

4       I think the marketplace will prove that to be

5   correct, that no one will use such an agent.

6       DR. RASKIN:  I have no problem with that, but I

7   would like to get back to the issue of power that you were

8   showing on the screen.   The critical element there, I think,

9   is the sensitivity of the instrument -- at least that is one

10  of the critical elements.

11      In that regard, I do feel, also, that cognition and

12  memory are sort of the hallmark of dementia as thought

13  disturbance is the hallmark of schizophrenia in some way.

14  It has been demonstrated, particularly in the early stages of

15  dementia, and particularly if you advertise in The New York

16  Times for subjects, that you really have to push the limits

17  of your scale to show deficit and to show change.

18      In that regard, I think if I am going to be

19  measuring cognition and memory, I would try to get something

20  like what Tom is doing, more than a rating-scale kind of

21  measures; in other words, something that has inherent sort of

22  face validity, one of the issues you are raising, some of

23  those kinds of things.  "Do you remember when you go out to

24  shop what you forgot and where you left your keys?" that kind

25  of thing.

at

1       I am wondering if you use that kind of instrument

2   whether you would need the kind of power that you had

3   outlined in terms of the sensitivity issue.

4       DR. THAL:  I don't know the answer.  I think it

5   remains to be demonstrated to develop such instruments.    I

6   will just give you sort of a synopsis.   We sort of broadly

7   looked at four instruments, now; namely the Blessed Informa-

8   tion Memory Concentrations Test, the Mini-Mental State, the

9   ADAS and the Mattis Dementia Rating Scale.

10      What I can tell you is that roughly the change that

11  you see in a patient over a course of one year, on the

12  average, equals the standard deviation of that test.   That

13  is about where we are at.

14      Now, you can devise better tests that have smaller

15  standard deviations, I would assume, and it will make it

16  easier to show an effect.   But that is what we are dealing

17  with, that is the data that we have in hand.

18      DR. LEBER:  Are you measuring the standard deviation

19  of the test or the standard deviation of the population to

20  whom the test is applied?

21      DR. THAL:  The standard deviation of the population

22  to whom the test is applied.

23      DR. LEBER:  So until we know how to select the

24  population and make it less heterogenious, you may not be

25  able to manipulate that independently.

at

114

1      I don't want to let people slide off the hook,
2  because I think we have an important question which, to me,
3  still seems, even though I am not making an official declara-
4  tion, somewhat arbitrary.

5      You said that even if we could document that we
6  don't have a pseudospecific effect -- that is one that
7  happens to be a drug working in a demented patient -- that we
8  couldn't say that is a drug for dementia if, in fact, the
9  effect of the drug depended upon the patient being demented.

10     Remember a diagnosis of an illness may depend on
11 its cardinal signs. But a phenomena of the illness, unrelated
12 to the cardinal sign, could still be important; outbursts,
13 wandering at night, hostile and aggressive behavior.  If you
14 had something that altered that, but only in the presence of
15 dementia, not in everyone else, wouldn't that be a legitimate
16 claim?

17     DR. GAMZU:  But you are suggesting that the same
18 drug is tested in all other patients with a wide variety of
19 disease states and found to be not effective.

20     DR. LEBER:  That is a logical maneuver to exclude
21 pseudospecificity.  I am just asking the general question.

22     DR. GAMZU:  But isn't that one of your basic
23 assumptions?

24     DR. LEBER:  I want to know where this panel, as
25 august as it may be, would have the right to exclude a

at

1  particular type of claim of that sort.   It is a matter of

2  opinion, isn't it?

3          DR. DRACHMAN:  We are into a serious semantic

4  argument here, I think.

5          DR. LEBER:  Not at all.   It is a substantive

6  argument.

7          DR. DRACHMAN:  Substantive, but semantic at its

8  root because, in fact, Alzheimer in his first paper described

9  a patient who had severe behavioral disorders and because we

10 are talking about the treatment of Alzheimer's disease rather

11 than just dementia, I do regard behavioral problems, which I

12 like to encapsulate as obstreperous behaviors, as one of the

13 most serious problems of Alzheimer's disease.

14         Barry alluded to that before.  It is, certainly,

15 the most common reason why patients go to institutionalized

16 settings such as nursing homes.   The whole issue that you

17 raise about pseudospecificity gives me a certain amount of

18 problem here.   Could one, indeed, alter the behavioral

19 disorders in a fairly benign fashion, there are many patients

20 with Alzheimer's disease who would stay in their homes for an

21 extra six months, a year or several years, as a matter of

22 fact.

23         So even though, in its purest sense, the conceptual

24 notion of dementia really refers to cognitive and memory

25 decline, it its practical sense, behavioral changes occur in

at

116

1    our studies in about 85 percent of all patients.

2              DR. WURTMAN:  I agree.    I think, Paul, the way you

3    phrased the question initially, as I understood it, was

4    whether or not a treatment directed toward another symptom or

5    another transmitter would, by the way, also enhance cognition.

6

7              That is not necessarily the case.  I think David is

8    quite right.    One could treat the obstreperous behavior

9    productively, whether or not by doing so cognition also

10   improves.

11             DR. LEBER:  Let me explain -- this is really a

12   point of reference, because not everyone here may understand

13   what we mean by pseudospecificity.   Assume for the moment

14   that I could stop obstreperous behavior by using general

15   anesthesia.    It works in everyone, regardless of whether or

16   not they have dementia.

17             You could not make a claim that that is a treatment

18   of dementia.   It is a general effect of the drug.  If, in

19   fact, depression, anxiety and all the other ennuis of modern

20   life and distresses were present in early dementia, treating

21   them effectively with drugs that work for those conditions

22   would not fairly be entitled to a claim.

23             This is a question of equity.   That doesn't mean

24   you couldn't use them.  It is a question of whether you want

25   to make the claim.

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1       What I wanted to get away from is the idea, and I

2  think most people would agree, that the real, unqualified

3  antidementia drug probably follows, for most of you, what Dr.

4  Thal has suggested; that is, an effect on the cardinal signs,

5  if you will, of the illness, affecting memory-cognition.

6  That doesn't mean there couldn't be other claims linked to

7  dementia if you could document them.

8       That is really what I want to get your consensus

9  about.                                —

10      DR. FERRIS:  There are a couple of sides to this.

11 I think I would also like, maybe, to turn the pseudospecific-

12 ity issue upside-down in the second part of my comments.  I

13 would suggest that, as long as there is a consensus on

14 groupings of important symptoms in the clinical syndrome that

15 we call Alzheimer's disease, any compound that can be shown

16 to be efficacious on that cluster of symptoms, if properly

17 defined, could be considered to be an antidementia drug.

18      But, again, apples and oranges and pears have to be

19 kept separate both in terms of the need to independently

20 assess in an unconfounded way Cluster of Symptoms A, such as

21 behavioral problems versus Cluster of Symptoms B, memory,

22 praxis, language, et cetera.

23      In other words, we have to be very careful in the

24 design of the study how we assess whether there is an effect

25 on one set of symptoms versus another.

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

118

1    Related to that comes the issue of what is the

2  claim; in other words, there could certainly be a claim for

3  an antidementia drug where the claim is specific to one group

4  of symptoms such as aberrant behaviors.

5    DR. LEBER:  Let me explain the regulatory problem

6  and the reason we are into this.  Let's assume that Dr.

7  Raskin's study had not turned out as it did.  Let's assume he

8  was lucky in his sampling and had come up -- and that is a

9  possible explanation for the finding of no difference that he

10  observed -- not that the drug didn't work in that patient

11  population but rather he didn't have the power to detect the

12  effect that does work sometimes, and he had gotten a positive

13  result with a classic drug, Imipramine or Amitriptyline.

14    Would that allow the makers of those drugs to make

15  a claim they have a drug for depression in dementia?

16  Probably, we would say that they are already known to be

17  antidepressants, and no.

18    But let's assume it was an undeveloped, not

19  particularly profitable, antidepressant that is languishing

20  on somebody's shelf.  And they say, "This is a nice way to

21  get the drug onto the market.  We have been unable to

22  develop it commercially.  There is no real window opportunity

23  here for this.  Let's bring it along for this selected

24  pseudospecific use."

25    I think that was sort of the thing that got us into

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

119

1   it, the inequity of, by doing an incomplete workup of a drug,

2   gaining a claim linked, through choice of the investigation,

3   to antidementia.

4          DR. FERRIS:  The other side of this question,

5   though, could be applied to the cognitive symptoms.   Let's

6   suppose there were a drug that was effective in a very

7   general way on enhancing the primary biologic substrate that

8   underlies memory functioning and that would imply that this

9   could well be a drug that would enhance memory in any subject

10  population for which there was some relative intactness of

11  that biological substrate.

12         So it would work in us, and it would work in

13  medical students, it would work in normal old people and it

14  would work, perhaps, at least in the milder end of the

15  dementia spectrum.

16         DR. LEBER:  It would be a great drug.

17         DR. FERRIS:  It would be a great drug and, of

18  course, it has no toxicity whatsoever.

19         DR. LEBER:  What would you call it?

20         DR. FERRIS:  The point is, if you developed that

21  drug specifically for Alzheimer's disease, one could argue

22  that that was an example of pseudospecificity.   But everyone

23  will accept that kind of pseudospecificity.

24         DR. LEBER:  It is, but if you wanted to be truthful

25  about that drug, you would say that drug is a cognitive or

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

120

1    memory enhancer, and it is not predicted on the basis on the

2    basis of one being demented

3            And that is a fairer and more accurate explanation.

4            DR. FERRIS:  I would apply the same reasoning to an

5    antidepressant that had a broad spectrum of application.

6            DR. DRACHMAN:  Is aspirin pseudospecific for

7    headache?   Is that what you are saying?

8            DR. LEBER:  My own judgment on controlled trials on

9    tension headache, possibly.   But I haven't reviewed them in

10    great depth, personally, and it's a different kind of

11    pseudospecificity.

12            DR. DRACHMAN:  Or could aspirin be labeled as being

13    useful for headache?

14            DR. LEBER:  Obviously, there is the possibility

15    that drugs are promiscuous in the sense that they have many

16    effects.   If you could prove that a drug had a specific

17    effect -- look, this is not something that anybody ordained

18    in the Federal Food, Drug and Cosmetic Act.   It is an

19    attempt on what we call local policy to take a fair and

20    reasonable stand on issues that are vexing in drug develop-

21    ment.

22            I am interested in what the panel thinks.   I hear a

23    vote for if somebody takes a new product not already marketed

24    and works with it in the demented population and fails to

25    show an effect on the cognitive and memory aspects of

at

121

1    dementia, but does show an effect on some important sign in

2    dementia, behavior, that we would be willing as a group --

3    and that is real question -- to accept it as a legitimate

4    antidementia agent.

5              Is that true?

6              DR. RASKIN:  I sat in on the review of Hydergine,

7    you may recall.   The indications for Hydergine came right

8    off the SCAG, the SCAG items.   I think there were five SCAG

9    items that showed significant drug-placebo differences.

10   These are exactly the behaviors described on the indication,

11   on the package insert.

12             DR. LEBER:  It is not approved for dementia, though.

13             DR. RASKIN:  That is the point I am making.   I

14   think we may be getting into a semantic quibble here.   I

15   don't like labels like antidementia drug, antidepressant

16   drug, because they have broad spectra.

17             Antidepressant drugs treat anxiety and hostility.

18             DR. WURTMAN:  Dementia is a symptom of Alzheimer's

19   disease.   What you are saying is the disease has other

20   symptoms.   The labeling might be better of this putative

21   drug for the treatment of patients with Alzheimer's who had

22   that symptom as opposed to labeling it as an antidementia

23   drug.   Is that a possibility?

24             DR. LEBER:  There are a lot of possibilities.   I

25   would be interested in what the panel thinks.   Rich Mohs had

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

122

1    his hand up and he is in the central position which means he

2    is underrepresented.

3          DR. MOHS:  What I think is that if you have a

4    troublesome symptom that people want to have treated, and

5    somebody comes up with a drug that actually helps make that

6    patient better, there ought to be some way to get that

7    approved, assuming that it doesn't have awful side effects.

8          In the case of a drug, this hypothetical drug which

9    I don't think would ever exist, but let's say that it did,

10   that actually helped in controlling agitation, obstreperous-

11   ness, but did not improve cognitive function in patients who

12   had Alzheimer's disease, I think that there ought to be a way

13   to get the drug into the people who need it, but I wouldn't

14   want to call it an antidementia drug because dementia -- just

15   to get back to the semantics of it -- dementia, by definition,

16   is a loss of cognitive function.

17         That is not what you are treating with that drug.

18   You are doing something useful, which I think ought to be

19   allowed and be approved, if it were possible, but I wouldn't

20   want to call it an antidementia drug.

21         DR. THAL:  Would you call it an anti-Alzheimer drug?

22         DR. MOHS:  No.  It doesn't stop Alzheimer's.

23         DR. THAL:  Would you call it an anti-obstreperous

24   drug?

25         DR. MOHS:  I would call it Streperase.    That's

at

123

1    what I would call it.

2          DR. GAMZU:  To be given to disputative panels in

3    front of the FDA.

4          I think I agree with what has been said before that

5    there is a major problem.  Nobody denies the fact that

6    behavioral disorders are very important in this group of

7    people.  By the same token, incontinence is, as well.  If

8    you had a drug for incontinence, it would do very well.

9          I think if the drug is shown to be effective in the

10   population, it should be approved if it has clinical sig-

11   nificance.   What you call it is a matter of what is going to

12   go in the labeling, and that is going to be a matter -- it is

13   a totally independent thing.   It is the semantics we are

14   talking about.

15         I don't think that is the question.   I think the

16   question is yes, it should be approvable.

17         One of the things, however, when we started this

18   round of discussion was you suggested a drug for treating,

19   say, depression or agitation in Alzheimer patients.   I think

20   that from a sponsor's perspective, and I will speak personal-

21   ly, if I were asked the question, "Should we devote a lot of

22   time and effort to looking for such a drug?" then I think the

23   answer would be no because there would be this danger of

24   specificity.

25         On the other hand, if we have reason to believe, for

at

1  whatever premises they are, that the drug that we are testing

2  in Alzheimer's ought to be tested in Alzheimer's, and that is

3  one of the outcomes, and it is specified a priori, obviously,

4  before a Phase III trial, then I think even by the rules that

5  you have talked about, that that has to be an approvable drug.

6        DR. LEBER:  I was really asking a much broader

7  question and that is, what does this panel -- this is an

8  external validity issue -- what is it that you are going to

9  allow us to make an assertion that a drug is an antidementia

10  drug.  I was just drawing out something which seemed to me

11  to be inherently controlling; that is to say, you can't have

12  it unless you do exactly what I think it should do.

13        I want to know if everyone agrees.  Maybe that is

14  the state of the art.  Do you have to have effects on the

15  cardinal symptoms, and I will call them cognition and memory,

16  reason, or whatever you want, to call a drug an antidementia

17  drug?

18        DR. DAVIS:  I think Richard's position is precisely

19  the correct one.  It is a drug that has an appropriate

20  indication but is not an antidementia drug.  The larger

21  issue that it then raises is what other similar conditions

22  may it be effective in?

23        The sponsor, I think, should, in fact, determine

24  that, what other conditions it may work in.  But if, in

25  fact, we have an agent that is effective for what is a non-

at

1    cognitive, but nonetheless, critical problem in dementia, we

2    should find a way to get that to people.

3            I think that, though in jest, Elkan talked about

4    urinary incontinence --

5            DR. GAMZU:  Not in jest.

6            DR. DAVIS:  It is an important issue just as is

7    contractures.   If someone came out with a drug for contrac-

8    tures in Alzheimer's, I would be surprised if it didn't work

9    in other conditions, but I would be very pleased to have that

10   in the therapeutic armamentarium.

11           DR. LEBER:  Again, it is the side of the issue.  It

12   is not so much that we are not interested in approving drugs

13   that have legitimate uses.   I am really trying to core in,

14   if you will, on the issue of what this panel would consider

15   to be a legitimate antidementia claim.   What is it going to

16   be based on?

17           I seem to be hearing almost agreement that that

18   name requires cognitive effects on valid outcome measures

19   that look at the content of what we have yet to discuss; that

20   is, what are the content of performances that we are going to

21   consider.

22           Now, we will probably consider that in the specific

23   session that we have on it, but I am interested in a global

24   way.   What kinds of changes do you want for this antidementia

25   effect?   This is unqualified.

at

126

1        DR. DRACHMAN:  Elkan said something that I am very,

2   very concerned about.  He said that should a drug be under

3   consideration for treatment of obstreperous behaviors, that

4   probably because it isn't specific for dementia, that

5   probably it wouldn't be pursued.  I hope I am saying that

6   correctly.  Maybe I missed that.

7        DR. GAMZU:  No, no.  I said if it were being

8   considered for the treatment of obstreperous behavior in

9   Alzheimer patients I don't think that that is a target that

10  most companies would focus on.   If you have a drug that is

11  likely to be useful in obstreperous behaviors, you would be

12  more interested in looking at it in a much broader situation

13  that is probably going to be an antipsychotic.

14        We tend to focus on the more global issues of what

15  are the unmet medical needs.   This is, clearly, an unmet

16  medical need.   On the other hand, there are a number of

17  drugs that are actually being used right now and have

18  labeling that suggests, for behavioral manifestations of

19  psychotic disturbances, I believe is the labeling, for quite

20  a few of the antipsychotic agents.

21        So there are things out there.   If the people who

22  are coming to this particular audience -- I am not saying you

23  shouldn't do it, but the people whose focus is in Alzheimer's

24  disease is on the primary factors.   You can look at it from

25  a pragmatic perspective.

at

127

1        Yesterday, some of us were at a presentation where

2    the Wilkerson Group gave their estimate of what the unmet

3    need was.   Now, their estimate was couched in dollar

4    figures, but it doesn't really matter.   Basically, they said

5    that 10 to 20 percent of the patients would benefit from a

6    drug that would treat these behavioral disorders.

7        Obviously, for a company making a major decision,

8    the 80 percent of all the other patients and their cognitive

9    loss in that extra 20 percent is a far greater focus.   That

10    doesn't mean to say it is not a legitimate avenue.

11        But most of us, I believe, are not in the business

12    for purely altruistic purposes.

13        DR. LEBER:   Can I cut this discussion off for a

14    reason.   I think we are drifting into an issue of almost

15    directional advice on investment possibilities in drug

16    development.   That is really not the thrust.   The thrust of

17    this is to talk about external validity.

18        So we have examined what the nature of the claim

19    most people would prefer.   I still think it is on this theme

20    of an effect on the cognitive symptoms of dementia.   What is

21    it that will make a claim a reasonable one?   The next

22    question was the sampling of the patient population.   Who

23    should you work with?

24        We started to get into that.   Do you want to use a

25    narrow population because you have some believe that you are

at

1    more likely to demonstate an effect because of ceiling or

2    floor effects which may or may not exist?   Do you have some

3    predictive device, or do you want to take unwashed Alzheimer's

4    patients that are acceptably diagnosed?

5          Let me get to that stage of the discussion.

6          DR. DAVIS:  I think Leon said this very well in his

7    presentation.   You would like to take everybody, but there

8    are certain constraints that make it very difficult to take

9    everybody.   The instruments don't work in everybody.   But

10   if we go beyond the instruments, we have talked about

11   biological heterogeneity.   The issue in biological heteroge-

12   neity is not so much whether there are different etiologies,

13   though I think there probably are.

14         The issue is whether there is pharmacological

15   heterogeneity.   I think we already know there is phar-

16   macological heterogeneity in this disease.   We shouldn't

17   discount all that has gone before the THA study.   There are

18   reasons for biological heterogeneity.   At the very least, we

19   know there is an inverted U-shaped curve for cholinomimetic

20   agents, but the inverted U-shaped is well-demonstrated in

21   animals.

22         It is almost a physiological law that you can't

23   infinitely improve things.   You can't do it in the heart.

24   You can't do it in muscles.   It is not surprising that there

25   would be an inverted U-shaped curve.

at

1        There is also the additional problem in elderly

2   people that 80-year-olds don't have pharmacokinetics like 20-

3   year-olds which also makes it very difficult to find a dose.

4   So when you think about those issues and then add to it, I

5   think, the fact that at autopsy, neurochemically, all these

6   brains are not alike and in therapies, at least as we

7   presently conceptualize them which, at least at this state of

8   the art, is replacement oriented and neurotransmitter driven,

9   and given that there is a heterogeneity of neurotransmitter

10  abnormalities and that there is a growing literature to

11  suggest that the plethora of neurotransmitted abnormalities

12  affect the efficacy of the cholinergic agent, it is quite

13  reasonable to say, beforehand, that not everyone will respond.

14        We need to develop a strategy that identifies those

15  who may.

16        What could be addressed about the THA study is,

17  perhaps, as it evolved, it was less than ideal to do that,

18  which may very well be the case.   But I don't think we can

19  fall away from the argument that it is, I think, at this

20  point, certainly without substantially more preclinical and

21  then early Phase II data, premature to run a drug in everybody

22  and in all comers.

23        DR. WHITEHOUSE:  Let me just link to that very

24  specifically by making a specific suggestion and claim.

25  There are predictors about the effect of cholinomymetics

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

130

1    based on the brain changes, based on two statements.    Older

2    patients, in several studies, less cholinergic abnormalities

3    and also tend to have less pathology in other systems.

4            So that would predict, or allow the prediction,

5    that older people might respond better to THA than younger

6    people.    If you believe that that is a subtype that is

7    identified on the basis of age, then look at that and maybe

8    stratify that.

9            DR. DAVIS:    Let me readdress that because I think

10   this is a very, very critical question about how these

11   studies are conducted and will be in the future.    The older

12   patients are generally patients with multisystem disease.

13   They are patients who, for the most part, are not getting

14   into the study.

15           So if you look at the average age of the study and

16   compare that, perhaps, to where do we see the greatest

17   prevalence of Alzheimer's disease, we are inevitably shifting

18   toward younger people.

19           We and lots of other groups, I think, have data

20   that suggest that when you have the disease, as you suggested,

21   at an earlier age of onset, the abnormalities are more severe

22   and the number of systems that are brought into play are more

23   severe.

24           But I would not be at all surprised that when we

25   come back and look at the THA data, and I am just guessing

at

1    now, but I wouldn't be surprised that, because of the

2    selection biases that happened or the necessity of getting a

3    healthy elderly population, that it will be impossible to see

4    what we all think should be seen based on the autopsy studies.

5        DR. LEBER:  I want to raise important use of terms.

6    One is prediction in the sense of statistical prediction,

7    having a maneuver which reliably allows you to say what

8    fraction -- it is sort of like a conditional probability, the

9    probability of success given this result, like a lab test --

10   as distinct from what I would call plausible intellectual

11   prediction which says, "Given the theories now extant and the

12   information we have, we believe it would be a good idea."

13       Now, I don't doubt, Ken, that you are absolutely

14   right, there is loads of data to support and inverted-U-

15   shaped dose-response curve in certain models.   But that does

16   not, as you have just suggested, mean that that will actually

17   be documentable or, in fact, useful in designing clinical

18   trials.

19       It so happens that the particular 971 study that is

20   being done may, in fact, not answer all the question but it

21   will be very interesting to see whether or not patients in

22   particular sequences with particular results, whether those

23   results predict the outcome in the double-blind phase.

24       I think that kind of thing may give you a lead.

25       But the whole point I want to distinguish -- theory

at

1    does not necessarily always turn into what is a predictable

2    outcome in clinical trials.    That is one of the things that

3    we are talking about, clinical trials.

4             DR. WURTMAN:   To get back to some data that Leon

5    showed that, I must say, I found very depressing.    There is

6    rather more heterogeneity among patients in the rate of

7    progression of the disease than one would have thought.    It

8    changes from one point to 20 points, or one point to 12

9    points in the space of one year?

10             Also, the fact that patients who do very badly in

11    one year don't necessarily do badly in succeeding years.    I

12    think that these facts, of necessity, make clinical trials

13    far more difficult than one would have guessed because of the

14    heterogeneity.    I would encourage Leon to go home and do 500

15    more patients so we can see if it is really true.

16             One of the things Leon said was that there was no

17    relationship between the starting age of the patient and the

18    average rate of progression.  This would seem to go against

19    what we have just been discussing.  I believed, before

20    walking into this room, that older patients had milder

21    disease, in general.

22             So I think that is critically important that more

23    data be obtained on this subject.    I don't know how long it

24    will take to do that.

25             DR. LEBER:  Another question: is it data?  Is it

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

133

1  source of variance?  Are those tests-retests on these

2  patients stable?    Could it be day effects, month effects?

3  Concomitant disease effect?

4           DR. THAL:  We actually have test-retest reliability

5  on a lot of the patients.    When there is test-retest

6  administration within a short period of time, meaning repeated

7  tests after one, two, three and six weeks, the test-retest

8  reliability in a given patients is quite high and it runs

9  about .85 for all of these tests.  —

10           DR. LEBER:  So that is not the cause.  It really is

11  a heterogeneous disease.

12           DR. FERRIS:  In regard to your central question

13  which is what patients or subgroups of patients would be

14  optimal for selection -- and a lot of people have addressed

15  various constraints -- but I think a very important one

16  relates to the best group for the measures that we have

17  available that are most sensitive for monitoring the symptoms

18  we are interested in.

19           And this, in part, I think, is what has been behind

20  the general assumption, which I still think is a good one,

21  that we really ought to look at the relatively mildly

22  impaired patients provided that they meet the specific

23  criteria for Alzheimer's disease, in terms of their severity,

24  which gets into another set of issues in terms of what about

25  patients who are even a little too mild in trials.

at

134

1    Nevertheless, provided we accept Leon's suggestion
2  that we, at least, must take patients with probably Al-
3  zheimer's disease, and that relates in part to how severe the
4  symptoms have to be, I would suggest that the measures we now
5  have available, whether it be even the global measures, but,
6  in particular, the objective cognitive assessments, have the
7  greatest utility and the greatest sensitivity for measuring
8  the treatment effects.

9    So we really ought to stick with the milder group
10  where those measures can be used.   One could also argue in
11  biological terms, in terms of the amount of pathology that
12  presumably is present in the milder patients, more opportunity
13  for a pharmacologic intervention to something, and so forth.

14    These are all the underlying assumptions.

15    Getting back to this milder group, since I would
16  suggest that there are three primary kinds of outcome
17  measures, and there are sessions here to address each of
18  them, the objective cognitive test, Leon talked about two of
19  them, the more global comprehensive measures such as the Mini-
20  Mental State and the ADAS, et cetera, and also the Activity
21  of Daily Living Scales, the third would be the Objective
22  Cognitive Test.

23    One assumption that I would make, at least in
24  ordinal terms, is that those three domains of measurement
25  differ with respect to sensitivity or ability to detect

at

135

1   fairly small changes.   I think the least sensitive would be,

2   probably, the Activity of Daily Living Scales.   Somewhere in

3   between would be the comprehensive or global measures.   I

4   believe the most sensitive to pick up small effects, perhaps

5   in a very selected cognitive area, would be the psychometric

6   or objective measures.

7              I would suggest that, at least during the course of

8   early drug development, all three are essential because you

9   wouldn't want to miss something by leaving out the more

10  sensitive objective cognitive tests.

11             DR. LEBER:  You are also arguing, though, that part

12  of our sampling for patients is going to be driven by the

13  sensitivity of the instruments that are available so that we

14  would not want to go into an area, even though that is where

15  the truth lies, because we don't have the instrumentation for

16  it, in part.

17             So you are going to be selectively picking people

18  who are less impaired because you can examine a broader range

19  of pathologies.   Interesting.   Do people agree with that?

20             DR. GAMZU:  No.  I strongly disagree with that.  I

21  think if you are asking about subpopulations -- Steve said

22  something earlier that we just don't have any information on

23  the subpopulations, and Paul emphasized that again.   We have

24  all sorts of theories, some of which may be correct and some

25  of which may not.

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

136

1    It is also interesting that people used to think
2    that cerebral vasodilators would solve the problems of
3    hardening of the arteries and that was wrong, too, but it was
4    seriously believed at the time.

5    I really think that until we have an effective
6    agent that will allow us to parse out and give us real data
7    to answer some of these questions that we ought to be looking
8    at as broad a population as possible and using broad clinical
9    measures, not the specific measures.

10    I certainly think that that gives you a better
11    opportunity of finding something that might be there.    There
12    might be subpopulations.    There may be inverted U-shaped
13    functions.    Despite all the work in animals, except for the
14    fact that in patients studied with physostigmine have a
15    single-point dose, an inverted V which may or may not be
16    real, there is no evidence yet in humans that that really
17    does exist.

18    I do not think that it is the case that you would
19    find that with all drugs.    I think the rate-limiting factor
20    for most drugs is toxicity and not the so-called benign
21    inversion of the U-shaped function.

22    Even if we take the assumption that an enriched
23    population will help us solve some of these problems, again,
24    I do not believe that there is sufficient evidence to say
25    that that design is necessarily the best design.

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C.  20002
(202) 546-6666

at

1          There is work from the Columbia group that suggests

2     that that patients that did not respond in the titration

3     phase may respond subsequently.   We have heard talk today

4     about how long do you have to treat.   The titration phase in

5     the tacrine study, which is the generic name for THA, that

6     stage, at the moment, is two weeks.

7          But I don't think anybody here would agree that the

8     minimum time to treat patients to show efficacy is two weeks.

9     I can tell you that, from our own experience in this and many

10    other studies that over a two-week period at the beginning of

11    a study, patients on placebo will improve.

12         But we also know from the longitudinal studies that

13    if you go long enough, they will decline.   So you are taking

14    a short period, you are making a brief putative assessment of

15    response, and making the assumption that that is going to be

16    replicated in a longer period of time.

17         Is the enriched-population design important?    I

18    think until we have some results, we won't know.   We

19    certainly will not know from this study the answer to the

20    question that Steve posed, and this is does it drop patients

21    who might otherwise have responded?

22         So I would say cast the net as broadly as possible.

23    I think the enriched-population design for the tacrine study

24    was crucial, but not because of theoretical aspects that we

25    are talking about now, but a lot more to do with safety

at

138

1    aspects.

2        DR. LEBER:  We are running out of time, but you

3    brought up, Elkan, a very important issue that relates to

4    time.  Given what we have all been discussing so far, is

5    there a minimum duration for any kind of clinical trial that

6    you would demand before you would be willing to accept the

7    results as reasonably a source of information to make a claim

8    as an antidementia drug.

9        Anybody want to deal with that?  Minimum time,

10   now.  Weeks?  Months?  Half a year?  Five days?  Any

11   thoughts?

12       DR. RASKIN:  Let me go back to an earlier -- it

13   sort of ties into what you are asking and to what has been

14   said.  I don't think there is any question, and certainly it

15   was demonstrated in the hypobaric oxygen study, that there is

16   a placebo effect if you take in mildly-demented patients.  So

17   to that extent, I think, first of all, you have to have

18   something that will measure that.  I will talk about that

19   maybe a little bit tomorrow.

20       But, beyond that, you should run the study long

21   enough so that there is a chance for that to wash out.

22       I was just having a little discussion with Gil

23   about what that is.  We used to study placebo effect, it was

24   sort of a major area of concern, very early on, with some of

25   the drug trials.  It hasn't been lately, but I don't know

at

139

1    what the placebo effect is in this population.

2              In others, it has been much shorter.

3              DR. THAL:  I think Ken or I could answer that.    In

4    reality, if you use objective instruments, we see essentially

5    no placebo effect.    If you look at what the family tells

6    you, you see a placebo effect.

7              DR. RASKIN:  I will show a slide tomorrow that

8    demonstrates a placebo effect in early Alzheimer's with an

9    adjective chest list.

10             DR. THAL:  Not with a measure of cognitive ability

11    such as a list-learning task

12             DR. CROOK:  No, but I think you can show that, too.

13    Like many of these issues, it comes back to severity.    In

14    the less-severely impaired patients, you clearly do see an

15    effect on objective measures.

16             The same with Elkan's point; in these less-severely

17    impaired patients, cognition is a complex phenomenon as it is

18    in humans.   It is multifactorial.  Drugs may have effect on

19    some parameters of cognitions, and not others.  I think it is

20    worth looking in much greater detail with objective test in

21    those patients.

22             By the time the disease has progressed so that it

23    is essentially a unitary phenomenon, many of the functions

24    have been compromised and a global assessment might be

25    enough.   But I think severity is an issue that overrides many

MILLER REPORTING CO., INC.
507 C Street, N.E.
Washington, D.C. 20002
(202) 546-6666

at

1    of these considerations.

2         DR. DAVIS:  You started, in your keynote comments,

3    and pointed out how many things we don't know.   This isn't

4    like developing antidepressants.   We took our best shot at a

5    reasonable protocol with THA and would probably do it

6    differently today because we have learned.

7         The number of things we don't know, including how

8    long to treat, is an example of just one.   On that issue,

9    Marshal Folstein has some terrific data from head studies

10   that were acute with physostigmine, seeing differences on a

11   praxis task and on a PET study.

12        When Rich and I did our IV physo, it was very

13   acute.  Yet, now, we noting things that suggest that you can

14   see effects that are much longer.   The implications of that

15   are what Elkan said; the dose-finding phase, then, may miss

16   some people.

17        All unanswered questions.   The only way we are

18   going to answer them is if we take the time in other studies

19   to variate from the standard design.

20        DR. DRACHMAN:  I think that is a theme that I hear

21   occurring throughout this morning, at least; that is, the

22   number of permutations and combinations of patients, degrees

23   of severity, types of trials, types of measures, et cetera,

24   is so great that the idea of zeroing in with a single type of

25   trial -- that is, two weeks, patients with a specific degree

at

141

1   of deficit, pure AD, only on the memory, et cetera, that idea

2   is probably rather destructive instead of being creative.

3          I think at this point, we aren't ready to do that.

4   I hope that that is what you are hearing.    I think that is

5   what I hear from the panel, that we aren't ready to do that

6   and that even though there is a clear message about the

7   importance of doing that at some point, before the regulatory

8   process accepts the drug as being effective and safe in a

9   defined population, I think that what we have to do is spread

10  a net, just exactly as Elkan said.

11         DR. LEBER:  I think that is a very eloquent

12  statement to end this session.    I want to thank you all.  I

13  think in a way, Dave, that you are echoing the earliest

14  things I said about why we don't have guidelines.    The world

15  is a little too complex for us to have closure on it.

16         I thank you all for illustrating that so clearly.

17         [Proceedings were recessed for lunch from 12:30

18  p.m. to 1:15 p.m.]

# EXHIBIT 42

# Nivalin and its Curative Effect upon Diseases of the Nervous System
### by K. G. Pernov

## I.    Pharmacodynamics

The theory on the chemical transmission of nerve impulses was developed during the first three decades of the 20th century from the work of a number of researchers (Langlay, Elliot, Mislawski – 1905, Dale – 1914 and Loewi – 1921). This theory [illegible] exciting avenues for therapeutic application. Researchers eagerly endeavored to boost chemical neuro-transmitter action, etc., either by directly introducing them into the organism or by using substances to block the antagonists to transmitter activity.

Many preparations were considered in this regard. Among them, two groups of substances having a cholinesterase-inhibiting effect are especially significant.

The first group comprises substances which reversibly inactivate the cholinesterase (represented by eserine). The second group consists of phosphororganic substances which produce an irreversible inactivating of the cholinesterase. Diisopropylfluorophosphate (DFP) is indicative of this group.

A new, more powerful cholinesterase inhibitor having a reversible effect is the Bulgarian preparation Nivalin (Galantamine hydrobromide), isolated (I. Iwanowa-Boubewa – 1957) from the snowdrop plant growing wild in Bulgaria (Galanthus nivalis, var.: gracilis, family: Amarillidaceae). Its chemical composition is that of an alkaloid of the phenanthridine group having a tertiary nitrogen atom. D. Paskov suggested its base pharmacological properties (1959). Nivalin is a preparation which, while similar to eserine and prostigmin, exhibits its own specific characteristics. Experimental tests conducted by D. Paskov determined that it reversibly blocked cholinesterase at both the M-cholinreactive systems of the effector organs as well as the N-cholinreactive systems of the vegetative ganglia. This phenomenon was confirmed by more recent bio-chemical studies (G. Chistoni, G. Gusrraldi) and electromyographic observations (V. Bergamini, P. Baggiore), as well as by clinical experiences made with late recovery from myasthenia gravis pseudoparalytica and that occurring some months following treatment with Nivalin. Nivalin intensifies the acetylcholine action in the central nervous system and in the smooth and striated musculature; it also activates acetylcholine's hypotensive effect. Contractures of the striated musculature are not only intensified by the acetylcholine accumulation but also by the direct effect of the Nivalin on the cholinreactive systems. It stimulates respiration, and its pronounced anticurare action arises from the mechanism of competitive effect in the neuromuscular synapse region. Nivalin facilitates the conduction of impulses in the nervous system and thereby increases reflex excitability, shortens the latency of the reflexes and boosts the process of excitation in the cerebral cortex.

Recent studies by M. D. Maschkowski and R. J. Iljutschenok on the bioelectric activity in the brains of cats and rabbits showed that Nivalin's mode of action is similar to that of eserine, although it differs substantially from prostigmin. At medium doses, Nivalin causes rapid-onset changes to the basic electroencephalogram rhythm, similar to the "arousal reaction," while prostigmin induces similar changes only at lethal doses and only after 50-60 minutes.

This difference in effect firstly between Nivalin and eserine and secondly with respect to prostigmin is to be explained by the fact that Nivalin and eserine are tertiary amines while prostigmin is a quaternary amine. As is generally known, of course, quaternary amines enter the central nervous system much more slowly and have a substantially weaker effect than the tertiaries.

Plaintiff's Exhibit
PX - 1181

MYLAN(GAL) 05983